---

**APPEAL NO. 24-4192**

---

In the

# United States Court of Appeals

### For the Fourth Circuit

## UNITED STATES OF AMERICA,

*Plaintiff - Appellee,*

v.

## JAMES GOULD,

*Defendant - Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

---

## BRIEF OF APPELLANT JAMES GOULD

---

**Wesley P. Page**
**Federal Public Defender**

**Jonathan D. Byrne**
**Appellate Counsel**

**Lex A. Coleman**
**Senior Litigator**

**U. S. Courthouse, Room 3400**
**300 Virginia Street East**
**Charleston, West Virginia 25301**
**Telephone: (304) 347-3350**

*Counsel for Appellant*

---

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................iii

STATEMENT OF JURISDICTION ................................................. 1

ISSUE PRESENTED ........................................................................ 1

STATEMENT OF THE CASE .......................................................... 2

SUMMARY OF ARGUMENT .......................................................... 8

ARGUMENT ..................................................................................... 11

Citizens previously committed to mental institutions were not permanently disarmed at the time of the Founding. Section 922(g)(4) fails to share the same "why" or "how" as any prospective "relevantly similar" historical analog, nor is Section 922(g)(4)'s mental institution commitment clause consistent with any well-established and representative historical tradition of firearm regulation in the United States. Irrespective of *Heller*'s *dicta* that laws disarming the mentally ill are presumptively valid, Section 922(g)(4)'s permanent disarmament of citizens previously committed to a mental institution violates the Second Amendment. ........................................................... 11

A.   Standard of Review. .................................................... 11

B.   18 U.S.C. § 922(g)(4)'s mental institution commitment clause violates the individual right to keep and bear arms protected by the Second Amendment. .......................................... 12

1.   Before *Bruen*, lower courts resolved Second Amendment challenges by applying some form of means-ends scrutiny.......... 12

2.   *Bruen* replaced means-ends balancing with a test rooted solely in the Second Amendment's "text and history." ................ 16

a.   The Government must identify a "well-established and representative" tradition of comparable regulations. .......................................... 20

b.    The Government bears the burden of demonstrating that a firearm regulation is consistent with the Nation's historical tradition....................................... 21

3.    Section 922(g)(4) fails *Bruen*'s "text-and-history" Second Amendment standard and has been unconstitutionally applied to Gould. .................................................... 22

a.    The Second Amendment's "plain text" protects Gould's possession of a firearm. ............................. 23

b.    The Second Amendment does not only apply to "law-abiding, responsible citizens," and Gould is part of "the people" entitled to Second Amendment protections.............................................................. 24

4.    *Rahimi* rejected the United States' argument that the Second Amendment only applies to "law abiding, responsible citizens." ............................................ 32

5.    The Government failed to show that § 922(g)(4) is consistent with the United States' "historical tradition of firearm regulation." .......................................... 37

C.    How the District Court erred denying Gould's motion. ......................... 41

CONCLUSION ...................................................................................... 48

REQUEST FOR ORAL ARGUMENT.......................................................... 50

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

## <u>Cases</u>

*Campiti v. Garland*, 649 F. Supp. 3d 1 (D. Conn. 2023) ................................... 31

*Class v. United States*, 138 S. Ct. 798 (2018) ......................................... 1

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ...........................*Passim*

*Kanter v. Burr,* 919 F.3d 437, 440 (7th Cir. 2019) ............................... 46

*Love v. Pepersack,* 47 F.3d 120, 124 (4th Cir. 1995) ............................ 13

*McDonald v. City of Chicago*, 561 U.S. 742 (2010) ........................... 14, 16, 29, 37

*Miller v. Bonta*, 2023 WL 6929336 (S.D. Cal. 2023) .......................... 23

*National Rifle Ass's of America, Inc. v. Bureau of Alcohol, Tobacco, Firearms, and Explosives*, 700 F.3d 185 (5th Cir. 2012) ...................... 38

*New York Rifle & Pistol Ass'n Inc. v. Bruen*, 142 S. Ct. 2111 (2022) ...........................*Passim*

*Raffone v. Adams*, 468 F.2d 860 (2d Cir. 1972) ................................. 12

*Range v. Attorney General United States of America*, 69 F.4th 96 (3d Cir. 2023)......28, 36, 46

*Stimmel v. Sessions*, 879 F.3d 198 (6th Cir. 2018) .......................... 26, 27

*Tyler v. Hillsdale Ct. Sheriff's Dept.*, 837 F.3d 678 (6th Cir. 2016) ..................... 39

*United States v. Alston*, 2023 WL 4758734 (E.D.N.C. 2023) ...................... 30, 47

*United States v. Barber*, 2023 WL 1073667 (E.D. Tex. 2023) ............................. 31

*United States v. Bernard*, 2022 WL 17416681 (N.D. Iowa 2022) ...................... 31

*United States v. Brooks*, 2023 WL 6880419 (E.D. Ky. 2023) ............................. 30

*United States v. Brown*, 2023 WL 4826846 (D. Utah 2023) ............................. 31

*United States v. Bullock*, 2023 WL 4232309,
679 F. Supp. 3d 501 (S.D. Miss. 2023)........................................................ 30, 36, 45, 46

*United States v. Carter*, 669 F.3d 411 (4th Cir. 2012) ......................................................... 43

*United States v. Carter*, 750 F.3d 462 (4th Cir 2014) .................................................... 15, 16

*United States v. Chapman*, 666 F.3d 220 (4th Cir. 2012) .............................................. 15, 16

*United States v. Chester*, 628 F.3d 673 (4th Cir. 2010) ......................................................... 15

*United States v. Coleman*, 2023 WL 6690935 (E.D. Va. 2023) ........................................... 30

*United States v. Combs*, 2023 WL 1466614 (E.D. Ky. 2023) .............................................. 31

*United States v. Connelly*, 2023 WL 2806324 (W. D. Tex. 2023)....................................... 30

*United States v. Cruikshank*, 92 U.S. 542, 553 (1875) ........................................................ 13

*United States v. Daniels*, 77 F.4th 337 (5th Cir. 2023) .................................................. 29, 35

*United States v. Davila*, 2023 WL 5361799 (S.D.N.Y. 2023) ........................................... 30

*United States v. Duarte*, 101 F.4th 657, 677-679 (2024) ..........................................45, 46, 47

*United States v. Espinoza-Melgar*, 2023 WL 5279654 (D. Utah 2023)........................ 29, 30

*United States v. Ford*, 2023 WL 7131742 (S.D.N.Y. 2023)................................................ 30

*United States v. Gates*, 2023 WL 5748362 (N.D. Ill. 2023)................................................ 30

*United States v. Goins*, 647 F. Supp. 3d 538 (E.D. Ky. 2022) ........................................... 31

*United States v. Gore*, 2023 WL 2141032 (S.D. Ohio 2023)............................................. 31

*United States v. Guthery*, 2023 WL 2696824 (E.D. Cal. 2023) ......................................... 31

*United States v. Harrison*, 2023 WL 1771138,
654 F. Supp. 3d 1191 (W.D. Okla. 2023) ............................................................30, 46, 47

*United States v. Hernandez*, 2023 WL 4161203 (N.D. Tex. 2023) ................................. 30

*United States v. Hester*, No. 1:22-cr-20333-RNS, (S.D. Fla. Jan. 27, 2023) ..................... 31

*United States v. Hicks*, 2023 WL 164170 (W.D. Tex. 2023) ........................................ 31

*United States v. Holmes*, 2023 WL 4494340 (E.D. Mich. 2023) .................................... 30

*United States v. Hosford*, 843 F.3d 161 (4th Cir. 2016) .................................... 14, 16

*United States v. Jackson*, 2022 WL 3582504 (W.D. Okla. 2022) ................................... 31

*United States v. Jackson*, 2023 WL 7160921 (N.D. Ill. 2023) ...................................... 30

*United States v. Johnson*, 497 F.3d 548 (4th Cir. 1974) ........................................... 13

*United States v. Johnson*, 2023 WL 6049529 (W.D. Okla. 2023) .................................. 30

*United States v. Johnson*, 2023 WL 6690388 (N.D. Ill. 2023) ..................................... 30

*United States v. Kays*, 624 F. Supp. 3d 1262 (W.D. Okla. 2022) ................................. 32

*United States v. Lane*, 2023 WL 5614798 (D. Vt. 2023) ........................................... 30

*United States v. Levasseur*, 2023 WL 6623165 (D. Me. 2023) ..................................... 30

*United States v. Lewis*, 2023 WL 187582 (W.D. Okla. 2023) ...................................... 30

*United States v. Lewis*, 2023 WL 4604563 (S.D. Ala. 2023) ....................................... 30

*United States v. Lewis*, 2023 WL 6066260 (S.D.N.Y. 2023) ....................................... 31

*United States v. Lowry*, 2023 WL 3587309 (D.S.D. 2023) ......................................... 31

*United States v. Mahin*, 668 F.3d 119 (4th Cir. 2012) ............................................. 31

*United States v. Malloy*, 568 F.3d 166 (4th Cir. 2009) ............................................ 11

*United States v. Martin*, 2023 WL 1767161 (D. Vt. 2023) ......................................... 31

*United States v. Meza-Rodriguez*, 798 F.3d 664 (7th Cir. 2015)............................................ 25

*United States v. Moore*, 666 F.3d 313 (4th Cir. 2012) ......................................................... 11

*United States v. Neal*, 2024 WL 933607 (N.D. Ill. 2024).................................................... 37, 45

*United States v. Nordvold*, 2023 WL 5596623 (D.S.D. 2023)............................................... 30

*United States v. Nutter*, 2022 WL 3718516 (S.D. W. Va. 2022).........................7, 43, 44, 48

*United States v. Okello*, 2023 WL 5515828 (D.S.D. 2023)................................................... 29

*United States v. Perez-Gallan*, 640 F. Supp. 3d 697 (W.D. Tex. 2022)............................... 27

*United States v. Pierre*, No. 1:22-cr-20321-JEM (S.D. Fla. Nov. 28, 2022) ...................... 31

*United States v. Price*, 635 F. Supp. 3d 455, 460 (S.D. W. Va. 2022)................................. 31

*United States v. Prince*, 2023 WL 7220127 (N.D. Ill. dec. Nov. 2, 2023)......................... 30

*United States v. Pruess*, 703 F.3d 242 (4th Cir. 2012) ........................................................ 15

*United States v. Quailes*, 2023 WL 5401733 (M.D. Pa. 2023)............................................. 30

*United States v. Rahimi*, 602 U.S. ___ (2024) .................................................................*Passim*

*United States v. Rahimi*, No. 22-915 (U.S. Aug. 14, 2023).................................................. 34

*United States v. Rahimi*, 61 F.4th 443, 453 (5th Cir. 2023),
*rev'd on other grounds*, 602 U.S.___ (2024) ................................................................... 35, 45

*United States v. Reaves*, No. 4:22-cr-224-HEA (E.D. Mo. 2023)....................................... 31

*United States v. Rowson*, 2023 WL 431037 (S.D.N.Y. 2023) ............................................. 31

*United States v. Ryno*, 2023 WL 3736420 (D. Alaska 2023) .............................................. 31

*United States v. Silvers*, 2023 WL 3232605 (W.D. Ky. 2023) ............................................ 31

*United States v. Skoien*, 614 F.3d 638 (7th Cir. 2010) ....................................................... 39

*United States v. Smoot*, 690 F.3d 215 (4th Cir. 2012)............................................... 11

*United States v. Springer*, 2023 WL 4981583 (N.D. Iowa 2023).................................. 30, 31

*United States v. Stambaugh*, 641 F. Supp. 3d 1185 (W.D. Okla. 2022) ............................. 32

*United States v. Ware*, 2023 WL 3568606,
673 F. Supp. 3d 947 (S.D. Ill. 2023) ................................................ 30, 45, 46, 47

*United States v. White*, 2023 WL 6066201 (S.D.N.Y. 2023).............................................. 30

*United States v. Williams*, 2022 WL 18285005 (N.D. Ga. 2022)....................................... 31

*United States v. Williams*, 2024 WL 731932 (E.D. Mich. 2024)..................... 44, 45, 47, 48

*United States v. Wuchter*, 2023 WL 4999862 (N.D. Iowa 2023) ....................................... 30

## Constitutional Provisions

U.S. Const. amend. I ................................................................................................25, 47

U.S. Const. amend. II............................................................................................*Passim*

U.S. Const. amend. IV ................................................................................................ 25

U.S. Const. amend. IX ................................................................................................ 25

U.S. Const. amend. XIV ........................................................................................14, 46

National Archives, Milestone Documents, Bill of Rights,
https://www.archives.gov/milestone-documents/bill-of-rights ................................ 12

## Federal Statutes

18 U.S.C. § 922.......................................................................................................... 2, 3

18 U.S.C. § 922(d) ......................................................................................................... 3

18 U.S.C. § 922(g) .........................................................................................3, 11, 13, 38

18 U.S.C. § 922(g)(1) ............................................................28, 30, 47

18 U.S.C. § 922(g)(3) ............................................................ 29

18 U.S.C. § 922(g)(4) ............................................................ *Passim*

18 U.S.C. § 922(g)(8) ............................................................31, 33, 34

18 U.S.C. § 922(g)(8)(C)(i) .................................................. 32

18 U.S.C. § 922(g)(9) ............................................................ 7, 31

18 U.S.C. § 922(n) ................................................................ 31

18 U.S.C. § 924(a) ................................................................ 3

18 U.S.C. § 3231 .................................................................... 1

18 U.S.C. § 3742 .................................................................... 1

28 U.S.C. § 1291 .................................................................... 1

82 Stat. 1227-1236, codified at 18 U.S.C. §§ 922(g) and (h)
(Title IV, Omnibus Crime Control and Safe Streets Act of 1968 ................................ 12

Act of June 26, 1934, c. 757, Pub. L. No. 73-474, 48 Stat. 1236,
codified at 26 U.S.C. §§ 5801-5872 (National Firearms Act) ........................................ 12

Act of June 30, 1938, c. 850, 52 Stat. 1250,
codified at 15 U.S.C. §§ 901-909 (Federal Firearms Act) ................................................ 12

Pub. L. No. 87-342, 75 Stat. 757 (Oct. 4, 1961)
(An Act to Strengthen the Federal Firearms Act) ................................................................ 12

Pub. L. No. 90-351, 82 Stat. 236 (June 19, 1968)
(Gun Control Act of 1968 - Title VII,
Omnibus Crime Control and Safe Streets Act of 1968)
(codified at 18 U.S.C. app. §§ 1201-1203 (now repealed)) ............................................ 12

Pub. L. No. 90-618, 82 Stat. 1213-1236 (Oct. 22, 1968)
(Title II, Omnibus Crime Control and Safe Streets Act of 1968) ................................. 12

Pub. L. No. 99-308, 100 Stat. 449 (May 19, 1986)
(Firearm Owners' Protection Act) ............................................................................. 13, 38

Pub. L. No. 103-159, Title I, 107 Stat. 1536 (Nov. 30, 1993)
(Brady Handgun Violence Prevention Act) ..................................................................... 13

Pub. L. No. 103-322, 108 Stat. 1796
(Violent Crime Control and Law Enforcement Act of 1994)........................................ 13

Pub. L. No. 104-208, 110 Stat. 3009, 3009-371 to 372 (1996)
(Lautenberg Amendment to the Gun Control Act of 1968............................................ 13

Pub. L. No. 117-159, 136 Stat. 1313 (June 25, 2022)
(Bipartisan Safer Communities Act).............................................................................. .13

## State Statutes

W. Va. Code § 27-5-2............................................................................................................. 2

## Regulations

27 C.F.R. § 478.11 ...................................................................................................... 3, 4, 42

## Other Authorities and Sources

1689 English Declaration of Rights ....................................................................... 7, 43, 44

Carlton F.W. Larson, *Four Exceptions in Search of a Theory:*
*District of Columbia v. Heller and Jud. Ipse Dixit,*
60 Hastings L.J. 1371, 1376 (2009)...................................................................... 39, 43

Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to*
*Keep Arms in Early America*, 25 Law & Hist. Rev. 139 (2007) ..................................... 38, 39

Stephen P. Halbrook, *That Every Man Be Armed*
(University of New Mexico Press 1984) ............................................................................ 40

Stephen P. Halbrook, *The Founders' Second Amendment*
(Ivan R. Dee Publishers 2008) .......................................................... 40

Stephen P. Halbrook, *When the Redcoats Confiscated Guns*,
Washington Post (May 31, 1995).................................................... 40

## STATEMENT OF JURISDICTION

On May 3, 2022, a federal grand jury sitting in the Southern District of West Virginia returned a single count indictment charging James Gould with unlawfully possessing a Remington 12-gauge shotgun in his home, after having been previously committed to a mental institution, in violation of 18 U.S.C. § 922(g)(4). JA12. Because that charge constituted an offense against the United States, the district court had original jurisdiction pursuant to 18 U.S.C. § 3231. This is an appeal from the district court's May 5, 2023, memorandum and order denying Gould's *Bruen*-based motion to dismiss, JA117-143, and the final judgment imposed April 1, 2024, JA170, after Gould pled guilty to the indictment without a plea agreement. JA144, JA145; *see also Class v. United States*, 138 S. Ct. 798 (2018). Gould timely filed a notice of appeal on April 1, 2024. JA177. This Court has jurisdiction pursuant to 18 U.S.C. § 3742 and 28 U.S.C. § 1291.

## ISSUE PRESENTED

Whether permanent disarmament under 18 U.S.C. § 922(g)(4), based upon prior temporary involuntary commitment to a mental institution, violates the Second Amendment under *New York Rifle & Pistol Ass'n Inc. v. Bruen*, 597 U.S. 1, 142 S. Ct. 2111 (2022), such that the district court erred denying Gould's motion to dismiss.

## STATEMENT OF THE CASE

On February 18, 2022, James Gould possessed a Remington 11-87 12-gauge shotgun inside his home in Ravenswood, West Virginia. JA12. There is nothing in the record suggesting that at the time Gould was suffering from any mental disease or defect, nor was he behaving in any manner to suggest otherwise. There likewise is nothing in the record indicating that Gould was doing anything with the shotgun to suggest he was a danger to himself or anyone else. Gould has <u>never</u> been adjudged mentally incompetent or as a mental defective, and was not subject to any pending mental institution commitment order at the time he possessed the shotgun.

Prior to February 18, 2022, according to the indictment, James Gould had been involuntarily committed to a mental institution by the Circuit Court of Jackson County, West Virginia on July 30, 2019. JA12. The district court later found that Gould had also previously been involuntarily committed for mental health examinations[1] on three other occasions – all occurring over two and a half years or more prior to Gould possessing the shotgun in his home. JA117.

On May 3, 2022, based upon his February 16, 2022, conduct, Gould was indicted for violating 18 U.S.C. § 922(g)(4). JA12. Section 922 provides in pertinent part:

---

[1] W. Va. Code § 27-5-2

(g) It shall be unlawful for any person—

\* \* \*

(4) who has been adjudicated as a mental defective or who has been committed to a mental institution; . . .

\* \* \*

to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.

18 U.S.C. § 924(a) further provides that "(8) Whoever knowingly violates subsection (d) or (g) of section 922 shall be fined under this title, imprisoned for not more than 15 years, or both."

As enacted and amended, the Gun Control Act of 1968 does not define "adjudicated a mental defective," or "committed to a mental institution." The Bureau of Alcohol, Tobacco and Explosives ("ATF"), however, has through a regulation:

*Adjudicated as a mental defective.*

(a) A determination by a court, board, commission, or other lawful authority that a person, as a result of marked subnormal intelligence, or mental illness, incompetency, condition, or disease:

(1) Is a danger to himself or to others; or

(2) Lacks the mental capacity to contract or manage his own affairs.

(b) The term shall include –

(1) A finding of insanity by a court in a criminal case; and

>    (2) Those persons found incompetent to stand trial or found not guilty
>    by reason of lack of mental responsibility pursuant to articles 50a
>    and 72b of the Uniform Code of Military Justice, 10 U.S.C. 850a,
>    876b.
>
> * * *
>
>    *Committed to a mental institution.* A formal commitment of a person to a
>    mental institution by a court, board, commission, or other lawful
>    authority. The term includes a commitment to a mental institution
>    involuntarily. The terms includes commitment for mental defectiveness
>    or mental illness. It also includes commitments for other reasons, such as
>    for drug use. The term does not include a person in a mental institution
>    for observation or a voluntary admission to a mental institution.

27 C.F.R. § 478.11.

Gould moved to dismiss his indictment on February 17, 2023, arguing under

*New York State Rifle & Pistol Association, Inc. v. Bruen*, 597 U.S. 1, 142 S. Ct. 2111 (2022),

that § 922(g)(4)'s "committed to a mental institution" clause violated the Second

Amendment. JA13-52. Relying on *Bruen's* plain text and history standard, Gould argued

that his keeping and bearing the Remington 12-gauge shotgun inside his own home was

conduct presumptively protected by the Second Amendment, and that the United

States would be unable to rebut that presumption where permanent disarmament by

mental institution commitment laws like § 922(g)(4) were unknown to the founding

generation and did not enjoy a well-established historical tradition in the United States.

The United States did not dispute that Gould's shotgun was in common use at

the time, or that his conduct of possessing that shotgun in his home was otherwise

subject to Second Amendment protection. Instead, it asserted that the Second

Amendment only applied to "law-abiding, responsible citizens." Based further on *Heller's dicta* suggesting laws disarming the mentally ill are presumptively lawful, the United States maintained that Second Amendment protections do not extend to citizens with prior involuntary commitments to mental institutions. JA53; JA57-65. In the Government's view, prior, temporary involuntary commitment to a mental institution made citizens like Gould sufficiently untrustworthy, dangerous, and/or a threat to public safety to permanently disarm them, even after they had been released and were no longer subject to mental health treatment or continuing court control.

As part of its arguments the United States revived a key dynamic under pre-*Bruen* intermediate scrutiny, the straw "law-abiding citizen" who distinguished between "core"/"non-core" Second Amendment rights and the application of diminished protections to persons who were not. With *Bruen*'s express rejection of means-end scrutiny, the United States took the non-law-abiding citizen construct a step further – insisting instead of the *diminished* Second Amendment protections which had applied post-*Heller* for fourteen years, that citizens like Gould now enjoyed no Second Amendment protections at all. JA57-60. The United States claimed the *Bruen* concurrences supported its position, and strategically made this assertion in relation to *Bruen*'s step one as opposed to *Bruen*'s step two. JA60.

The United States further asserted even if § 922(g)(4) did manage to regulate conduct protected by the Second Amendment, it was still consistent with the nation's

historical tradition of firearm regulation. JA60-66. The United States briefly cited instances of English and American justices of the peace seizing property to pay for the cost of locking up lunatics in support, as well as the historical practice of "generally disarming people deemed to be dangerous," including colonists who refused to swear loyalty oaths. JA65-66.

The district court heard oral argument on defendant's motion March 30, 2023. JA44; JA69-106. Just over a month later, on May 5, 2023, the district court filed a memorandum and order denying it. JA117-143. In its opinion, the district court initially equated James Gould to John Hinckley, Jr., under § 922(g)(4). JA120. The district court then discussed *Heller*'s *dicta* about presumptively lawful "longstanding regulatory measures" disarming the mentally ill. This was relative to the United States' argument that Second Amendment protections only apply to "law-abiding, responsible citizens." Ultimately, however, the district court acknowledged Fourth Circuit precedent suggesting reliance on *Heller's dicta* might be "a potentially faulty practice." JA129. The district court then by-passed making any finding on *Bruen's* step one, assuming without deciding that Second Amendment protections applied to Gould's conduct. JA131.

Moving on to *Bruen*'s step two, the district court declined to decide the precise historical standard to apply. JA135. The district court opted instead to broadly construe the problem sought to be addressed by § 922(g)(4)'s mental institution commitment clause. JA135-140. Rather than find § 922(g)(4)'s "why" was related to or directed at

the risks of firearm violence by the mentally ill - the district court found the statute was sufficiently disconnected from actual mental illness to be more broadly intended to disarm persons considered a danger to themselves or others. This "why" was added to other generalized Congressional purposes of protecting the community from crime and preventing suicides. JA136-140 The district court then found the United States carried its burden of establishing an analogous historical tradition of firearm regulation through (1) the 1689 English Declaration of Rights, JA141, (2) the Address and Reasons for Dissent of the Minority of the Convention of the State of Pennsylvania, JA141-142, and "copious sources discussing the historical basis of laws disarming individuals deemed 'dangerous' to society." JA142. The Court favorably cited *United States v. Nutter*, 624 F. Supp. 3d 636 (S.D. W. Va. 2022)(Berger, J.), as another district opinion detailing historical laws prohibiting dangerous individuals from possessing firearms.[2] JA142. The district court then had little difficulty finding a historical tradition which would remove Section 922(g)(4) from of the presumptive unconstitutionality of *Bruen's* step one. JA143.

---

[2] *Nutter* had separately relied on a diverse basket of historical regulations including civil surety laws; pre-1791 gun registration statutes; statutes requiring attendance at militia trainings; fire codes for the storage of firearms and gun powder; and statutes disarming slaves, free blacks, Native Americans, Catholics, and loyalists to sustain a post-*Bruen* Second Amendment challenge to 18 U.S.C. § 922(g)(9). *Nutter*, 624 F. Supp. 3d at 641-643.

On October 12, 2023, Gould entered a guilty plea to his indictment without a plea agreement - for which adjudication of guilt was deferred until sentencing. JA144-145. On April 1, 2024, Gould was finally adjudged guilty, and while subject to an advisory guideline range of 1 to 7 months imprisonment – was sentenced to time served and a 3-year term of supervised release. JA144-166, 167-173. Gould filed his notice of appeal the same day. JA174.

## SUMMARY OF ARGUMENT

18 U.S.C. § 922(g)(4) is unconstitutional under the "text-and-history standard" of *New York State Rifle & Pistol Association, Inc. v. Bruen. Bruen* instructs that "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct," and the Government may rebut the presumption of unconstitutionality only by showing that "the regulation is consistent with this Nation's historical tradition of firearm regulation."

The Second Amendment textually protects the specific conduct of keeping and bearing arms, which includes possessing a firearm both in the home and outside the home for purposes of self-defense. Section 922(g)(4) expressly prohibits possession of a firearm anywhere, which falls directly within that plain text and burdens conduct protected by the Second Amendment. Gould's shotgun was not dangerous and unusual, and was in common use at the time; Gould possessed it inside his home.

Section 922(g)(4) does not permanently prohibit firearm possession generally, but in two specific instances based on possessor characteristics (as opposed to possessor conduct while possessing or otherwise using a firearm) – where the possessor has either been adjudged to be a "mental defective," or where they have been otherwise committed to a mental institution.

Section 922(g)(4) is an entirely twentieth century convention which was enacted as part of the Gun Control Act of 1968. It directly burdens conduct textually identified in and protected by the Second Amendment. At no time prior to 1968 were intermittent actual or suspected suffers of mental disease or defects permanently disarmed for their afflictions or as a result of legal proceedings surrounding them. James Gould has never been adjudged to be a mental incompetent or mental defective in his entire life, so the only part of § 922(g)(4) at issue is the "commitment to a mental institution" clause. There is no evidence that Gould was suffering from a mental disease or defect at the time of his offense conduct, and he was definitely not subject to any involuntary commitment order to any type of mental institution at the time he possessed the 12-guage shotgun.

*Rahimi* expressly rejected the Government's contention that a citizen may be disarmed just because they are not "responsible." In *Rahimi's* briefing and oral argument, the United States treated "non-responsible" and "dangerous" interchangeably. So when *Rahimi* rejected the Government's "not-responsible" theory

as vague and undefinable, it also rejected the overgeneralized "dangerousness" theory being advanced here.

Gould and his conduct are protected by the Second Amendment. Despite his temporary prior commitments (two of which related to allergic reactions to steroids), Gould is an American citizen who remains part of "the people" under the Second Amendment's plain text. The Second Amendment's text does not distinguish between citizens previously committed to mental institutions or other citizens, any more than it distinguishes between firearm possession inside or outside the home, law-abiding and non-law-abiding citizens, or responsible and irresponsible citizens. So the Second Amendment's protections plainly <u>do</u> extend to Gould and his conduct of possessing the shotgun inside his home. This necessarily triggers application of *Bruen's* step one and the presumption that § 922(g)(4) violates the Second Amendment.

Under *Bruen*, as further applied by *Rahimi*, this presumption shifted the burden of proving that § 922(g)(4) is still constitutional to the United States, because it is consistent with a robust, well-established and representative historical tradition of firearm regulation in the United States. The Government did not make this showing below, nor did the district court properly rely upon any well-established and representative historical tradition on its own advancing the same "why" and "how," or comparable purpose and burden that are implicated by § 922(g)(4)'s permanent disarmament. The overgeneralized label of "dangerousness" is vague, overbroad,

undefined, and a too easily manipulated metric to guide evaluation of historical sources depriving citizens of fundamental Second Amendment protections. As a consequence, even as *Bruen*'s constitutional standard was applied by *Rahimi*, § 922(g)(4)'s mental institution commitment clause still facially violates the Second Amendment. The district court erred denying Gould's motion to dismiss. This Court should reverse that ruling and dismiss Gould's case without any further remand or, alternately, remand with instructions to dismiss the indictment.

## ARGUMENT

**Citizens previously committed to mental institutions were not permanently disarmed at the time of the Founding. Section 922(g)(4) fails to share the same "why" or "how" as any prospective "relevantly similar" historical analog, nor is Section 922(g)(4)'s mental institution commitment clause consistent with any well-established and representative historical tradition of firearm regulation in the United States. Irrespective of *Heller*'s *dicta* that laws disarming the mentally ill are presumptively valid, Section 922(g)(4)'s permanent disarmament of citizens previously committed to a mental institution violates the Second Amendment.**

### A.    Standard of Review

This Court reviews *de novo* questions of whether a conviction under 18 U.S.C. § 922(g) violates the Second Amendment. *United States v. Moore*, 666 F.3d 313, 316 (4th Cir. 2012); *United States v. Smoot*, 690 F.3d 215, 219 (4th Cir. 2012); *see also United States v. Malloy,* 568 F.3d 166, 171 (4th Cir. 2009)("This court reviews a challenge to the constitutionality of a federal statute *de novo*").

**B.**    **18 U.S.C. § 922(g)(4)'s mental institution commitment clause violates the individual right to keep and bear arms protected by the Second Amendment.**

    **1.**    **Before *Bruen*, lower courts resolved Second Amendment challenges by applying some form of means-ends scrutiny.**

The Second Amendment was ratified December 15, 1791,[3] and provides: A "well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. Every existing federal firearm regulation in the United States was subsequently enacted during the Twentieth Century or later.[4]

---

[3] *See, e.g.,* U.S. Const. amend. II, historical note; *Raffone v. Adams*, 468 F.2d 860, 864 n.4 (2d Cir. 1972); National Archives, Milestone Documents, Bill of Rights, https://www.archives.gov/milestone-documents/bill-of-rights.

[4] *See, e.g.,* Act of June 26, 1934, c. 757, Pub. L. No. 73-474, 48 Stat. 1236, codified at 26 U.S.C. §§ 5801-5872 (National Firearms Act); Act of June 30, 1938, c. 850, 52 Stat. 1250, 1251, codified at 15 U.S.C. §§ 901-909 (Federal Firearms Act); Pub. L. No. 87-342, 75 Stat. 757 (October 4, 1961)(An Act to Strengthen the Federal Firearms Act - amended FFA to delete "citizens convicted of crimes of violence," and replace them with "citizens having felony convictions"); Pub. L. No. 90-351, 82 Stat. 236, effective June 19, 1968 (Gun Control Act of 1968 - Title VII, Omnibus Crime Control and Safe Streets Act of 1968, codified at 18 U.S.C. app. §§ 1201-1203 (now repealed) - categorically made it unlawful for felons, veterans with dishonorable discharges, mental incompetents, illegal aliens, and former citizens who had renounced their citizenship to *possess* firearms); Pub. L. No. 90-618, 82 Stat. 1213-1236, effective October 22, 1968 (Title II, Omnibus Crime Control and Safe Streets Act of 1968; strengthened 1934 NFA. Added "destructive devices" to definition of firearm; expanded definition of "machinegun"); 82 Stat. 1227-1236, codified at 18 U.S.C. §§ 922(g) and (h)(Title IV, Omnibus Crime Control and Safe Streets Act of 1968; categorically prohibited persons under indictment, felons, fugitives from justice, users or addicts of drugs, and persons adjudicated mental defectives or committed to a mental institution from transporting

Prior to *District of Columbia v. Heller*, 554 U.S. 570 (2008), challenges to federal firearm regulations were resolved through rational basis means-end scrutiny, subject to the now unconstitutional collectivist interpretation of the Second Amendment. *See, e.g., Love v. Pepersack,* 47 F.3d 120, 124 (4th Cir. 1995); *United States v. Johnson*, 497 F.3d 548, 550 (4th Cir. 1974).

In *Heller*, the Supreme Court held the Second Amendment codified a pre-existing[5] "individual right to possess and carry weapons in case of confrontation." *Heller,* 554 U.S. at 592, 624. The Court canvassed "the historical background of the

---

or receiving firearms in interstate commerce; folded 1938 FFA, as amended, into the Gun Control Act as part of the OCCSSA of 1968); Pub. L. No. 99-308, 100 Stat. 449, effective May 19, 1986 (Firearm Owners' Protection Act; reopened interstate sales of long guns, legalized ammunition shipments through the US Postal Service, removed record keeping requirements for non-armor piercing ammunition, banned sale of machine guns manufactured after enactment date to civilians, added possession of a firearm as an unlawful act under § 922(g)); Pub. L. No. 103-159, Title I, 107 Stat. 1536, effective November 30, 1993 (Brady Handgun Violence Prevention Act); Pub. L. No. 103-322, 108 Stat. 1796 (Violent Crime Control and Law Enforcement Act of 1994 – added Sec. 922(g)(8), persons under domestic violence restraining orders, to the GCA of 1968); Pub. L. No. 104-208, 110 Stat. 3009, 3009-371 to 372 (1996)(Lautenberg Amendment to the Gun Control Act of 1968; added Section 922(g)(9) prohibiting domestic violence misdemeanants from possessing firearms); Pub. L. No. 117-159, 136 Stat. 1313, June 25, 2022 (Bipartisan Safer Communities Act – added separate straw purchaser offenses to Title 18, as Sec. 933; increased all penalties under Sec. 922(g) to a maximum 15 years, Sec. 12004, moved firearm possession penalties to Sec. 924(a)(8); expanded GCA Sec. 922(g)(9) to include current or former dating relationships, Sec. 12005).

[5] *See United States v. Cruikshank*, 92 U.S. 542, 553 (1875)(The right of "bearing arms for a lawful purpose" is not a right granted by the Constitution. Neither is it in any manner dependent upon that instrument for its existence. The Second Amendment simply declares that it shall not be infringed).

Second Amendment," including English history from the 1600s through American independence, law and practice in the colonial and early-Republic periods, and evidence of how the Second Amendment was interpreted in the century after its enactment (e.g., legal treatises, pre-Civil War case law, post-Civil War legislation, and late-19th-century commentary). *Id.* at 592-619. Based on this survey, the Court concluded the Second Amendment "confers an individual right to keep and bear arms" that is "not limited to the carrying of arms in a militia." *Id.* at 586, 622. The Court therefore struck down District of Columbia statutes that prohibited the possession of handguns in the home and required that any other guns in the home be kept inoperable. *Id.* at 628-34.

Two years later, in *McDonald v. City of Chicago*, 561 U.S. 742 (2010), the Court extended the individual right recognized by *Heller* to the states through the Fourteenth Amendment Due Process Clause. In so incorporating Second Amendment protections, the Court described the right to keep and bear arms as "fundamental to our scheme of ordered liberty" and "deeply rooted in this Nation's history and tradition." *Id.* at 767. This right, the Court warned, should not be treated "as a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees." *Id.* at 780.

After *Heller*, most of the same federal firearm regulations were again sustained (in the context of Second Amendment challenges to federal criminal statutes), through intermediate means-end scrutiny subject to the individual rights interpretation of the Second Amendment. *See, e.g., United States v. Hosford*, 843 F.3d 161 (4th Cir. 2016); *United*

*States v. Carter*, 750 F.3d 462 (4th Cir. 2014); *United States v. Pruess*, 703 F.3d 242 (4th Cir. 2012); *United States v. Mahin*, 668 F.3d 119 (4th Cir. 2012); *United States v. Chester*, 628 F.3d 673, 676 (4th Cir. 2010)(noting *Heller*'s explanation of how rational-basis scrutiny would be inappropriate for analyzing infringements on individual Second Amendment rights).

In *United States v. Chester*, 628 F.3d 673, 680 (4th Cir. 2010), this Court developed its "two-part approach" for resolving post-*Heller* Second Amendment claims. The first step asked "whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee," as it was understood "at the time of ratification." *Ibid*. If it did not, the challenge failed. But if the statute did "burden[] conduct that was within the scope of the Second Amendment as historically understood," the Court then "appl[ied] an appropriate form of means-end scrutiny." *Ibid*. Within this framework, the Court opted to further define Second Amendment "conduct" not just by what a given citizen was doing with a firearm, but by who they were. Through this categorial add-on, the Court divided Second Amendment protections into two types – those that applied to "law-abiding" citizens, and those that applied to persons who were not. This Court employed strict scrutiny if a challenger's claim implicated "the core right" recognized in *Heller* – "the right of law-abiding, responsible citizens to use arms in defense of hearth and home." *United States v. Chapman*, 666 F.3d 220, 224, 226 (4th Cir. 2012). Otherwise, a lesser level of protection

termed as "intermediate scrutiny" applied. *Id.* at 225-226. *See United States v. Hosford*, 843 F.3d 161, 168 (4th Cir. 2016). Under this analysis, as opposed to finding that a given category of "non-law-abiding citizens" enjoyed some lessor form of Second Amendment protections, the Court frequently would "assume without finding" that they did and sustain the challenged firearm regulation using intermediate scrutiny. *See, e.g., United States v. Carter*, 750 F.3d 462, 464 (4th Cir 2014). By 2014, intermediate scrutiny had become the accepted standard of review for Second Amendment challenges to federal criminal firearm laws.

> **2.** *Bruen* **replaced means-ends balancing with a test rooted solely in the Second Amendment's "text and history."**

Fourteen years after *Heller,* the Supreme Court in *New York State Rifle & Pistol Association, Inc. v. Bruen*, 597 U.S. 1 (2022), disavowed this Court's intermediate scrutiny framework by holding that "*Heller* and *McDonald* do not support applying means-end scrutiny in the Second Amendment context." *Id.* at 19. In its place, the Supreme Court adopted a "text-and-history" standard more consistent with *Heller*'s methodology. *Id.* at 37. This standard directed courts to begin by asking whether "the Second Amendment's plain text covers an individual's conduct." *Id.* at 17. If it did, then "the Constitution presumptively protects that conduct." *Ibid.* Answering this preliminary question in *Bruen* was straightforward. At issue was a New York law providing that to obtain a permit to carry a concealed handgun in public, an applicant had to demonstrate "proper cause,"

i.e., "a special need for self-protection distinguishable from that of the general community." *Id.* at 8-13. The Supreme Court "ha[d] little difficulty concluding" that "the Second Amendment protect[ed] [the petitioners'] proposed course of conduct – carrying handguns publicly for self-defense." *Id.* at 31. As the Court explained, "[n]othing in the Second Amendment's text draws a home/public distinction with respect to the right to keep and bear arms." *Ibid.* The Second Amendment therefore "presumptively guarantee[d]" a right to carry firearms in public, and New York's "proper cause" requirement, which infringed that right, could pass constitutional muster only if the state overcame the presumption. *Id.* at 22-24, 32-33.

To rebut the presumption of unconstitutionality, *Bruen* held, "the government may not simply posit that [a] regulation promotes an important interest." *Bruen*, 597 U.S. at 17. "Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command." *Ibid.* This test requires courts to "consider whether 'historical precedent' . . . evinces a comparable tradition of regulation." *Id.* at 26-28. If "no such tradition" exists, then the statute being challenged is unconstitutional. *Id.* at 27-28. The Court explained that "[c]onstitutional rights are enshrined with the scope they were understood to have when the people adopted them." *Id.* at 34-36. For that reason, the relevant "historical

tradition" for purposes of a federal gun regulation is that which existed in 1791, when the Second Amendment was ratified. *Id.* at 36. Courts may look to the tradition of firearms regulation "before . . . and even after the founding" period, but they should do so with care. *Id.* at 26-27. *Bruen* cautioned, for example, that "[h]istorical evidence that long predates [1791] may not illuminate the scope of the [Second Amendment] right if linguistic or legal conventions changed in the intervening years." *Id.* at 34-36. Courts should not "rely on an ancient practice that had become obsolete in England at the time of the adoption of the Constitution and never was acted upon or accepted in the colonies." *Ibid.*

Conversely, courts must "guard against giving postenactment history more weight than it can rightly bear." *Bruen*, 597 U.S. at 34-36. Evidence "of how the Second Amendment was interpreted from immediately after its ratification through the end of the 19th century represent[s] a critical tool of constitutional interpretation." *Ibid.* But the farther forward in time one goes from 1791, the less probative historical evidence becomes. *Id.* at 36-37 ("As we recognized in *Heller* itself, because post-Civil War discussions of the right to keep and bear arms took place 75 years after the ratification of the Second Amendment, they do not provide as much insight into its original meaning as earlier sources."). Evidence from "the mid- to late-19th-century" provides little "insight into the meaning of the Constitution in [1791]." *Ibid.* Courts should therefore credit such history to the extent it provides "confirmation" of prior practice

but should otherwise afford it little weight. *Ibid.* That is because "post-ratification adoption or acceptance of laws that are inconsistent with the original meaning of the constitutional text obviously cannot overcome or alter that text." *Ibid.*; *see also id.* at 66 n.28 (ignoring "20th-century historical evidence" because it is too far removed from 1791). *Accord United States v. Rahimi*, 602 U.S. ___, *15 (2024)("Courts must proceed with care in making comparisons to historic firearms regulations, or else they risk gaming away an individual right the people expressly preserved for themselves in the Constitution's text.")(Gorsuch, concurring).

In *Bruen* the Supreme Court held that because New York could not point to a robust tradition of regulations similar to the proper-cause requirement, the state's statute violated the Second Amendment. *Bruen* at 37-70. In reaching its conclusion, the Court did not elaborate a comprehensive scheme for evaluating historical evidence, but rather staked certain guideposts for lower courts to follow.

With respect to *Bruen*'s second prong, deciding "whether a historical regulation is a proper analogue for a distinctly modern firearm regulation requires a determination of whether the two regulations are relevantly similar." *Bruen*, 597 U.S. at 27-28. *Bruen* declined to "provide an exhaustive survey of the features that render regulations relevantly similar under the Second Amendment," but it identified "at least two metrics: how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 27-30. In other words, "whether modern and historical regulations impose a

comparable burden on the right of armed self-defense [i.e., the 'how'] and whether that burden is comparably justified [i.e., the 'why'] are central considerations when engaging in an analogical inquiry." *Id.* at 29 (emphasis omitted). *Accord United States v. Rahimi*, 602 U.S. \_\_\_, at \*6, 14-15. (2024).

### a. The Government must identify a "well-established and representative" tradition of comparable regulations.

Under *Bruen* and *Rahimi*, the "comparable tradition of regulation" must still be widespread and robust. To carry its burden, the Government must show that the historical tradition on which it relies is "***well-established and representative***." *Bruen*, 597 U.S. at 30 (emphasis added); *see also id.* at 36 (explaining that "a governmental practice" can "guide [courts'] interpretation of an ambiguous constitutional provision" if that practice "has been open, widespread, and unchallenged since the early days of the Republic"). Importantly, a handful of "outlier[]" statutes or cases from a few "outlier jurisdictions" do not make out a historical tradition. *Id.* at 65-66, 69-70. The Supreme Court expressed "doubt," for instance, that statutes from only three of the original thirteen colonies would establish a relevant tradition. *Id.* at 46. And in evaluating 19th-century "surety laws," which New York argued were precursors to its proper-cause requirement, the Court discounted two of those ten laws – which were most similar to New York's – as unrepresentative. *Id.* at 55-56 n.24. Here, the relevant date

for the historical analysis is December 15, 1791, when the Second Amendment was

ratified. At that time the United States as a nation consisted of the following states:



**b.** **The Government bears the burden of demonstrating that a firearm regulation is consistent with the Nation's historical tradition.**

Finally, *Bruen* emphasized that "the burden falls on [the Government] to show

that [a statute] is consistent with this Nation's historical tradition of firearm regulation."

*Bruen*, 597 U.S. at 24-25. Consistent with "the principle of party presentation," courts

are "entitled to decide a case based on the historical record compiled by the parties."

*Id.* at 25 n.6. As a consequence, courts "are not obliged to sift the historical materials

for evidence to sustain [a] statute. That is [the Government's] burden." *Id.* at 60. And

insofar as there are "multiple plausible interpretations" of an ambiguous historical record, courts must "favor the one that is more consistent with the Second Amendment's command." *Id.* at 44 n.11. The tie goes to the Second Amendment claimant. *See also id.* at 39-40 (concluding that where "history [is] ambiguous at best," it "is not sufficiently probative to defend [a statute]").

> ### 3. Section 922(g)(4) fails *Bruen*'s "text-and-history" Second Amendment standard and has been unconstitutionally applied to Gould.

By dispensing with means-ends scrutiny, *Bruen* refined *Heller* to the point that all modern federal firearm regulations are now subject to reexamination under the Second Amendment, using *Bruen*'s plain text and history standard. Applying that standard, the district court should have granted Gould's motion to dismiss.

Under *Bruen*'s framework, § 922(g)(4)'s "committed to a mental institution" clause violates Gould's Second Amendment right to keep and bear arms. The amendment's "plain text" protects the conduct of keeping and bearing arms. It does not differentiate between who can or cannot keep and bear arms, including between persons committed to mental institutions or not, and a total prohibition on firearm possession for persons so previously committed presumptively violates the Second Amendment. The Government cannot rebut that presumption. Mental institution involuntary commitment disarmament did not appear until the 20th century; the "Founders themselves could have adopted" involuntary commitment disarmament

laws, but did not do so. *Bruen*, 591 U.S. at 27 (discussing *Heller*). Because there was no "historical tradition," as of 1791 or even before the Twentieth Century, of regulations "relevantly similar" to § 922(g)(4), that statute violates the Second Amendment.

### a. The Second Amendment's "plain text" protects Gould's possession of a firearm.

*Bruen* directs courts to begin by asking whether "the Second Amendment's plain text covers an individual's ***conduct***." *Bruen*, 597 U.S. at 17 (emphasis added). The answer to that question is easy in Gould's case. The Second Amendment's operative clause contains three textual elements: it protects the right of (1) "the people" to (2) "keep and bear" (3) "Arms." Gould satisfies all three elements with respect to his possession of the 12-gauge shotgun seized from his home on February 18, 2022.

 "Arms" under the Second Amendment include all firearms that are not dangerous and unusual, and which are in common use. *Heller*, 554 U.S. at 581. This would include the shotgun seized from Gould's home. *See, e.g., Miller v. Bonta*, 2023 WL 6929336 (S.D. Cal. 2023). *Heller* further defines "keep" as "to retain; not to lose," "to have in custody," and "to hold; to retain in one's power or possession" – in short, to "have weapons." *Heller*, 554 U.S. at 582. Here Gould possessed the shotgun in his home.

> **b.** **The Second Amendment does not only apply to "law-abiding, responsible citizens," and Gould is part of "the people" entitled to Second Amendment protections**.

Contrary to the Government's assertions below, Gould is still part of "the people" protected by the Second Amendment. Just as that amendment does not "draw[] a home/public distinction with respect to the right to keep and bear arms," *Bruen*, 597 U.S. at 4, it does not draw a textual distinction between law-abiding and non-law-abiding citizens, any more than it draws a distinction between previously committed and any other American citizen. "Nothing in the Second Amendment's text" suggests those who have been temporarily involuntarily committed to a mental institution are not entitled to the amendment's protection. *Ibid.*

*Heller* confirms this conclusion. Construing the words "the people," the Supreme Court said "the term unambiguously refers to all members of the political community, not an unspecified subset." *Heller*, 554 U.S. at 580. It interpreted "the people" to refer to all "persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community." *Ibid.* Thus the Second Amendment right "is exercised individually and belongs to all Americans." *Id.* at 581. Interpreting "the people" to exclude someone who has not been adjudged a mental defective, but previously temporarily committed to a mental institution would contradict *Heller*'s Second Amendment application to "all

Americans." In addition, *Heller* explained that "the people" is a "term of art" that bears a uniform meaning across the First, Second, Fourth, and Ninth Amendments. *Heller*, 554 U.S. at 580. The result is that, if being previously temporarily committed somehow deprives a citizen of his Second Amendment right to bear arms, it would also deprive him of his First Amendment rights to speak about matters of public concern and worship according to his faith, and his Fourth Amendment right to be free from warrantless searches of his home. No court that has ever endorsed that proposition. *See, e.g., United States v. Meza-Rodriguez*, 798 F.3d 664, 670-71 (7th Cir. 2015)(concluding "the term 'the people' in the Second Amendment has the same meaning as it carries in other parts of the Bill of Rights" and therefore should be interpreted "as consistent with the other amendments passed as part of the Bill of Rights," such as the First and Fourth Amendments).

Notwithstanding this straightforward interpretation of the Second Amendment's "plain text," the Government has argued and is expected to continue to argue that "the people" comprises only law-abiding, responsible people. This argument derives from language in *Heller* related to determining the proper standard of review for Second Amendment claims. In rejecting the "interest-balancing inquiry" proposed in Justice Breyer's dissent, the *Heller* majority explained that the Second Amendment "is the very product of an interest balancing by the people." *Heller*, 554 U.S. at 634-35. Judges therefore lack authority to "conduct [that balancing] anew" or "decide on a case-by-

case basis whether the right is really worth insisting upon." *Ibid.* And regardless, the Court wrote, "whatever else [the Second Amendment] leaves to future evaluation, it surely elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home." *Id.* at 635. This latter sentence, the Government's argument goes, limits the right to keep and bear arms to only "law-abiding, responsible citizens."

This argument definitely misreads *Heller*. It was also just rejected by the Supreme Court in *United States v. Rahimi*, 602 U.S. ___ (2024).[6] By beginning the quoted passage with "whatever else it leaves to future evaluation," the Supreme Court in *Heller* made clear that its reference to "law-abiding, responsible citizens" established a Second Amendment floor, not a ceiling. The Court held that law-abiding, responsible citizens have a right to possess firearms, but it did not address, much less rule out, whether other people have that right too. Rather, *Heller* expressly left that question "to future evaluation." *Heller*, 554 U.S. at 635. *Heller*'s "law-abiding" statement was not meant to amend, *sub silentio*, its holding that "the people" are all members of the national community, and "not an unspecified subset." *Id.* at 580.

*Heller* "conclusively established [that] the Second Amendment applies to law-abiding and peaceable citizens ***at the very least***." *Stimmel v. Sessions*, 879 F.3d 198, 204-05 (6th Cir. 2018)(emphasis added). *Heller*'s "law-abiding" language does not

---

[6] As discussed in subpart 5 below.

"demarcate [the Second Amendment's] outer limit" or "exclude[]" anyone from the amendment's coverage, it merely establishes that certain people do fall within the amendment's reach. *Ibid.*; *see also Perez-Gallan*, 640 F. Supp. 3d at 708 (explaining *Heller* "defined 'the people' as 'members of the political community,' not 'law-abiding, responsible citizens'"). *Heller*'s qualifying language is clear, but to the extent it was ambiguous, *Bruen* resolved any ambiguity. The passage cited above references law-abiding, responsible citizens' right to use arms "in defense of hearth and home." If that passage were meant to mark off the outer edges of the Second Amendment right, then even law-abiding, responsible citizens would have no right to use firearms outside the home. But *Bruen* held the Second Amendment right does extend outside the home, and the Court in *Bruen* gave no hint it believed it was contradicting *Heller* in that regard. Thus *Bruen* confirms that it would be a mistake to read *Heller*'s "law-abiding, responsible citizens" language as a limitation on the Second Amendment.

It is true that at several points, *Bruen* uses the term "law-abiding." *See, e.g.*, *Bruen*, 597 U.S. at 71 ("New York's proper-cause requirement violates the [Second] Amendment in that it prevents law-abiding citizens with ordinary self-defense needs from exercising their right to keep and bear arms."). But *Bruen* repeated the "law-abiding" appellation because the petitioners in that case alleged, "[a]s set forth in the pleadings below," that they were "law-abiding, adult citizens," and the Court granted *certiorari* to decide only whether "New York's denial of petitioners' license applications

violated the Constitution." *Id.* at 17. No other questions were before the Court in *Bruen*, and at no point did the Court say Second Amendment rights are limited to law-abiding citizens.

*Bruen* reaffirmed *Heller*'s holding that the Second Amendment right belongs to "'all Americans.'" *Bruen*, 587 U.S. at 7, *quoting Heller*, 554 U.S. at 581. That statement cannot be reconciled with the Government's view that *Bruen* limits the arms right to only law-abiding citizens. *Bruen* also repeated *Heller*'s instruction that courts should give "the Second Amendment's language" its "'normal and ordinary' meaning." *Id.* at 20, *quoting Heller*, 554 U.S. at 576. There is nothing normal or ordinary about reading "the people" to mean only "law-abiding people." *Bruen* held "that ordinary, law-abiding citizens have [the] right to carry handguns publicly for their self-defense." *Id.* at 8. If the word "law-abiding" in that sentence limits the Second Amendment's scope, then the word "ordinary" must do so, too. But surely the Government does not believe unordinary citizens lack Second Amendment rights. It cannot be that the Supreme Court meant to exclude anyone deemed abnormal – a term with no discernible meaning – from exercising a fundamental, enumerated constitutional right. Limiting the Second Amendment by negative implication is equally unjustified regarding "law-abiding."

The Third Circuit addressed the lack of impact of *Bruen*'s "law-abiding" language on 18 U.S.C. § 922(g)(1) in *Range v. Attorney General United States of America*, 69 F.4th 96, 101-103 (3d Cir. 2023)(*en banc*). The court concluded that because the criminal histories

of the plaintiffs in *Heller*, *McDonald*, and *Bruen* were not at issue in those cases, references to "law-abiding, responsible citizens" were *dicta*. *Id.* at 101. The court noted that "the phrase 'law-abiding, responsible citizens' is as expansive as it is vague" and that "the Government's claim that only 'law-abiding, responsible citizens' are protected by the Second Amendment devolves authority to legislators to decide whom to exclude from 'the people.'" *Id.* at 102. The court "reject[ed] that approach because such 'extreme deference gives legislatures unreviewable power to manipulate the Second Amendment by choosing a label.'" *Id.* at 102-103. "In sum," the court concluded, "we reject the Government's contention that only 'law-abiding, responsible citizens' are counted among 'the people' protected by the Second Amendment." *Id.* at 103. Therefore, § 922(g)(4) regulates and burdens protected Second Amendment conduct.

Gould, who is an American citizen, is part of the United States' "national community." *Heller*, 554 U.S. at 580. He remained part of the "national community," despite any purported regular drug use or his NFA conviction. Gould is therefore among "the people" protected by the Second Amendment, and his conduct of possessing a shotgun in his own home is protected by the Second Amendment's text. *Bruen*, 597 U.S. at 17-18.

Other courts have held the same with respect to 18 U.S.C. § 922(g)(3). *See, e.g., United States v. Daniels*, 77 F.4th 337, 342-343 (5th Cir. 2023); *United States v. Okello*, 2023 WL 5515828, at *3 (D.S.D. 2023); *United States v. Espinoza-Melgar*, 2023 WL 5279654, at

*3 (D. Utah 2023); *United States v. Wuchter*, 2023 WL 4999862, at *2 (N.D. Iowa 2023); *United States v. Springer*, 2023 WL 4981583, at *2 (N.D. Iowa 2023); *United States v. Alston*, 2023 WL 4758734, at *6 (E.D.N.C. 2023); *United States v. Lewis*, 2023 WL 4604563 (S.D. Ala. 2023); *United States v. Connelly*, 2023 WL 2806324 (W. D. Tex. 2023); *United States v. Harrison*, 2023 WL 1771138, at *8-9 (W.D. Okla. 2023); *United States v. Lewis*, 2023 WL 187582, at *2 (W.D. Okla. 2023).

As they have with respect to 18 U.S.C. § 922(g)(1). *See, e.g., United States v. Prince*, 2023 WL 7220127, at *4-5 (N.D. Ill. dec. Nov. 2, 2023); *United States v. Jackson*, 2023 WL 7160921, at *5-6 (N.D. Ill. 2023); *United States v. Ford*, 2023 WL 7131742 (S.D.N.Y. 2023); *United States v. Brooks*, 2023 WL 6880419 (E.D. Ky. 2023); *United States v. Coleman*, 2023 WL 6690935, at *5-6 (E.D. Va. 2023); *United States v. Johnson*, 2023 WL 6690388, at *3 (N.D. Ill. 2023); *United States v. Levasseur*, 2023 WL 6623165, at *2-3 (D. Me. 2023); *United States v. White*, 2023 WL 6066201, at *4 (S.D.N.Y. 2023); *United States v. Johnson*, 2023 WL 6049529, at *4-5 (W.D. Okla. 2023); *United States v. Gates*, 2023 WL 5748362 (N.D. Ill. 2023); *United States v. Lane*, 2023 WL 5614798, at *2 (D. Vt. 2023); *United States v. Nordvold*, 2023 WL 5596623, at *4 (D.S.D. 2023); *United States v. Quailes*, 2023 WL 5401733 (M.D. Pa. 2023); *United States v. Davila*, 2023 WL 5361799, at *2 (S.D.N.Y. 2023); *United States v. Holmes*, 2023 WL 4494340 (E.D. Mich. 2023); *United States v. Bullock*, 2023 WL 4232309, at *20, *29 (S.D. Miss. 2023); *United States v. Hernandez*, 2023 WL 4161203, at *3-4 (N.D. Tex. 2023); *United States v. Ware*, 2023 WL 3568606, at *5

(S.D. Ill. 2023); *United States v. Lowry*, 2023 WL 3587309, at \*3 (D.S.D. 2023); *United States v. Martin*, 2023 WL 1767161, at \*2 (D. Vt. 2023); *United States v. Barber*, 2023 WL 1073667, at \*5-6 (E.D. Tex. 2023); *United States v. Hester*, No. 1:22-cr-20333-RNS, ECF No. 39 (S.D. Fla. Jan. 27, 2023); *Campiti v. Garland*, 649 F. Supp. 3d 1 (D. Conn. 2023); *United States v. Goins*, 647 F. Supp. 3d 538 (E.D. Ky. 2022); *United States v. Pierre*, No. 1:22-cr-20321-JEM, ECF No. 53 (S.D. Fla. Nov. 28, 2022); *United States v. Williams*, 2022 WL 18285005 (N.D. Ga. 2022); *United States v. Price*, 635 F. Supp. 3d 455, 460 (S.D. W. Va. 2022).

And with respect to 18 U.S.C. §§ 922(g)(8) & (9). *See, e.g., United States v. Lewis*, 2023 WL 6066260, at \*4 (S.D.N.Y. 2023); *United States v. Springer*, 2023 WL 4981583, at \*2 (N.D. Iowa 2023); *United States v. Brown*, 2023 WL 4826846, at \*5-6 (D. Utah 2023); *United States v. Guthery*, 2023 WL 2696824 (E.D. Cal. 2023); *United States v. Silvers*, 2023 WL 3232605 (W.D. Ky. 2023); *United States v. Combs*, 2023 WL 1466614, at \*3 (E.D. Ky. 2023); *United States v. Ryno*, 2023 WL 3736420, at \*12-14 (D. Alaska 2023); *United States v. Bernard*, 2022 WL 17416681, at \*7 (N.D. Iowa 2022); *United States v. Jackson*, 2022 WL 3582504, at \*2 (W.D. Okla. 2022).

And, finally, with respect to 18 U.S.C. § 922(n). *See, e.g., United States v. Gore*, 2023 WL 2141032, at \*2 (S.D. Ohio 2023); *United States v. Rowson*, 2023 WL 431037, at \*15-19 (S.D.N.Y. 2023); *United States v. Hicks*, 2023 WL 164170 (W.D. Tex. 2023); *United States v. Reaves*, No. 4:22-cr-224-HEA, ECF No. 55 at 16 (E.D. Mo. Jan. 9, 2023); *United*

*States v. Stambaugh*, 641 F. Supp. 3d 1185, 1189-1190 (W.D. Okla. 2022); *United States v. Kays*, 624 F. Supp. 3d 1262 (W.D. Okla. 2022).

A growing number of courts recognize that the inquiry under *Bruen*'s first step is a narrow one. They have held that citizens charged with a crime, even a crime based on prior criminal conduct, easily fall within the ambit of the Second Amendment. Gould's conduct in this case, simple possession of a 12-gauge shotgun in his home after having previously been temporarily involuntarily committed to a mental institution, falls within the scope of the Second Amendment.

> **4.**    ***Rahimi* rejected the United States' argument that the Second Amendment only applies to "law-abiding, responsible citizens."**

In *United States v. Rahimi*, 602 U.S. ___ (2024), the Supreme Court applied the *Bruen* framework for analyzing Second Amendment challenges to a criminal law for the first time. The Court held that 18 U.S.C. § 922(g)(8)(C)(i), which prohibits an individual subject to a domestic violence restraining order from possessing a firearm if that order includes a finding that the person represents a credible threat to the physical safety of others, is constitutional.

*Rahimi* is a narrow decision that embraces *Bruen*'s focus on text, history, and tradition. *First*, the Supreme Court rejected the Government's theory that the Second Amendment allows Congress to disarm anyone who is not "responsible" and "law-abiding." *Second*, the Court conducted a historical analysis and concluded that surety

laws and "going armed" laws established a tradition— temporarily disarming someone found by a court to pose a credible threat to the physical safety of others—similar to § 922(g)(8). *Rahimi* endorses an incremental approach to Second Amendment challenges driven by a detailed historical analysis applied to a specific law, not sweeping generalities.

Applying that analysis here, this Court should hold that the mental institution commitment clause of 18 U.S.C. § 922(g)(4) is unconstitutional. As in *Rahimi*, the Government's argument that the Second Amendment protects only so-called "law-abiding, responsible citizens" fails. And *Rahimi*'s historical analysis regarding civil surety and criminal affray laws provides little guidance because § 922(g)(4) is very different from § 922(g)(8). The latter law imposes a temporary restriction on gun possession only after a court makes an individualized finding that a person poses a clear threat of physical violence to another. By contrast, § 922(g)(4) merely requires a previous involuntary commitment to a mental institution (even if temporary) to impose a permanent and categorical ban without any similar finding, which persists well after any temporary commitment order has expired and any directed mental health treatment or court supervision has ended.

Unlike in *Rahimi*, the Government has failed to identify any historical evidence supporting such a far-reaching restriction with respect to citizens previously committed to a mental institution. Thus, § 922(g)(4) violates the Second Amendment. Again, at the

time Gould possessed the shotgun in his home, he was not suffering from any mental disease or defect, he had not been adjudged a mental incompetent, and he was not subject to a pending order committing him to a mental institution.

In *Rahimi*, as here, the Government argued that the Second Amendment "protects only law-abiding, responsible citizens." Gov't Br. at 12, *United States v. Rahimi*, No. 22-915 (U.S. Aug. 14, 2023). In doing so, the Government cited several references to "law-abiding, responsible citizens" from *Heller* and *Bruen*, claiming that the Supreme Court's "precedents recognize that Congress may disarm persons who are not law-abiding, responsible citizens." *Id.* at 11.

The Supreme Court easily rejected that argument.[7] *Rahimi*, 602 U.S. ___, *17; *see id.* at *27 (Thomas, J., dissenting) ("The Government . . . argues that the Second Amendment allows Congress to disarm anyone who is not 'responsible' and 'law-abiding.' Not a single Member of the Court adopts the Government's theory."). *First*, the Court stated that "responsible" is a "vague term" and it is "unclear what such a rule would entail." *Id.* at *17 (majority opinion). *Second*, the Court explained that the

---

[7] At oral argument, the Government said that it was not invoking the "law-abiding" prong of its proposed rule for individuals subject to § 922(g)(8). *See* Tr. of Oral Arg. 8-9, *United States v. Rahimi*, No. 22-915 (U.S. Nov. 7, 2023). So the majority opinion discussed only the "responsible" prong. *Rahimi*, 602 U.S. ___, *17. In his dissenting opinion, Justice Thomas—who agreed with the majority in rejecting the Government's theory—provided a more robust analysis discussing both prongs. *Id.* at *27–31 (Thomas, J., dissenting).

Government's proposed rule did not "derive from [the Court's] case law." *Ibid.* It noted that *Heller* and *Bruen* used the term "responsible" to "describe the class of ordinary citizens who undoubtedly enjoy the right," but neither decision adopted that formulation to define the limits of the Second Amendment. *Ibid.*; *see also id.* at *7 (Thomas, J., dissenting)("The Government's claim that the Court already held the Second Amendment protects only 'law-abiding, responsible citizens' is specious at best.").

The Government argued before the district court (and is expected to again argue here) that the Second Amendment "cover[s] only law-abiding, responsible citizens." As in *Rahimi*, that argument fails. *Rahimi* already rejected the "responsible" prong. *Rahimi*, 602 U.S. ___, *17. And the "law-abiding" prong fares no better. Like "responsible," "law-abiding" is vague. The Supreme Court cast no doubt on the Fifth Circuit's observation that "'law-abiding' admits to no true limiting principle." *United States v. Rahimi*, 61 F.4th 443, 453 (5th Cir. 2023), *rev'd on other grounds*, 602 U.S.___ (2024). And if the "responsible" prong of the Government's proposed "law-abiding, responsible citizen" test does not limit the Second Amendment's text, then neither does the "law-abiding" prong. *Rahimi* echoes the Fifth Circuit's caution against "read[ing] too much into the Supreme Court's chosen ['law-abiding, responsible citizen'] epithet." *See United States v. Daniels*, 77 F.4th 337, 342 (5th Cir. 2023).

The Government also asserted before the district court that the Second
Amendment permits Congress to disarm anyone it deems "dangerous." As with other
fictional distinctions, the Second Amendment's text simply does not distinguish
between "dangerous" and "non-dangerous" citizens (wherever they are supposed to be,
and by whatever standard they are supposed to be measured). But besides being
insidiously overgeneralized to the point of rendering the Second Amendment
effectively meaningless, this argument just repackages the Government's "responsible
citizen" theory. The Government confirmed at oral argument in *Rahimi* that it uses the
terms "not responsible" and "dangerous" interchangeably. Tr. of Oral Arg. 10–12,
*Rahimi*, *supra* (No. 22-915). So by rejecting the Government's "responsible" theory, the
Supreme Court also rejected its "dangerous" theory. Indeed, "dangerous" is just as
"vague" as "responsible." *See Rahimi*, 602 U.S. ___, *17*; see also Range*, 69 F.4th 96 at
102-103 (3d Cir. 2023), *Bullock*, 679 F. Supp. 3d at 535 (calling "law-abiding, responsible
citizens" "hopelessly vague"). In addition, interpreting historical principles "at such a
high level of generality . . . waters down the right," *id.* at *4 (Barrett, J., concurring), by
leaving the scope of the Second Amendment to "Congress's policy choice," *Id.* at 29–
31 (Thomas, J., dissenting). Unfortunately, this is the very real risk emerging from jurists
avoiding the straight forward application of *Bruen*, where they force the purpose of
every historical analogue into the square hole of protecting public safety and disarming
"dangerous" citizens. Whoever has the power to label a category of citizens

"dangerous," has the power to strip them of their Second Amendment protections. *Bruen*, 597 U.S. at 35-37, 30-31 (historical restrictions on firearms in "sensitive places" do not empower legislatures to designate any place "sensitive" and then ban firearms there). *Accord Neal*, 2024 WL 933607, *7-9 (N.D. Ill. 2024).

In short, the "law-abiding, responsible citizen" theory unanimously rejected by the Supreme Court in *Rahimi* "is the Government's own creation, designed to justify every one of its existing regulations." *Rahimi*, 602 U.S. ___ at *28 (Thomas, J., dissenting). "It has no doctrinal or constitutional mooring." *Ibid*. To the contrary, *Rahimi* confirms that the Supreme Court meant what it said when it declared that the Second Amendment right to keep and bear arms is not a second-class right, *see McDonald*, 561 U.S. at 780; *Bruen* 597 U.S. at 70, which "belongs to all Americans." *Heller*, 554 U.S. at 581.

### 5. The Government failed to show that § 922(g)(4) is consistent with the United States' "historical tradition of firearm regulation."

To rebut *Bruen*'s presumption of unconstitutionality, the Government had to establish that § 922(g)(4) "is consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 17. The Government did not carry this burden before the district court, nor can it do so here.

What is today § 922(g)(4) traces its origins to 1968, when Congress passed Title I of the Omnibus Crime Control and Safe Streets Act of 1968 (the "Gun Control Act"),

and added § 922 to 18 U.S.C. ch. 44. Pub. L. No. 90-618, Oct. 22, 1968, 82 Stat. 1213, 1217, 1200-1221. Later in 1986, Congress added firearm or ammunition <u>possession</u> to the list of unlawful acts prohibited by 18 U.S.C. § 922(g). Pub. L. No. 99-308, May 19, 1986, 100 Stat. 449, 451-452 (the "Firearm Owners Protection Act").

The Supreme Court in *Bruen* said it would not even "address any of the 20th-century historical evidence brought to bear by respondents or their *amici*," since evidence of that type "does not provide insight into the meaning of the Second Amendment when it contradicts earlier evidence." *Bruen*, 597 U.S. at 66 n.28. Regulations of such recent vintage cannot establish a historical tradition unless they "confirm[]" earlier practice. *Id.* at 36-37. Here, they simply do not. Section 922(g)(4) "bears little resemblance to laws in effect at the time the Second Amendment was ratified." *National Rifle Ass's of America, Inc. v. Bureau of Alcohol, Tobacco, Firearms, and Explosives*, 700 F.3d 185, 196 (5th Cir. 2012).

In 2007, Robert H. Churchill, a history professor at the University of Hartford, undertook "a full survey of printed session laws pertaining to gun regulation in the thirteen colonies and Vermont between 1607 and 1815." Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America*, 25 Law & Hist. Rev. 139, 143 n.11 (2007). Based on that survey, Churchill concluded that "at no time between 1607 and 1815 did the colonial or state governments of what would become

the first fourteen states exercise a police power to restrict the ownership of guns by members of the body politic." *Id.* at 142.

Carlton Larson, a professor at the University of California-Davis School of Law, has separately written in the context of disarming "lunatics" that "one searches in vain through eighteenth-century records to find any laws specifically excluding the mentally ill from firearms ownership." Carlton F.W. Larson, *Four Exceptions in Search of a Theory: District of Columbia v. Heller and Jud. Ipse Dixit*, 60 Hastings L.J. 1371, 1376 (2009); *accord Tyler v. Hillsdale Ct. Sheriff's Dept.*, 837 F.3d 678, 689 (6th Cir. 2016); *see also United States v. Skoien*, 614 F.3d 638, 646-651 (7th Cir. 2010)(in the context of convicted felons and domestic violence misdemeanants – "the historical evidence is inconclusive at best")(Sykes J., dissenting)(citing additional scholarly works).

That the Founding generation would have been reluctant, if not unwilling, to embrace permanent citizen disarmament as a mechanism for societal problem solving, in any context, is not surprising given the historical circumstances in which the Constitution and the Second Amendment were ratified. British General Thomas Gage's unprecedented deception during the siege of Boston between April 19, 1775, and March 17, 1776, was still very much "top of mind" with the founding generation when our Constitution was ratified in 1791. Recall that shortly after the Battle of Lexington and Concord, Gage extended the offer to Boston colonists to disarm themselves under the promise of being allowed to leave the city. In response, Boston residents surrendered

thousands of firearms and related weapons: 1778 muskets, 634 pistols, 973 bayonets, and 38 blunderbusses. The number of firearms seized by one account was one for every 5.6 inhabitants of a town with a population of 15,000. Having disarmed the local populace, within five days Gage reneged on his promise to allow any exit from Boston, and kept the entire city captive for eleven months. Nothing like that had ever happened in the American Colonies before, nor has it happened since. *See* Stephen P. Halbrook, *When the Redcoats Confiscated Guns*, Washington Post (May 31, 1995);[8] Stephen P. Halbrook, *That Every Man Be Armed* at 59 (University of New Mexico Press 1984); Stephen P. Halbrook, *The Founders' Second Amendment* at 2-3, 75-108 (Ivan R. Dee Publishers 2008).

As noted in Mr. Halbrook's treatise:

Americans were reminded of Gage's confiscation of arms some fourteen years later, when adoption of the Bill of Rights was pending. In 1789, Dr. David Ramsay published his *History of the American Revolution*. A prominent federalist, Ramsay wrote this work while he was a member of the Continental Congress in the 1780s. He also served as a delegate to the South Carolina convention that ratified the Constitution in 1788. James Madison, who served with Ramsay in the Continental Congress, was aware of the book. Ramsay's account of grievances leading to the Revolution was apropos, particularly in regard to what became the Second Amendment.

*The Founders' Second Amendment*, at 85-86 (footnotes omitted).

---

[8] Available online at https://www.washingtonpost.com/archive/opinions/1995/05/31/when-the-redcoats-confiscated-guns/e38d0810-af85-4949-8d93-3da746601e65/ (last viewed December 5, 2022)

There was no well-established and representative "historical tradition" of gun regulations "relevantly similar" to § 922(g)(4)'s mental institution commitment clause at the time of the Founding. *Bruen*, 597 U.S. at 24-26 There were no laws widely prescribed disarming persons previously involuntarily committed to a mental institution at all, much less regulations imposing the same "why" and "how" as Section 922(g)(4). The "Founders themselves could have adopted" laws like § 922(g)(4) to "confront" the "perceived societal problem" posed by the mentally ill's access to guns. *Id.* at 27. They declined to do so, and that inaction strongly indicates Section 922(g)(4)'s "committed to a mental institution" clause "[i]s unconstitutional."

## C.   How the District Court erred denying Gould's motion.

The district court made several erroneous decisions leading up to the denial of defendant's motion. First, that court equated Gould with John Hinckley, Jr. JA120. This was hardly an effective comparison because Hinckley (1) had previously actually been adjudged to be a mental incompetent; (2) been found not guilty for trying to assassinate President Reagan in 1981 by reason of insanity; and (3) had been committed to a mental institution and remained under mental health supervision until June 2022. *Id.* Unlike Hinckley, Gould had only previously been involuntarily committed to a mental institution for evaluation, never adjudged a mental defective, never adjudged not guilty in a criminal proceeding by reason of insanity, and – out of the three of four involuntary commitments attempted – had been only briefly committed, observed and released

three times without further court or medical supervision. Whereas Hinckley's firearm disability arose out the operation of <u>both</u> clauses under 922(g)(4) (using the ATF's definitions), Gould's only arose under one – the commitment to a mental institution clause.

The two clauses within Section 922(g)(4) are definitely not the same because a citizen can be adjudged a mental defective without being committed to a mental institution, while commitment to a mental institution does not necessarily involve or require a citizen be adjudged as a mental defective. *See* 27 C.F.R. § 478.11. Ironically under the ATF's definition of "committed to a mental institution," mentally ill individuals admitted *just for observation* or who *voluntarily* enter such a facility are not permanently disarmed by § 922(g)(4)'s mental institution commitment clause. This is despite *Heller*'s presumptively lawful *dicta*, and even if such individuals have a more serious or arguably dangerous mental illness than those citizens who are involuntarily committed. So finding § 922(g)(4)'s mental institution commitment clause unconstitutional under *Bruen* does not necessarily dictate that § 922(g)(4)'s "adjudged a mental incompetent" clause also violates the Second Amendment. That issue is not before this Court.

The district court further erred by not finding that *Bruen*'s Second Amendment standard displaced *Heller*'s presumptively lawful *dicta*, and that Gould was still one of the people entitled to Second Amendment protections under *Bruen*'s step one. JA121-

131. Instead, the district court continued the pre-*Bruen* intermediate scrutiny practice of *assuming without deciding* that Second Amendment protections applied to Gould's conduct. JA131; *see also United States v. Carter*, 669 F.3d 411, 416 (4th Cir. 2012)(citing cases following the same practice); *Nutter,* 624 F. Supp. 3d at 639 n.5.

Turning to *Bruen*'s step two, the district court declined to decide the precise historical standard to apply. JA135. The district court then correctly observed that the United States did not rebut Gould's assertions that a formal regulation disarming the mentally ill did not exist when the Second Amendment was ratified. JA140; *see also* Carlton Larson, *Four Exceptions in Search of a Theory*: *District of Columbia v. Heller and Judicial Ipse Dixit*, 60 Hastings L.J. 1371, 1376-1377 (2009). Despite this acknowledgement, in analyzing the "why" and "how" of Section 922(g)(4), the district court still found that there was a historical tradition establishing its constitutionality. JA140-143. Specifically, the district court accepted the United States' reliance upon the 1689 English Declarations of Rights, and the Minority dissent of the State of Pennsylvania. *Ibid.* The district court then separately placed great emphasis on authorities cited by *Nutter* as detailing an "historical tradition for prohibiting individuals deemed 'dangerous' from possessing guns "in the interest of public safety." *Ibid. Nutter*, in turn, had relied on civil surety laws; pre-Colonial laws requiring gun registration; required citizen attendance at militia trainings; fire codes regulating firearm and gun powder storage; and purported gun bans for slaves, free blacks, Native Americans, Catholics, and citizens refusing to

sign loyalty oaths to find a well-established and representative historical tradition of firearm regulation to sustain the constitutionality of 18 U.S.C. § 922(g)(9). *Nutter*, 624 F. Supp. 3d at 641-643. The district court then erroneously treated that broad basket of historical regulation as one allowing persons deemed a potential danger to themselves or others to be disarmed by Section 922(g)(4)'s mental institution commitment clause. JA140-143.

The district court's cited historical analogues – neither separately nor collectively – save § 922(g)(4) from being presumptively unconstitutional. While the absence of any directly relevant analogue may not have been dispositive, it should have constituted very strong evidence in the *Bruen* step two analysis. *Bruen,* 597 U.S. at 26-27. Separately, the English Bill of Rights did not disarm anyone, and its text guaranteed Protestants rights to arms "suitable to their Conditions and as allowed by Law." While that original guarantee only applied to the Crown and not Parliament in 1689, it was not a limit similarly adopted by the Second Amendment in this country a century later. *Bruen* itself observed that by the time the Second Amendment was ratified, the individual right it protected had "matured" and "was understood to be an individual right protecting against both public and private violence." *Id.* at 44-45; s*ee also United States v. Williams*, 2024 WL 731932, *16 (E.D. Mich. Feb. 22, 2024).

The minority positions from state constitutional conventions referencing the categorical disarming of certain citizens likewise cannot serve as a supportive historical

tradition, because such proposals were rejected and never enacted, and because none of the "peaceable," "virtuous," or "law-abiding, responsible citizen" language made its way into the Second Amendment. And the fact such limitations were debated in only three of thirteen state convictions, and – again – rejected, in no way establishes any well-established and representative tradition of anything. *See United States v. Duarte*, 101 F.4th 657, 677-679 (2024), *United States v. Neal*, 2024 WL 933607, *10-11 (N.D. Ill. Feb. 7, 2024); *United States v. Ware*, 673 F. Supp. 3d 947, 956-957 (S.D. Ill. 2023); *United States v. Bullock*, 679 F. Supp. 3d 501, 526-528 (S.D. Miss. 2023), citing *United States v. Rahimi*, 61 F.4th 443, 457 (5th Cir. 2023), *rev'd on other grounds*, 602 U.S. ____ (2024); *Williams*, 2024 WL 731932, *18.

Surety laws fair no better, as civil surety laws did not disarm anyone, even temporarily. Gun registration statutes only existed in the colonies before the Revolutionary War, not after 1791. That citizens were required to attend militia trainings, where they were also required to furnish their own firearms – bears no similar "why" or "how" to § 922(g)(4)'s permanent disarmament of citizens involuntarily committed to mental institutions. It is the same with colonial and post-founding laws regulating the storage of guns and gun powder. Magazine, powder certification, and even barrel proofing statutes were essentially founding era consumer protection laws adopted to minimize injury from defective arms or powder exploding during storage or use. They were hardly confiscations or permanent disarmaments, and the penalties for

violating most provisions involved a fine or forfeiture of the offending gun or barrel of powder, not permanent denial of the right to possess or use other conforming firearms and powder, or imprisonment if a citizen was later caught possessing a gun.

Racially-based or religiously-based firearm regulations for slaves, free blacks, Native Americans, Catholics, and citizens refusing to sign loyalty oaths provide no better support for the constitutionality of § 922(g)(4)'s mental institution commitment clause, much less demonstrate a consistent well-established and representative historical tradition of firearm regulation. Neither slaves nor Indians were understood to be part of the political community of persons protected by the Second Amendment in 1791. Slaves were not made a part of the political community until after the American Civil War. The Fourteenth Amendment's Citizenship Clause, which granted citizenship to newly freed slaves, was initially interpreted not to apply to all Indians. It took until 1924 with enactment of the Indian Citizenship Act to grant all non-citizen Indians born in the United States citizenship. *See Duarte,* 101 F.4th at 685-688; *Range*, 69 F.4th at 104-105; *United States v. Harrison*, 654 F. Supp. 3d 1191, 1216-1217 (W.D. Okla. 2023) (citing authorities); *Ware*, 573 F. Supp. 3d at 958; *Bullock*, 679 F. Supp. 3d at 514-515 (discussing now Justice Barrett's examination of the same in *Kanter v. Barr*, 919 F.3d 437, 440 (7th Cir. 2019)).

Disarmaments of Catholics and loyalists also involved "wholesale deprivation" of other civil liberties as well. While the "how" with such regulations was arguably the

same or even greater than with slaves, Native Americans, and today persons committed to mental institutions (i.e. at least total, permanent disarmament), the respective "why"s were in in no way comparable to the modern statute, even if inflated to the over generalized-purpose of disarming "dangerous" people.

Catholic and loyalist disarmaments were justified based on the exercise of what would today be First Amendment protected conduct and a legislature's decision that because of such conduct they were "untrustworthy" out of fear that the groups were likely to wage active war against the colonies or interfere with colonial war efforts. Such laws disarmed individuals based on their unchangeable characteristics or religious affiliations rather than their actions (which would be necessary to have any chance of rationally being "dangerous" to others). Just as importantly, only two colonies – Virginia in 1756 and Pennsylvania in 1759 – ever definitely disarmed Catholics. To the extent the debate lands on the side of Maryland also doing so, three out of thirteen colonies in no way constitutes a well-established and representative tradition of firearm regulation capable of supporting any modern firearm regulation. *See, e.g., Duarte*, 101 F.4th at 680-695; *Harrison*, 654 F. Supp. 3d at 1219-1220; *Ware,* 573 F. Supp. 3d at 958; *United States v. Alston*, 2023 WL 7003235, *5 (E.D.N.C. Oct. 24, 2023).

*But see Williams*, 2024 WL 731932, *17-18, 19-21, alternately finding that while laws disarming Catholics, free blacks, slaves, and Native Americans all shared the same "why" as Section 922(g)(1), they did not share any comparable burden with the

permanent disarmament of convicted felons. This was because such pre-founding measures did not result in total disarmaments of the affected categorical groups.[9] According to one court's historical deep dive, Catholics were still allowed to possess firearms for self-defense and upon renouncing their faith (or, like loyalists, upon signing a loyalty oath) could have all of their gun rights restored; slaves could possess firearms with permission of their masters; and Native Americans were apparently just prohibited from <u>buying</u> firearms – not possessing them (where they were still considered citizens of hostile sovereign nations). *Williams*, 2024 WL 731932, *19-20. So either way – whether differing in their "why" or "how" or both – pre-founding laws relied upon by the district court which would be unconstitutional today do not constitute a representative any viable historical tradition sustaining § 922(g)(4)'s mental institution commitment clause.

## CONCLUSION

It has been 248 years since America declared its independence from Britain, and 236 years since our Constitution was ratified. The Second Amendment was ratified 233 years ago, yet the individual right of self-defense it protects was not recognized by our Supreme Court until 2008. Over the 74 years between the National Firearms Act and *Heller*, Twentieth Century legislatures and courts imposed a plethora of firearm

---

[9] Contrary to what the court in *Nutter* assumed when quoting Adam Winkler's 2009 law review article. *Nutter*, 624 F. Supp. 3d at 643.

restrictions that are now very familiar to modern jurists – believing the Second Amendment only prohibited federal restrictions on firearms related to militia service. It took 219 years for individual rights Second Amendment protections to be applied to the states, and only two years ago did the Supreme Court reject means-ends scrutiny as a mechanism for determining the scope of that amendment.

Prior temporary and involuntary commitment to a mental institution <u>does</u> <u>not</u> fairly equate to permanent debilitating mental illness or "lunacy" as the terms are mentioned in *Heller's dicta*. Such also do not make an individual citizen inherently dangerous to the degree they should be categorically permanently disarmed. There is no evidence Gould was suffering from any mental disease or defect on February 18, 2022, and he was not subject to a pending order committing him to a mental institution. Despite his past temporary involuntary commitments (which were all over two and half years old), Gould was still subject to Second Amendment protections, as was his conduct of possessing a 12-guage shotgun in his home. Where § 922(g)(4)'s mental institution commitment clause is not supported by a well-established and representative tradition of firearm regulation (by relevant principles or otherwise), it violates the Second Amendment. This Court, therefore, should vacate Gould's conviction and dismiss his indictment with prejudice or, alternately, reverse and remand with instructions for the district court to do the same.

## REQUEST FOR ORAL ARGUMENT

This case presents the important question of whether the Second Amendment can tolerate permanent disarmament of citizens previously committed to a mental institution by 18 U.S.C. § 922(g)(4)'s involuntary commitment clause. The Court's answer to this question will affect the fundamental rights of countless uncharged citizens with mental health histories in the Fourth Circuit, as well as the growing cohort of defendants prosecuted under Section 922(g)(4). Gould believes oral argument will certainly assist the Court in resolving this very important question.

Respectfully submitted,

**JAMES GOULD**

By Counsel

**WESLEY P. PAGE**
**FEDERAL PUBLIC DEFENDER**

**s/Lex A. Coleman**
Lex A. Coleman
Senior Litigator
Office of the Federal Public Defender, SDWV
Room 3400, United States Courthouse
300 Virginia Street East
Charleston, West Virginia 25301
Phone: (304) 347-3350
E-mail: lex_coleman@fd.org

**s/Jonathan D. Byrne**
Jonathan D. Byrne
Appellate Counsel
Office of the Federal Public Defender, SDWV
Room 3400, United States Courthouse
300 Virginia Street East
Charleston, West Virginia 25301
Phone: (304) 347-3350
E-mail: jonthan_byrne@fd.org

*Dated*: July 8, 2024

## CERTIFICATE OF COMPLIANCE
## WITH TYPEFACE AND LENGTH LIMITATIONS

1.  This brief complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

    this brief contains 12,220 words

2.  This brief complies with the typeface and type style requirements because:

    this brief has been prepared in a proportionally spaced typeface using *Microsoft Word 2016* in *14 pt Garamond*.


**DATE:**    July 8, 2024

s/Lex A. Coleman
Lex A. Coleman
Senior Litigator AFPD
Room 3400, United States Courthouse
300 Virginia Street East
Charleston, West Virginia 25301
E-mail: lex_coleman@fd.org

s/Jonathan D. Byrne
Jonathan D. Byrne
Appellate Counsel
Room 3400, United States Courthouse
300 Virginia Street East
Charleston, West Virginia 25301
E-mail: jonathan_byrne@fd.org