APPEAL NO. 24-4192

In the

# United States Court of Appeals

### For the Fourth Circuit

## UNITED STATES OF AMERICA,

*Plaintiff - Appellee,*

v.

## JAMES GOULD,

*Defendant - Appellant.*

### ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA AT CHARLESTON

## JOINT APPENDIX – VOLUME I of II

| | |
|---|---|
| **Wesley P. Page**<br>**Federal Public Defender** | **William S. Thompson**<br>**United States Attorney** |
| **Jonathan D. Byrne**<br>**Appellate Counsel** | **Gabriel C. Price**<br>**Assistant United States Attorney** |
| **Lex A. Coleman**<br>**Senior Litigator** | |
| **U.S. Courthouse, Room 3400**<br>**300 Virginia Street, East**<br>**Charleston, West Virginia 25301**<br>**Telephone: (304) 347-3350** | **U.S. Courthouse, Room 4000**<br>**300 Virginia Street, East**<br>**Charleston, West Virginia 25301**<br>**Telephone: (304) 345-2200** |
| *Counsel for Appellant* | *Counsel for Appellee* |

## <u>TABLE OF CONTENTS</u>
VOLUME I OF II

Docket Entries ..........................................................................................................JA1

Indictment
      filed June 3, 2022...................................................................................JA12

Defendant's *Bruen*-Based Motion to Dismiss
      filed February 17, 2023 ........................................................................JA13

Response of the United States in Opposition to
Defendant's Motion to Dismiss
      filed March 17, 2023 ............................................................................JA53

Transcript of Pretrial Motions Hearing before
The Honorable Thomas E. Johnston
      on March 30, 2023 ...............................................................................JA69

Defendant's Post-Hearing Memorandum in Further Support
of his *Bruen* Motion to Dismiss
      filed April 13, 2023 ...........................................................................JA107

Memorandum Opinion and Order of
The Honorable Thomas E. Johnston
Re: Denying Motion to Dismiss
      filed May 5, 2023 .............................................................................JA117

District Judge Daybook Entry for Plea Hearing before
The Honorable Thomas E. Johnston
      filed October 12, 2023 ......................................................................JA144

Order of
The Honorable Thomas E. Johnston
      filed October 12, 2023......................................................................JA145

Transcript of Sentencing Hearing before
The Honorable Thomas E. Johnston
      on March 21, 2024 .............................................................................JA147

Judgment in a Criminal Case
    filed April 1, 2024..................................................................JA170

Notice of Appeal
    filed April 1, 2024..................................................................JA177

Query    Reports    Utilities    Help    Log Out

CLOSED,APPEAL,LC-3

# United States District Court
# Southern District of West Virginia (Charleston)
# CRIMINAL DOCKET FOR CASE #: 2:22-cr-00095-1

| | |
|---|---|
| Case title: United States of America v. Gould | Date Filed: 05/03/2022 |
| | Date Terminated: 04/01/2024 |

Assigned to: Judge Thomas E. Johnston

## Defendant (1)

| | | |
|---|---|---|
| **James Gould**<br>*TERMINATED: 04/01/2024* | represented by | **Lex A. Coleman**<br>FEDERAL PUBLIC DEFENDER'S OFFICE<br>Room 3400<br>300 Virginia Street East<br>Charleston, WV 25301<br>304-347-3350<br>Fax: 304-347-3356<br>Email: lex_coleman@fd.org<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED*<br>*Designation: Public Defender or Community Defender Appointment* |

| **Pending Counts** | **Disposition** |
|---|---|
| UNLAWFUL TRANSPORT OF FIREARMS, ETC.<br>(1) | time served, 3 years supervised release, no fine, $100 assessment |

**Highest Offense Level (Opening)**

Felony

| **Terminated Counts** | **Disposition** |
|---|---|
| None | |

**Highest Offense Level (Terminated)**

None

| **Complaints** | **Disposition** |
|---|---|

JA1

None

---

**Plaintiff**

**United States of America**                   represented by   **Negar M. Kordestani**
UNITED STATES ATTORNEY'S
OFFICE
Suite 4000
300 Virginia Street East
Charleston, WV 25301
304-340-7843
Fax: 304/347-5104
Email: negar.kordestani@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: for the United States of*
*America*

**Timothy D. Boggess**
UNITED STATES ATTORNEY'S
OFFICE
United States Courthouse & IRS Complex
110 North Heber Street, Room 261
Beckley, WV 25801
304-253-6722
Fax: 304/253-9206
Email: timothy.boggess@usdoj.gov
*ATTORNEY TO BE NOTICED*
*Designation: for the United States of*
*America*

| Date Filed | # | Docket Text |
|---|---|---|
| 05/03/2022 | 1 | INDICTMENT as to James Gould count 1. (Originally filed under seal 5/3/2022; Unsealed 6/14/2022) (lca) (Entered: 05/04/2022) |
| 05/03/2022 | 2 | INDICTMENT - Unredacted Copy for Court Users Only as to James Gould. (Originally filed under seal 5/3/2022; Unsealed 6/14/2022) (lca) (Entered: 05/04/2022) |
| 05/03/2022 |  | CASE as to James Gould assigned to Chief Judge Thomas E. Johnston. (klc) (Entered: 05/04/2022) |
| 05/04/2022 | 5 | SEALED ORDER as to James Gould directing that the indictment is SEALED; that a bench warrant be issued forthwith for the defendant and upon arrest, this case shall be UNSEALED without further Order. Signed by Magistrate Judge Dwane L. Tinsley on 5/4/2022. (cc: Judge, USA, USM, USP) (btm) |
| 05/06/2022 |  | NOTICE OF DOCKET CORRECTION re: 3 Defendant Information Relative to a Criminal Action as to James Gould. ERROR: Incorrect image attached. CORRECTION: Image replaced. (ts) |
| 06/14/2022 | 6 | MOTION by United States of America to Unseal Indictment as to James Gould. (lca) |

**JA2**

| 06/14/2022 | 7 | ORDER granting the Government's 6 Motion to Unseal. Signed by Magistrate Judge Dwane L. Tinsley on 6/14/2022. (cc: Judge, USA) (lca) |
|---|---|---|
| 08/23/2022 | 8 | MOTION by United States of America for Detention Hearing as to James Gould. (Kordestani, Negar) |
| 08/23/2022 | 9 | CJA 23 FINANCIAL AFFIDAVIT by James Gould. (kew) |
| 08/23/2022 | 10 | NOTICE OF ATTORNEY APPEARANCE: Lex A. Coleman APPEARING FOR James Gould (Coleman, Lex) |
| 08/23/2022 | 11 | INITIAL APPEARANCE as to James Gould held by Magistrate Judge Dwane L. Tinsley on 8/23/2022; Court Reporter: Court Smart. (kab) |
| 08/23/2022 | 12 | ORDER as to James Gould, re: hearing held 8/23/2022; directing that the Office of the Federal Public Defender is appointed to represent the Defendant; granting the 8 Motion for Detention Hearing; an Arraignment and Detention Hearing is set for 8/25/2022 at 3:00 PM in Charleston before Magistrate Judge Dwane L. Tinsley. The defendant is remanded to the custody of the United States Marshal. Signed by Magistrate Judge Dwane L. Tinsley on 8/23/2022. (cc: Judge, USP, USM, counsel of record, deft) (lca) |
| 08/23/2022 | 13 | DUE PROCESS PROTECTIONS ACT ORDER TO ALL COUNSEL REGARDING BRADY OBLIGATIONS as to James Gould. Signed by Magistrate Judge Dwane L. Tinsley on 8/23/2022. (cc: Judge, counsel of record) (lca) |
| 08/25/2022 | 14 | ARRAIGNMENT and DETENTION HEARING as to James Gould held by Magistrate Judge Dwane L. Tinsley on 8/25/2022; Court Reporter: Court Smart. (kab) |
| 08/25/2022 | 15 | RESPONSE by United States of America TO STANDARD DISCOVERY REQUESTS as to James Gould and REQUEST by USA for Reciprocal Discovery. (Kordestani, Negar) |
| 08/25/2022 | 16 | NOTICE OF ASSERTION OF RIGHT TO REMAIN SILENT AND NOT BE QUESTIONED BY ANY AUTHORITIES OUTSIDE THE PRESENCE OF COUNSEL by James Gould. (tmr) |
| 08/25/2022 | 17 | ARRAIGNMENT ORDER AND STANDARD DISCOVERY REQUESTS as to James Gould. Arraignment held on 8/25/2022. Jury Trial set for 10/25/2022 at 09:00 AM in Charleston before Judge Thomas E. Johnston. Pretrial Motions Hearing set for 10/6/2022 at 09:00 AM in Charleston before Judge Thomas E. Johnston. Pretrial motions due by 9/26/2022. Proposed Voir Dire Questions due by 10/17/2022. Proposed Jury Instructions due by 10/17/2022. Proposed Witness List due by 10/20/2022. Defendant detained pending detention hearing set for 8/30/2022 at 11:00 A.M. Signed by Magistrate Judge Dwane L. Tinsley on 8/25/2022. (cc: Judge, USA, USP, USM, counsel, deft) (tmr) |
| 08/26/2022 | 18 | ORDER as to James Gould; Upon hearing held 8/25/2022; granting defendant's oral motion to continue detention hearing; Detention Hearing set for 8/30/2022 at 11:00 AM in Charleston before Magistrate Judge Dwane L. Tinsley; defendant remanded to the custody of the United States Marshal. Signed by Magistrate Judge Dwane L. Tinsley on 8/26/2022. (cc: Judge, USA, USP, USM, counsel, deft) (tmr) |
| 08/26/2022 | 19 | WARRANT RETURNED EXECUTED in case as to James Gould. Defendant arrested on 8/23/22. (mfo) |

JA3

| 08/30/2022 | 20 | ORDER as to James Gould; Detention Hearing reset for 8/30/2022 at 02:00 PM in Charleston before Magistrate Judge Dwane L. Tinsley. Signed by Magistrate Judge Dwane L. Tinsley on 8/30/2022. (cc: Judge, USA, USP, USM, counsel, deft) (tmr) |
|---|---|---|
| 08/30/2022 | 21 | DETENTION HEARING as to James Gould held by Magistrate Judge Dwane L. Tinsley on 8/30/2022; Court Reporter: Court Smart. (kab) |
| 08/31/2022 | 23 | DETENTION ORDER as to James Gould. Signed by Magistrate Judge Dwane L. Tinsley on 8/31/2022. (cc: Judge, USA, USP, USM, counsel, deft) (arb) |
| 08/31/2022 | 24 | PRETRIAL SERVICES REPORT as to James Gould. (tmp) |
| 08/31/2022 | 25 | EXHIBIT LIST by James Gould, re: hearing held 8/30/2022. (Attachment: # 1 Exhibit D-1) (lca) |
| 09/01/2022 | 26 | ORDER as to James Gould; granting government's motion for authorization to disclose specified grand jury material to counsel for the defendant; Court places restrictions on the use of grand jury materials; directing that the motion be sealed. Signed by Judge Thomas E. Johnston on 9/1/2022. (cc: Judge, counsel of record) (tmr) |
| 09/21/2022 | 27 | MOTION to Continue Trial & related pretrial deadlines as to James Gould (Coleman, Lex) |
| 09/23/2022 | 28 | ORDER granting defendant's 27 MOTION to Continue as to James Gould; Trial is reset for 11/29/2022 at 9:00 AM in Charleston before Judge Thomas E. Johnston. Pretrial Motions Hearing is reset for 11/10/2022 at 9:00 AM in Charleston before Judge Thomas E. Johnston. Pretrial motions due by 11/1/2022. Proposed Voir Dire Questions due by 11/21/2022. Proposed Jury Instructions due by 11/21/2022. Proposed Witness List due by 11/23/2022. The time between 10/25/2022 and 11/29/2022 is excludable. Signed by Judge Thomas E. Johnston on 9/23/2022. (cc: Judge, USA, USP, USM, counsel, deft) (lca) |
| 10/31/2022 | 29 | MOTION by United States of America to Continue Trial and pretrial deadlines as to James Gould (Kordestani, Negar) |
| 11/02/2022 | 30 | ORDER as to James Gould granting the unopposed 29 MOTION by the United States to Continue Trial as follows: Jury Trial CONTINUED to 1/10/2023 at 9:00 AM in Charleston before Judge Thomas E. Johnston. Proposed Voir Dire and Jury Instructions due no later than 1/3/2023. Proposed Witness List due no later than 1/5/2023. Pretrial Motions Hearing CONTINUED to 12/15/2022 at 1:30 PM in Charleston before Judge Thomas E. Johnston. Pretrial Motions shall be filed no later than 12/5/2022. Time is excludable from 11/29/2022 until 1/10/2023. Signed by Judge Thomas E. Johnston on 11/2/2022. (cc: Judge, USA, USP, USM, counsel, deft) (arb) |
| 11/03/2022 | 31 | ORDER directing that the pretrial motions hearing currently scheduled for 12/15/2022 at 1:30 p.m. shall be held on 12/15/2022 at 2:30 p.m. Signed by Judge Thomas E. Johnston on 11/3/2022. (cc: Judge, USA, USP, USM, counsel, deft) (mfo) |
| 11/23/2022 | 32 | MOTION by United States of America to Continue Trial and Pretrial Deadlines as to James Gould (Kordestani, Negar) |
| 11/28/2022 | 33 | ORDER as to James Gould granting the United States' 32 Motion to Continue and moving the pretrial motions hearing to 12/7/2022 at 9:30 a.m.; all other dates and deadlines in the previous scheduling order shall remain in effect. Signed by Judge Thomas E. Johnston on 11/28/2022. (cc: Judge, Defendant and counsel, USA, USP, USM) (btm) |

| 12/05/2022 | 34 | MOTION to Continue Trial & Related Pretrial Deadlines as to James Gould (Coleman, Lex) |
|---|---|---|
| 12/06/2022 | 35 | ORDER as to James Gould; granting 34 MOTION to Continue Trial & Related Pretrial Deadlines; the Trial is CONTINUED to 2/7/2023 at 9:00 AM. The Pretrial Motions Hearing is CONTINUED to 1/19/2023 at 9:30 AM. Pretrial motions are due by 1/9/2023. Proposed Voir Dire Questions and Proposed Jury Instructions are due by 1/30/2023. Proposed Witness List is due by 2/2/2023. Time excludable from 1/10/2023 until 2/7/2023. Signed by Judge Thomas E. Johnston on 12/6/2022. (cc: Judge, USA, USP, USM, counsel, deft) (kew) |
| 01/09/2023 | 36 | MOTION to Continue trial & all pretrial deadlines as to James Gould (Coleman, Lex) |
| 01/12/2023 | 37 | ORDER granting 36 MOTION to Continue Trial & All Pretrial Deadlines by James Gould. Jury Trial reset for 3/14/2023 at 09:00 AM in Charleston before Judge Thomas E. Johnston. Pretrial Motions Hearing reset for 2/23/2023 at 09:00 AM in Charleston before Judge Thomas E. Johnston. Pretrial motions due by 2/13/2023. Proposed Voir Dire Questions due by 3/6/2023. Proposed Jury Instructions due by 3/6/2023. Proposed Witness List due by 3/9/2023. Time is excludable from 2/7/2023 to 3/14/2023, pursuant to 18 U.S.C. § 3161(h)(7). Signed by Judge Thomas E. Johnston on 1/12/2023. (cc: Judge, USA, USP, USM, counsel, deft) (tmr) |
| 01/17/2023 | 38 | NOTICE OF CHANGE OF ATTORNEY INFORMATION by Timothy D. Boggess appearing as to James Gould. (Boggess, Timothy) |
| 02/14/2023 | 39 | ORDER as to James Gould; directing that the pretrial motions hearing set for 2/23/2023, is canceled. Signed by Judge Thomas E. Johnston on 2/14/2023. (cc: Judge, USA, USP, USM, counsel, deft) (tmr) |
| 02/17/2023 | 40 | BRUEN-BASED MOTION to Dismiss as to James Gould (Coleman, Lex) |
| 02/17/2023 | 41 | MOTION to Accept Filing Out of Time & Related Relief re: 40 BRUEN-BASED MOTION to Dismiss as to James Gould. (Coleman, Lex) |
| 02/22/2023 | 42 | ORDER granting 41 MOTION to Accept Filing Out of Time and to Continue by James Gould; Jury Trial reset for 5/2/2023 at 09:00 AM in Charleston before Judge Thomas E. Johnston; Proposed Voir Dire Questions due by 4/24/2023; Proposed Jury Instructions due by 4/24/2023; Proposed Witness List due by 4/27/2023; a hearing on 40 MOTION to Dismiss shall be held on 3/30/2023 at 10:00 am.; government shall file a response to the motion by 3/17/2023; time is excludable from 3/14/2023 to 5/2/2023, pursuant to 18 U.S.C. § 3161(h)(7). Signed by Judge Thomas E. Johnston on 2/22/2023. (cc: Judge, USA, USP, USM, counsel, deft) (tmr) (Main Document 42 replaced on 2/22/2023) (cbo). |
| 02/22/2023 | | NOTICE OF DOCKET CORRECTION re: 42 ORDER granting 41 MOTION to Accept Filing Out of Time and to Continue by James Gould. ERROR: Original image noted incorrect ECF Nos. CORRECTION: Image removed and replaced with corrected image. (cbo) |
| 03/17/2023 | 43 | RESPONSE IN OPPOSITION by United States of America as to James Gould re: 40 BRUEN-BASED MOTION to Dismiss as to James Gould (Boggess, Timothy) |
| 03/30/2023 | 44 | MOTION HEARING as to James Gould held by Judge Thomas E. Johnston on 3/30/2023; Court Reporter: Ayme Cochran. re: 40 BRUEN-BASED MOTION to Dismiss as to James Gould filed by James Gould (slw) |

| 04/07/2023 | 45 | ORDER as to James Gould directing that the Court will hold a hearing in this case regarding detention issues on 4/13/2023 at 1:30 PM. Signed by Judge Thomas E. Johnston on 4/7/2023. (cc: Judge, Defendant and counsel, USA, USP, USM) (btm) |
| 04/11/2023 | 46 | MOTION to Reschedule Hearing as to James Gould. (Coleman, Lex) |
| 04/11/2023 | 47 | ORDER denying as moot the 46 MOTION by James Gould to Reschedule Hearing. Signed by Judge Thomas E. Johnston on 4/11/2023. (cc: Judge, USA, USP, USM, counsel, deft) (arb) |
| 04/13/2023 | 48 | REPLY by James Gould to 43 Response In Opposition/Post-Hearing Memorandum re: 40 Bruen-Based Motion to Dismiss (Coleman, Lex) |
| 04/13/2023 | 49 | NON-EVIDENTIARY HEARING as to James Gould held by Judge Thomas E. Johnston on 4/13/2023; Court Reporter: Ayme Cochran. (slw) |
| 04/20/2023 | 50 | ORDER as to James Gould; hearing regarding Detention Issues set for 4/25/2023 at 02:30 PM in Charleston before Judge Thomas E. Johnston. Signed by Judge Thomas E. Johnston on 4/20/2023. (cc: Judge, USA, USP, USM, counsel, deft) (tmr) |
| 04/25/2023 | 51 | NON-EVIDENTIARY HEARING as to James Gould held by Judge Thomas E. Johnston on 4/25/2023; Court Reporter: Ayme Cochran. (slw) |
| 04/25/2023 | 52 | ORDER as to James Gould, directing Carter County Detention Center to transport the Defendant to the Robert C. Byrd, United States Courthouse, 300 Virginia Street East, Charleston, West Virginia on 4/26/2023 at 8:30 a.m., upon arrival the Defendant is ordered released from custody and immediately placed on home incarceration with electronic monitoring. Signed by Judge Thomas E. Johnston on 4/25/2023. (cc: Judge, USA, USP, USM, counsel, deft) (lca) |
| 04/26/2023 | 53 | MOTION to Continue trial & all pretrial deadlines as to James Gould (Coleman, Lex) |
| 04/26/2023 | 54 | ORDER SETTING CONDITIONS OF RELEASE as to James Gould. Signed by Judge Thomas E. Johnston on 4/25/2023. (cc: Judge, USA, USP, USM, counsel, deft) (tmr) |
| 04/26/2023 | 55 | APPEARANCE BOND as to James Gould in amount of $10,000 unsecured. (tmr) |
| 04/27/2023 | 56 | ORDER granting 53 MOTION to Continue Trial & all Pretrial Deadlines by James Gould; Jury Trial reset for 6/13/2023 at 09:00 AM in Charleston before Judge Thomas E. Johnston; Proposed Voir Dire Questions due by 6/5/2023; Proposed Jury Instructions due by 6/5/2023; Proposed Witness List due by 6/8/2023; time is excludable from 5/2/2023 to 6/13/2023, pursuant to 18 U.S.C. § 3161(h)(7). Signed by Judge Thomas E. Johnston on 4/27/2023. (cc: Judge, USA, USP, USM, counsel, deft) (tmr) |
| 05/04/2023 | 57 | ORDER as to James Gould setting a hearing on the 58 Petition for Action on Conditions of Pretrial Release submitted by Defendant's probation officer for 5/8/2023 at 2:00 PM in Charleston before Judge Thomas E. Johnston. Signed by Judge Thomas E. Johnston on 5/4/2023. (cc: Judge, USA, USP, USM, counsel, deft) (arb) |
| 05/04/2023 | 58 | PETITION/ORDER as to James Gould; directing that a summons be issued for the defendant. Signed by Judge Thomas E. Johnston on 5/4/2023. (cc: Judge, USA, USP, USM, counsel) (tmr) |
| 05/05/2023 | 60 | SUMMONS RETURNED EXECUTED on 5/5/2023, as to James Gould. (lca) |

JA6

| 05/05/2023 | 61 | MEMORANDUM OPINION AND ORDER as to James Gould; denying Defendant's 40 BRUEN-BASED MOTION to Dismiss. Signed by Judge Thomas E. Johnston on 5/5/2023. (cc: Judge, USA, USP, USM, counsel, deft) (jsa) |
| 05/08/2023 | 62 | BOND REVOCATION HEARING as to James Gould held by Judge Thomas E. Johnston on 5/8/2023; Court Reporter: Ayme Cochran. (slw) (Entered: 05/09/2023) |
| 05/23/2023 | 63 | PS 40 - NOTICE TO THE U. S. DEPARTMENT OF STATE REGARDING UNITED STATES PASSPORT FOR CRIMINAL DEFENDANT - ORIGINAL NOTICE as to James Gould. Defendant is not permitted to obtain a passport as a condition of pretrial bond. (tmp) |
| 06/02/2023 | 64 | MOTION to Continue trial & all pretrial deadlines as to James Gould (Coleman, Lex) |
| 06/05/2023 | 65 | ORDER granting 64 MOTION to Continue Trial & All Pretrial Deadlines by James Gould ; Jury Trial reset for 7/18/2023 at 09:00 AM in Charleston before Judge Thomas E. Johnston; Proposed Voir Dire Questions due by 7/10/2023; Proposed Jury Instructions due by 7/10/2023; Proposed Witness List due by 7/13/2023; time is excludable from 6/13/2023 to 7/18/2023, pursuant to 18 U.S.C. § 3161(h)(7). Signed by Judge Thomas E. Johnston on 6/5/2023. (cc: Judge, USA, USP, USM, counsel, deft) (tmr) |
| 06/20/2023 | 66 | NONCOMPLIANCE SUMMARY as to James Gould, directing that no action be taken at this time. Signed by Judge Thomas E. Johnston on 6/20/2023. (cc: Judge, USA, USP, USM, counsel) (lca) |
| 07/07/2023 | 67 | MOTION to Continue trial & all pretrial deadlines as to James Gould (Coleman, Lex) |
| 07/11/2023 | 68 | ORDER granting the Defendant's 67 MOTION to Continue trial & all pretrial deadlines as to James Gould (1); directing that the trial is CONTINUED to 8/22/2023 at 9:00 a.m.; the parties shall submit any proposed voir dire and jury instructions no later than 8/14/2023, and their respective witness lists no later than 8/18/2023; FINDING that the time between 7/18/2023 and 8/22/2023, is excludable. Signed by Judge Thomas E. Johnston on 7/11/2023. (cc: Judge, Defendant and counsel, USA, USP, USM) (msa) |
| 08/10/2023 | 70 | MOTION to Temporarily Modify Bond Conditions as to James Gould. (Coleman, Lex) |
| 08/11/2023 | 71 | ORDER granting Defendant's 70 MOTION to Temporarily Modify Bond Conditions as to James Gould (1); Defendant's conditions of bond is modified as noted in the motion. Signed by Judge Thomas E. Johnston on 8/11/2023. (cc: Judge, USA, USP, USM, counsel, deft) (lca) |
| 08/11/2023 | 72 | MOTION to Continue trial & all pretrial deadlines as to James Gould (Coleman, Lex) |
| 08/14/2023 | 73 | ORDER granting 72 MOTION to Continue Trial & All Pretrial Deadlines by James Gould; Jury Trial reset for 10/17/2023 at 09:00 AM in Charleston before Judge Thomas E. Johnston; Proposed Voir Dire Questions due by 10/9/2023; Proposed Jury Instructions due by 10/9/2023; Proposed Witness List due by 10/12/2023; time is excludable from 8/22/2023 to 10/17/2023, pursuant to 18 U.S.C. § 3161(h)(7). Signed by Judge Thomas E. Johnston on 8/14/2023. (cc: Judge, USA, USP, USM, counsel, deft) (tmr) |
| 09/20/2023 | 75 | NONCOMPLIANCE SUMMARY as to James Gould. Signed by Judge Thomas E. Johnston on 9/20/2023. (cc: Judge, USP) (skm) |

**JA7**

| 09/25/2023 | 76 | MOTION by United States of America to Continue Trial and Pretrial Deadlines as to James Gould (Boggess, Timothy) |
|---|---|---|
| 10/02/2023 | 77 | ORDER as to James Gould denying the 76 MOTION by the United States to Continue. Signed by Judge Thomas E. Johnston on 10/2/2023. (cc: Judge, USA, USP, USM, counsel, deft) (arb) |
| 10/04/2023 | 78 | MOTION for Order Directing Preparation of a Presentence Report and to Schedule Joint Change of Plea and Sentencing Hearings as to James Gould. (Coleman, Lex). Modified on 10/4/2023 to add additional motion relief (mk). |
| 10/04/2023 | 79 | SUBPOENAS issued by the Clerk. Issued 8 subpoenas. (Attachments: # 1 Subpoena as to Detective Seth Fisher, # 2 Subpoena as to Deputy Lucas Casto, # 3 Subpoena as to Steven Peery, # 4 Subpoena as to Special Agent Jarrod Chittum, # 5 Subpoena as to Edwin Gould, # 6 Subpoena as to CO Benjamin Willis, # 7 Subpoena as to Corporal Jonathan Weaver) (skm) |
| 10/05/2023 | 80 | ORDER as to James Gould, granting in part and denying in part Defendant's 78 MOTION for Order Directing Preparation of a Presentence Report; directing that a Guilty Plea Hearing is set for 10/12/2023 at 10:00 AM in Charleston before Judge Thomas E. Johnston; the Trial date is vacated. Signed by Judge Thomas E. Johnston on 10/5/2023. (cc: Judge, USA, USP, USM, counsel, deft) (lca) |
| 10/12/2023 | 81 | PLEA HEARING as to James Gould held by Judge Thomas E. Johnston on 10/12/2023; Court Reporter: Ayme Cochran. (slw) |
| 10/12/2023 | 82 | ORDER as to James Gould; directing that defendants mental health/risk assessment be placed on the docket under seal. Signed by Judge Thomas E. Johnston on 10/12/2023. (cc: Judge, USA, USP, USM, counsel, deft) (tmr) |
| 10/12/2023 | 84 | ORDER as to James Gould. Upon hearing held 10/12/2023. Written plea of guilty executed. Defendant released on bond pending sentencing. Presentence Investigation Report Deadline 1/11/2024. Sentencing set for 1/25/2024 at 03:00 PM in Charleston before Judge Thomas E. Johnston. Sentencing Memorandum due by 1/18/2024. The trial of this criminal action is vacated. Signed by Judge Thomas E. Johnston on 10/12/2023. (cc: Judge, USA, USP, USM, counsel, deft) (tmr) |
| 10/12/2023 | 85 | WITNESS LIST by United States of America as to James Gould, re: Plea Hearing held 10/12/2023. (mfo) |
| 10/12/2023 | 86 | WRITTEN PLEA OF GUILTY by Defendant James Gould. (mfo) |
| 10/13/2023 | 87 | RETURN OF SERVICE ON SUBPOENA for Steven Peery. (kew) |
| 10/13/2023 | 88 | RETURN OF SERVICE ON SUBPOENA for Benjamin Willis. (kew) |
| 10/20/2023 | | PROBATION OFFICER ASSIGNMENT FOR PRESENTENCE REPORT as to James Gould: Heather Edwards (tmp) |
| 12/14/2023 | 89 | ORDER as to James Gould continuing the sentencing hearing to 2/29/2024 at 2:00 PM; draft presentence report due 1/18/2024; objections to the draft presentence report due 2/1/2024; final presentence report due 2/15/2024; the filing of the Sentencing Memorandum is MANDATORY and shall be filed with and received by the Clerk no later than 2/22/2024. Signed by Judge Thomas E. Johnston on 12/14/2023. (cc: Judge, Defendant and counsel, USA, USP, USM) (btm) |

| 01/23/2024 | 90 | MOTION by United States of America to Continue Sentencing Hearing as to James Gould (Boggess, Timothy) |
| 01/24/2024 | 91 | ORDER granting government's 90 MOTION to Continue Sentencing as to James Gould; Sentencing reset for 3/21/2024 at 02:00 PM in Charleston before Judge Thomas E. Johnston. Signed by Judge Thomas E. Johnston on 1/24/2024. (cc: Judge, USA, USP, USM, counsel, deft) (tmr) |
| 01/31/2024 | 92 | MOTION to Temporarily Modify Bond Conditions as to James Gould. (Coleman, Lex) |
| 02/01/2024 | 93 | ORDER granting 92 MOTION to Temporarily Modify Bond Conditions by James Gould; modifying defendant's bond as noted in the motion. Signed by Judge Thomas E. Johnston on 2/1/2024. (cc: Judge, USA, USP, USM, counsel, deft) (tmr) |
| 02/15/2024 | 94 | MOTION to Temporarily Modify Bond Conditions as to James Gould. (Coleman, Lex) |
| 02/16/2024 | 95 | ORDER granting 94 MOTION to Temporarily Modify Bond Conditions by James Gould; modifying conditions of bond as noted in the motion. Signed by Judge Thomas E. Johnston on 2/16/2024. (cc: Judge, USA, USP, USM, counsel, deft) (tmr) |
| 02/22/2024 | 96 | MOTION by United States of America to Exceed Page Limit for Sentencing Memorandum as to James Gould (Boggess, Timothy) |
| 02/22/2024 | 97 | SENTENCING MEMORANDUM by United States of America as to James Gould (Boggess, Timothy) |
| 02/23/2024 | 98 | MOTION to Accept Filing Out of Time as to James Gould. (Coleman, Lex) |
| 02/23/2024 | 99 | MOTION to Exceed Page Limit as to James Gould (Coleman, Lex) |
| 02/23/2024 | 100 | SENTENCING MEMORANDUM as to James Gould (Attachments: # 1 Exhibit A Gould hunting license) (Coleman, Lex) |
| 03/19/2024 | 101 | ORDER as to James Gould granting the 96 MOTION by the United States to Exceed Page Limit for Sentencing Memorandum and the 99 MOTION by James Gould to Exceed Page Limit for Sentencing Memorandum; further, granting the 98 MOTION by James Gould to Accept Filing Out of Time. Signed by Judge Thomas E. Johnston on 3/19/2024. (cc: Judge, USA, USP, USM, counsel, deft) (arb) |
| 03/21/2024 | 102 | SENTENCING as to James Gould held by Judge Thomas E. Johnston on 3/21/2024; Court Reporter: Ayme Cochran. (slw) (Entered: 03/26/2024) |
| 03/22/2024 |  | PROBATION OFFICER ASSIGNMENT FOR SUPERVISION as to James Gould: Codie Blankenship (cay) |
| 04/01/2024 | 103 | JUDGMENT as to James Gould (1), Count 1, time served, 3 years supervised release, no fine, $100 assessment. Signed by Judge Thomas E. Johnston on 4/1/2024. (cc: Judge, USA, USP, USM, counsel, deft) (lca) |
| 04/01/2024 | 104 | TRANSMITTED CERTIFIED COPY of 103 Judgment to USA, USP, USM, counsel, deft as to James Gould. (lca) |
| 04/01/2024 | 105 | SEALED/SOR as to James Gould signed by Judge Thomas E. Johnston. (lca) |
| 04/01/2024 | 106 | NOTICE OF APPEAL by James Gould re: 103 Judgment (Coleman, Lex) |

WVSD NextGen CM/ECF Release L7.1    https://ecf.wvsd.uscourts.gov/cgi-bin/DktRpt.pl?794902191983707-L_1_0-1

| 04/01/2024 | 107 | TRANSMITTAL OF NOTICE OF APPEAL TO 4CCA via APPEAL TRANSMITTAL SHEET as to James Gould re: 106 Notice of Appeal. (tmr) |
|---|---|---|
| 04/02/2024 | 108 | TRANSCRIPT REQUEST by James Gould for proceedings held on 3/30/2023 before Judge Thomas E. Johnston. (Coleman, Lex) |
| 04/02/2024 | 109 | TRANSCRIPT REQUEST by James Gould for proceedings held on 3/21/2024 before Judge Thomas E. Johnston. (Coleman, Lex) |
| 04/02/2024 | 110 | LETTER to Clerk of Court, from Nicholas Werling (pro se) 239308 dated 3/22/2024, re: Request for docket sheet in this case. (tmr) |
| 04/02/2024 | 111 | LETTER to Nicholas Werling, from Rory L. Perry II dated 4/2/2024, re: 110 letter requesting copy of docket sheet. (klc) |
| 04/02/2024 | 112 | PRESENTENCE REPORT (SEALED DOCUMENT) as to James Gould. (tmp) |
| 04/02/2024 | 113 | PS 40 - NOTICE REGARDING UNITED STATES PASSPORT FOR CRIMINAL DEFENDANT - NOTICE OF DISPOSITION to U. S. Department of State as to James Gould, on 4/2/2024, by Probation Office. Bond conditions no longer in effect. (tmp) |
| 04/03/2024 | 114 | NOTICE OF APPELLATE CASE OPENING BY 4CCA as to James Gould re: 106 Notice of Appeal in 4CCA Case No. 24-4192. Case Manager: Cyndi Halupa. (mfo) |
| 04/03/2024 | 115 | ORDER OF 4CCA as to James Gould re: 106 Notice of Appeal to represent Appellant in 4CCA Case No. 24-4192. The court appoints the Federal Defender for the Southern District of West Virginia to represent James Gould. (tmr) |
| 04/10/2024 | 116 | CRIMINAL DEBT PAYMENT as to James Gould. Receipt No: 2002393; Amount: $100.00. (cc: USA, Administrative Services, WVSP) (mfo) |
| 04/30/2024 | 117 | TRANSCRIPT ORDER ACKNOWLEDGMENT with Forms Attached as to James Gould. 4CCA Case Number: 24-4192. Court Reporter: Ayme Cochran. Transcript due on 6/6/2024. Dates of Proceedings: 3/21/2024 and 3/30/2024. (lca) |
| 05/01/2024 | 118 | APPEAL TRANSCRIPT FILED as to James Gould for dates of 03/30/2023 before Judge Thomas E. Johnston, re 106 Notice of Appeal - Final Judgment Court Reporter Ayme Cochran, Telephone number 304-347-3128. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Does this satisfy all appellate orders for this reporter? - No. Notice of Intent to Redact due 5/13/2024. Redaction Request due 5/22/2024. Redacted Transcript Deadline set for 6/3/2024. Release of Transcript Restriction set for 7/30/2024. (aac) |
| 05/01/2024 | 119 | APPEAL TRANSCRIPT FILED as to James Gould for dates of 03/21/2024 before Judge Thomas E. Johnston, re 106 Notice of Appeal - Final Judgment Court Reporter Ayme Cochran, Telephone number 304-347-3128. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Does this satisfy all appellate orders for this reporter? - Yes. Notice of Intent to Redact due 5/13/2024. Redaction Request due |

**JA10**

| | | 5/22/2024. Redacted Transcript Deadline set for 6/3/2024. Release of Transcript Restriction set for 7/30/2024. (aac) |

| **PACER Service Center** | | |
|---|---|---|
| **Transaction Receipt** | | |
| 06/26/2024 09:38:44 | | |
| **PACER Login:** | fpdwvs3400 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 2:22-cr-00095 |
| **Billable Pages:** | 8 | **Cost:** | 0.80 |
| **Exempt flag:** | Exempt | **Exempt reason:** | Always |

**JA11**

**SEALED**

UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON GRAND JURY 2022
MAY 3, 2022 SESSION

**FILED**

MAY - 3 2022

CLERK
U.S. District Court
Southern District of West Virginia

UNITED STATES OF AMERICA

v.                                CRIMINAL NO. 2:22-cr-00095
                                  18 U.S.C. § 922(g)(4)
                                  18 U.S.C. § 924(a)(2)
JAMES GOULD

# I N D I C T M E N T

The Grand Jury Charges:

1.    On or about February 18, 2022, at or near Ravenswood, Jackson County, West Virginia, and within the Southern District of West Virginia, defendant JAMES GOULD did knowingly possess a firearm, that is, a Remington, 11-87, 12 gage shotgun, in and affecting interstate commerce.

2.    At the time defendant JAMES GOULD possessed the aforesaid firearm, he had been adjudicated mentally defective and had been involuntarily committed in Jackson County, West Virginia, on or about July 30, 2019.

In violation of Title 18, United States Code, Sections 922(g)(4) and 924(a)(2).

                              WILLIAM S. THOMPSON
                              United States Attorney

                    By:      _____
                              NEGAR M. KORDESTANI
                              Assistant United States Attorney

Pg: 15 of 180    Filed: 07/08/2024    Doc: 16    USCA4 Appeal: 24-4192

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION

UNITED STATES OF AMERICA

v.                                                    Case No. 2:22-cr-00095

JAMES GOULD

**DEFENDANT'S *BRUEN*-BASED MOTION TO DISMISS**

On May 3, 2022, a federal grand jury sitting in Charleston, West Virginia,
returned a single count indictment charging James Gould with unlawfully possessing a
Remington, 11-87, 12-gauge shotgun (a hunting long gun), on February 18, 2022 - after
having been previously involuntarily committed on July 30, 2019, in violation of 18
U.S.C. §§ 922(g)(4) & 924(a)(2). *See* Dkt. No. 1. Defendant was arrested August 23,
2022 on his federal indictment. *See* Dkt. No. 19.  On August 30, 2022, the United States'
motion to detain Mr. Gould was granted over defendant's objections. *See* Dkt. No. 23.

After his indictment was returned, but prior to Mr. Gould's federal arrest -
on June 23, 2022, the Supreme Court of the United States rendered its decision in
*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022). *Bruen* marked
a dramatic shift in post-*Heller* Second Amendment jurisprudence. Before *Bruen*,
courts decided Second Amendment challenges by balancing the strength of the
government's interest in firearm regulation against the degree of infringement on

Page **1** of **40**

the challenger's right to keep and bear arms. *Bruen* rejected that approach, instructing courts, instead, to consider only "constitutional text and history." 142 S. Ct. at 2128-29. If "the Second Amendment's plain text covers an individual's conduct," then under *Bruen* "the Constitution presumptively protects that conduct." *Id.* at 2129-30 (emphasis added). To rebut the presumption, the government must affirmatively show that a challenged law "is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2129-30. The test for historical consistency is demanding: a firearm regulation is consistent with American tradition only if similar regulations were widespread and commonly accepted during and around the founding era, when the Second Amendment was adopted.

Under the new framework mandated by *Bruen*, this Court should dismiss the indictment against James Gould, which charges him with being a previously involuntarily committed citizen subsequently in possession of a firearm under 18 U.S.C. § 922(g)(4). At all times relevant the firearm possessed by Gould was not a dangerous or unusual weapon, and was in common use at the time for lawful purposes. Because possession of a long-barreled shotgun in the home comes within the Second Amendment's "plain text," and Section 922(g)(4) infringes upon Gould's keeping and bearing any firearm - Gould's conduct was and is presumptively protected. Gould's having been previously involuntarily committed

does not remove him from the Second Amendment's protections, or *Bruen*'s presumption of unconstitutionality. Defendant contends that the government will be unable to rebut that presumption under *Bruen*'s step two - by pointing to a distinctly similar, well-established and representative, historical tradition of firearm regulation. Permanent involuntary commitment disarmament laws, which did not appear in the United States until the Twentieth century, were unknown to the generation that ratified the Second Amendment. As a consequence, defendant's indictment must be dismissed.

### I. Factual background.

Defendant does not expect the United States to dispute or otherwise contest the following facts. On July 30, 2019, on an application filed by his brother Bryan Gould and Jackson County Sheriff's Deputy Herbert Faber, and after a finding of probable cause for involuntary hospitalization, defendant was involuntarily committed by the Jackson County Circuit Court for a mental health examination as provided under W.Va. Code § 27-5-2. Defendant's commitment order expressly provided, pursuant to W.Va. Code § 61-7-7(a)(4), that he was required to immediately surrender any firearms "in their ownership or possession" to the Jackson County Sheriff. Subsequently, over two and half years later on February 18, 2022, defendant was found to be in possession of the 12 gauge shotgun and a box of turkey shells in his Ravenswood, West Virginia home.

## II. Legal background.

### A. 18 U.S.C. § 922(g)(4).

18 U.S.C. § 922(g)(4) provides that it shall be unlawful for any person "who has been adjudicated as a mental defective or who has been committed to a mental institution" to possess in or affecting commerce, any firearm or ammunition. The United States' indictment sounds in the second clause or disability under Section 922(g)(4), which is that Mr. Gould is a citizen who has previously "been committed to a mental institution." *See* Dkt. No. 1. If convicted, Mr. Gould is in jeopardy of being imprisoned for up to ten years. *See* 18 U.S.C. § 924(a)(2).

In order for Mr. Gould to be convicted under Section 922(g)(4), the United States would have to prove beyond a reasonable doubt (1) a status element, i.e. that Mr. Gould was someone previously involuntarily committed; (2) a possession element, i.e. that Mr. Gould possessed the firearm identified in the indictment; (3) a jurisdictional element, i.e. that the particular firearm traveled in or affecting interstate commerce; and (4) a firearm element, i.e. a device meeting the statutory definition of a firearm. The scienter requirement of "knowing" for a Section 922(g)(4) offense applies to elements (1), (2) and (4). *See Rehaif v. United* States, 139 S. Ct. 2191, 2195-96 (2019).

Whether a defendant has previously been "committed" to a mental institution is a question of federal law, but in making that determination the Court

must consider state law. *See e.g. United States v. Waters*, 786 F.Supp. 1111, 1114 (N.D.NY 1992). For purposes of defendant's motion, and without conceding the issue otherwise, let's assume that involuntary commitment for a mental health evaluation under West Virginia law fits the definition of "committed to a mental institution" under Section 922(g)(4). *See United States v. Collins*, 982 F.3d 236 (4th Cir. 2020).[1]

Section 922(g)(4) was enacted as part of the Gun Control Act of 1968. *See* Pub. Law 90-618, 82 Stat. 1213, 1220 (Oct. 22, 1968) & Conf. Rep. 90-1956, 1968 U.S.C.C.A.N. 4426 (1968). The Fourth Circuit, post-*Heller* but pre-*Bruen*, rejected an as applied challenge to Section 922(g)(4) in part because *Heller* found (in *dicta*) that regulations prohibiting the mentally ill from possessing firearms are "presumptively lawful". *See Collins*, *supra*, 982 F.3d at 243. This district has previously held that Section 922(g)(4) is narrowly tailored "in that it grants states the opportunity to provide a process by which those Second Amendment rights can be regained and the disability removed after competency is restored." *See United States v. Collins*, No. 5:18-cr-00068, 2018 WL 3084708, at *5 (S.D.W.V. June 22, 2018)(ICB).

---

[1]  Under West Virginia law, if Mr. Gould's involuntary commitment actually resulted from a physiological, as opposed to a true mental health condition, then he would not have been prohibited from possessing a firearm under Section 922(g)(4).

Under 18 U.S.C. § 925(c), a person previously committed to a mental institution supposedly can petition the Attorney General for relief from the firearm ban in Section 922(g)(4). Since 1992, however, Congress has prohibited use of appropriated funds for investigating or acting on such petitions. *See United States v. Booker*, 570 F.Supp.2d 161, 164 n. 2 (D. Me. 2008). As a consequence, what may have initially been intended as a form of temporary conditional disarmament in 1968, has operated as a form of permanent disarmament since at least 1992. This means that someone like Mr. Gould is not just disarmed temporarily during any period in which he may have been involuntarily committed, but in perpetuity for the rest of their life. And to the extent he possesses a firearm during that time, he is subject to further felony prosecution under Section 922(g)(4).

In the wake of the 2007 Virginia Tech massacre, Congress did enact the NICS Improvement Amendments Act of 2007, authorizing federal grants to help states improve the quality of the mental health information they make available to the databases searched by the national instant criminal background check system ("NICS") when an individual tries to purchase a firearm. Pub. L. No. 110–180, § 103(a)(1), 121 Stat. 2567 (2008). To be eligible for a grant, a state must certify that it has implemented a program allowing those disqualified from possessing a firearm under § 922(g)(4) to apply to the state for relief from that firearm disability. *Id.* § 103(c), 121 Stat. 2568; *id.* §

105(a), 121 Stat. 2569. As a practical matter, however, the 2007 legislation does nothing to address the continuing Congressional prohibition regarding Section 925(c). To date, only thirty-two states have created programs for obtaining relief from a prior mental health disability – with varying standards and results. *See* Laura E. Johnson, *Mental Health History is History: A Lifetime Ban on Gun Possession Due to History of Involuntary Commitment Violates the Second Amendment*, 100 N.C.L. Rev. 919, 923 (2022).

### B. Before <u>Bruen</u>, lower courts assessed Second Amendment challenges by applying means-ends scrutiny.

The Second Amendment provides, "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. In *District of Columbia v. Heller*, the Supreme Court held the Second Amendment codified a pre-existing individual right to possess and use firearms for lawful purposes like self-defense. 554 U.S. 570, 592, 624 (2008). The Court canvassed "the historical background of the Second Amendment," including English history from the 1600s through American independence, colonial law and practice leading up to and immediately following 1791, and evidence of how the Second Amendment was interpreted in the century after its enactment (e.g., legal treatises, pre-Civil War case law, post-Civil War legislation, and late-19th-century commentary). *Id.* at 592-619. Based on this survey, the Court concluded the right protected by the Second Amendment is "not limited to the carrying of arms in a militia." *Id.* at 586. Rather, "the Second

Amendment confers an individual right to keep and bear arms" that "belongs to all Americans." *Id.* at 581, 622. The Court therefore struck down District of Columbia statutes that prohibited the possession of handguns in the home and required that any other guns in the home be kept inoperable. *Id.* at 628-34.

Two years after *Heller*, in *McDonald v. City of Chicago*, the Court reaffirmed *Heller*'s "central holding": that "the Second Amendment protects a personal right to keep and bear arms for lawful purposes, most notably for self-defense within the home." 561 U.S. 742, 780 (2010). In holding that the Second Amendment applies against the states as well as the federal government, the Court described the right to keep and bear arms as "fundamental to our scheme of ordered liberty" and "deeply rooted in this Nation's history and tradition." *Id.* at 767. And that right, the Court warned, should not be treated "as a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees." *Id.* at 780.

Following *Heller* and *McDonald*, the federal courts of appeals developed a two-step inquiry for deciding Second Amendment challenges. *See Bruen*, 142 S. Ct. at 2126-27 & n.4. The first step "ask[ed] whether the challenged law impose[d] a burden on conduct falling within the scope of the Second Amendment's guarantee as historically understood." *United States v. Chapman*, 666 F.3d 220, 225 (4th Cir. 2012). If not, the challenge failed. *Id.* But if the statute did burden Second Amendment conduct, courts then "appli[ed] the appropriate form of means-end

scrutiny." *Id.* Courts employed strict scrutiny if a challenger's claim implicated "the core right identified in *Heller*—the right of a law-abiding, responsible citizen to possess and carry a weapon for self-defense." *Id.* at 225-26 (emphasis omitted). Otherwise, intermediate scrutiny applied. *Id.* Both forms of scrutiny involved weighing the governmental interest in firearm restrictions against the challenger's interest in exercising his right to keep and bear arms. *See United States v. Hosford*, 843 F.3d 161, 168 (4th Cir. 2016).

### C. *Bruen* replaced means-ends interest balancing with a test rooted solely in the Second Amendment's "text and history."

*Bruen* expressly disavowed the lower courts' post-*Heller* framework, holding "*Heller* and *McDonald* do not support applying means-end scrutiny in the Second Amendment context." 142 S. Ct. at 2127. In its place, the Court adopted a "text-and-history standard" more consistent with *Heller*'s methodology. *Id.* at 2138.

That standard directs courts to begin by asking whether "the Second Amendment's plain text covers an individual's <u>conduct</u>." *Id.* at 2126. If it does, then "the Constitution presumptively protects that <u>conduct</u>." *Id.* Answering this threshold question in *Bruen* was straightforward. At issue there was a New York law providing that, to obtain a permit to carry a handgun in public, an applicant had to demonstrate "proper cause," i.e., "a special need for self-protection distinguishable from that of the general community." *Id.* at 2122-23. The Court "ha[d] little difficulty concluding" that "the Second Amendment protects [the

petitioners'] proposed course of conduct—carrying handguns publicly for self-defense." *Id.* at 2134. As the Court explained, "[n]othing in the Second Amendment's text draws a home/public distinction with respect to the right to keep and bear arms." *Id.* The Second Amendment therefore "presumptively guarantees" a right to carry firearms in public, and New York's "proper cause" requirement, which burdened that right, could pass constitutional muster only if the state overcame the presumption. *Id.* at 2129-30, 2135.

To rebut the presumption of unconstitutionality, *Bruen* held, "the government may not simply posit that [a] regulation promotes an important interest." *Id.* at 2126. "Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command." *Id.* This test requires courts to "consider whether historical precedent . . . evinces a comparable tradition of regulation." *Id.* at 2131-32. If "no such tradition" exists, then the statute being challenged is unconstitutional. *Id.* at 2132. And insofar as there are "multiple plausible interpretations" of an ambiguous historical record, courts must "favor the one that is more consistent with the Second Amendment's command." *Id.* at 2141 n.11. Put differently, the tie goes to the Second Amendment claimant. *See also id.* at 2139

(concluding that where "history [is] ambiguous at best," it "is not sufficiently probative to defend [a statute]").

## III. ARGUMENT

The Second Amendment was ratified December 15, 1791.[2] Every existing federal firearm regulation was subsequently enacted during the Twentieth Century or later. Generally, those surviving constitutional challenges, at least before *New York State Rifle & Pistol Ass'n Inc. v. Bruen*, 142 S. Ct. 2111 (2022), have been sustained through rational basis review subject to the unconstitutional collectivist interpretation of the Second Amendment,[3] _or_ post *District of Columbia v. Heller*, 554 U.S. 570, 128 S. Ct. 2783 (2008), through intermediate scrutiny review subject to the individual rights interpretation of the Second Amendment.[4] By dispensing with means-ends scrutiny, *Bruen* refined *Heller* to the point all modern federal firearm regulations are now subject to reexamination under the Second Amendment, using *Bruen*'s plain text and history standard.

*Bruen* says when the Second Amendment's plain text covers an individual's conduct – the Constitution presumptively protects that conduct. To justify any

---

[2]   *See e.g.* U.S. Const., amend. II, historical note; *Raffone v. Adams*, 468 F.2d 860, n.4 (2nd Cir. 1972); National Archives, Milestone Documents, Bill of Rights, https://www.archives.gov/milestone-documents/bill-of-rights.

[3]   *See e.g. United States v. Johnson*, 497 F.3d 548, 550 (4th Cir. 1974).

[4]   *See e.g. United States v. Hosford*, 843 F.3d 161 (4th Cir. 2016); *United States v. Carter*, 750 F.3d 462 (4th Cir. 2014); *United States v. Pruess*, 703 F.3d 242 (4th Cir. 2012); *United States v. Mahin*, 668 F.3d 119 (4th Cir. 2012); *United States v. Chester*, 628 F.3d 673 (4th Cir. 2010).

regulation, the Government must demonstrate that it is consistent with this Nation's well-established and representative historical tradition of firearm regulation. Only if this showing is made, may a court conclude that an individual's conduct falls outside the Second Amendment's "unqualified command". *Bruen*, 142 S. Ct. at 2126.

This case is *not* about whether the Second Amendment, post-*Bruen,* still "allows a 'variety' of gun regulations." *See Bruen*, 142 S. Ct. at 2162 (Kavanaugh, J., concurring). It does. This case is *not* about whether disarming previously involuntarily committed citizens, either temporarily or permanently, is good policy. Rather, this case is about whether Section 922(g)(4), post-*Bruen,* violates the Second Amendment. Finding Section 922(g)(4) facially unconstitutional and dismissing Gould's indictment will not mean the Second Amendment is "unlimited," any more than *Heller*, or *Bruen* have made it unlimited.

### A. Standard of Review.

Under Fed. R. Crim. P. 12, district courts should dismiss criminal charges where there is an infirmity of law in the prosecution – such as an unconstitutional statute. *United States v. Engle*, 676 F.3d 405, 415 (4th Cir. 2012).

### B. Gould, and his conduct, are protected by the Second Amendment, such that Section 922(g)(4) is presumptively unconstitutional.

Through the operative clause, the textual substance of the individual right protected by the Second Amendment is "to keep and bear arms in case of confrontation." *See Heller*, 554 U.S. at 581, 591;  *Bruen*, 142 S. Ct. at 2127. *Heller*

acknowledged Second Amendment protection of this *conduct* inside the home, *Heller*, 554 U.S. at 635; *Bruen* acknowledged Second Amendment protection of this *conduct* outside the home. *Bruen*,142 S. Ct. at 2122. Under the standard announced in *Bruen*, Section 922(g)(4) directly burdens Mr. Gould's Second Amendment right to keep and bear arms.

Note, the amendment's "plain text" does not differentiate between persons previously involuntarily committed and other members of "the people," and a total permanent prohibition on firearm possession by citizens who have previously been involuntarily committed presumptively violates the Second Amendment. *See United States v. Rahimi*, ___ F.4th ___, 2023 WL 1459240 (5th Cir. 2023) (finding that Second Amendment protections are not limited just to "law abiding citizens," and that18 U.S.C. § 922(g)(8) is unconstitutional).

*Heller* supports this understanding. Construing the words "the people" in that case, the Court said "the term unambiguously refers to *all* members of the political community, *not an unspecified subset*." *Heller*, 554 U.S. at 580 (emphasis added). The Court determined that the Second Amendment right—like the rights of "the people" in the First, Fourth, Ninth, and Tenth Amendments—"is exercised individually and belongs to *all* Americans." *Id.* (emphasis added); *see also Bruen*, 142 S. Ct. at 2156 ("The Second Amendment guaranteed to *all Americans* the right to bear commonly used arms in public subject to certain reasonable, well-defined

restrictions." (emphasis added)). Interpreting "the people" to exclude previously involuntarily committed citzens would conflict with that principle. Section 922(g)(4), therefore, is presumptively unconstitutional.

As will be demonstrated below, the government will be unable to rebut this presumption. Permanent involuntary commitment disarmament laws, which did not appear in this country until the 20th century, were unknown to the founding generation. There was no "historical tradition," as of 1791, of permanently barring previously involuntarily committed citizens from possessing firearms, much less imprisoning them for determinant periods as felons. More recent legislative enactments cannot supplant the understanding of the right to keep and bear arms that prevailed when the Second Amendment was enacted. Which is why, post-*Bruen*, this Court should dismiss Mr. Gould's indictment.

### C. "At the time of the Founding" directs *Bruen*'s historical inquiry.

In the context of historical federal firearm regulations, *Bruen*'s second prong focuses on how Second Amendment protections were burdened or otherwise limited "at the time of the Founding." This is because "constitutional rights are enshrined with the scope they were understood to have *when the people adopted them*." *Bruen*, 142 S. Ct. at 2136.

In *United States v. Cruikshank*, 92 U.S. 542 (1875), the Supreme Court acknowledged that the rights protected by the Second Amendment were "not granted

by the Constitution [or] in any manner dependent upon that instrument for its existence. The second amendment … means no more than that it shall not be infringed by Congress." *Heller* repeatedly reaffirmed this position, and – in assessing the constitutionality of a federal firearm regulation – looked to 1791, not 1868. *See Heller,* 554 U.S. at 592, 619-20. *Bruen* similarly says the Court has "generally assumed that the scope of the protection applicable to the Federal Government and the States is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791." *Bruen,* 142 S.Ct. at 2137. Because *Bruen* expressly said it "need not address" whether 1791 or 1868 provides the proper historical baseline, that opinion provides no basis for deviating from the Supreme Court's normal "assum[ption]." *Bruen,* 142 S. Ct. at 2138. Consistent with *Heller*, "*Bruen* is clear that the Second Amendment 'codified a right inherited from our English ancestors," a right that '*pre-existed*' the Constitution. *Bruen,* 142 S. Ct., 2130, 2139. The entire universe of permissible firearm regulations, then, was set at the adoption of the Bill of Rights, if not earlier." *United States v. Love*, 2022 WL 17829438, at *4 (N.D. Ind. 2022).

The emphasis on the time the Constitution and Second Amendment were ratified is the foundation of *Bruen*'s "text and history" standard. What made up the United States – i.e. what sovereign states geographically made up our country; and therefore what jurisdictions' laws should be consulted for historical restrictions on Second Amendment protections, is defined by "at the time of the Founding." The

United States' Constitution was signed on September 17, 1787, then ratified by nine of the thirteen state legislatures between December 7, 1787, and June 22, 1788. The Confederation Congress began operating under the new Constitution on March 9, 1789. The Bill of Rights were later ratified on December 15, 1791. So the "time of the Founding" essentially consists of mid-1787 to the end of 1791. Geographically, by the end of 1791, our physical country consisted of thirteen sovereign states, and two territories on the north and south sides of Virginia:[5]



States and Territories of the United States of America
September 9 1791 to March 3 1792

---

[5]     Wikipedia Commons, United States 1791-09-1792-03.png map, https://upload.wikimedia.org/wikipedia/commons/4/43/United_States_1791-09-1792-03.png.

Page **16** of 40

JA28

*Bruen* does say that courts *may* still look to the tradition of firearms regulation "before . . . and even after the founding" period, but they should do so with care. *Id.* at 2131-32. The Court cautioned, for example, that "[h]istorical evidence that long predates [1791] may not illuminate the scope of the [Second Amendment] right if linguistic or legal conventions changed in the intervening years." *Id.* at 2136. Courts should not "rely on an ancient practice that had become obsolete in England at the time of the adoption of the Constitution and never was acted upon or accepted in the colonies." *Id.*

Conversely, courts must "guard against giving post-enactment history more weight than it can rightly bear." *Id.* Evidence "of how the Second Amendment was interpreted from immediately after its ratification through the end of the 19th century represent[s] a critical tool of constitutional interpretation." *Id.* But **the farther forward in time one goes from 1791, the less probative historical evidence becomes**. *See id.* at 2137 (emphasis added)("As we recognized in *Heller* itself, because post-Civil War discussions of the right to keep and bear arms took place 75 years after the ratification of the Second Amendment, they do not provide as much insight into its original meaning as earlier sources."). Evidence from "the mid- to late-19th-century" provides little "insight into the meaning of the Constitution in [1791]." *Id.* Courts should therefore credit such history to the extent it provides "confirmation" of prior practice with which it is consistent, but

should otherwise afford it little weight. *Id.* After all, "post-ratification adoption or acceptance of laws that are *inconsistent* with the original meaning of the constitutional text obviously cannot overcome or alter that text." *Id.* (emphasis in original)("[T]o the extent later history contradicts what the text says, the text controls."). Looking to 1791, the Court in *Bruen* ultimately held that because New York could not point to a robust tradition of regulations similar to the "proper cause" requirement, the state's statute violated the Second Amendment. *Id.* at 2138-56.

Given the composition of our country "at the time of the Founding," post-*Bruen* courts should look to the particular history of laws and traditions followed by the first thirteen states between mid-1787 and the end of 1791. This would be the strongest evidence of any distinctly similar historical tradition of firearms regulation consistent with the Second Amendment, particularly with respect to societal problems which existed in 1791.

   **D.** ***Bruen*'s "distinctly similar" and "relevantly similar" anological inquiries work as alternatives. *Bruen*'s "relevantly similar" inquiry is limited to particular circumstances and not a supplemental "do over" for regulations failing *Bruen*'s "distinctly similar standard".**

*Bruen* sets out two different analogical inquiries for determining whether a challenged regulation is consistent with our Nation's historical tradition of firearm regulation. Which inquiry applies depends on what kind of problem a statute targets and whether it is old or new.

In "some cases," where "a challenged regulation addresses a general societal problem that has persisted since the 18th century," the historical inquiry "will be fairly straightforward." *Bruen,* 142 S. Ct. at 2131. For such statutes, "the lack of a *distinctly similar* historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Ibid.* (emphasis added). If "the Founders themselves could have adopted" a particular regulation "to confront [a longstanding] problem," but did not do so, then the law "[i]s unconstitutional" today. *Ibid.* Similarly, "if earlier generations addressed the societal problem, but did so through materially different means, that also could be evidence that a modern regulation is unconstitutional." *Ibid.* Both *Heller* and *Bruen* fell in this first category: the laws challenged in those cases were aimed at a problem – "handgun violence, primarily in urban areas" – that existed at the founding, and the Court therefore required a tight fit between those laws and historical precursors. *Ibid.*

Conversely, in "other cases," a challenged law will "implicat[e] unprecedented societal concerns or dramatic technological changes," or will be addressed to "challenges" that are "not . . . the same as those that preoccupied the Founders in 1791." *Bruen*, 142 S.Ct. at 2132. Historical inquiry into these statutes "may require a more nuanced approach," which "will often involve reasoning by analogy." *Ibid.* Deciding "whether a historical regulation is a proper analogue for a distinctly modern firearm regulation requires a determination of whether the two regulations are *relevantly similar*."

*Ibid.* (emphasis added). The "central considerations" in the "relevantly similar" analysis are "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified"—what the Court called the "how" and the "why." *Id.* at 2133 (emphasis omitted).

This "relevantly similar" inquiry – which the Court did not undertake in *Bruen* – is less onerous. Unlike the "distinctly similar" standard, it may be satisfied even if the Government does not identify "a historical *twin*" or "a dead ringer" for a modern firearm regulation. *Bruen,* 142 S.Ct. at 2133.[6]  But courts may employ the "relevantly similar" approach only when the challenged statute is geared toward a societal problem that would have been "unimaginable at the founding." *Id.* at 2132. It is not available when the challenged statute "addresses a general societal problem that has persisted since the 18th century." *Id.* at 2131.

At the threshold, therefore, courts faced with a *Bruen* challenge must identify the problem at which a statute is aimed, and then determine whether that problem existed in 1791 or instead grows out of "unprecedented," "unimaginable" societal changes. *Id.* at 2132; *see United States v. Lewis*, 2023 WL 187582, at *3 (W.D. Okla. 2023)("[T]he court concludes, upon careful reading of [*Bruen*], that it does articulate two standards for

---

[6]  Even when on the "relevantly similar" track, "courts should not uphold every modern law that remotely resembles a historical analogue, because doing so risks endorsing outliers that our ancestors would never have accepted." *Ibid.*

assessment of the Government's proffered historical analogues, depending on whether the 'challenged regulation addresses a general societal problem that has persisted since the 18th century,' or whether the statute addresses 'unprecedented societal concerns or dramatic technological changes'," *quoting Bruen*, 142  142 S. Ct. at 2131-32.

*Bruen's* historical second prong is not linear, or multi-tiered. If a distinctly similar historical analogue does not exist regarding a societal problem which existed at the Founding, the challenged regulation is unconstitutional. That is the end of the inquiry. The Government is not permitted a less demanding "do-over" to explore whether there might be an alternately "relevantly similar" historical analogue. The distinctly similar and relevantly similar inquiries operate as alternatives: one applies to statutes aimed at *old* problems, the other applies to statutes aimed at *new* problems. The relevantly similar inquiry is not a supplemental approach the Court may turn to if the distinctly similar analysis does not work out.  *See Bruen,* 142 S. Ct., at 2131-2134.  Were Courts or the government allowed to go straight to the much more deferential "relevantly similar" inquiry, there would have been no reason for *Bruen* to have even recognized or discussed the "distinctly similar" anological inquiry requiring a tighter fit – which is what was actually applied in that case.

**E. The societal problem addressed by Section 922(g)(4) existed at the time of the Founding, and is neither "unprecedented," "unimaginable at the founding," or based on any "dramatic technological changes."**

The societal problem Congress sought to address through Section 922(g)(4) was firearm violence by the mentally ill.  Irrespective of that being or not being a laudable policy objective (which permanent disarmament has not really effectively advanced[7]), this was not a problem that came about during the Twentieth century, that was unimaginable at the founding, or which arose from dramatic technological changes. Firearm violence by the mentally afflicted existed in 1791 when the Second Amendment was ratified. Given the nature of the problem targeted by Section 922(g)(4), the appropriate analogical inquiry under *Bruen*'s second prong should be the "distinctly similar standard, not the "relevantly similar" standard.

### F. The government will be unable to carry its burden of establishing a historical tradition of involuntary commitment disarmament laws.

In 2007, Robert H. Churchill, a history professor at the University of Hartford, undertook "a full survey of printed session laws pertaining to gun regulation in the thirteen colonies and Vermont between 1607 and 1815." Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 Law & Hist. Rev. 139, 143 &

---

[7] *See e.g. The Effects of Prohibitions Associated with Mental Illness*, Rand, Gun Policy in America (Jan. 10, 2023), https://www.rand.org/research/gun-policy/analysis/mental-illness-prohibitions.html ; *Mental Illness and Gun Violence*, The Educational Fund to Stop Gun Violence, https://efsgv.org/learn/learn-more-about-gun-violence/mental-illness-and-gun-violence/;
Jacob Sullum, Disarming 'Individuals With Mental Illness' Would Affect a Quarter of the Population, Reason (Feb. 16, 2018), https://reason.com/2018/02/16/disarming-individuals-with-mental-illnes/ ; Jacob Sullum, Psychiatrists Explain Why Disarming the 'Mentally Ill' Won't Prevent Mass Murders, Reason (Oct. 16, 2013),  https://reason.com/2013/10/16/psychiatrists-explain-why-keeping-guns-f/ (all last viewed Feb. 17, 2023).

n.11 (2007). Based on that survey, Churchill concluded that "at no time between 1607 and 1815 did the colonial or state governments of what would become the first fourteen states exercise a police power to restrict the ownership of guns by members of the body politic." *Id.* at 142.

That the Founding generation would have been reluctant, if not unwilling, to embrace permanent citizen disarmament as a mechanism of societal problem solving - in any context - is not surprising, particularly when you keep in mind the historical circumstances in which the Constitution and the Second Amendment were ratified. British General Thomas Gage's sinister deception during the siege of Boston between April 19, 1775 and March 17, 1776, was still very much "top of mind" with the founding generation when our Constitution was ratified in 1791. Recall that shortly after the Battle of Lexington and Concord, Gage extended the offer to Boston colonists to disarm themselves under the promise of being allowed to leave the city. In response, Boston residents surrendered 2,674 firearms: 1778 muskets, 634 pistols, 973 bayonets, and 38 blunderbusses. The number of firearms seized by one account was one for every 5.6 inhabitants of a town with a population of 15,000. Having disarmed the local populace, within five days Gage reneged on his promise to allow any exit from Boston, and kept the entire city captive for eleven months. Nothing like that had ever happened in the American Colonies before, nor has it happened since. *See* Stephen P.

Halbrook, *When the Redcoats Confiscated Guns*, Washington Post, May 31, 1995[8];  Stephen

P. Halbrook, *That Every Man Be Armed*, at 59 (Albuquerque, N.M. – University of New

Mexico Press, 1984);  Stephen A. Halbrook, The Founders' Second Amendment, at 2-

3 & 75-108 (Ivan R. Dee Publishers 2008).  As noted by Mr. Halbrook's well-researched

treatise –

> Americans were reminded of Gage's confiscation of arms some fourteen years
> later, when adoption of the Bill of Rights was pending.  In 1789, Dr. David
> Ramsay published his <u>History of the American Revolution</u>.  A prominent
> federalist, Ramsay wrote this work while he was a member of the Continental
> Congress in the 1780s.  He also served as a delegate to the South Carolina
> convention that ratified the Constitution in 1788.  James Madison, who served
> with Ramsay in the Continental Congress, was aware of the book.  Ramsay's
> account of grievances leading to the Revolution was apropos, particularly in
> regard to what became the Second Amendment.

<u>The Founders' Second Amendment</u>, at 85-86 (footnotes omitted).

In short, there was no "historical tradition," circa 1791, of gun regulations

"distinctly similar" to § 922(g)(4). *Bruen*, 142 S. Ct. at 2130-31. The "Founders

themselves could have adopted" laws like § 922(g)(4) to "confront" the "perceived

societal problem" posed by individuals with mental illness or a history of the

mentally ill possessing firearms. *Id.* at 2131. But they declined to do so, and that

inaction indicates § 922(g)(4) "[i]s unconstitutional." *Id.*

---

[8]    https://www.washingtonpost.com/archive/opinions/1995/05/31/when-the-redcoats-confiscated-guns/e38d0810-af85-4949-8d93-3da746601e65/ (last viewed December 5, 2022).

## G. *Heller*'s statements about "presumptively lawful regulatory measures" and "law-abiding, responsible citizens" do not require a different conclusion.

Movant expects the government will attempt to sidestep the straightforward *Bruen* analysis of Section 922(g)(4) by falling back on two passages from *Heller* that supposedly place "mental incompetents" or "lunatics" outside the protection of the Second Amendment. In the government's view, these passages would deem involuntary commitment disarmament laws "presumptively lawful" and limit Second Amendment rights to "law-abiding, responsible citizens." Neither passage justifies ignoring *Bruen*'s clear command. *See e.g. United States v. Rahimi*, ___ F.4th ___, 2023 WL 1459240 (5th Cir. 2023). The first was *dicta* and, in any event, has been superseded by the new *Bruen* framework; the second establishes a constitutional baseline that protects, rather than limits, Second Amendment rights. These passages cannot save Section 922(g)(4).

### 1. "Presumptively lawful regulatory measures"

After completing its historical survey, and before assessing the constitutionality of the District of Columbia's statutes, the Court in *Heller* inserted some "precautionary language." *Tyler v. Hillsdale Cty. Sheriff's Dep't*, 837 F.3d 678, 688 (6th Cir. 2016) (en banc). The Court wrote that the Second Amendment right "is not unlimited" and is "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Heller*, 554 U.S. at 626. It then added the language movant expects the government to cite in this case:

> Although we do not undertake an exhaustive historical analysis today of the full scope of the Second Amendment, nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.

*Id.* at 626-27. In an accompanying footnote, the Court wrote, "[w]e identify these *presumptively* lawful regulatory measures only as examples; our list does not purport to be exhaustive." *Id.* at 627 n.26 (emphasis added).

In other cases, the government has argued this portion of *Heller* definitively establishes that involuntarily commitment disarmament laws are consistent with the Second Amendment. That view is incorrect. The question of involuntary commitment-disarmament laws' constitutionality was not before the Court in *Heller*, and any statements in the opinion addressing that question are therefore "dicta." *United States v. Scroggins*, 599 F.3d 433, 451 (5th Cir. 2010); *see also, e.g., Tyler*, 837 F.3d at 686-87 (describing *Heller*'s "presumptively lawful" language as "dictum"); *United States v. Williams*, 616 F.3d 685, 692 (7th Cir. 2010) (same); *United States v. McCane*, 573 F.3d 1037, 1049 (10th Cir. 2009) (Tymkovich, J., concurring) (characterizing "presumptively lawful" language as "the opinion's *deus ex machina* dicta"). The result is that, as the *en banc* Seventh Circuit has explained, the passage cited above should not be treated as a holding:

> The language we have quoted warns readers not to treat *Heller* as containing broader holdings than the Court set out to establish: that

the Second Amendment creates individual rights, one of which is keeping operable handguns at home for self-defense. What other entitlements the Second Amendment creates, and what regulations legislatures may establish, were left open. The opinion is not a comprehensive code; it is just an explanation for the Court's disposition. Judicial opinions must not be confused with statutes, and general expressions must be read in light of the subject under consideration.

*Skoien*, 614 F.3d at 640; *accord Tyler*, 837 F.3d at 687 (same).

Of course, lower courts should "give great weight to Supreme Court *dicta*," *N.L.R.B. v. Bluefield Hosp. Co., LLC*, 821 F.3d 534, 541 n.6 (4th Cir. 2016), at least when the Court's opinion engages in an "extended discussion" of an issue, the Court gives "full and careful consideration to the matter," and the issue is "important, if not essential, to the Court's analysis," *Hengle v. Treppa*, 19 F.4th 324, 346-47 (4th Cir. 2021). Ultimately, however, lower courts "are not bound by *dicta* or separate opinions of the Supreme Court." *Myers v. Loudoun Cty. Pub. Sch.*, 418 F.3d 395, 406 (4th Cir. 2005). Where the Supreme Court's discussion of an issue is "peripheral" or "cursory," courts need not defer to it. *Hengle*, 19 F.4th at 347. The Fourth Circuit has therefore declined to follow Supreme Court *dicta* that is "unaccompanied by any analysis from which [it] might gain insight into the Court's reasoning." *In re Bateman*, 515 F.3d 272, 282 (4th Cir. 2008); *see also id.* at 283 (refusing to "afford[] talismanic effect" to unexplained Supreme Court dicta). Other courts, too, disregard *dicta* for which the Supreme Court provides no reasoning or analysis. *See, e.g.*, *United States v. Montero-Camargo*, 208 F.3d 1122, 1132

n.17 (9th Cir. 2000) ("[W]e conclude that the brief dictum to which we allude should not dictate the result here."); *cf. Schwab v. Crosby*, 451 F.3d 1308, 1325 (11th Cir. 2006) (choosing to follow Supreme Court dicta because it was "not subordinate clause, negative pregnant, devoid-of-analysis, throw-away kind of dicta").

*Heller*'s discussion of "presumptively lawful regulatory measures" is exactly the kind of Supreme Court *dicta* which is not entitled to "talismanic effect." *In re Bateman*, 515 F.3d at 283. It was "unaccompanied by any analysis," *id.*, and was—at best—"peripheral" to the questions at issue in that case, *Hengle*, 19 F.4th at 347. The *Heller* Court provided no "extended discussion" of felon-disarmament laws. *Hengle*, 19 F.4th at 346. While the Court described felon-disarmament laws as "longstanding," 554 U.S. at 626, it "never actually addressed the historical pedigree" of those laws, *Kanter v. Barr*, 919 F.3d 437 (7th Cir. 2019) (Barrett, J., dissenting). Indeed, the Court prefaced its reference to "longstanding prohibitions on the possession of firearms by felons" by noting that it "d[id] not undertake an exhaustive historical analysis today of the full scope of the Second Amendment." *Heller*, 554 U.S. at 626. The Court, in other words, did not even claim it had surveyed the relevant history and discovered a (robust but undisclosed) tradition of felon-disarmament laws dating back to the founding era. It simply asserted such laws were longstanding, and therefore presumptively lawful, "without any reasoning or explanation." Winkler, 56 U.C.L.A. L. Rev. at 1567; *see also United*

*States v. Chester*, 628 F.3d 673, 679 (4th Cir. 2010) ("*Heller* described its exemplary list of 'longstanding prohibitions' as 'presumptively lawful regulatory measures' without alluding to any historical evidence that the right to keep and bear arms did not extend to felons.").

But as explained above, permanent involuntary commitment disarmament laws are *not* longstanding—at least not in the sense that *Bruen* would use that term. It appears that no American jurisdiction enacted such a law until the 20th *Century, and Congress did not pass the federal statute at issue here until 1968. Heller*'s discussion of "longstanding" involuntary commitment disarmament laws, therefore, is not just *dicta*, but *dicta* based on a factually unsupportable premise. That is a slender reed on which to rest the categorical denial of an enumerated constitutional right. As the *en banc* Sixth Circuit has observed, absent "historical evidence conclusively supporting a permanent ban on the possession of guns" by felons, "it would be odd to rely solely on *Heller* to rubber stamp the legislature's power to permanently exclude individuals from a fundamental right…." *See Tyler*, 837 F.3d at 687 (applying this reasoning to 18 U.S.C. § 922(g)(4)'s prohibition of firearm possession by anyone "who has been adjudicated as a mental defective or who has been committed to a mental institution," which aligns with another category of laws *Heller* called "presumptively lawful"); *see also id.* ("Refusing to give

*Heller* conclusive effect in this case is particularly proper given § 922(g)(4)'s lack of historical pedigree.").

 *Heller* itself indicates that its *dicta* should not control here. Dissenting in *Heller*, Justice Breyer criticized the reference to longstanding felon-disarmament laws as "*ipse dixit*," noting that the majority "fail[ed] to cite any colonial analogues" to such statutes. 554 U.S. at 721-22. The majority responded that there would "be time enough to expound upon the historical justifications for the exceptions we have mentioned if and when those exceptions come before us." *Id.* at 635. This rejoinder suggests the *Heller* Court assumed "felons can be deprived of the [Second Amendment] right *if that deprivation is consistent with history and tradition.*" Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 Wyo. L. Rev. 249, 252 (2020) (emphasis added). The Court's allusion to "expound[ing] upon the historical justifications" for felon-disarmament laws would make no sense if the Court believed felons could be disarmed *regardless* of whether history supported that exclusion.

 And—crucially—the Court stressed that it had not canvassed the historical record and made a determination, one way or the other, about whether that record supported mentally ill disarmament laws. *Heller*, 554 U.S. at 626 ("[W]e do not undertake an exhaustive historical analysis today of the full scope of the Second Amendment."). *Bruen*, in turn, affirmed that *Heller* did not purport to settle any

questions beyond those necessary to resolve the petitioners' claim in that case. 142 S. Ct. at 2128 (noting *Heller* described Second Amendment right as "not unlimited," but adding, "[t]hat said, we cautioned that we were not 'undertak[ing] an exhaustive historical analysis today of the full scope of the Second Amendment' and moved on to considering the constitutionality of the District of Columbia's handgun ban"). It is therefore "particularly wrongheaded to read [*Heller*] for more than what it said, because the case did not even purport to be a thorough examination of the Second Amendment." *Heller*, 554 U.S. at 623.

Even more telling is *Heller*'s discussion of *Lewis v. United States*, 445 U.S. 55 (1980). The defendant in that case, who was convicted under the federal felon-in-possession statute, argued the prosecution violated his equal-protection rights because his underlying felony conviction had been secured in the absence of counsel. *Lewis*, 445 U.S. at 58, 65. The Court rejected that argument, reasoning that Congress "could rationally conclude that any felony conviction, even an allegedly invalid one, is a sufficient basis on which to prohibit the possession of a firearm." *Id.* at 66. In *Heller*'s words, the *Lewis* Court then "commented gratuitously, in a footnote," on a Second Amendment question that was not "raised or briefed by any party." 554 U.S. at 625 n.25. Specifically, the *Lewis* Court observed:

> These legislative restrictions on the use of firearms are neither based upon constitutionally suspect criteria, nor do they trench upon any constitutionally protected liberties. See *United States v. Miller*, 307 U.S. 174, 178, 59 S. Ct. 816, 818, 83 L.Ed. 1206 (1939) (the Second

Amendment guarantees no right to keep and bear a firearm that does not have "some reasonable relationship to the preservation or efficiency of a well regulated militia"); *United States v. Three Winchester 30-30 Caliber Lever Action Carbines*, 504 F.2d 1288, 1290, n. 5 (CA7 1974); *United States v. Johnson*, 497 F.2d 548 (CA4 1974); *Cody v. United States*, 460 F.2d 34 (CA8), cert. denied, 409 U.S. 1010, 93 S. Ct. 454, 34 L.Ed.2d 303 (1972) (the latter three cases holding, respectively, that § 1202(a)(1), § 922(g), and § 922(a)(6) do not violate the Second Amendment).

445 U.S. at 65 n.8. The *Heller* Court went out of its way to make clear it was not bound by *Lewis*' interpretation of the Second Amendment, writing, "It is inconceivable that we would rest our interpretation of the basic meaning of any guarantee of the Bill of Rights upon such a footnoted dictum in a case where the point was not at issue and was not argued." 554 U.S. at 625 n.25.

To accept, as the government is expected to argue, that *Heller* settled the constitutionality of involuntary commitment disarmament laws would be to do exactly what that case called "inconceivable": interpreting "the basic meaning" of the Second Amendment based on "a footnoted dictum in a case where the point was not at issue and was not argued." *See* 554 U.S. at 627 n.26 (describing felon-disarmament laws, in a footnote, as "presumptively lawful regulatory measures"). Indeed, treating *Heller*'s "presumptively lawful" language as binding would be especially ironic given that, in the footnote *Heller* disclaimed as *dicta*, *Lewis* suggested felon-disarmament laws do not violate the Second Amendment. *Lewis*, 445 U.S. at 65 n.8 (citing three court of appeals opinions to that effect).

Page **32** of **40**

JA44

Finally, even if the *Heller dicta* might once have warranted deference, it no longer does today. The Fourth Circuit has said lower courts need not follow Supreme Court *dicta* that has been "enfeebled by later statements" in other Supreme Court cases. *Hengle*, 19 F.4th at 347. That is the case here. It may be true that "nothing in [*Heller*] cast doubt on longstanding prohibitions on the possession of firearms by felons," *Heller*, 554 U.S. at 626, but *Bruen*'s new framework plainly *does* cast doubt on such laws. As explained above, *Bruen* demands a "text-and-history" analysis that looks only to "the Second Amendment's plain text" and our "Nation's historical tradition of firearm regulation." 142 S. Ct. at 2126, 2138. Neither of those sources provides any support for involuntary commitment disarmament laws. It is perhaps unsurprising, then, that the Court in *Bruen* did not repeat *Heller*'s *dicta* about "longstanding" and "presumptively lawful" involuntary commitment disarmament laws.

Rather than following historically unsupportable *dicta* from *Heller*, this Court should adhere to the binding framework supplied by *Bruen*. Elevating *Heller*'s *dicta* over *Bruen*'s holding would treat the Second Amendment right "as a second-class right," contrary to the Supreme Court's admonishment in *McDonald*. 561 U.S. at 780.

### 2. "Law-abiding, responsible citizens"

In rejecting the "interest-balancing inquiry" proposed by Justice Breyer's dissent, the *Heller* majority explained that the Second Amendment "is the

Page **33** of 40

**JA45**

very *product* of an interest balancing by the people." 554 U.S. at 634-35 (emphasis in original). The result is that judges lack authority to "conduct [that balancing] anew" or "decide on a case-by-case basis whether the right is *really worth* insisting upon." *Id.* (emphasis in original). And regardless, the Court wrote, "whatever else [the Second Amendment] leaves to future evaluation, it surely elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home." *Id.* at 635. Based on this language, the government has argued elsewhere that only "law-abiding, responsible citizens" enjoy the right to keep and bear arms.

This argument plainly misreads *Heller*. The Court in *Heller* did not limit the Second Amendment right to law-abiding, responsible citizens. Rather, it said that, *at the very least*, such people are protected by the Second Amendment. By beginning the quoted passage with "whatever else it leaves to future evaluation," the Court made clear that its reference to "law-abiding, responsible citizens" was meant to establish a Second Amendment floor, not a ceiling. The Court, in other words, held that law-abiding, responsible citizens have a right to possess firearms, but it did not address whether—much less rule out the conclusion that—other people have that right, too.

*Heller*'s qualifying language is clear, but to the extent it was ambiguous, *Bruen* dispelled the ambiguity. The passage cited above references law-abiding,

responsible citizens' right to use arms "in defense of hearth and home." *Id.* If that passage were meant to demarcate the outer limits of the Second Amendment right, then even law-abiding, responsible citizens would have no right to use firearms *outside* the home. But *Bruen* held the Second Amendment right does extend outside the home, 142 S. Ct. at 2134, and the Court in *Bruen* gave no hint that it believed it was contradicting what it said in *Heller*. Thus *Bruen* confirms that it would be a mistake to read *Heller*'s "law-abiding, responsible citizens" language as a limitation on the Second Amendment. The Fifth Circuit has recently acknowledged the same. *See supra, Rahimi.*

*Heller* also used the word "law-abiding" during a discussion of the Court's opinion in *United States v. Miller*, 307 U.S. 174 (1939), which the District of Columbia cited to support its collective-rights view of the Second Amendment. The *Heller* Court wrote that it "read *Miller* to say only that the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes." 554 U.S. at 625. This reference to "law-abiding" citizens, like the last, does not suggest, much less hold, that *only* the law-abiding enjoy Second Amendment rights. As the *Heller* Court emphasized, *Miller* addressed "the *type of weapon[s]*" that are "eligible for Second Amendment protection"—which *Heller* explicitly contrasted with the question of the *type of people* who are eligible for Second Amendment protection. *Id.* at 622 (emphasis in original) (explaining *Miller*

did not turn on whether "the Second Amendment protects only those serving in the militia," but rather on "the character of the weapon" at issue in that case); *see United States v. Perez*, 6 F.4th 448, 451 (2d Cir. 2021) ("[*Heller*] considered the scope of the Second Amendment along two dimensions: what types of 'arms' are protected and who are among 'the people.'"). *Heller*'s use of the word "law-abiding," therefore, provides no support for the view that felons are unentitled to the Second Amendment's protection.

Movant recognizes that, at times, *Bruen* repeats *Heller*'s "law-abiding citizens" formulation. *E.g.*, 142 S. Ct. at 2156 ("New York's proper-cause requirement violates the Fourteenth Amendment in that it prevents law-abiding citizens with ordinary self-defense needs from exercising their right to keep and bear arms."). But that is because the petitioners alleged, "[a]s set forth in the pleadings below," that they were "law-abiding, adult citizens," and the Court granted *certiorari* to decide only whether "New York's denial of *petitioners'* license applications violated the Constitution." *Id.* at 2124-25 (emphasis added). No other questions were before the Court in *Bruen*. *Heller*'s description of the right to bear arms "in the home" does not mean the Second Amendment is inapplicable to other *places*, and the same is true here: *Bruen*'s description of "law-abiding citizens" does not mean the Second Amendment is inapplicable to other *people*.

If *Bruen* excluded the non-law-abiding from the Second Amendment, the opinion would suffer from hopeless internal inconsistency. *Bruen*'s central lesson is that history is paramount in Second Amendment interpretation—a point the Court made over and over again. *See, e.g.*, *id.* at 2127 ("[*Heller*] demands a test rooted in the Second Amendment's text, as informed by history."); *id.* ("[*Heller*] looked to history because 'it has always been widely understood that the Second Amendment . . . codified a *pre-existing* right.'" (emphasis in original)); *id.* at 2128-29 ("*Heller*'s methodology centered on constitutional text and history."); *id.* at 2129 (describing means-ends balancing as "inconsistent with *Heller*'s historical approach"); *id.* at 2130 (likening Second Amendment to First because, in both instances, "to carry [its] burden, the government must generally point to *historical* evidence about the reach of the [amendment's] protections" (emphasis in original)); *id.* ("And beyond the freedom of speech, our focus on history also comports with how we assess many other constitutional claims."); *id.* at 2131 ("The test that we set forth in *Heller* and apply today requires courts to assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding."); *id.* at 2135 ("[T]he burden falls on respondents to show that New York's proper-cause requirement is consistent with this Nation's historical tradition of firearm regulation."); *id.* at 2138 ("We conclude that respondents have failed to meet their burden to identify an American tradition justifying New York's proper-cause

requirement. Under *Heller*'s text-and-history standard, the proper-cause requirement is therefore unconstitutional."); *id.* at 2145 ("Thus, all told, in the century leading up to the Second Amendment and in the first decade after its adoption, there is no historical basis for concluding that the pre-existing right enshrined in the Second Amendment permitted broad prohibitions on all forms of public carry.").

Yet as explained above, the historical record provides no support whatsoever for involuntary commitment disarmament laws. The government's position would have this Court hold, based solely on the implication from a negative inference unnecessary to *Bruen*'s holding, that the question of whether non-law-abiding citizens can possess firearms is—uniquely among all issues of Second Amendment interpretation—exempt from the requirement that the amendment's scope be firmly rooted in history. Nothing in *Bruen* permits that result.

A final critical problem with limiting Second Amendment protections to only "law abiding citizens" is that neither the Constitution nor the Supreme Court have defined who, what, when or where "law abiding citizens" actually are. Is a jay walker not protected by the Second Amendment? Citizens cited for disobeying parking ordinances or speeding? Citizens caught fishing without the required license? Citizens who are late paying their taxes? Citizens who did not return a library book for ten years? Citizens attending a rally espousing a dissenting viewpoint from a particular government

policy?  Citizens "parading" as post-*Dodd*'s protesters did around Justices Alito's, Kavannah's, and Barrett's homes?  Black Lives Matter and Antifa protesters looting and burning businesses in Minneapolis?  Citizens attending a January 6, 2021 rally, who remained outside the capital and did nothing to capital police officers? Where does the categorical citizen disarmament properly start, and where does it end – when Second Amendment protections ONLY apply to some amorphous category of undefined perfect "law abiding citizens"?  The fundamental right protected by the Second Amendment cannot be so arbitrarily constrained.

## IV.   CONCLUSION

Applying *Bruen*'s standard, Gould's possessing a shotgun was conduct protected by the Second Amendment, such that a presumption of unconstitutionality applies to Section 922(g)(4). Firearm violence by the mentally ill was a societal concern which could have been addressed by permanent citizen disarmament in 1791, but was not. The United States will not be able to point to any distinctly similar historical tradition of firearm regulation that would rebut Bruen's presumption that Section 922(g)(4) is unconstitutional. This Court, therefore, should dismiss defendant's indictment with prejudice.

The Court's current scheduling order, among other things, set the parties' pretrial motion deadline for February 13, 2023.  Relative to consideration of the merits of his *Bruen* motion to dismiss, defendant asks that the parties' requirements to file other motions as well as to meet other stated pretrial deadlines be suspended

pending the Court's full disposition of his motion. Defendant submits that the time

devoted for that purpose would be excludable time under the Speedy Trial Act.

      Date:  February 17, 2023.        Respectfully submitted,

                                                **JAMES GOULD**

                                                By Counsel

**WESLEY P. PAGE**
**FEDERAL PUBLIC DEFENDER**

**s/ Lex A. Coleman**
Lex A. Coleman, WV Bar No. 10484
Senior Litigator, AFPD
300 Virginia Street, East, Room 3400
Charleston, West Virginia  25301
Telephone: (304) 347-3350
Facsimile:   (304) 347-3356
E-mail: lex_coleman@fd.org

IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

**UNITED STATES OF AMERICA**

**v.**                                                    **CRIMINAL NO.  2:22-cr-00095**

**JAMES GOULD**

RESPONSE OF THE UNITED STATES IN OPPOSITION
TO DEFENDANT'S MOTION TO DISMISS

Defendant James Gould ("Gould") has filed a motion to dismiss the indictment.  ECF No.

40.  The defendant does not dispute any of the facts alleged in the indictment.  He argues the

indictment charging him with being a prohibited person in possession of firearm in violation of 18

U.S.C. § 922(g)(4) is unconstitutional after the Supreme Court's recent decision in *New York State*

*Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022).

Gould's claim regarding the § 922(g)(4) charge fails because the Second Amendment's

protections do not extend to those who have been adjudicated as a mental defective or have been

committed to a mental institution.  Even if the aforementioned statute did regulate protected

conduct, it would still be constitutional because it is consistent with the nation's historical tradition

of firearm regulation.  Thus, Gould's motion to dismiss should be denied.

I.      **LEGAL BACKGROUND**

   a.  **Statutory Regulations on Firearm Possession**

Section 922(g)(4) makes it unlawful for any person who "has been adjudicated as a mental

defective or has been committed to any mental institution" to "ship or transport in interstate or

foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive

any firearm or ammunition which has been shipped or transported in interstate or foreign commerce." 18 U.S.C. § 922(g)(4).

### b. The Second Amendment

The Second Amendment to the Constitution provides that "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. Amend. II. In *District of Columbia v. Heller*, 554 U.S. 570, 635 (2008), the Supreme Court recognized that the Second and Fourteenth Amendments protect the right of law-abiding, responsible citizens to possess a handgun in the home for lawful purposes, like self-defense. The Court thus held unconstitutional two District of Columbia laws that effectively banned handgun possession in the home and required all firearms within homes to be kept inoperable and so unavailable for self-defense. *Id.* at 628–34.

"Like most rights," however, *Heller* emphasized that "the right secured by the Second Amendment is not unlimited." *Id.* at 626. It is "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id. Heller* made clear that the opinion should not "be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." *Id.* at 626-27; *see also McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 786 (2010). *Heller* described these regulations as "presumptively lawful" measures. 554 U.S. at 627 n.26.

In *Bruen*, the Supreme Court "made the constitutional standard endorsed in *Heller* more explicit." 142 S.Ct. at 2134. It clarified the test *Heller* and *McDonald* set forth to determine whether a government regulation infringes on the Second Amendment right to possess and carry

2

guns for self-defense: "When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2129-30. Only after the government makes that showing "may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'" *Id.* at 2130.

In announcing the test to be used for determining whether the Second Amendment has been infringed, *Bruen* did not alter *Heller's* conclusion that rights under the Second Amendment can be limited. The Justices who made up the majority understood the opinion to "decide[] nothing about who may lawfully possess a firearm." *Id.* at 2157 (Alito, J., concurring). Justice Kavanaugh, in his concurrence, was more explicit. He recognized that "the Second Amendment allows a 'variety' of gun regulations" and the Court's decision was not meant to "cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill." *Id.* at 2162 (Kavanaugh, J., concurring) (internal citations omitted).

Applying its more explicit standard of review, the Court held unconstitutional a New York licensing law that allowed an applicant to obtain a license to carry a gun outside his home only upon proving "proper cause exists." *Id.* at 2123. First, the Court held the Second Amendment's plain text covered the conduct at issue. *Id.* at 2134–35. The petitioners were "ordinary, law-abiding, adult citizens" who sought to carry handguns publicly for self-defense. *Id.* at 2134.[1] This, the Court concluded, fell within "the right to keep and bear arms." *Id.*

---

[1] That the individuals were "law-abiding," but still required to demonstrate a special need appears to have been the Supreme Court's primary issue with the New York law. *See generally, id.*.

3

The Court then surveyed historical data from "medieval to early modern England" through "the late-19th and early-20th centuries" to determine whether the licensing law squared with historical tradition. *Id.* at 2135–56. After a "long journey through the Anglo-American history of public carry, [the Court] conclude[d] that respondents ha[d] not met their burden to identify an American tradition justifying the State's proper-cause requirement." *Id.* at 2156. "Apart from a few late-19th-century outlier jurisdictions," the Court summarized, "American governments simply have not broadly prohibited the public carry of commonly used firearms for personal defense" or required a showing of special need for public carry. *Id.*

*Bruen* rejected the means-end scrutiny framework most courts had relied upon to assess the constitutionality of gun regulations. *Id.* at 2127. But it did not, as Gould claims, invalidate § 922(g)(4). Nor did it entirely abrogate the Fourth Circuit's post-*Heller* Second Amendment precedent. After *Heller*, the Fourth Circuit explained that, when determining whether a statute burdens conduct falling within the scope of the Second Amendment, a court should conduct "historical inquiry seek[ing] to determine whether the conduct at issue was understood to be within the scope of the right at the time of ratification." *United States v. Chester*, 628 F.3d 673, 680 (4th Cir. 2010), *abrogated on other grounds by Bruen*, 142 S.Ct. 2111 (quotation marks omitted). *Bruen* described such an inquiry as "broadly consistent with *Heller*, which demands a test rooted in the Second Amendment's text, as informed by history." 142 S.Ct. at 2127. It also did not undermine the Fourth Circuit's earlier analysis of the historical tradition of firearms regulations. As explained below, a review of that history and of relevant caselaw compels the conclusion that § 922(g)(4) is constitutional.

4

JA56

## II.    SECTION § 922(g)(4) IS CONSTITUTIONAL.

Gould argues § 922(g)(4) is facially unconstitutional because its prohibitions are not deeply rooted in this country's history.  ECF No. 40.  He faces a heavy burden:  "A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid."  *United States v. Salerno*, 481 U.S. 739, 745 (1987).  Section 922(g)(4) proscribes the possession of firearms by those found mentally deficient or committed to a mental institution; as discussed below, this prohibition on possession of firearms by members of this group is not constitutionally protected as it involves conduct outside the scope of the Second Amendment.  Assuming he could show his conduct is protected, § 922(g)(4) would still be constitutional because the statute is consistent with the nation's longstanding historical tradition of disarming persons considered a risk to society, including the mentally ill.  The statute is constitutional, and Gould's motion to dismiss should be denied.

### A.  Gould's motion to dismiss the § 922(g)(4) charge should be denied because the Second Amendment does not extend to the possession of firearms by those adjudicated mentally defective and/or involuntarily committed.

Gould's facial challenge to the constitutionality of § 922(g)(4) is without merit.  First, Gould cannot show the Second Amendment right to keep and bear arms protects the prohibited conduct:  possession of a firearm by someone who has been adjudicated as a mental defective or has been committed to a mental institution.  Under the first step of the *Bruen* analysis, the text of the Second Amendment does not cover the right of those adjudicated mentally defective or committed to a mental institution to possess a firearm because they are not "responsible citizens." *Heller*, 554 U.S. at 635.  *Heller* emphasized that "[l]ike most rights, the right secured by the Second Amendment is not unlimited."  *Heller*, 554 U.S. at 626.  Although the Court did "not undertake an

5

exhaustive historical analysis," it said that "nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill." *Id.* As *Heller* implicitly recognized, those individuals, like Gould, who have been involuntarily committed to a mental institution on multiple occasions are not responsible citizens with the same right to bear firearms as other citizens.[2] The Court described such prohibitions on possession of firearms by the mentally ill as "presumptively lawful" and falling within "exceptions" to the protected right to bear arms. *Id.* at 627 n.26, 635.

Regulations prohibiting the possession of firearms by the mentally ill are analogous to regulations prohibiting the possession of firearms by unlawful users of controlled substances. It should be uncontroversial that both classes consist of people who may present diminished mental capacity or impaired judgment.[3] *United States v. Yancy*, 621 F.3d 681, 685 (7th Cir. 2010) (observing "habitual drug abusers, like the mentally ill, are more likely to have difficulty exercising self-control, making it dangerous for them to possess deadly firearms.").

---

[2] While the indictment only refers to his most recent July 30, 2019, involuntary commitment in Jackson County, West Virginia, Gould was also previously involuntarily committed in Jackson County on February 14, 2018 and June 28, 2019, and in Wood County, West Virginia, on May 12, 2016.

[3] Title 27 C.F.R. § 478.11(a), containing the companion regulations to Section 922, defines "mental defective" as those determined, "as a result of marked subnormal intelligence, or mental illness, incompetency, condition, or disease: (1) [i]s a danger to himself or to others; or (2) [l]acks the mental capacity to contract or manage his own affairs." The Code defines that an "unlawful user of or addicted to any controlled substance" as "[a] person who uses a controlled substance and has lost the power of self-control with reference to the use of controlled substance; and any person who is a current user of a controlled substance in a manner other than as prescribed by a licensed physician." 27 C.F.R. § 478.11(a).

6

Evaluating Second Amendment challenges to gun regulations requires courts to make a "threshold inquiry" into whether the conduct regulated "fall[s] within the scope of the Second Amendment's guarantee." *United States v. Marzzarella*, 614 F.3d 85, 89 (3d Cir. 2010). Here, that inquiry proves dispositive because, as both *Heller* and history make clear, people suffering from significant mental illness do not possess Second Amendment rights.

Colonial society at the time of the founding did not view persons with mental illness as being among those who could bear arms without "real danger of public injury." *United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010). "[M]ost scholars of the Second Amendment agree that the right to bear arms was tied to the concept of a virtuous citizenry," which did not include individuals with a history of mental illness. *Yancey*, 621 F.3d at 684–85; see also Robert Dowlut, The Right to Arms: Does the Constitution or the Predilection of Judges Reign?, 36 OKLA. L. REV. 65, 96 (1983) ("Colonial and English societies of the eighteenth century, as well as their modern counterparts, have excluded infants, idiots, lunatics, and felons [from possessing firearms]."). Such individuals were often removed from the community at large through home confinement or involuntary commitment to welfare and penal institutions. *See, e.g.*, Gerald N. Grob, The Mad Among Us: A History of the Care of America's Mentally Ill 5-21, 29, 43 (1994). Moreover, "in eighteenth-century America, justices of the peace were authorized to 'lock up' 'lunatics' who were 'dangerous to be permitted to go abroad'" Carlton F.W. Larson, Four Exceptions in Search of a Theory: District of Columbia v. Heller and Judicial Ipse Dixit, 60 HASTINGS L. J. 1371, 1377 (2009). These historical realities strongly suggest that the Framers did not understand the Second Amendment to guarantee those with mental illness the unqualified right to possess a firearm.

Critically, *Heller* held that the "longstanding prohibitions on the possession of firearms by felons and the mentally ill" comport with the Second Amendment, which only protects the "right

7

of law-abiding, responsible citizens" to possess a firearm. *Heller's* commentary is not mere dicta. *United States v. Vongxay*, 594 F.3d 1111, 1115 (9th Cir. 2010).

Indeed, the Supreme Court has repeatedly assured the presumptive validity of such laws under its Second Amendment holdings. *McDonald v. City of Chicago*, Ill., 561 U.S. 742, 786 (2010). *Bruen* did nothing to disturb the decision in *Heller*. It only reiterated that the Second Amendment "is neither a regulatory straightjacket nor a regulatory blank check." *Bruen*, 142 S. Ct. at 2133. Justice Kavanaugh, joined by Chief Justice Roberts in a concurring opinion, noted the "presumptively lawful regulatory measures" described in *Heller*, including the "longstanding prohibitions on the possession of firearms by felons and the mentally ill. " *Bruen*, 142 S. Ct. at 2162 (Kavanaugh, J., concurring).

Moreover, Justice Kavanaugh's concurrence observed that *Bruen* only concerned "may-issue" licensing regimes. *Id*. It did not reach "shall-issue" licensing regimes—which commonly disqualify felons, the mentally ill, and drug users. *Id*. These regimes, Justice Kavanaugh suggests are likely constitutional. *Id*. ("Going forward, therefore, the 43 States that employ objective shall-issue licensing regimes for carrying handguns for self-defense may continue to do so.") (See West Virginia Code §§ 61-7-4 and 61-7-7 for obtaining a concealed weapons permit and prohibitions.) *Heller* makes clear that people who suffer from a significant mental illness may be disarmed consistent with the Second Amendment.  Moreover, although the passage is not conclusive on this point, it suggests that such people fall outside the scope of the Second Amendment altogether.  *See United States v. Rene E.*, 583 F.3d 8, 12 (1st Cir. 2009) (concluding that "[t]hese restrictions, as well as others similarly rooted in history, were left intact by the Second Amendment"); *Marzzarella*, 614 F.3d at 91 ("better reading" of the language in *Heller* is that it identifies "exceptions to the right to bear arms").

8

A historical analysis of the right to bear arms confirms this view. In particular, from the time it originated in English law to the time of the Founding, the right to keep and bear arms was understood not to have extended to those citizens whose possession of them posed a danger to themselves or others. *See Heller*, 554 U.S. at 635 (recognizing right of "law-abiding *responsible* citizens" to use firearms in the home for self-defense) (emphasis added); *Rene E.*, 583 F.3d at 15 (noting "a longstanding practice of prohibiting certain classes of individuals from possessing firearms – those whose possession poses a particular danger to the public").

*Heller* identified the right to arms recognized in the 1689 English Declaration of Rights as "the predecessor of our Second Amendment." *Id.* at 593. This document provided "[t]hat the subjects which are Protestants may have arms for their defense suitable to their conditions and as allowed by law." 1 W. & M., c. 2, § 7, in 3 Eng. Stat. at Large 441 (1698). Moreover, even after adoption of the Declaration of Rights, lieutenants of the militia (appointed by the King) could and did disarm "any person or persons" judged "*dangerous to the Peace of the Kingdome*" under the 1662 Militia Act. 13 & 14 Car. 2, c. 3, § 1 (1662)(Eng.) (emphasis added).[4] *See* Joyce Lee Malcolm, *To Keep and Bear Arms*, 123 (Harvard Univ. Press) (1994); *accord* Patrick J. Charles, "*Arms for Their Defence*"?: *An Historical, Legal, and Textual Analysis of the English Right to Have Arms and Whether the Second Amendment Should Be Incorporated In McDonald v. City of Chicago*, 57 Clev. State L. Rev. 351, 373, 376, 382-83, 405 (2009).

In the colonies, as well, governments frequently disarmed those perceived as dangerous, and such restrictions were not viewed as inconsistent with the right to bear arms. Malcolm, supra,

---

[4] By providing that Protestants could have arms "suitable to their conditions" and "as allowed by law," the Bill of Rights apparently provided a small minority of upper-class Protestants a right to arms via the Crown (but not Parliament). Lois Schwoerer, *To Hold And Bear Arms: The English Perspective*, 76 Chicago-Kent L. Rev. 27, 43, 47-48, 59 (2000).

9

at 140-41; Robert J. Cottrol and Raymond T. Diamond, *The Second Amendment: Toward an Afro-Americanist Reconsideration*, 80 Georgetown L.J. 309, 323-27 (1991). Colonial governments also used "Test Acts" to disarm persons who refused to swear a loyalty oath. Saul Cornell, *Commonplace or Anachronism: the Standard Model, the Second Amendment, and the Problem of History in Contemporary Constitutional Theory*, 16 Const. Comment. 221, 228-29 (1999); Saul Cornell, *A Well-Regulated Militia: The Founding Fathers and the Origins of Gun Control in America*, 28-30 (2006). The adoption of these Acts demonstrated that the right to bear arms was viewed as "limited to those members of the polity who were deemed capable of exercising it in a virtuous manner." Saul Cornell, "*Don't Know Much About History" The Current Crisis in Second Amendment Scholarship*, 29 N. Ky. L. Rev. 657, 671 (2002).

The documentary record surrounding adoption of the Constitution further confirms this view. Most significantly, the Pennsylvania anti-federalist faction offered the following proposal at the Pennsylvania Convention:

> That the people have a right to bear arms for the defense of themselves and their own state or the United States, or for the purpose of killing game; and no law shall be passed for disarming the people or any of them, *unless for crimes committed, or real danger of public injury from individuals*;....

> > The Address and Reasons of Dissent of the Minority of the Convention of the State of Pennsylvania to Their Constituents, 1787, *reprinted in* 2 Schwartz, *The Bill of Rights, A Documentary History* 665 (1971) (emphasis added).

The *Heller* Court found this Pennsylvania Minority proposal to be both "highly influential" and a "precursor[]" to the Second Amendment. *Heller,* 554 U.S. at 603-04.[5]

---

[5] Although the Second Amendment itself proved more "succinct[ ]" than this proposal, *Heller*, 554 U.S. at 659 (Stevens, J., dissenting), the latter remains probative of how the Amendment's supporters viewed the balance between public safety and the right to keep and bear arms. *See id.* at 605 (reaffirming that "the Bill of Rights codified venerable, widely understood liberties").

Nor was the Pennsylvania proposal an aberration.  In Massachusetts, Samuel Adams offered a similar amendment at the ratifying convention, recommending "that the said Constitution be never construed to authorize Congress * * * to prevent the people of the United States who are *peaceable citizens*, from keeping their own arms." Schwartz, *supra,* at 674-75, 681 (emphasis added).[6]  Although not identical to the Pennsylvania proposal, this formulation likewise reflected an understanding that arms could be denied to those whose inability to control their behavior threatened public safety.

Both of these proposals support the view that "[i]n classical republican political philosophy, the concept of a right to arms was inextricably and multifariously tied to that of the 'virtuous citizen.'...One implication of this emphasis on the virtuous citizen is that the right to arms does not preclude laws disarming the unvirtuous citizens (i.e., criminals) or those who, like children *or the mentally unbalanced*, are deemed incapable of virtue." Don B. Kates, Jr., *The Second Amendment: A Dialogue*, 49 Law & Contemp. Probs. 143, 146 (1986)(emphasis added); *see* Don B. Kates & Clayton E. Cramer, *Second Amendment Limitations and Criminological Considerations*, 60 Hastings L.J. 1339, 1359-62 (2009); Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 Fordham L. Rev. 487, 492 (2004); Robert E. Shalhope, *The Armed Citizen in the Early Republic*, 49 Law & Contemp. Probs. 125, 130 (1986).

---

[6] For contemporaneous definitions of "peaceable," *see* Johnson ("1. Free from war; free from tumult; 2. Quiet; undisturbed; 3. Not violent; not bloody; 4. Not quarrelsome; not turbulent"); Sheridan ("Free from war; free from tumult"); Noah Webster, American Dictionary of the English Language (1828) (definitions include "free from private feuds and quarrels;" and "quiet, undisturbed, not agitated with passion").

11

This historical backdrop confirms *Heller*'s suggestion that the right to keep and bear arms would not have extended at the Founding to persons suffering from significant mental illness. The lack of laws formally disarming such persons does not suggest otherwise.[7] Instead, it merely reflects a larger absence, in the "decentralized" and "rural" colonies, of "systematic policies" regarding the mentally ill. Gerald N. Grob, *The Mad Among Us: A History of the Care of America's Mentally Ill*, 5, 13, 21 (1994).

During the colonial period, "[m]ental illness was perceived to be an individual rather than a social problem[.]" *Id.* at 5. Accordingly, families were largely expected to address it on their own, while protecting others from any resulting harm. *See generally*, *id.* at 5-21; Mary Ann Jimenez, *Changing Faces of Madness: Early American Attitudes and Treatment of the Insane*, 49 (1987). In cases where government involvement was needed, local officials responded on an "ad hoc" basis. Grob, *supra*, at 15; Jimenez, *supra*, at 57; Shomer S. Zwelling, *Quest for a Cure: The Public Hospital in Williamsburg, Virginia, 1773-1885*, 3 (1985) ("[T]he insane in Virginia were * * * dealt with by local officials in a haphazard and unsystematic fashion.").[8]

None of this suggests that significantly mentally ill persons had access to firearms, let alone a "right" to keep them. Instead, "disordered persons" who threatened public safety were dealt with harshly, by confining them in tiny rooms, cells or cages. Grob, *supra*, at 15-16; Jimenez, *supra*,

---

[7] Indeed, the lack of formal laws, despite so many references to the belief that the mentally ill should not possess firearms, suggests that it was presumed that such individuals fell outside the scope of those with any right to possess firearms, and thus formal laws regarding disarmament were simply unnecessary.

[8] Local justices of the peace had the power to seize arms involved in an "affray," *i.e.*, a public assault or fight. *See Conductor Generalis: Or The Office, Duty and Authority of Justices of the Peace*, 10, 12 (1788). Thus, if the family of a "disordered" person failed to prevent them from acquiring firearms, local officials likely could step in and remove them.

at 43, 92.  Clearly, this response obviated any general need to legislate against firearm possession by the mentally ill.  The historical record confirms *Heller*'s apparent conclusion that mentally ill individuals fall entirely outside the scope of the Second Amendment.  Gould was within that category of individuals when he possessed firearms on multiple occasions and committed the offense at issue here.

**B.  In the alternative, Gould's motion to dismiss the § 922(g)(4) charge should be denied because the statute is consistent with the nation's historical tradition of regulating and disarming persons considered a risk to society, such as the mentally ill.**

Statutes disarming persons considered a risk to society, such as the mentally ill, are well known to the American legal tradition.  Indeed, substantially greater restrictions on liberty than mere disarmament were permitted to protect the public from the mentally ill. In England, justices of the peace could lock up dangerous "lunatics" and seize their property to pay for the cost of securing them. *See The Origin of Insanity As A Special Verdict: The Trial for Treason of James Hadfield (1800)*, 19 Law & Soc'y Rev. 487 (1985) (citing Vagrancy Act of 1744, 17 Geo. 2, c. 5.).

Similarly, "in eighteenth-century America, justices of the peace were authorized to 'lock up' 'lunatics' who were 'dangerous to be permitted to go abroad.'" Carlton F.W. Larson, *Four Exceptions in Search of A Theory: District of Columbia v. Heller and Judicial Ipse Dixit*, 60 Hastings L.J. 1371, 1377 (2009).  For example, an 18th century Connecticut law required authorities to confine to home or another suitable place "any distracted or lunatic Person . . . who is dangerous and unfit to be without restraint," and if those responsible for the person "refuse[d] or neglect[ed] to confine" the person, then the authorities were to "take all proper and effectual measures" to keep the person "from going at large," including committing him "to the Gaol in that County where he or she dwells." 1 Acts and Laws of the State of Connecticut, in America 236 (1796). In addition, as the Third Circuit recently reasoned, in a decision vacated on other grounds,

13

these severe restrictions on the liberty of the mentally ill made specific restrictions on firearm possession unnecessary at the time. *Beers v. Attorney General of the United States*, 927 F.3d 150, 157 (3d Cir. 2019), vacated, 140 S. Ct. 2758 (2020).

Moreover, a historical practice has existed generally of disarming people deemed to be dangerous, such as those unwilling to swear an oath of allegiance to the colonies or the states. *See Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 700 F.3d 185, 200 (5th Cir. 2012); Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 Law & Hist. Rev. 139, 157-60 (2007); Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 Fordham L. Rev. 487, 506-08 (2004). The mentally ill who have been adjudicated a mental defective or who have been committed to an institution are exactly the kind of potentially dangerous people that have historically been excluded from possessing firearms. Thus, Section 922(g)(4) is consistent with that longstanding and analogous traditions of restricting firearm possession. Restrictions on the rights of those adjudicated mentally ill or involuntarily committed to a mental institution are therefore constitutional under *Bruen.* As such, Gould's claim that § 922(g)(4) unconstitutionally infringes on a Second Amendment right should be denied.

## III.    CONCLUSION

*Heller* and *Bruen* are clear that the Second Amendment protects possession and use of firearms for lawful purposes by law-abiding, responsible citizens. The Constitution does not protect the conduct § 922(g)(4) prohibits: possession of a firearm by a person who has been adjudicated as a mental defective or has been committed to any mental institution. Moreover, even if such conduct was covered by the Second Amendment, the statute is consistent with the nation's

14

historical tradition of firearm regulation with respect to the mentally ill. The statute is facially

constitutional, and Gould's motion to dismiss should be denied.

Respectfully submitted,

WILLIAM S. THOMPSON
United States Attorney

By:     */s/ Timothy D. Boggess*
        TIMOTHY D. BOGGESS
        Assistant United States Attorney
        West Virginia Bar No. 6768
        300 Virginia Street, East
        Room 4000
        Charleston, WV 25301
        Telephone:  304-345-2200
        Fax: 304-347-5104
        Email:  Timothy.Boggess@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

It is hereby certified that the foregoing "RESPONSE OF THE UNITED STATES IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS" has been electronically filed and service has been made on all counsel of record this the 17th day of March, 2023 upon:

>      Lex Coleman, AFPD
>      United States Courthouse, Room 3400
>      300 Virginia Street East
>      Charleston, West Virginia 25307

>      <u>/s/ Timothy D. Boggess</u>
>      TIMOTHY D. BOGGESS
>      Assistant United States Attorney
>      WV Bar No. 6768
>      300 Virginia Street, East
>      Room 4000
>      Charleston, WV 25301
>      Telephone: 304-345-2200
>      Fax: 304-347-5104
>      Email: Timothy.Boggess@usdoj.gov

1

```
              IN THE UNITED STATES DISTRICT COURT
          FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
                        AT CHARLESTON

_____x
                              :
UNITED STATES OF AMERICA,      :      Criminal Action
                              :
              Plaintiff,       :      No.  2:22-cr-00095
                              :
v.                             :
                              :      Date:  March 30, 2023
JAMES GOULD,                   :
                              :
              Defendant.  :
_____x


         TRANSCRIPT OF PRETRIAL MOTIONS HEARING HELD
    BEFORE THE HONORABLE THOMAS E. JOHNSTON, CHIEF JUDGE
              UNITED STATES DISTRICT COURT
              IN CHARLESTON, WEST VIRGINIA

APPEARANCES:

For the Government:       AUSA TIMOTHY D. BOGGESS
                          U.S. Attorney's Office
                          United States Courthouse & IRS
                          Complex
                          110 North Heber Street, Room 261
                          Beckley, WV  25801


For the Defendant:        AFPD LEX A. COLEMAN
                          Federal Public Defender's Office
                          Room 3400
                          300 Virginia Street, East
                          Charleston, WV  25301


Court Reporter:           Ayme Cochran, RMR, CRR

Proceedings recorded by mechanical stenography;
transcript produced by computer.
```

2

1           PROCEEDINGS had before The Honorable Thomas E.

2    Johnston, Chief Judge, United States District Court,

3    Southern District of West Virginia, in Charleston, West

4    Virginia, on March 30, 2023, at 10:01 a.m., as follows:

5           COURTROOM DEPUTY CLERK:  The matter before the

6    Court is the United States of America versus James Gould,

7    criminal action number 2:22-cr-00095, scheduled for a

8    Pretrial Motions Hearing.

9           THE COURT:  Good morning.  Will counsel please

10   note their appearances?

11          MR. BOGGESS:  Timm Boggess, Assistant U. S.

12   Attorney for the United States.

13          MR. COLEMAN:  Lex Coleman, Your Honor, on behalf

14   of James Gould, who is seated in the courtroom to my left.

15          THE COURT:  Good morning.  I don't think we

16   anticipate any testimony today.  We're talking about legal

17   argument; am I correct about that?

18          MR. COLEMAN:  That's correct.

19          THE COURT:  Okay.  So, I don't think there's any

20   need to put the defendant under oath.

21       We are here today on the defendant's motion to dismiss.

22   I have read the briefing, so keep that in mind.  I'm

23   familiar with the arguments.

24       I guess the question is who goes first?  It is the

25   defendant's motion, but as I read *Bruen*, it's the

```
 1    Government's burden.  So --
 2              MR. COLEMAN:  I offered before the hearing to
 3    allow Mr. Boggess to go first, but I'll accommodate anything
 4    as you wish.
 5              THE COURT:  All right.  Mr. Boggess, I will hear
 6    from you first.
 7              MR. BOGGESS:  First off, Your Honor, the United
 8    States obviously feels this motion should be denied.  For
 9    the reasons we set forth in our sentencing memo, the United
10    States takes the position that this regulation, 922(g)(4),
11    is consistent with the historical tradition of firearm
12    regulation.
13         In looking at the cases, you've got to first look at
14    what *Bruen* actually stood for and what *Bruen* actually
15    decided.  And that was when *Bruen* looked at a may issue
16    licensing regime that directed -- that reviewed whether or
17    not the Government could make law-abiding citizens show
18    proper cause to get a permit to carry a gun for self defense
19    or possess a firearm for self defense.
20         The concurring opinions referenced that it did nothing
21    to impact those shall-issue states or jurisdiction that is
22    would often restrict gun ownership by convicted felons and
23    those that are mentally ill.  The possession or the
24    prohibiting of the possession by those who have suffered
25    some kind of mental illness is consistent with the
```

4

1    historical tradition in that it disarms those that are

2    dangerous -- or dangerous to the community.

3         We set forth much of that in my -- in my memo to the

4    Court.  So, I don't want to rehash everything.  The Court's

5    familiar with that.  But I do want to make a couple of

6    points.

7         I think it is very important to know that the

8    concurring opinions, and I know that they were concurring

9    opinions, but we still have Supreme Court justices

10   addressing how they view what *Bruen* stood for.  Justice

11   Kavanaugh actually said it's not meant to cast out on

12   longstanding prohibitions of the possession of firearms by

13   felons and the mentally ill.

14             THE COURT:  Now, that's a familiar passage from

15   *Heller*, correct?

16             MR. BOGGESS:  Yes.  It's also from *Heller*.  And

17   then Kavanaugh quotes that in his concurring opinion and

18   Justice Alito actually mentioned that we decide -- we decide

19   nothing about who may lawfully possess a firearm and that

20   the U. S. Government's -- in *Bruen* the respondents could not

21   establish or show a -- could not establish the required

22   showing of a special need to establish that they must have a

23   special need.

24        Let me rephrase that.

25        They could not establish the historical tradition of

1    showing a historical -- the historical tradition, a showing

2    of a special need, to carry a firearm for self defense.

3    That's where *Bruen* failed; or *Bruen* didn't fail, but the

4    Government failed in *Bruen*.

5        So, for those reasons, the United States still feels

6    that the fact that through history -- actually, those that

7    suffer from mental illness have been either adjudicated a

8    mental defective or committed to an institution,

9    fortunately, are treated much better now than they did at

10    the time of the founding of the Second Amendment.

11        At that time, the -- those that suffered from mental

12    illness were treated within their families as a personal

13    issue or, if the Government did step in, they were

14    committing them and putting them in cells and completely

15    removing them from society.

16        THE COURT:  Places like the Trans-Allegheny

17    Lunatic Asylum.

18        MR. BOGGESS:  So, they -- this -- they disarmed

19    them by removing them completely from society so there was

20    not a need to specifically have legislation preventing them

21    from possessing the firearms because they removed them from

22    all of society so that they could no longer create that

23    danger.

24        Fortunately, there -- there are much more avenues for

25    those that suffer from mental illness today and, in doing

1    so, there is also the regulation now that prohibits them

2    from possessing the firearms because they do -- are more

3    likely to create a danger to the community.

4         I hate to bring it up, but, you know, we see it all the

5    time in the news of problems that are happening in our

6    society.  The most recent was the one in Nashville.  That

7    person had not been adjudicated mentally defective, nor

8    committed, but there are many things coming out now about

9    the mental issues that that person may have been facing and

10   there's much of a call for legislation and work by our

11   Congress to make more restrictions on people obtaining

12   certain types of firearms.  And so, still as recently as

13   last week, we're seeing the dangers of those that have

14   suffered from mental illness in possessing these firearms.

15        So, for all of those reasons, with the reasons that

16   I've set forth in my sentencing memorandum to the Court --

17   or not sentencing memorandum, but my memo to the Court, the

18   United States feels that this is a proper regulation and

19   that the motion filed by the defendant should be dismissed.

20             THE COURT:  All right.  I've got a few questions

21   for you.

22             MR. BOGGESS:  Yes, sir.

23             THE COURT:  I understand your argument that the --

24   in the founding era people who displayed mental health

25   problems and particularly those who appeared to be dangerous

1    as a result were typically locked up.

2              MR. BOGGESS:  Yes, sir.

3              THE COURT:  Either dealt with as a matter of -- as

4    a family matter or locked up in these places that are now

5    tourist attractions.

6        Did you go and look and see if there were any actual

7    statutes in the colonial era, in the founding era, in any of

8    the colonies or states that address this specific issue?

9              MR. BOGGESS:  I did not see any.  I did not do a

10   complete deep dive into that, but what I did look, I did not

11   find anything that specifically addressed that.

12       When you look at it, you know, historically we also

13   didn't find anything talking about the possession of

14   firearms by the illegal users of controlled substances, for

15   those that are addicted to controlled substances or alcohol,

16   but that is still somewhat consistent with the historical

17   regulations and that prohibits those that are dangerous to

18   the community, those that could show impaired judgment in

19   possessing these firearms.

20       The Second Amendment was not unlimited.  So, first off,

21   under these circumstances the United States' position is, as

22   we said in our memo, that this defendant is not protected by

23   the Second Amendment because the Second Amendment protects

24   those law-abiding citizens to possess the firearms.  We're

25   not necessarily saying that he's necessarily not

```
 1   law-abiding, but he does have other restrictions that makes

 2   him a danger to his -- a danger to the community.

 3            THE COURT:  Law-abiding and responsible.

 4            MR. BOGGESS:  Right.  And the responsible part of

 5   it is the fact that they just show impaired judgment either

 6   through the addiction of controlled substances or through

 7   the mental -- through the mental illness.  We're not saying

 8   that they're necessarily a bad person, but there is things

 9   that impact their ability to exercise sound judgment.

10        This defendant has actually been committed four times,

11   which is concerning for the possession of the firearms.

12        So, I did not find a specific regulation.  I do not

13   find anything that addressed mental illness like it does

14   today.  I mean, the Court is well aware that that's becoming

15   a bigger and bigger issue that people are talking about more

16   openly.

17        You know, even when I was a kid, people didn't talk

18   much about mental illness.  It's just now becoming to where

19   it's becoming a topic and being addressed by Congress and

20   everyone else.  So, that was not something that was a -- as

21   you said and as I said, you know, people were locked up.

22   They were kind of hidden from the public in the day.  It was

23   not something that was specifically addressed like it is in

24   today's -- or I hate to say modern times, but in modern

25   times.
```

9

1            THE COURT:  Well, and even in modern times, this

2    statute was passed in, what was it, 1968.  And, you know, it

3    seems to me that cuts a couple of different ways.

4            Number one, I think that we have a less-stigmatized,

5    more scientific view of people with mental illness now than

6    we did in 1968.  However, we also have, as you mentioned, a

7    proliferation of incidents like the one in Nashville last

8    week starting, and I'm sure it wasn't the first one, but the

9    first one that sort of emerged into public consciousness was

10   the Columbine incident.  And so, in many of these instances

11   it appears that mental health was at issue, at least in

12   part.

13           So, even since 1968, we have a different understanding

14   of these -- of these issues than we did at that time.  I'm

15   not sure that that makes a whole lot of difference in this

16   particular argument, but the views of mental illness and

17   violence, I think, have changed even since this statute was

18   passed.

19           That does bring me -- and that's an editorial comment,

20   I think, more than a question, but that does bring me to

21   another question that the defendant actually did not raise,

22   and that is the breadth of the sweep of the statute.  Now, I

23   guess this would be an argument Mr. Coleman might make if he

24   was raising an as-applied challenge but, for example, if you

25   have somebody who was committed for 30 days to a mental

1    health hospital, mental health facility, at the age of 18 or

2    19, after their 30 days they come out, they have improved,

3    they go on with their lives, they have no further

4    difficulties.  What would you think the *Bruen* Court would

5    say about a lifetime firearm prohibition on someone like

6    that?

7           MR. BOGGESS:  Well, Your Honor, the West Virginia

8    statute actually specifically addresses -- and I know I'm

9    talking a state statute, but under the State Code, I think

10    it's 61-7-4.  I noted it in my -- in my brief.

11       If you look at the state statute, it actually has a

12    provision that those that have been committed can actually

13    establish that they have had their -- I don't know the exact

14    term.  I don't want to say competency restored.  That's a

15    term that we use oftentimes in court for people that are

16    incompetent to stand trial, but if they can establish that

17    they have overcome their mental illness they can actually

18    have their gun -- their rights to possess a firearm

19    restored.

20       So, under West Virginia Code, they can address that

21    very specific issue.  I think if you have your right to have

22    your firearm restored under a state statute, I would think

23    that the federal courts would give some credence to that if

24    they had been able to go through that process and establish

25    that they are no longer suffering from that mental illness.

```
 1              THE COURT:  Well, in fact, this charge is not
 2     brought very often.  This specific charge is not brought
 3     very often.  In fact, in probably 20-25 years of handling
 4     firearms cases, including prosecuting them vigorously when I
 5     was a U. S. Attorney, we never once brought one of these
 6     because there's a built-in defense.
 7          If somebody has been adjudicated to be a mental
 8     defective, or has been committed, especially long-term or on
 9     multiple occasions to a mental health facility, you're
10     probably looking down the barrel of a -- which is a terrible
11     pun I did not intend, but --
12              MR. BOGGESS:  I'm glad you said that.
13              THE COURT:  You can expect an insanity defense.
14              MR. BOGGESS:  Yes, sir.
15              THE COURT:  And so, this is actually the first
16     time I've seen this charge.  And so, there's not a lot of
17     law on it, unfortunately, which may or may not be part of
18     the reason that Mr. Coleman chose this case to raise this
19     issue.
20          I've got myself off track there, so is -- but I guess
21     the -- I guess my original question was could it be argued
22     that this sweeps too -- that this statute sweeps too broadly
23     and you say that the State -- the State has a process to
24     restore the person's rights, but the federal government
25     doesn't.
```

```
 1        Now, we have an interesting analog to that because we
 2   have a whole host of states now that legalize marijuana,
 3   which to such a great extent that there's a lot of people
 4   out there that think that in those states it's completely
 5   legal to use marijuana and it's still totally illegal to do
 6   so under federal law.
 7        So, anyway, again, I'm editorializing.  I think this is
 8   an interesting issue so I'm editorializing here a little
 9   bit, but I think it's obvious you can't speak for a future
10   U. S. Attorney who might be confronted with that very
11   situation.
12            MR. BOGGESS:  That, I cannot do, but I would hope
13   that all prosecutors would use prosecutorial discretion in
14   reviewing such matters and although that may sweep with a
15   broad brush when you look at the underlying factors they
16   have gone through the process of having their gun rights
17   restored, I do not -- I cannot speak for everyone, but I
18   would not think that would be one that personally I would
19   want to bring forward for numerous reasons, but the statute
20   is there that we are -- that does sit there and it's still
21   the United States' position that it is there for a specific
22   reason and that reason is to protect the public from the
23   dangerousness of those that would suffer from mental illness
24   and can cause dangers to the community and harm to the
25   community.
```

1          THE COURT:  I'm going to editorialize again.  When

2    I was in college, I did a paper on colonial militias because

3    I had a professor who was really into that stuff and I

4    thought I was going to impress him, and I spent hours and

5    hours in the downtown library at WVU in a very old dusty

6    section of the library several floors up reading books about

7    colonial militias that were covered with dust and -- and I

8    still got a B on the paper, which made me mad.

9          But, anyway, the Supreme Court has sort of set this

10    thing up at -- on an analysis that I think would be

11    challenging for historians, let alone lawyers.

12          And -- now, Mr. Coleman has obviously taken a

13    particular interest in this going back a decade or so now,

14    and that's great.  I'm interested in history, too.  I'm not

15    as interested in militias as I used to be because I still

16    have a bad taste in my mouth from the grade I got on that

17    paper, but it seems to me that this presents difficulties

18    because, instead of focusing on what the law is now, you

19    have to do this analysis based on what is for us now rather

20    ancient law and that, in particular, since the Government

21    has the burden, is pretty challenging for you all.

22          MR. BOGGESS:  It is and it isn't, Your Honor,

23    because when you look back historically, it's clear that

24    historically the founding fathers even limited the

25    possession of firearms by those that they considered a

1    danger to the community.  So, that has been since the

2    beginning.

3        The reason that they limit possession of firearms by

4    those that suffer from mental illness is because they do

5    exhibit impaired judgment, thereby creating dangers to the

6    community.

7        So, from that standpoint, since the founding fathers

8    created the Second Amendment there has been limits under

9    that in that those that were dangerous to the community

10   could not possess firearms.

11       So, this is directly consistent with the historical

12   tradition of firearm regulation.

13               THE COURT:  All right.  Anything else?

14               MR. BOGGESS:  No, Your Honor.

15               THE COURT:  All right.  Mr. Coleman, the floor is

16   yours.

17               MR. COLEMAN:  Thank you, Your Honor.

18       And the interest in the case is, besides filing the

19   motion for this client, I was happy you were taking cases

20   and you would analyze this because whether I win or lose, I

21   have confidence in the analysis.

22       *Bruen* is problematic in some senses, but if we're going

23   to say -- or dismiss *Bruen* because of originalism, I'm

24   sorry, I kind of -- that's been the way the Constitution in

25   my mind should have been construed from the beginning.

1         And *Bruen* has openly said, you know, we interpret these

2    rights as the way they existed when they were enshrined and

3    that was in 1791, or at least the range I gave in my brief

4    that we can best place it.

5         The United States focus on English law, that, to me, is

6    ancient and it's also interesting George III had documented

7    mental illness and was king of a country.

8             THE COURT:  I don't figure anybody was disarming

9    him though.

10            MR. COLEMAN:  No, sir.  Exactly.

11        I'm -- I don't mean to be scattered.  Monday I got to

12   see the name of a child I last saw when she was two murdered

13   and we've now had five national -- our last five national

14   mass shootings were committed by one nonbinary and four

15   transgender shooters.  Irrespective of whether gender

16   dysmorphia [sic] is a mental illness, no one is going to

17   categorically disarm transgender citizens in this country.

18        Yet, my client, having been involuntarily committed by

19   a simple probable cause standard in a civil proceeding with

20   a certificate of a licensee, in many instances by a licensed

21   social worker supervised by a psychologist was, under our

22   State's law and under the 50 states' law, and now it's very

23   easy to deprive some of our must vulnerable citizens of all

24   of their rights.  If for no other reason, then they want to

25   be conservative and just be safe.  They don't know.

1      And I've seen certificates of licensed professionals

2   that were written out by hand on a form that is smaller than

3   what Probation uses to try and do a Pretrial Services

4   Report.

5      And that's the nature of the law and the way we've

6   decided, unfortunately, with our states how to handle,

7   again, what I consider a category of some of our most

8   vulnerable citizens, and my client is one of them, or has

9   been presumed to be part of them.  I haven't heard anyone

10  declare him mental defective at all.  And each time he's

11  been involuntarily committed they've deemed he's not a

12  danger to himself or the community and they've released him.

13     And even though there have been four things filed by

14  his former wife, who is now deceased; his brother, where

15  there is a family dispute over a business and an estate,

16  where those motives, either they were a concern I had, but

17  it's not relevant to the criminal case.  He hasn't shot

18  anyone.  The first time they tried to do it was in 2007.  He

19  hadn't hurt a soul.

20     So, the prediction that just because he has been

21  involuntarily committed he poses this excess danger has not

22  been realized whether people fully understand his behavior

23  or not, regardless of what speculation they have about that.

24          THE COURT:  Well, and this may be your next --

25  this may very well be your next motion, but there are quite

```
 1    a few convicted felons out there who you could argue pretty
 2    persuasively are not particularly dangerous.  And the first
 3    one -- the first one that comes to mind for me before he
 4    passed away was Arch Moore.  Arch Moore was a convicted
 5    felon, but I don't think anybody thought he was a danger to
 6    anybody.  So, the law -- and the law has always captured
 7    people in its sweep that are not necessarily dangerous, but
 8    have -- but has recognized that those categories of people
 9    are far more likely to be dangerous.
10              MR. COLEMAN:  One of the more depriving people of
11    fundamental interest on probability and potential, which has
12    always troubled me.  It's like the thought police.  It's
13    like pre-crime.  We want to be -- err on the safer side, so
14    we're going to take the rights away from a category.  Even
15    though people swept up in the category, aren't doing
16    anything wrong and aren't likely to do it, we've decided --
17    our Government, more accurately has decided, in the
18    Twentieth Century, not prior to it, and the United States,
19    in its memorandum, your question was good, whether
20    distinctly similar or relevantly similar, there is not one
21    identified historical analog to say that -- would support
22    922(g)(4).  Not a municipal code, not a colonial code, not a
23    state statute.
24              THE COURT:  Now, have you dug into those dusty
25    books to figure that out?
```

1           MR. COLEMAN:  I almost brought my 1803 copy of

2    Blackstone up and I figured -- I showed it to Judge Faber --

3    I'd save the dust and the bugs.  But I have looked and

4    there's very little there.

5         But there are state codes available through Duke.

6    There's plenty available through Westlaw and Lexis.  A lot

7    of it is hard to read.  A lot of it doesn't make any sense.

8    It's very time consuming.

9         But you don't need an historian or a Second Amendment

10   scholar to come in and look.  You've got to -- if we're

11   going to look at concurrences, look at the one for *Rahimi*,

12   as well as the majority opinion dealing with the idea of we

13   have these dangerous people we have to manage.  The Fifth

14   Circuit dealt with that very effectively and justified very

15   clearly why it did not support a (g)(8) being

16   constitutional.  There's no difference with a (g)(4).

17        What we do have --

18           THE COURT:  The (g)(8) being the protective order?

19           MR. COLEMAN:  Yes, sir.  So --

20           THE COURT:  A protective order though is -- is the

21   only prohibition that has an end point.

22           MR. COLEMAN:  It has a --

23           THE COURT:  An end point.  In other words, once

24   the protective order ends, the prohibition ends.

25           MR. COLEMAN:  I agree.

```
 1                THE COURT:  That's the only one --
 2                MR. COLEMAN:  And then the Fourth Circuit opined
 3      if you don't want a (g)(3), stop using drugs.  But, you're
 4      right, having an actual end point formally is the (g)(8).
 5                THE COURT:  That's true.  That's true.
 6                MR. COLEMAN:  As far as the scope of (g)(4), it --
 7      the Gun Control Act does not take into account the degree of
 8      any infirmity that might be an issue that would justify the
 9      involuntary commitment.  It doesn't take into account the
10      duration.  It doesn't take into account the permanent
11      disarmament that results that once they're released, they've
12      been deemed non-dangerous to anybody.  It doesn't take into
13      account how long ago it happened, which you've perceived.
14      The scope of the statute is certainly -- and we're really
15      before the Court just on one-half of it.  My client has not
16      been deemed a mental incompetent.  He has simply been
17      involuntarily committed.
18          So, to the extent --
19                THE COURT:  That finding wasn't made as a part of
20      that commitment proceeding?
21                MR. COLEMAN:  Sir?
22                THE COURT:  That finding was not made as a part of
23      that commitment proceeding?
24                MR. COLEMAN:  No, sir.  There was a probable cause
25      finding only.  There was no formal designation.
```

1          THE COURT:  Probable cause of what?

2          MR. COLEMAN:  Probable cause of -- I think the way

3  it's worded on the form that he does pose a danger to

4  himself or other people.

5     Sorry I'm talkative.  I'm kind of possessive about

6  that.

7          THE COURT:  Well, at any rate, the Government is

8  not charging him under that prong of the statute.

9          MR. COLEMAN:  Right.  So, again, they've cited no

10  -- if we're doing *Bruen* and the Government's memoranda is

11  like, well, *Bruen* didn't decide (g)(4).  He is absolutely

12  right.  It set a standard.

13     It -- Judge Thomas went to great lengths.  And I'm

14  disappointed in *Rahimi* where the Fifth Circuit went straight

15  to the relevant point analogous and said the distinctly

16  similar prong of the *Bruen* analysis because mental health

17  was an issue at the time of the founding, whether people

18  were mentally infirm or not and what damage they may or may

19  not -- and they did not choose to address it through

20  disarmament.

21     And, again, I cite an historical example of why that

22  made sense.  It wasn't that we kept it secret in the family

23  because when someone's running around with a musket shooting

24  people in public, you're not hiding it.  And the presumption

25  is they really just locked everybody up, there is an

1    expectation about the Government that has the burden

2    establishing that there were laws that did that.

3        I mean, when Scalia made the comment in *Heller* to kind

4    of settle everybody down he did such a lengthy analysis of

5    the people to get to the finding that this is an individual

6    right.  The rest of the opinion more or less in the home is

7    going, look, this is where it's -- if we're going to have

8    it, it's the strongest, and not the exclusive right.  And

9    you know that.

10       I mean, the dicta argument has been around for awhile,

11   but that's actually how it worked.  But I took Justice

12   Scalia as knowing more than me in saying, you know,

13   long-standing.  I assume felons, and lunatics, and however

14   many people they wanted to offhand identify, which was dicta

15   because it had nothing to do with the substantive ruling,

16   were right and had been around since the founding.  No.  We

17   have a very 20th Century perspective because that's our

18   generation and when we've lived.  I assumed somebody knowing

19   more than me understood the history.  They didn't disarm

20   felons.  The ones they didn't execute, the gave a musket and

21   said show up.  The British are coming.  And whoever else is

22   coming after that.  People who were, let's call them

23   lunatics, they were temporarily disarmed because they were

24   temporarily held until the mania passed.  And then, back

25   then, a rifle was a grocery cart.  It was an Army since we

1    didn't have a standing one.  It protected you from people

2    who would harm you and your family.  And it fed you in many

3    instances.  So, it made sense that -- and particularly with,

4    again, the Boston Siege, as I cited in my memo, they did not

5    address problems by disarming citizens.  So, there is not an

6    historical analog to this and the dearth of law, even

7    dealing on the civil side with it, that surprised me, as

8    well, and I have litigated the felon side of it.  And I've

9    referred to it some because, to me, they go hand-in-hand as

10   to how they were briefly mentioned in *Heller*.  They're only

11   mentioned three times in *Heller*.  They're mentioned once or

12   twice in *McDonald*.  They were mentioned over and over and

13   over in *Bruen* because that's what the parties were saying,

14   we should be able to get this under these circumstances

15   because my client is law-abiding and it was part of their

16   argument, but it was not the basis of the Court's decision.

17       They -- we watched -- and I'm sorry.  I consider the

18   amorphous law-abiding citizen.  That's not defined and even

19   mentioned in the Second Amendment.  It's not fairly defined

20   in any Supreme Court opinion.  I may have went a little far

21   with the examples in my brief, but what is that?  Who is

22   that?  And who -- more importantly, who decides that and how

23   often?  It's like the second opinion, the final opinion, the

24   *Rahimi* decision at the 61 F.4th 443.  They said one day

25   you're in, one day you're out, depending on who decides

1    what, a magistrate in West Virginia when you get picked up

2    on a complaint?  Congress?  These are fundamental rights.  I

3    mean, the First and Second Amendment, there's no doubt

4    they're under attack right now, fully under attack, and all

5    the judges that don't even get to applying the analysis of

6    *Bruen* correctly, there are easily 40 District Court opinions

7    now on the felon in possession.  *Range* was withdrawn because

8    it flippantly went in quickly.

9        But they're -- whether deliberately or unwittingly,

10   they're helping advance these attacks on First and Second

11   Amendment freedoms.  I've never seen anything like this in

12   my life.  I never believed I would.  I was very relieved to

13   see *Heller* finally get it right with the Second Amendment.

14   And like every over fundamental right and every other -- the

15   way our system is set up, this is going to be litigated long

16   after we're dead.  And that's okay.  That's the pragmatism

17   of the system the founders put together.  It's okay.

18       Judge, I remember after constitutional carry was passed

19   here, went to Kroger, going for a lower shelf can.  There

20   was a lady behind me.  And I turn and look.  And there's a

21   .32 in a holster.  And I'm thinking, what is this, a police

22   officer?  No.  It was a blue-haired girl with a lot of

23   piercings and tattoos.  And I thought for a minute, okay,

24   this is what constitutional carry is.  And you know what?

25   It's okay.  She's not posing any threat to me.  She has a

1    tool.  Just like if I walked in with a hammer and a

2    screwdriver, it's a tool, and it's something --

3         THE COURT:  Arguably, what she was doing was never

4    illegal because she was openly carrying.

5         MR. COLEMAN:  Exactly.

6         THE COURT:  Under constitutional carry, as I

7    understood it, meant it was concealed carry without the need

8    for a permit.

9         MR. COLEMAN:  You're right, but after that had

10   passed, that's when I started noticing citizens carrying

11   their guns.

12        THE COURT:  I understand

13        MR. COLEMAN:  And it's okay.  It's different.

14   That -- that -- I had this argument with Judge Aboulhosn.  A

15   lot of our struggle is that the originalism and how it was

16   in 1791 is obviously unfamiliar to us.  That doesn't make it

17   wrong, and it doesn't make it bad, and there are benefits to

18   having those deterrents out in the open and not

19   criminalized.

20       I mean, we look -- look at the gun statistics with the

21   U. S. Sentencing Commission.  How many people are going to

22   jail for lack of money?  Actually, illegally using a gun to

23   cause injury; whereas, in the federal system, just

24   possessing one?

25       They get pulled over, they've got a gun in the car.

1    They did a search warrant for something else, there was a

2    gun in the car.  Had nothing to do with the reason that the

3    officers were there.  And now, they're not just looking at

4    0-10, thanks to the Safer Communities Act last June, they're

5    looking at 0-15.  And here I've got with a (g)(4) the least

6    culpable of the categorical groups of citizens to be

7    disarmed and hold to different standards.

8        He did nothing to create whether disability applies to

9    him.  Third parties did.  Nature did.  Something else did.

10   And it wasn't the result of deliberate conduct on his part.

11       And, yet, Congress in 1968 in Kennedy, Robert Kennedy.

12   Malcomb X had been murdered.  We had all these rash of

13   murders at the end of the 60s.  Congress met twice that year

14   to pass the Gun Control Act when it hadn't done anything

15   nationally since the 30s when Bonnie and Clyde were using

16   machine guns to kill state troopers.  Those were our two big

17   waves in the late 90s after the Reagan War on Drugs or the

18   Nixon War, but we had the War on Drugs.  We had adjustments

19   to that.  But those are the two epics in the 20th Century

20   when we disarmed our citizens.

21       There are -- if we're going to apply -- let's -- let's

22   stick to *Bruen*.  I don't want to wander too far afield.

23   *Bruen* repeatedly says conduct, conduct, conduct.  It doesn't

24   say whose conduct.  It says conduct.

25       The first prong is simply related to is conduct

```
 1    protected by the Second Amendment burdened by the
 2    regulation.  The Government has changed the language on
 3    that.  And I'm not saying Mr. Boggess specifically.  I know
 4    DOJ has been arguing it even since '08 that, well, it's
 5    possessing a gun by a law-abiding citizen.  And, to me,
 6    that's insidious because, again, whoever is making that
 7    definition is trying to decide and delineate who we have as
 8    other citizens can exercise our fundamental rights just as
 9    much.
10                THE COURT:  Should John Hinckley, Jr. have a gun?
11                MR. COLEMAN:  Well, he's done his sentence and
12    he's been released.
13                THE COURT:  Well, I don't think he's -- I don't
14    think he was ever convicted.
15                MR. COLEMAN:  Was he not?  Actually, I think
16    you're right.  I think --
17                THE COURT:  I think he was found not guilty by
18    reason of insanity and was committed.
19                MR. COLEMAN:  Right.
20                THE COURT:  And ended up being committed for
21    something in the neighborhood of 35 years, but was released
22    within the last couple of years.  So, should he have a gun?
23    Jodie Foster is still alive.
24                MR. COLEMAN:  Should he have a gun or is it
25    constitutional to disarm him?  And I would say it's not
```

1　constitutional to disarm him.

2　　　　THE COURT:  So, constitutionally, your argument is

3　that John Hinckley, Jr. should be able to have a gun?

4　　　　MR. COLEMAN:  Applying *Bruen* to the Second

5　Amendment, yes, sir.  There's no historic tradition of

6　disarming mental incompetents at the time of the founding.

7　And it's the same question the *Rahimi* Court put that I put

8　in my memo, too.

9　　We're not debating whether it's a good prudent idea or

10　good policy.  We're applying the Constitution.  The text

11　does not allow for it.  The history does not allow for it.

12　And *Bruen* says when those two buttons aren't pushed, it's

13　presumed to be unconstitutional unless they carry the burden

14　to show an historical tradition that supports it.

15　　And in the term -- in the context of who can have a gun

16　what the Government has been consistently doing nationally

17　is being very general, very broad, going back to England

18　saying Protestants could have it and Catholics couldn't.

19　Native Americans, Blacks, slaves could not, and neither

20　could -- did I say Native American Indians?  The point is

21　classifications of people that wouldn't possibly pass

22　constitutional muster today.

23　　So, they're left with the generalized, gosh, it might

24　be dangerous.  And we're back to that's undefined.  And

25　we're back to under the guise of law-abiding, responsible

1    citizens, that sounds reasonable until someone starts

2    designating what that is.  And the big speech with the red

3    lights last summer was that MAGA Republicans aren't.

4        How far does that go?  Are we going to go to

5    transgender?  Are we going to go to the nonbinary?  Are we

6    going to go to any other classification we're seeing people

7    struggling with living here?

8        That's why it's the Constitution.  It's not fluid with

9    that.  That's why we have the originalism, because the

10   foundational premises need to be stable over time.  They

11   weren't for the longest time because in the 20th Century we

12   interpreted the Second Amendment in an unconstitutional way

13   by saying, hey, it's all about malitia.  It doesn't matter.

14   We can do whatever we want to, to disarm them.  And it took

15   until 2008, over 200 years, for the Court to get it right

16   and say, well, no, there's an individual right to self

17   defense historically under natural law consistent with our

18   tradition of individual rights.

19       The founders did this.  And they did it after a war

20   where basic euphemisms of war and interaction with citizens

21   were not observed or recognized by the British when they

22   were trying to keep the colonies.  That's why we needed help

23   from the French.  And our founders didn't want to repeat all

24   that.

25       I mean, I -- it's very difficult not to conclude that

1   the founders in our Constitution were not (unintelligible)

2   --

3           COURT REPORTER:  Were not -- I'm sorry, what?

4           MR. COLEMAN:  Divinely inspired because the

5   insights, the foresight, the precepts that have prevailed

6   over time have made a society where we have 7 million people

7   trying to break in and walking in and have over the past two

8   years and, yet, we have a hundred thousand people who are

9   OD'ing that were born here and have all the benefits of

10  being our citizens.  I can't reconcile that contradiction

11  any more than I can get my head around it or anytime any

12  incident like that happens.

13      But it's not the gun's fault.  It's not the Second

14  Amendment's fault.  It's not dealing with some of the

15  problems constitutionally that we need to be doing and

16  choosing to do it by limiting the right to access a tool.

17      So, getting back to *Bruen*, *Heller* does not say that the

18  people are only law-abiding citizens.  *Rahimi* did a really

19  good analysis of that in the 2023 opinion.  And I think it's

20  a correct one.  And I think -- I think if you're going to

21  apply *Bruen* the way it's written and the five justices

22  signed onto it, your first finding needs to be that his

23  conduct is protected by the first *Bruen* prong and protected

24  by the Second Amendment.

25      The burden then shifts to the United States to

1   establish with evidence to you that there's enough tradition

2   there.  I submit it should be distinctly similar so there's

3   a tight match.

4        But in the absence of that, that at least in this

5   individual's case, is the indictment should be dismissed,

6   again, applying *Bruen*.

7        *Bruen* doesn't say we're controlling who.  It gives us a

8   standard that's being applied now.  *Bruen* has thrown into

9   question the legitimacy of every firearm regulation in this

10  country now, particularly those that were adopted under the

11  pre-*Heller* interpretation in the Second Amendment.  And

12  we're going to have to go through this.  And that's -- and

13  that's okay, too.

14       And there are going to be some people who are concerned

15  about having guns that I would hope Courts would recognize

16  and apply and say, yeah, they can because that's part of the

17  fundamental freedoms we have.

18       In light of everything where we're not scared, there's

19  no guarantee of outcomes with our way of life.  There's a

20  guarantee of opportunity.  And that has been slowly whittled

21  away not in the 20th Century, and even in my own lifetime,

22  and if it doesn't stop, I mean, instead of being complicit

23  in the denial of that, my hope, my investment is that the

24  Courts will be the buffer, the protection of those rights,

25  where the Executive and Legislative Branches seem to have

1    totally run off the road.  They bought into fear.  We saw

2    that during the pandemic.  We're afraid of people who might

3    have been committed before.  Does that mean they can't

4    defend themselves?  Does that mean they're supposed to

5    continue being victims all their lives?  That's not fair.

6    And it's certainly not consistent.  And the way the

7    categories were set 50-60 years ago, you're right.  Are we

8    going to modify them now?  Are we going to have Gun Control

9    Act III?  Are we going to be like the Versailles Act and how

10   -- have the new Patriot Act on steroids?

11       I don't know if you saw that last night.  They're --

12   they're -- they want to give to the Senate, Lindsey Graham

13   is supporting it, which would be hilarious if it wasn't so

14   dire.  An act that's going to give the Commerce Department

15   under the guise of regulating TikTok the right to go through

16   all our search histories, seize it whenever they want.  It

17   can't be subject to a Freedom of Information Act request.

18   We can't object to it.  And if we interfere with it, they

19   propose to put us in jail for 20 years.  Nothing like that

20   would have been successfully proposed, much less introduced

21   as a bill even 20 years ago.  And that's where this is

22   going.

23       I think that's why *Bruen* was put down.  I mean, I

24   haven't talked to any of the Justices.  I'm very alarmed

25   that the Government, our Department of Justice, keeps

1    pointing to Brett Kavanaugh's concurrence as guiding the

2    interpretation of a case.  He didn't write a separate

3    concurring opinion.  It wasn't a plurality.  He signed onto

4    it as it was written, the majority opinion.

5         So, I -- great.  And he Justice Roberts felt like maybe

6    they had to explain something, but *Bruen* still says what it

7    says and they really went out of their way to articulate and

8    respond to the dissent, just like Scalia did with *Heller*

9    responding to the Stevens dissent.

10        So, the District Courts are left to apply that standard

11   and, at least in this case, there's no evidence before you

12   that shows any historic tradition, much less a relevantly

13   similar one and certainly not a distinctly similar one.

14        So, if you're faithfully applying *Bruen,* I would hope

15   the result is academic.  We may not like it, but we're not

16   in this to be result-oriented.  I'm an advocate for a client

17   but, at the end, our law didn't need to be developed in that

18   way and, unfortunately, after *Heller*, when we got to the

19   means in scrutiny and intermediate scrutiny and the

20   law-abiding citizen construct, that was result-oriented.  It

21   maintained the status quo.  *Bruen* changed the status quo;

22   not us.  Not you.  Not the Government.  And that's what we

23   have to work with.

24        There may be cases going up where they may tweak it

25   more, but until they do, this is what we've got.  And my

33

1    client has been in custody just about the length of time he

2    would be if he were convicted on this with his guidelines

3    and my argument to the Court is that you're right, this case

4    didn't come up a lot because it shouldn't be brought.  This

5    is not the way to handle mental health.  This is not the way

6    to ensure the safety of our communities.  And if we're not

7    going to take everybody who is posing a threat, like I

8    mentioned earlier, for the last five mass shootings, he

9    hasn't shot anybody and, yet, he's been sitting in jail and

10   subject to federal felony indictment.

11        He used to run a family business.  His parents died.

12   He's had an estate dispute with his brothers.  And he's got

13   a house up in Ravenswood.  His wife died of cancer a year

14   ago.  And he's had to spend that time in jail while his

15   child turns 18.

16        So, I hope you will rule in our favor on the merits

17   because it's the correct application.

18        Thank you.

19             THE COURT:  All right.  Mr. Boggess, I'll give you

20   the last word.

21             MR. BOGGESS:  Your Honor, Mr. Coleman indicates

22   that the defendant's danger has not been realized.  If we

23   wait all the time until the danger is realized then we

24   defeat our purpose of enforcing our laws and protecting the

25   community.

```
 1        Many of the laws are written to protect the community

 2   before dangers are realized.  This law is written to protect

 3   the community from the dangers that they see coming down the

 4   pike.

 5        There are increased danger of people that suffer from

 6   certain mental illnesses from possessing firearms.  The

 7   Court mentioned it.  I mentioned it.  Mr. Coleman has

 8   mentioned it.

 9        There have been many of the mass shootings that the

10   common thread in many of those seems to be underlying mental

11   illness.

12        The Court mentioned John Hinckley and whether or not he

13   should possess a firearm.  That is exactly what we're

14   talking about today, those that have been adjudicated mental

15   defective or committed.  There are avenues in the State of

16   West Virginia that they can have their rights restored.  If

17   they have something indicating that their rights have been

18   restored, I understand what the Court is saying there's not

19   a federal rights to restore.  I personally have not

20   prosecuted anyone that had their rights restored to possess

21   a firearm.

22             THE COURT:  Have you ever prosecuted a 922(g)(4)

23   before?

24             MR. BOGGESS:  I'm stepping into the shoes of one

25   today, Your Honor.  This is the first case -- this is -- a
```

1    922(g)(4) that I've ever encountered.

2              THE COURT:  Okay.  All right.  So, same here.

3              MR. BOGGESS:  This case was initially brought by

4    another AUSA prior to her leaving our office, but

5    nonetheless, this is a valid charge.  This is a valid

6    statute.  And it should be held constitutional.  It should

7    not be dismissed.

8         At the inception, and I mentioned it in my opening, but

9    I still think it's important to note that consistent with

10   the historical tradition of firearm regulation, the founding

11   fathers prohibited those that were dangerous to the

12   community from possessing firearms.  This is analogous to

13   that.  This statute is protecting the community from those

14   that have increased dangers of -- increased risk of

15   committing -- of being dangerous to the community.  That is

16   what this statute is written for.  It is valid.

17        We're asking the Court to uphold this and not dismiss

18   this -- this statute.

19        If the Court has any other questions, I think

20   everything else is in my memo.  I think I've -- now, I'm

21   just repeating everything I had said previously, but it is

22   important, and the United States requests that you deny that

23   motion.

24             THE COURT:  All right.  One last question.  Mr.

25   Coleman mentioned something a moment ago that perked my ears

1    up.

2        Assuming he's convicted of this, what -- have you done

3    a guideline calculation?

4            MR. BOGGESS:  I have at one point, Your Honor, and

5    I don't recall.  It's not --

6            THE COURT:  How long has he been in custody?

7            MR. BOGGESS:  Not quite -- I don't think it's been

8    a year yet.

9            THE DEFENDANT:  Can I speak?

10           MR. COLEMAN:  To me.  To me.

11           THE DEFENDANT:  I'm sorry.

12           MR. COLEMAN:  My client's reminded me his federal

13   custody started on August 23rd of 2022.

14           MR. BOGGESS:  So, almost nine months.

15           THE COURT:  So, he was in state custody before

16   that?

17           MR. COLEMAN:  Yes, sir.  There was -- yes, but

18   that has ended.  I calculate him as a 14, taking 2 off the

19   12, Category I.

20           THE COURT:  Is that correct?

21           MR. BOGGESS:  That sounds accurate, Your Honor.  I

22   just didn't remember what that range was.

23           THE COURT:  Well, in the *Pagans* case, when that

24   went on for awhile, when I started realizing that there were

25   people who, even if they were convicted, were spending more

```
1    time in custody than their sentence was likely to be, I

2    started releasing them on bond.  So, I'm going to take a

3    look at this.

4             MR. COLEMAN:  Thank you.

5             THE COURT:  Because it cuts into my sentencing

6    discretion.  And I have no idea what Mr. Coleman's

7    intentions are in the event that his motion is denied, but

8    assuming that his plan would be to either plead guilty or go

9    to trial and he's convicted, if he's looking at less time

10   than he's -- than he's spending now, that's not fair.

11      So, I don't know what the determination was to hold him

12   at the time.  I guess one of the magistrate judges must have

13   made that decision, but I will be looking at whether or not

14   he should be released on bond because he's already served

15   more time than he would even if he was -- even if he was

16   convicted at trial and didn't get acceptance of

17   responsibility, if he's already served more time than that,

18   it doesn't seem fair that he's still in custody.

19      Do you have anything to -- I -- I know I'm preaching to

20   the choir with Mr. Coleman.  So, do you have anything to say

21   about that?

22            MR. BOGGESS:  I absolutely cannot dispute that

23   logic, Your Honor.

24            THE COURT:  Well, all right then.  That's very

25   candid.
```

1          All right.  I'll be taking a look at that.

2          Anything else we need to take up today?

3               MR. BOGGESS:  No, Your Honor.

4               MR. COLEMAN:  No, Your Honor.  Thank you.

5               THE COURT:  All right.  I'll obviously take the

6     motion under advisement and we'll be working on an opinion.

7               MR. CARR:  Thank you.

8               THE COURT:  Thank you.

9          (Proceedings concluded at 10:55 a.m., March 30, 2023.)

10

11    CERTIFICATION:

12         I, Ayme A. Cochran, Official Court Reporter, certify

13    that the foregoing is a correct transcript from the record

14    of proceedings in the above-entitled matters as reported on

15    March 30, 2023.

16

17    s/Ayme A. Cochran, RMR, CRR                April 30, 2024

18    Ayme A. Cochran, RMR, CRR                          DATE

19

20

21

22

23

24

25

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### CHARLESTON DIVISION

**UNITED STATES OF AMERICA**

**v.**                                                    **Case No. 2:22-cr-00095**

**JAMES GOULD**

### DEFENDANT'S POST-HEARING MEMORANDUM
### IN FURTHER SUPPORT OF HIS *BRUEN* MOTION TO DISMISS

Comes James Gould, through his counsel Senior Litigator AFPD Lex A. Coleman, and based upon positions asserted by the United States during oral argument, further submits the following in support of his *Bruen*-based motion to dismiss:

**A. Housekeeping: Gould has fully served any prospective sentence through his pretrial detention, such that he should now be released.**

Under 18 U.S.C. § 924(a)(2), if convicted of violating Section 922(g)(4) Mr. Gould would be subject to a statutory sentencing range of 0 to 10 years imprisonment. Pursuant to U.S.S.G. § 2K2.1(a)(6), as a prohibited person Gould's starting base offense level would be 14. Because he possessed a single shotgun (and turkey shells) for lawful sporting purposes, and is not otherwise subject to subsections § 2K2.1(a)(1)-(5), his adjusted offense level should be 6. U.S.S.G. § 2K2.1(b)(2).

Gould has prior convictions for DUI, and violating a protective order in the Jackson County Magistrate Court on May 24, 2022, for which he served six months in jail (prior to activation of his federal detainer in this case). *See* PTSR, at 8. He also pled no contest to the misdemeanor possession of a firearm by a prohibited person before the same court in 2019 (for which he was fined). *Id,* at 6. Worst case, therefore, Mr. Gould has 3 criminal history points, *see* U.S.S.G. § 4A1.1(c), placing him in Category II of the Sentencing Table. This would produce an advisory guideline range of 1 to 7 months imprisonment. Gould has been in federal custody since August 23, 2022, or just over seven months.

Page 1 of **10**

*See* Dkt. No. 19. Through his pretrial detention, therefore, Gould has already been in custody longer than the top of the Commission's advisory guideline range if he was actually convicted on his Section 922(g)(4) charge.

Defendant already owns at least one residence in Ravenswood, West Virginia. The front door has been repaired, and the power and water are in the process of being restored - such that the residence is now secure and habitable. Gould also has the option of residing with two other family members (not his brothers) who live in proximity to his residence in Jackson County. As a consequence, irrespective of the merits of his case – Mr. Gould should be released on bond until it is resolved.

### B. Gould possessed a 12-guage shotgun in his home for purposes of hunting and self-defense, which is <u>conduct</u> protected by the Second Amendment. Section 922(g)(4), therefore, is presumptively unconstitutional under *Bruen*'s first prong.

West Virginia allows involuntary commitment based only on a finding of probable cause, which does not itself constitute a conviction or any other state-sponsored sanction for violence or otherwise deliberate wrongful acts. Based solely on such a probable cause finding, Section 922(g)(4) permanently disarms citizens subjected to involuntary commitment orders. Section 922(g)(4) does not disarm citizens temporarily only for the term of commitment or evaluation, or after any purported competency restoration. Section 922(g)(4) does not allow for the return of seized arms after the involuntary commitment is completed or any related mental health episode has passed. It instead disarms citizens and criminalizes future firearm possession permanently – whether the involuntary commitment occurred yesterday or twenty years ago, and whether a given citizen's competency was restored years prior to or practically contemporaneous with any future firearm possession. A Section 922(g)(4) conviction further shifts the affected citizen's future firearm disability into Section 922(g)(1).

Excluding non-law-abiding citizens from "the people" is "precisely the sort of carving out of a subset from 'all Americans' that the *Heller* Court rejected." *United States v. Harrison*, No. CR-22-

Page **2** of **10**

00398-PRW, ___ F.Supp.3d ___, 2023 WL 17771138, *4 n. 20 (W.D.Okla. Feb. 3, 2023)(finding Section 922(g)(3) unconstitutional). The government cannot constrict the Second Amendment's "plain text" by doing exactly what *Heller* forbids.  *See United States v. Pierre*, No. 1:22-cr-20321-JEM, ECF No. 53 at 17 (S.D. Fla. Nov. 28, 2022) ("[I]t is no surprise that [*Bruen*] used the term 'law-abiding' because that was the factual scenario the Court was considering. Indeed, there would have been no reason for the Court in *Bruen* to address or even consider whether non-law-abiding citizens were part 'of the people.' It did not, and *Bruen*'s references to 'law abiding' do not support the Government's position."); *cf. United States v. McCollum*, 885 F.3d 300, 305 n.5 (4th Cir. 2018)("[Previous cases'] references to a prior *state* conviction are an accident of circumstance: those cases involved state statutes." (emphasis in original)).

In addition to *Rahimi*, other courts have found that the <u>conduct</u> of discrete categories of citizens currently disarmed by the Gun Control Act are still part of "the people," and thereby still subject to Second Amendment protections under *Bruen*'s first prong:

*See e.g. Harrison*, ___ F.Supp.3d ___, 2023 WL 17771138 at *3-*4 & nn. 19-21 (the Second Amendment applies to the conduct of **<u>marijuana users</u>**, finding Section 922(g)(3) unconstitutional); *United States v. Combs*, 5:22-136-DCR, 2023 WL 1466614, *2-*3 (E.D. Ky Feb. 2, 2023)(Second Amendment protections apply to the conduct of **<u>individuals subject to domestic violence protective orders</u>**); *United States v. Hester*, No. 1:22-cr-20333-RNS, ECF No. 39 (S.D. Fla. Jan 27, 2023)(**<u>convicted felons</u>**);   United States v. Barber, 2023 WL 1073667, *5-*6 (E.D. Tex. Jan. 27, 2023)(**<u>same</u>**); *Campiti v. Garland*, 2023 WL 143173, *3 (D. Conn. Jan. 10, 2023)(**<u>same</u>**); *United States v. Hicks*, W:21-CR-00060-ADA, ___ F.Supp.3d ___, 2023 WL 164170 (W.D.Tex. Jan. 9, 2023)(Second Amendment protections apply to **<u>individuals under indictment</u>**); *United States v. Bernard,* No. 22-CR-03 CJW-MAR, 2022 WL 17416681 *6-*7 (N.D. Iowa Dec. 5, 2022)(Second Amendment protections apply to conduct of **<u>domestic violence misdemeanants</u>**)*; United States v. Stambaugh*, 5:22-cr-00218-

PRW, ___ F.Supp.3d ___, 2022 WL 16936043, *2 (W.D. Okla. Nov. 14, 2022)(**individuals under indictment** are part of "the people" under the Second Amendment); *United States v. Williams,* 2022 WL 1825005, *2 (N.D. Ga. Nov. 14, 2022)(**convicted felons** are among "the people"); *United States v. Perez-Gallan*, PE:22-CR-00427-DC, ___ F.Supp.3d ___, 2022 WL 16858516, *3 (W.D. Tex. Nov. 10, 2022)(Second Amendment protects conduct of **individuals subject to domestic violence protective orders**); *United States v. Gray*, No. 22-cr-00247-CNS, 2022 WL 16855969, *2 (D. Colorado Nov. 10, 2022)(Second Amendment applies to the conduct of **convicted felons**); *United States v. Holden,* 3:22-CR-30 RLM-MGG, ___ F. Supp.3d ___, 2022 WL 17103509 (N.D. Ind. Oct 31, 2022)(**individuals under indictment**); *United States v. Carrero*, No.2:22-CR-00030, ___ F.Supp.3d ___, 2022 WL 9348792, at *2 (D. Utah Oct.14, 2022 (**convicted felons** fall within "the people" as contemplated by the First, Second, and Fourth Amendments); *United States v. Coombes*, No. 22-CR-00189, ___ F.Supp.3d ___, 2022 WL 4367056 (N.D. Okla. Sept. 21, 2022)(**same**); *United States v. Quiroz*, PE:22-CR-00104-DC, ___ F.Supp.3d ___, 2022 WL 4352482, *3-*4 (W.D. Tex. Sept. 19, 2022)(Second Amendment protects conduct of **person under felony indictment**); *United States v. Kays*, No.CR-22-40-D, ___ F.Supp.3d ___, 2022 WL 3718519, *2- (W.D. Okla. Aug. 28, 2022)(**same**); *United States v. Jackson*, No. CR-22-59-D, ___ F.Supp.3d ___, 2022 WL 3582504, *1 (W.D. Okla. Aug. 19, 2022)("This Court declines to read into *Bruen* a qualification that Second Amendment rights belong only to individuals who have not violated any laws" – with respect to **domestic violence misdemeanants**.).

These courts' treatment of Second Amendment protections in *Bruen*'s first prong - even those ultimately denying a given defendants' *Bruen* motion to dismiss, is wholly consistent with *Heller*'s construction of "the people" in the First, Fourth, and Second Amendments, *see, Heller* 554 U.S. at 579-

580, as they are with the *Bruen* first prong's emphasis on protected *conduct*.[1]  This Court should join these courts, and adopt the same position regarding *Bruen*'s first prong.

As *Pierre*, *supra*, noted - that *Heller*'s lengthy majority opinion mentioned "law-abiding citizen" three times, 554 U.S. at 625-626, 635, does not require a different conclusion. Nor does *McDonald*'s lengthy plurality opinion mentioning "law-abiding" only one time, *see*, 561 U.S. at 790, or *Bruen*'s lengthy majority opinion referring to some combination of "law-abiding citizen" or "law-abiding, responsible citizens" over twelve times. *See, Bruen* 142 S. Ct. at 2122, 2125, 2131, 2133, 2134, 2138, 2150, 2156. The "law-abiding" nomenclature, at least in *Bruen*'s majority opinion, was the product of assertions made in the parties' pleadings that the two petitioners were law-abiding citizens entitled to firearm carry permits. *Bruen*, 142 S. Ct. at 2124-2125 ("as set forth in the pleadings below, petitioners … are law abiding, adult citizens"). Use of the term throughout *Bruen* did not define or limit any substantive finding, conclusion, or policy statement within the Court's articulation of the Second Amendment standard of review. *See, e.g.,* 142 S.Ct. at 2124-2125; 2152-2156.  *Accord*, 142 S. Ct. at 2157 ("Our holding decides nothing about who may lawfully possess a firearm…." Alito, Concurring).[2] Significantly, "virtuous" and "virtuous citizen" are not mentioned in *Heller*, *McDonald*, or *Bruen* at all.

Pre-*Bruen*, in *United States v. Chovan*, 735 F.3d 1127, 1137-1138 (9th Cir. 2013), the Ninth Circuit similarly rejected the government's efforts (repeated here a decade later) to exclude persons subject to Section 922(g)(9) from Second Amendment protections by analogizing the statute to "a 'long line of prohibitions and restrictions on the right to possess firearms by people perceived as dangerous or violent." 735 F.3d at 1137. *Chovan* instead expressly held that the Second Amendment applies to

---

[1]  Between *Heller* and *Bruen*, the Fourth Circuit previously spoke with a similar emphasis on protected *conduct* applying the first prong of pre-*Bruen* Second Amendment review to Section 922(g)(9). *See, United States v. Staten*, 666 F.3d 154, 159 (4th Cir. 2011).

[2]  Otherwise, Justice Alito's concurrence uses "law-abiding" five times, while Justice Kavanaugh's concurrence only uses the term once. *See,* 142 S. Ct. at 2156-2162.

persons covered by § 922(g)(9) - i.e., domestic misdemeanants. *Id.* at 1137-1138. Irrespective of Gould's status, therefore, his conduct is still protected by the Second Amendment for purposes of *Bruen*'s first prong.

As consistently argued by the Government (post-*Bruen* in order to avoid having the carry the burden required by *Bruen*'s second prong), "law-abiding citizens" operates as a holdover from means-end scrutiny vocabulary and reasoning which contradicts *Heller*'s defining of "the people" under the Second Amendment. The idea - that if the founding era tolerated discriminatory disarmament of "dangerous" people based on race, religion, and political viewpoint, it would easily tolerate practically any disarmament of discrete categories of citizens deemed undesirable (under the guise of the artificial "law-abiding" partition) - is not a just a constitutional slippery slope, it's a societal cliff. In fact, this proposition is an incredibly pernicious, and precarious position for any governmental institution to assert (just as it should be for any court to accept).

Lacking any governing textual basis or case law definition, who or what ends up defining "law-abiding" and with it any discrete category of "dangerous" people, becomes very powerful and very capable of arbitrarily depriving citizens of Second Amendment protections. For example, over the past two years the FBI has separately deemed traditional Roman Catholics[3] and American public school parents[4] as "violent extremists" and potential domestic terrorists. Meanwhile, the Biden

---

[3]   *See e.g.* Tyler O'Neil, *The FBI's Targeting of "Radical-Traditional Catholics" Bodes Ill*, The Heritage Foundation (Feb. 27, 2023), https://www.heritage.org/religious-liberty/commentary/the-fbis-targeting-radical-traditional-catholics-bodes-ill; Hugh Hewitt, *Opinion: Is the FBI targeting traditional Catholics?* The Washington Post (Feb. 13, 2023), https://www.washingtonpost.com/opinions/2023/02/13/control-fbi-christopher-wray/; Kyle Seraphin, *The FBI Doubles Down on Christians and White Supremacy in 2023*, UncoveredDC.com (Feb. 8, 2023)(article containing actual FBI 8-page threat assessment memo), https://www.uncoverdc.com/2023/02/08/the-fbi-doubles-down-on-christians-and-white-supremacy-in-2023/ (all last viewed April 7, 2023).

[4]   *See* U.S. House Judiciary Committee Report, *A "Manufactured" Issue and "Misapplied" Priorities: Subpoenaed Documents Show No Legitimate Basis For The Attorney General's Anti-Parent Memo* (March 21,

Administration has pointed to MAGA Republicans as "true threats to democracy."[5] Similarly, recent mass shootings have reportedly been perpetrated by non-binary and transgender offenders.[6] Using the government's overbroad, overgeneralized "law-abiding citizen" construction of the Second Amendment and *Bruen's* first prong, Congress could just as easily deem each of these discrete categories of citizens "dangerous" to place them outside Second Amendment protections, and then disarm them like individuals who have been involuntarily committed. Which is why *Bruen*'s first prong looks solely to the <u>*conduct*</u> of any or all Americans, and under *Bruen*'s second prong - general historical "dangerousness" is impermissibly overbroad. *Bruen* necessarily requires a robust <u>similar</u> (either distinctly or relevantly) historical analogue in order to disarm citizens through modern regulations of protected Second Amendment conduct. Otherwise, under the guise of overgeneralized "dangerousness," citizens' Second Amendment protections would be completely erased. This is an interpretation of the history that the Constitution will not tolerate.

### C. The United States has not carried its burden under *Bruen*'s second prong.

---

2023), https://judiciary.house.gov/sites/evo-subsites/republicans-judiciary.house.gov/files/evo-media-document/2023-03-21-school-board-documents-interim-report.pdf ; Annie Grayer, *'No legitimate basis' for 2021 DOJ memo on school board threats, House GOP alleges in new report,* CNN.com (March 23, 2023), https://www.cnn.com/2023/03/22/politics/house-gop-report-garland-memo/index.html; Department of Justice, Press Release, *Justice Department Addresses Violent Threats Against School Officials and Teachers* (Oct. 4, 2021), https://www.justice.gov/opa/pr/justice-department-addresses-violent-threats-against-school-officials-and-teachers (all last viewed April 7, 2023).

[5] *See* Emma Kinery, *Biden Warns Trump's extreme MAGA Republicans are 'clear and present danger' to U.S. democracy*, CNBC.com (Sept. 2, 2022), https://www.cnbc.com/2022/09/01/biden-warns-trumps-extreme-maga-republicans-are-a-danger-to-us-democracy.html, Morgan Chalfant, *Biden portrays 'MAGA' Republicans as a threat to democracy,* The Hill (Aug. 25, 2022), https://thehill.com/homenews/administration/3616334-biden-portrays-maga-republicans-as-a-threat-to-democracy/ (all last viewed April 7, 2023). This is not to mention non-violent protesters who did not enter the U.S. Capital on January 6, 2021, who are still being prosecuted by the Department of Justice.

[6] *See e.g.* Noah DeGarmo, *Nashville Suspect Was Not First Trans Shooter*, The Dallas Express (March 31, 2023), https://dallasexpress.com/national/nashville-suspect-was-not-first-trans-shooter/ (last viewed April 7, 2023).

Contrary to the United States' assertions, *Bruen* "constitutes an intervening decision that relieves this Court of its obligation to follow" otherwise binding Circuit precedent. *See e.g. Nutter,* ___ F. Supp.3d ___, 2022 WL 3718518, * 4  (citing *United States, v. Jackson*, No. CR-22-59-D, 2022 WL 3582504, at *2 (W.D. Okla. Aug. 19, 2022)).

As part of its oral argument, the United States maintained (as it has in other cases) that *Bruen* endorsed the constitutionality of shall-issue regimes under the Second Amendment - which still include background checks, fingerprinting, and other steps to assess the suitability of the applicant possessing a firearm.  The government, however, oversold what Bruen said. *Bruen* did not consider, much less rule on the constitutionality of 43 shall-issue state licensing regimes - because that issue and those statutes were not what was before the Court. *Bruen* instead, in a footnote, merely observed that its invalidation of may-issue regimes did not necessarily render shall-issue regimes unconstitutional. 142 S. Ct. at 2138  n.9  Bruen did not say the government may disarm anyone who is not "law abiding." "The issue of whether a non-law-abiding citizen qualifies for Second Amendment protection was not before the Court [in *Bruen*]," *Goins*, 2022 WL 17836677, at *5.

As further noted during oral argument - there are no founding era firearm regulations which disarmed involuntarily committed citizens at all, much less distinctly similar historical analogues that would satisfy *Bruen*'s second prong.  Under *Bruen* this should be dispositive.  *See Harrison,* 2023 WL 1771138 (W.D. Okla. Feb. 3, 2023)("the United States has not identified a single historical law that is "distinctly similar" to § 922(g)(3) – which *Bruen* suggests is dispositive.").[7]

---

[7]  *See also United States v. Lewis*, 2023 WL 187582, at *3 (W.D. Okla. 2023)("the court concludes, upon careful reading of [*Bruen*], that it does articulate two standards for assessment of the Government's proffered historical analogues, depending on whether the challenged regulation addresses a general societal problem that has persisted since the 18th century, or whether the statute addresses unprecedented societal concerns or dramatic technological changes")(cleaned up).

Page **8** of **10**

Lacking any such historical analogues, the United States presents a number of overbroad and unrelated historical firearm regulations that are not even "relevantly similar" to 922(g)(4). Presumably aware of this, the government encourages this Court to overgeneralize its own historical inquiry to sustain Section 922(g)(4) as consistent with the purported historical tradition of generally disarming "dangerous" people. The government's efforts should fail.

*Bruen* properly instructs that "[w]hen it comes to interpreting the Constitution, not all history is created equal." 142 S. Ct. at 2136; *Rahimi*, 61 F.4th at 454. The government's so-called historical analogues are simply not *well-established and representative* as *Bruen* requires – even under the more deferential "relevantly similar" standard (which should not apply to Section 922(g)(4)). 142 S. Ct. at 2133.

The United States' extensive reliance on Eighteen Century capital punishment and forfeiture of estates laws is misplaced, where none of the cited historical authorities disarmed citizens. To the extent they were not put to death, such individuals were not permanently prohibited from possessing new firearms. The same was true for the surety laws discussed in the government's brief, which imposed a much less severe burden on possessing firearms than Section 922(g)(4): they only applied to public carry, not possession in the home; they allowed people to continue public carrying if they posted a bond; and the Nineteen Century statutes contained a self-defense exception. *See* 142 S. Ct. at 2148-2149; *Rahimi*, 61 F.2d at 458-461; *United States v. Stanbaugh*, No. CR-22-00218-PRW-2, 2023 WL 172037 (W.D. Okla. Jan. 12, 2023).

In addition to deficiencies with government-cited surety laws – *Rahimi* readily addresses the insufficiency of the government's reliance on the Militia Act of 1662, 61 F.4th at 456; loyalty oath and unacceptable person laws  - i.e. laws disarming slaves, Native Americans (who were not considered citizens at the time and thereby not among "the people") and other persons

Page **9** of **10**

considered "dangerous" (i.e. Catholics), *id.* at 456-457; the minority positions of the Pennsylvania and Massachusetts ratifying convictions, *id.* at 457; and laws that prohibited going armed to "terrify" the king's subjects, i*d.* at 457-458. *See also United States v. Perez-Gallan*, ___ F.Supp.3d ___, 2022 WL 16858516 (W.D. Tex. Nov. 10, 2022).

### D. Conclusion

The Second Amendment right to keep and bear arms is not a second class right. *Bruen*, 142 S. Ct. at 2156. Lacking any distinctly similar historical analogues to Section 922(g)(4), the United States is encouraging this Court to do exactly what *Bruen* prohibited with respect to analogical reasoning - because the government believes disarming citizens who have previously been involuntarily committed is good policy. *See* 142 S. Ct. at 2133, n.7. This Court should decline that invitation, and instead directly apply *Bruen*'s distinctly similar standard to dismiss Mr. Gould's indictment.

Date:   April 13, 2023.                    Respectfully submitted,

**JAMES GOULD**

By Counsel

**WESLEY P. PAGE**
**FEDERAL PUBLIC DEFENDER**

**s/ Lex A. Coleman**
Lex A. Coleman, WV Bar No. 10484
Senior Litigator, AFPD
300 Virginia Street, East, Room 3400
Charleston, West Virginia  25301
Telephone: (304) 347-3350
Facsimile:  (304) 347-3356
E-mail: lex_coleman@fd.org

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### CHARLESTON DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,

v.                              CRIMINAL ACTION NO. 2:22-cr-00095

JAMES GOULD,

        Defendant.

### MEMORANDUM OPINION AND ORDER

Pending before the Court is Defendant James Gould's ("Defendant") *Bruen*-Based Motion to Dismiss. (ECF No. 40.) For the reasons discussed below, the motion is **DENIED**.

### I.    *BACKGROUND*

For nearly a decade, Defendant struggled with his mental health so much that he was involuntarily committed to treatment facilities four separate times. He was first involuntarily committed on May 12, 2016. (ECF No. 43 at 6 n.2.) Then, he was again involuntarily committed on February 14, 2018. (*Id.*) Shortly after that, on June 28, 2019, Defendant was committed for a short-lived third time. (*Id.*) Finally, Defendant was committed one more time on June 30, 2019. (*Id.*)

Because of these involuntary commitments, Defendant was prohibited from possessing firearms under federal and state law. Yet in April 2019 and again in November 2020, Defendant was charged with unlawfully possessing a firearm under state law. (ECF No. 24 at 6–7.) He pleaded guilty to the 2019 offense, but the 2020 charge was dismissed. (*Id.*)

1

Defendant's habitual involuntary commitments and firearm violations intertwine with his turbulent relationship with his family. For instance, on June 4, 2019, a domestic violence emergency protection order was filed against Defendant by his wife and children, shortly before Defendant was involuntarily committed on June 28, 2019. (*Id.* at 2.) Then, on October 16, 2021, Defendant was charged with two counts of domestic battery and one count for brandishing a deadly weapon. (*Id.* at 7.) Although those charges were dropped, (*id.*), his wife and children filed another domestic violence emergency protection order against him on October 22, 2021, (*id.* at 2). Defendant's wife filed a final domestic violence emergency protection order against him on April 13, 2022, (*id.*), and, just seven days later, Defendant was arrested on April 20, 2022, for four violations of the protective order, (*id.* at 8). On March 24, 2022,[1] he pleaded guilty to one count, and the other three counts were dismissed. (*Id.*)

Shortly before the final protective order was filed, though, Defendant was found in possession of a Remington, 11-87, 12-gauge shotgun on February 18, 2022. (ECF No. 1.) Defendant was then indicted by a federal grand jury on May 3, 2022, and arrested on August 23, 2022, for unlawfully possessing a firearm in violation of 18 U.S.C. §§ 922(g)(4), 924(a)(2). (ECF Nos. 1, 19.) However, on June 23, 2022—after Defendant's indictment was returned, but prior to his arrest—the Supreme Court of the United States rendered its decision in *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022).

On February 17, 2023, Defendant filed the pending motion to dismiss, arguing that *Bruen* invalidated § 922(g)(4). (*See* ECF No. 40.) The United States filed a response on March 17, 2023.[2] (ECF No. 43.) As such, this motion is fully briefed and ripe for adjudication.

---

[1] On the same day, Defendant pled guilty to driving under the influence, for which he was arrested on January 3, 2022.

[2] Although Defendant was not afforded the opportunity to file a reply brief under the Local Rules of Criminal

## II.    LEGAL STANDARD

Under Federal Rule of Criminal Procedure 12, the court should dismiss criminal charges in an indictment "where there is an infirmity of law in the prosecution[,]" such as when the statute charged is unconstitutional. *United States v. Engle*, 676 F.3d 405, 415 (4th Cir. 2012). Typically, "[a] facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987). However, the Supreme Court has made clear that the Government carries the burden in Second Amendment cases. *See Bruen* 142 S. Ct. at 2130.

After the Supreme Court's decision in *District of Columbia v. Heller*, 554 U.S. 570 (2008), courts applied the two-part test developed by circuit courts, including the Fourth Circuit, to Second Amendment challenges.  Under that test, courts conducted a historical inquiry into whether a law regulated conduct within the scope of the Second Amendment, then conducted an intermediate scrutiny analysis to evaluate the fit between the law and the governmental objective. *United States v. Chester*, 628 F.3d 673, 680–83 (4th Cir. 2010).  This intermediate scrutiny analysis determined whether the state's interest in the regulation was sufficient to overcome whatever burden the law placed on one's Second Amendment right. *See, e.g.*, *United States v. Carter*, 669 F.3d 411 (4th Cir. 2012).

In *Bruen*, however, the Supreme Court determined that the lower courts had been incorrect in applying this "means-end scrutiny" test because it was inconsistent with the Second

---

Procedure, *see* L.R. Cr. P. 12.1, he took it upon himself to file one almost a month later on April 13, 2023, (ECF No. 48).  This is far beyond typical response/rely deadlines set forth in the local rules, but the Court will consider it nonetheless.

3

Amendment, and the appropriate methodology centers on the "constitutional text and history." *Bruen*, 142 S. Ct. at 2127–29. The Court articulated that the proper standard is as follows:

> In keeping with *Heller*, we hold that when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

*Id.* at 2129–2130 (quoting *Koningsberg v. State Bar of Cal.*, 366 U.S. 36, 50 n.10 (1961)).

Phrased another way, this test has two steps. The first step is determining whether the plain text of the Second Amendment covers the conduct at issue. *Id.* at 2129, 2134–35. The second step is determining whether the Government has established the regulation is consistent with the historical tradition of firearms regulation in the United States. *Id.* at 2129–30.

### III.    DISCUSSION

On March 30, 1981, John W. Hinckley, Jr. attempted to assassinate then-President Ronald Reagan. *Hinckley v. United States*, 163 F.3d 647, 648 (D.C. Cir. 1999). During his criminal trial, a jury found Hinckley not guilty by reason of insanity. *Id.* He was then involuntarily committed to St. Elizabeth's Hospital in 1982, *id.*, until his release in June 2022, *United States v. Hinckley*, No. CR 81-306 (PLF), 2021 WL 8200009, at *4 (D.D.C. Sept. 30, 2021).

Because he has been involuntarily committed, Hinckley—like Defendant—cannot possess a firearm under 18 U.S.C. § 922(g)(4). However, Defendant argues that § 922(g)(4) is unconstitutional under *Bruen*. (ECF No. 40.) Thus, Defendant claims full stop that he, Hinckley, and others like them who have been determined to be a danger to themselves or society, have a constitutional right to possess a firearm despite the danger they pose. (*See id.*) Even under *Bruen*'s more demanding standards, the Court disagrees.

4

A. *The plain text of the Second Amendment*

The first step of a Second Amendment challenge is deciding whether the regulated conduct falls within the scope of the Second Amendment's plain text. *Bruen*, 142 S. Ct. at 2129–30. The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." In interpreting this text, courts are guided by the principle that "[t]he Constitution was written to be understood by the voters; its words and phrases were used in their normal and ordinary as distinguished from technical meaning." *United States v. Sprague*, 282 U.S. 716, 731 (1931). "Normal meaning may of course include an idiomatic meaning, but it excludes secret or technical meanings that would not have been known to ordinary citizens in the founding generation." *Heller*, 554 U.S. at 576–77.

The Supreme Court has explained that the operative clause of the Second Amendment—"right of the people to keep and bear Arms"—protects the right to possess a handgun in the home for self-defense. *See Bruen*, 142 S. Ct. at 2122 (citing *Heller*, 554 U.S. 570 (2008) and *McDonald v. Chicago*, 561 U.S. 742 (2010)). *Bruen* further clarified that the Second Amendment also protects such conduct outside of the home. *Id.*

As to whose conduct is protected by this right, the Supreme Court has explained that the words "the people" in the Second Amendment "unambiguously refer[ ] to all members of the political community, not an unspecified subset." *Heller*, 554 U.S. at 580 (stating that "the people" "refer[ ] to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community"). Based on this, *Heller* began its analysis with the "strong presumption that the Second Amendment

5

right is exercised individually and belongs to all Americans," *id.* at 581, and then confirmed that presumption, *id.* at 595.

Still, the *Heller* Court made clear that "the right secured by the Second Amendment is not unlimited." *Id.* at 626. Specifically, the *Heller* Court cautioned that "nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill." *Id.* The Court went so far as to say that such prohibitions are "presumptively lawful regulatory measures." *Id.* at 626-27 n.26. The Court's assurances on these prohibitions' presumptive constitutionality confirm that the Second Amendment is not an absolute barrier to congressional regulation of firearms and that some categorical prohibitions are assumed to be constitutional. *See United States v. Carter*, 669 F.3d 411, 420–21 (4th Cir. 2012). However, in making this observation, the Court expressly noted that it was not "clarify[ing] the entire field" of the Second Amendment, and the Court reserved for later cases an exploration of the historical justifications for its enumerated prohibitions. *Heller*, 554 U.S. at 635.

In this case, the Government contends that the Second Amendment does not cover the right of those adjudicated mentally defective or committed to a mental institution to possess arms. (ECF No. 43 at 5.) For support, the Government argues that "*Heller* held that the 'longstanding prohibitions on the possession of firearms by felons and the mentally ill' comport with the Second Amendment, which only protect the 'right of law-abiding, responsible citizens' to possess firearms." (*Id.* at 7–8.) Conversely, Defendant asserts that (1) the Supreme Court's reference to "law-abiding, responsible citizens" does not limit the scope of the Second Amendment, and (2) *Heller*'s "presumptively lawful" language is dicta.[3] (ECF No. 40 at 25.) Each of these

---

[3] Defendant also emphasizes that the first step of *Bruen* only asks whether the Second Amendment covers the *conduct* at issue without regard to the actor. (*See*, *e.g.*, ECF No. 40 at 9 ("That standard directs courts to begin by asking

6

arguments is discussed below.

1. "Law-abiding, responsible citizens"

When discussing the Second Amendment's scope, *Heller* referred to "law-abiding, responsible citizens." *See* 554 U.S. at 635. *Bruen* echoed *Heller*, also referring to "ordinary, law-abiding citizens" throughout the opinion. *See* 142 S. Ct. at 2122, 2131, 2133, 2156.

Based on this language, the Fourth Circuit has interpreted the Second Amendment as covering only "law-abiding" citizens. *See United States v. Carpio-Leon*, 701 F.3d 974, 975 (4th Cir. 2012) (stating that "the scope of the Second Amendment does not extend to provide protection to illegal aliens, because illegal aliens are not law-abiding members of the political community"). In *Bruen*'s wake, other district courts in the Fourth Circuit have continued to understand the Supreme Court's reference to "law-abiding" citizens as limiting the scope of the Second Amendment. *See United States v. Medrano*, No. 3:21-CR-39, 2023 WL 122650, at *3 (N.D. W. Va. Jan. 6, 2023) (collecting cases); *see also United States v. Jackson*, No. CR ELH-22-141, 2023 WL 2242873, at *7 (D. Md. Feb. 27, 2023) (collecting cases from other circuits). In fact, this Court recently referenced this language in rejecting a post-*Bruen* challenge to the constitutionality of §§ 922(g)(9) and 924(a)(2). *See United States v. Nutter*, -- F.Supp.3d ---, No. 2:21-CR-00142, 2022 WL 3718518, at *7–8 (S.D. W. Va. Aug. 29, 2022) (Berger, J.) (underscoring the importance of "the Supreme Court's repeated invocation of 'law-abiding citizens' in its recent Second Amendment jurisprudence," and finding support in the historical tradition for laws prohibiting certain categories of persons from possessing firearms in the interest of public safety).

---

whether the Second Amendment's plain text covers an individual's <u>conduct</u>. If it does, then the Constitution presumptively protects that <u>conduct</u>." (internal quotation marks and citations omitted) (emphasis in original)); ECF No. 48 at 2–3 (similarly emphasizing "conduct").)

Now, similarly drawing on the reference to "responsible citizen[s]," the Government argues that individuals like Defendant "who have been involuntarily committed to a mental institution on multiple occasions are not responsible citizens with the same right to bear arms as other citizens." (ECF No. 43 at 6.)  Defendant counters that neither the Constitution nor the Supreme Court have defined the category of "law-abiding, responsible citizens." (*See* ECF No. 40 at 38–39.)  While Defendant questions the scope of the meaning of a "law-abiding" citizen, (*see id.* ("Is a jay walker not protected by the Second Amendment?")), a more difficult question is who constitutes a "responsible" citizen?

Further, Defendant argues that the Supreme Court's reference to "law-abiding, responsible citizens" "establishes a constitutional baseline that protects, rather than limits, Second Amendment rights." (ECF No. 40 at 25.)   For support, Defendant cites to a Fifth Circuit opinion that has been withdrawn and superseded. (*See id.* at 35 (citing *United States v. Rahimi*, ___ F.4th ___, 2023 WL 1459240 (5th Cir. 2023).)   Nevertheless, the Fifth Circuit's superseding opinion is enlightening. *See United States v. Rahimi*, 61 F.4th 443 (5th Cir. 2023).

The *Rahimi* Court acknowledged that there is "some debate over the extent" that *Heller*'s "qualifier constricts the Second Amendment's reach." *Rahimi*, 61 F.4th 451. "As summarized by now-Justice Barrett, 'one [approach] uses history and tradition to identify the scope of the right, and the other uses that same body of evidence to identify the scope of the legislature's power to take it away.'" *Id.* at 451 (citing *Kanter v. Barr*, 919 F.3d 437, 452 (7th Cir. 2019) (Barrett, J. dissenting), *abrogated by Bruen*, 142 S. Ct. 2111.)  An argument that certain individuals fall outside the Second Amendment because they are not law-abiding, responsible citizens "rests on the first approach," but "runs headlong into *Heller* and *Bruen*, which . . . espouse the second

8

JA124

[approach]." *Id.* Thus, "in context, *Heller* simply uses 'law-abiding, responsible citizens' as shorthand in explaining that its holding—that the amendment codifies an individual right to keep and bear arms—should not 'be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill . . ..'" *Id.* The Government's argument, which focuses on the history of constitutional legislation that prohibited certain subsets of the community from possessing firearms, (ECF No. 43 at 7–13), supports this understanding.

Thus, the resolution of this issue rests upon *Heller*'s "presumptively lawful" language, which is addressed below.

2. "Presumptively lawful regulatory measures"

Defendant categorizes the Supreme Court's "presumptively lawful" language as dicta and urges the Court to disregard it, (ECF No. 40 at 25)—a proposition the Government disputes, (ECF No. 43 at 8 ("*Heller*'s commentary is not mere dicta."). This Court has addressed this question before and consistently found that "much of the language quoted by the Court in [*Heller* and] *Bruen*, both in the majority and the concurring opinions, is dicta." *See United States v. Price*, No. 2:22-CR-00097, 2022 WL 6968457, at *7 (S.D. W. Va. Oct. 12, 2022) (Goodwin, J.); *see also United States v. Tooley*, 717 F. Supp. 2d 580, 585 (S.D. W. Va. 2010) (Chambers, J.), *aff'd*, 468 F. App'x 357 (4th Cir. 2012); *United States v. Smith*, 742 F. Supp. 2d 855, 859 (S.D. W. Va. 2010) (Johnston, J.). Further, it is axiomatic that courts are "not bound by dicta or separate opinions of the Supreme Court." *Myers v. Loudoun Cnty. Pub. Schs.*, 418 F.3d 395, 406 (4th Cir. 2005).

Nevertheless, the Fourth Circuit has repeatedly instructed that courts should "afford substantial, if not controlling deference to dicta from the Supreme Court," "particularly when the supposed dicta is recent and not enfeebled by later statements." *Hengle v. Treppa*, 19 F.4th 324,

9

347 (4th Cir. 2021) (internal citations omitted) (noting that "[t]he lengthy discussion of alternative remedies . . . was important, if not essential, to the Court's analysis"); *Manning v. Caldwell*, 930 F.3d 264, 281 (4th Cir. 2019) (recognizing the importance of relying on dicta when "grappling with complex legal questions of first impression . . . so as to ensure consistent and uniform development and application of the law"); *McCravy v. Metro. Life. Ins. Co.*, 690 F.3d 176, 181 n.2 (4th Cir. 2012) ("[W]e cannot simply override a legal pronouncement endorsed just last year by a majority of the Supreme Court."). On the other hand, the Fourth Circuit has declined to follow Supreme Court dicta that is "unaccompanied by any analysis from which [it] might gain insight into the Court's reasoning." *In re Bateman*, 515 F.3d 272, 282 (4th Cir. 2008).

In this case, *Heller*'s "presumptively lawful" language has not been "enfeebled by later statements." *Hengle*, 19 F.4th at 347. In fact, it was reinforced two years later in *McDonald*, 561 U.S. at 786 (quoting *Heller*), and again *just last year*, in *Bruen*, 142 S. Ct. at 2162 (Kavanaugh, J., concurring) (same). Additionally, the constitutionality of § 922(g)(4) in *Bruen*'s wake is certainly a "complex legal question of first impression." *Caldwell*, 930 F.3d at 281.

On top of that, the Fourth Circuit has already relied on *Heller*'s "presumptively lawful" language to resolve facial constitutional challenges to § 922(g). In *U.S. v. Moore*, 666 F.3d 313 (2012), the Fourth Circuit—citing *Heller*'s "presumptively lawful" language—concluded with "no difficulty" that § 922(g)(1)—which prohibits individuals "convicted in any court of[] a crime punishable by imprisonment for a term exceeding one year" from possessing a gun—did not violate the Second Amendment on its face. *Id.* at 316–19 (explaining that the Supreme Court's identification of "longstanding prohibitions on the possession of firearms by felons [and the mentally ill]" as presumptively lawful "streamlined" the otherwise-applicable two-pronged

10

JA126

analysis).   In fact, almost every federal court of appeals has relied on the "presumptively lawful"

language in *Heller* and *McDonald* and held that § 922(g)(1) does not facially violate the Second

Amendment.   *See United States v. Bogle*, 717 F.3d 281, 281–82 (2d Cir. 2013) (per curiam);

*United States v. Barton*, 633 F.3d 168, 172 (3d Cir. 2011), *overruled on other grounds by Binderup

v. Att'y Gen.*, 836 F.3d 336 (3d Cir. 2016) (en banc); *Moore*, 666 F.3d at 318–19; *United States v.

Anderson*, 559 F.3d 348, 352 (5th Cir. 2009); *United States v. Khami*, 362 F. App'x 501, 508 (6th

Cir. 2010), *cert. denied*, 560 U.S. 934 (2010); *United States v. Davis*, 406 F. App'x 52, 53–54 (7th

Cir. 2010); *United States v. Joos*, 638 F.3d 581, 586 (8th Cir. 2011); *United States v. Smith*, 329

F. App'x 109, 110–11 (9th Cir. 2009); *United States v. McCane*, 573 F.3d 1037, 1047 (10th Cir.

2009), *cert. denied*, 559 U.S. 970 (2010); *United States v. Battle*, 347 F. App'x 478, 480 (11th Cir.

2009) (per curiam); *Schrader v. Holder*, 704 F.3d 980, 989–91 (D.C. Cir. 2013), *cert. denied*, 571

U.S. 989 (2013);

Following *Moore*, the Fourth Circuit has consistently upheld the facial constitutionality of

§ 922(g)(1) and other provisions of § 922(g) based at least in part on *Heller*'s "presumptively

lawful" language.[4]   *See, e.g.*, *United States v. Pruess*, 703 F.3d 242, 247 (4th Cir. 2012) (§

922(g)(1)); *United States v. Izaguirre–De La Cruz*, 510 Fed.Appx. 233, 234 (4th Cir. 2013) (§

922(g)(5)); *United States v. Larson*, 502 Fed.Appx. 336, 339 (4th Cir. 2013) (§ 922(g)(8)).   Of

relevance, the Fourth Circuit relied on *Heller*'s dicta to affirm the constitutionality of § 922(g)(4).

*United States v. McRobie*, No. 08-4632, 2009 WL 82715, at *1 (4th Cir. Jan. 14, 2009)

---

[4] Defendant cites a Fourth Circuit case criticizing this approach that "treat[s] *Heller*'s listing of 'presumptively lawful regulatory measures[ ]' . . . as a kind of 'safe harbor.'"   (ECF No. 40 at (citing *United States v. Chester*, 628 F.3d 673, 679 (4th Cir. 2010).   But the "safe harbor" analysis that the Fourth Circuit was criticizing in *Chester* is an approach that some courts have used to evaluate laws that are "unlisted" in *Heller*'s "presumptively lawful" passage, such as Section 922(g)(9)'s dispossession of domestic-violence misdemeanants.   *Id.* at 679.   Whereas "prohibition[ ] on the possession of firearms by . . . the mentally ill," *Heller*, 554 U.S. at 626, is "specifically listed in *Heller*," *Chester*, 628 F.3d at 679.

11

(unpublished) ("While the *Heller* opinion recognized a Second Amendment right for citizens to bear arms, it specifically cautioned that 'nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill.'" (citing *Heller*)). However, unpublished opinions are "entitled to only the weight they generate by the persuasiveness of their reasoning," *Collins v. Pond Creek Mining Co.*, 468 F.3d 213, 219 (4th Cir. 2006), and *McRobie* lacks any analysis or reasoning.

While *Bruen* abrogated some of these cases to the extent they employed means-end scrutiny, *Bruen* does not question the "longstanding regulatory measures" declared presumptively lawful in *Heller* and *McDonald*. Importantly, the *Bruen* Court characterized its decision as "ma[king] the constitutional standard endorsed in *Heller* more explicit,"—not abrogating or overturning it. *Bruen*, 142 S. Ct. at 2134. In fact, two of the concurring opinions in *Bruen* emphasized the presumptively lawful regulations referenced in *Heller* and *McDonald*. *See id.* at 2162 (Kavanaugh, J., concurring) (reiterating language from *Heller* and *McDonald* about "longstanding prohibitions on the possession of firearms by felons and the mentally ill"); *id.* at 2157 (Alito, J., concurring) (clarifying that the Court's holding did not "disturb[] anything that we said in *Heller* or *McDonald v. Chicago* . . . about restrictions that may be imposed on the possession or carrying of guns"). The dissent also viewed the majority opinion the same way, stating that it "understand[s] the Court's opinion today to cast no doubt on" *Heller*'s treatment of laws prohibiting firearm possession by felons and the mentally ill. *Id.* at 2189 (Breyer, J., joined by Sotomayor, J., and Kagan, J., dissenting). The Supreme Court's repeated emphasis on restraint and desire to avoid disturbing "presumptively lawful" regulations sounds a clarion call to lower courts to exercise the same caution to not apply the holdings of *Bruen*, *McDonald*, and *Heller* any

12

further than the Court itself did.

Moreover, since *Bruen*, many courts—including this Court—have relied on that presumption to uphold the constitutionality of various provisions of § 922(g).  *See Price*, 2022 WL 6968457, at *8 (collecting cases); *United States v. Riley*, No. 1:22-CR-163 (RDA), 2022 WL 7610264, at *9 n.9 (E.D. Va. Oct. 13, 2022) (collecting cases); *United States v. Robinson-Davis*, No. 7:22-CR-00045, 2023 WL 2495805, at *2 (W.D. Va. Mar. 14, 2023) (collecting cases); *see also United States v. Ingram*, No. CR 0:18-557-MGL-3, 2022 WL 3691350, at *3 (D.S.C. Aug. 25, 2022) (applying *Heller*'s presumptively lawful language to 21 U.S.C. §924(c)).   On this basis, courts across the country have deemed it unnecessary to engage in the historical analysis test articulated in *Bruen* as to § 922(g).  *See Price*, 2022 WL 6968457, at *9 (explaining that "the Supreme Court left generally undisturbed the regulatory framework that keeps firearms out of the hands of dangerous felons through its decision in *Bruen* by reaffirming and adhering to its reasoning in *Heller* and *McDonald*" and deeming it unnecessary to engage in the *Bruen* historical analysis test).   For so many courts to have systemically misunderstood the relevance and applicability of this language is unlikely.

Still, the Fourth Circuit recently acknowledged that relying on *Heller*'s dicta is a potentially faulty practice.  *See Hirschfeld v. Bureau of Alcohol, Firearms, Tobacco & Explosives*, 5 F.4th 407, 415 n.6 (4th Cir. 2021), *vacated as moot*, 14 F.4th 322 (4th Cir. 2021) ("Though we follow this framework, one might question relying on the list in *Heller* to carve out exceptions to the Second Amendment.").   Additionally, this Court was unable to find any post-*Bruen* district court decisions relying on *Heller*'s dicta to address § 922(g)(4), and none of the circuit courts that have addressed § 922(g)(4) have addressed a facial challenge or relied on *Heller*'s "presumptively

lawful" dictum.   *See Tyler v. Hillsdale Cnty. Sheriff's Dep't*, 837 F.3d 678, 687 (6th Cir. 2016)

(refusing to give *Heller* conclusive effect to an as-applied challenge); *Beers v. Attorney Gen. U.S.*,

927 F.3d 150, 158 (3d Cir. 2019), *cert. granted, judgment vacated sub nom. Beers v. Barr*, 140 S.

Ct. 2758 (2020) (applying a two-part test to resolve an as-applied challenge); *Mai v. United States*,

952 F.3d 1106, 1115 (9th Cir. 2020) (applying intermediate scrutiny to an as-applied challenge).

While some believe there is no reason to "us[e] a different approach to evaluate challenges

to § 922(g)(4)," as opposed to other subsections of § 922(g), *see Tyler*, 837 F.3d at 715 (Moore,

J., dissenting), several courts relied on *Heller*'s dicta for other subsections of § 922(g) based on

the Supreme Court's "emphasi[s] that its holding applied to gun laws relating to 'law-abiding, []

citizens.'"   *See, e.g.*, *Riley*, 2022 WL 7610264, at *6 (analyzing § 922(g)(1) for felon in

possession).   Those courts held that *Bruen* and its predecessors only "make[] clear that the Second

Amendment protects the conduct of law-abiding citizens," but those cases "provide[] no

constitutional sanctuary for those who use firearms to commit crimes."   *United States v. Snead*,

No. 1:22-CR-033, 2022 WL 16534278, at *5 (W.D. Va. Oct. 28, 2022).

Indeed, *Heller*, *McDonald*, and *Bruen* all concern "a law-abiding citizen's right to armed

self-defense." *see Bruen*, 142 S. Ct. at 2133.   Focusing on this fact, Defendant asserts that, unlike

subsections of § 922(g) that concern individuals like felons, the Supreme Court's reference to the

"mentally ill," was "peripheral to the questions at issue," and was "unaccompanied by any

analysis," "extended discussion" on relevant disarmament laws, or "any reasoning or explanation."

(ECF No. 40 at 28 (internal citations omitted).)   Defendant also points to *Heller*'s own discussion

of dictum in a footnote of one of its previous decisions.   (*Id.* at 31–32 (citing 554 U.S. at 625 n.25

("It is inconceivable that we would rest our interpretation . . . upon such a footnoted dictum in a

14

case where the point was not at issue and was not argued.")).)

Further, Defendant argues that while "nothing in *Heller* [or *Bruen*] cast doubt on longstanding prohibitions on the possession of firearms by felons . . . *Bruen*'s new framework plainly does cast doubt on such laws." (ECF No. 40 at 33 (internal citations omitted).)   It is true that "*Bruen* demands a 'text-and history' analysis that looks only to 'the Second Amendment's plain text' and our 'Nation's historical tradition of firearm regulation.'" (*Id.* (quoting *Bruen*, 142 S. Ct. at 2138).)   Yet *Heller* did not "undertake an exhaustive historical analysis . . . of the full scope of the Second Amendment," and even explicitly deferred an analysis of whether disarmament of the mentally ill had historical support.   *See Heller*, 554 U.S. at 626–27 n. 26.

Ultimately, the Court assumes without deciding that Defendant's conduct is protected by the Second Amendment.   Because this issue can be resolved under the second prong of *Bruen*, the Court will not pave a new road by definitively answering the first step but will instead take the "well-trodden and judicious course" of conducting an analysis to determine whether § 922(g)(4) "does burden conduct protected by the Second Amendment."   *See Pena v. Lindley*, 898 F.3d 969, 976 (9th Cir. 2018) (quoting *Woollard v. Gallagher*, 712 F.3d 865, 876 (4th Cir. 2013)).   Further, "[w]hile courts may be free to 'presume' that many regulations (including those listed) will ultimately be declared lawful, it does not eliminate the need to conduct a careful constitutional analysis.   The Second Amendment, after all, is now clearly an important individual right, which should not be given short shrift."   *Tooley*, 717 F. Supp. 2d at 585.

### B.  Historical Basis

As to whether a challenged regulation has a historical basis, the Supreme Court explained that, "[i]n some cases, that inquiry will be fairly straightforward."   *Bruen*, 142 S. Ct. at 2131.   For

15

example, "when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Id.* Conversely, in "other cases," a challenged law will "implicat[e] unprecedented societal concerns or dramatic technological changes," or will be addressed to "challenges" that are "not . . . the same as those that preoccupied the Founders in 1791." *Id.* at 2132. Historical inquiry into these unprecedented statutes "may require a more nuanced approach," which "will often involve reasoning by analogy." *Id.*

As discussed below, there is a historical basis for upholding the constitutionality of § 922(g)(4). Prior to engaging with the second prong of the *Bruen* test, though, the Court must determine the proper standard and scope of review.

### 1. The proper standard

Defendant argues that the "distinctly similar standard" must be employed in determining whether § 922(g)(4) has a historical basis under the second prong of *Bruen*. (ECF No. 40 at 22.) He reasons that "[t]he societal problem Congress sought to address through Section 922(g)(4) was firearm violence by the mentally ill," which "existed in 1791 when the Second Amendment was ratified." (*Id.* (arguing that "this was not a problem that came about during the Twentieth century, that was unimaginable at the founding, or which arose from dramatic technological changes")). Although the Government did not respond to this argument, (*see generally* ECF No. 43), Defendant's claims raise two issues, which the Court will now address.

### i. Does *Bruen* create two different standards?

The first question is whether *Bruen* created different standards. The Court begins with a

16

review of *Bruen's* analysis.

      The Supreme Court began its reasoning with the following example:

> For instance, when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment. Likewise, if earlier generations addressed the societal problem, but did so through materially different means, that also could be evidence that a modern regulation is unconstitutional. And if some jurisdictions actually attempted to enact analogous regulations during this timeframe, but those proposals were rejected on constitutional grounds, that rejection surely would provide some probative evidence of unconstitutionality.

*Id.*, 142 S. Ct. at 2131.   Then, the Court used one of the challenged regulations in *Heller*—"totally banned handgun possession in the home"—as an illustration of this framework in action.   *Id.* (quoting *Heller*, 554 U.S. at 628).   After identifying the "perceived societal problem" as "firearm violence in densely populated communities," the Court determined that "the Founders themselves could have adopted" a flat ban on the possession of handguns.   *Id.*   Yet "after considering 'founding-era historical precedent,' including 'various restrictive laws in the colonial period,' and finding that none was analogous to the District's ban, *Heller* concluded that the handgun ban was unconstitutional."   *Id.* (quoting *Heller*, 554 U.S. at 631, 634).

      That mode of analysis is only for the straightforward cases, though.   The "other cases" "will often involve reasoning by analogy."   *Id.* at 2132.   Under this inquiry into unprecedented statutes, "determining whether a historical regulation is a proper analogue for a distinctly modern firearm regulation requires a determination of whether the two regulations are 'relevantly similar.'"   *Id.*   This standard is "neither a regulatory straightjacket nor a regulatory blank check." Instead, the standard "requires only that the government identify a well-established and representative historical analogue."   *Id.*   Further the challenged statute need not have a "historical

twin" or be a "dead ringer for historical precursors." *Id.* In this way, the Supreme Court sought only to avoid "endorsing outliers that our ancestors would never have accepted." *Id.*

Further, although *Bruen* does not "provide an exhaustive survey of the features that render regulations relevantly similar under the Second Amendment," it identified "two metrics: how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 2132-33. Sharpened even finer, there are two "central" considerations: (1) "whether modern and historical regulations impose a comparable burden on the right of armed self-defense" and (2) "whether that burden is comparably justified." *Id.* at 2133.

When determining how to do this historical analysis, *Bruen*'s discussion of limitations on firearms in sensitive places is instructive. The Court explained that "[a]lthough the historical record yields relatively few 18th- and 19th-century 'sensitive places' where weapons were altogether prohibited . . . we are also aware of no disputes regarding the lawfulness of such prohibitions." *Id.* at 2133. "And courts can use analogies to those historical regulations of 'sensitive places' to determine that modern regulations prohibiting the carry of firearms in new and analogous sensitive places are constitutionally permissible." *Id.*

On the one hand, *Bruen* could be read to create two different standards. To start, the Supreme Court compared the "fairly straightforward" inquiry in "some cases," in which the societal problem existed at the time of the Founding Fathers, *id.* at 2131, with the "more nuanced approach" in "other cases," which addressed new issues, *id.* at 2132. This seems to identify two separate inquiries. Then, when discussing the first inquiry, the Court mentions "distinctly similar" historical regulations but only mentions "relevantly similar" historical regulations when discussing the second inquiry. As such, some courts have applied a more stringent standard of

18

review for gun regulations aimed at societal ills dating to the Founding era.   *See e.g.*, *United States v. Holden*, 2022 WL 17103509, at *3 (N.D. Ind. Oct. 31, 2022); *United States v. Lewis*, 2023 WL 187582, at *4–5 (W.D. Okla. Jan. 13, 2023).

On the other hand, *Bruen* does not *require* a "distinctly similar" historical regulation under the first inquiry.   Instead, the Court provided several examples to guide courts, and "the lack of a distinctly similar historical regulation addressing that problem" was just one example of "relevant evidence" that the challenged law is unconstitutional.   *Bruen*, 142 S. Ct. 2131.   Importantly, the Court also seemed to endorse reasoning by analogy:   "[I]f some jurisdictions actually attempted to enact *analogous regulations* during this timeframe," which "were rejected on constitutional grounds, that rejection surely would provide some probative evidence of unconstitutionality."   *Id.* (emphasis added).   In fact, when discussing *Heller* as an example, the Court recalled that, of all the "founding-era historical precedent" it considered, "none was *analogous* to the District's ban." *Id.* at 2131 (emphasis added).   Thus, under both inquiries, courts may use analogous reasoning.

Once again, though, the Court does not need to decide this issue either because, even if there are two standards, any such distinction does not help Defendant because clear historical precedent exists in this case as explained below.

ii.   <u>What is the proper "societal problem" to address?</u>

The second question is whether Defendant is correct in asserting—without any explanation—that the "societal problem" § 922(g)(4) seeks to address is "firearm violence by the mentally ill"?   Put simply, no.

Statutory interpretation starts with "the language of the statute itself."   *United States v. Weaver*, 659 F.3d 353, 356 (4th Cir. 2011).   "If the plain language is unambiguous, [a court] need

19

look no further." *Lee v. Norfolk S. Ry. Co.*, 802 F.3d 626, 631 (4th Cir.2015) (citation omitted). On the other hand, if the text of a statute is ambiguous, courts look to "other indicia of congressional intent such as the legislative history" to interpret the statute. *Id.* (quoting *CGM, LLC v. BellSouth Telecomms., Inc.*, 664 F.3d 46, 53 (4th Cir.2011)). A court "determine[s] the 'plainness or ambiguity of statutory language . . . by reference to the language itself, . . . the specific context in which that language is used, and the broader context of the statute as a whole.'" *Id.* (second and third alterations in original) (quoting *Yates v. United States*, 574 U.S. 528, 237 (2015)). "A statute is ambiguous if it 'lends itself to more than one reasonable interpretation.'" *Id.* (quoting *Newport News Shipbuilding & Dry Dock Co. v. Brown*, 376 F.3d 245, 248 (4th Cir.2004)).

In this case, Defendant's framing is far too broad for the simple reason that § 922(g)(4) does not prohibit just anyone with a mental illness from possessing a firearm. *See* 18 U.S.C. § 922(g)(4). Instead, it prohibits only individuals "who ha[ve] been *adjudicated as a mental defective* or who ha[ve] been *committed to a mental institution*" from possessing a firearm. *Id.* (emphasis added). In turn, "[a]djudicated as a mental defective"[5] is defined as follows:

> (a) A determination by a court, board, commission, or other lawful authority that a person, as a result of marked subnormal intelligence, or mental illness, incompetency, condition, or disease:
> (1) Is a danger to himself or to others; or
> (2) Lacks the mental capacity to contract or manage his own affairs.

27 C.F.R. § 478.11.

Similarly, the definition of "committed to a mental institution" is a "[f]ormal commitment

---

[5] The Court notes that scholars and disability rights activists criticize the term "mental defective" for being offensive and vague. *See, e.g.*, Jana R. McCreary, ''*Mentally Defective" Language in the Gun Control Act*, 45 CONN. L. REV. 813, 864 (2013) ("Continuing the use of a term over forty years old ignores the strides made in recognizing the importance of people and people-first language."). It is used here only due to its statutorily enshrined status.

of a person to a mental institution by a court, board, commission, or other lawful authority,"

including "commitment to a mental institution involuntarily" and "commitment for mental

defectiveness or mental illness" or "drug use."   27 C.F.R. § 478.11.

These definitions are largely coextensive, as a defendant who is committed to a mental

institution by a court because he poses a danger to himself or others,[6] which is a criterion for

commitment in nearly every state,[7] qualifies both under the first prong of "committed to a mental

institution" and as being adjudicated as a "mental defective."   However, "committed to a mental

institution" also captures a person who is committed "for other reasons, such as drug usage."   *Id.*

From these definitions, it becomes clear that § 922(g)(4) seeks to prevent a variety of

groups from possessing firearms.   While possibly overlapping, the legal meanings of related

concepts such as "marked subnormal intelligence,"[8] "mental illness,"[9] and "incompetency"[10] are

---

[6] Defendant takes great issue with the fact that West Virginia law allows for "involuntary commitment based only on
a finding of probable cause."   (*See, e.g.*, ECF No. 48 at 2.)   However, nothing in his briefing or the Court's research
suggests this issue is material for the present case in any way.

[7] Alaska Stat. Ann. § 47.30.755(a); Ariz. Rev. Stat. Ann. § 36-540(A); Cal. Welf. & Inst. Code § 5250; Colo. Rev.
Stat. Ann. § 27-65-109(4); Conn. Gen. Stat. Ann. § 17a-498(c); Fla. Stat. Ann. § 394.467(1); Ga. Code. Ann. § 37-3-
1(9.1); Haw. Rev. Stat. Ann. § 334-60.2; Idaho Code § 66-329(11); 405 Ill. Comp. Stat. Ann. 5/1-119; Ind. Code.
Ann. § 12-26-6-8(a); Iowa Code Ann. § 229.1(20); Kan. Stat. Ann. § 59-2946(f); Ky. Rev. Stat. Ann. § 202A.026;
La. Rev. Stat. Ann. § 28:55(E)(1); Mass. Gen. Laws. Ann. ch. 123, § 1; Mich. Comp. Laws Ann. § 330.1401.(1);
Miss. Code Ann. §§ 41-21-73(4), 41-21-61(f); Mo. Ann. Stat. §§ 632.350(5), 632.005(10); Mont. Code Ann. § 53-
21-126(1); Neb. Rev. Stat. Ann. §§ 71-925(1), 71-908; Nev. Rev. Stat. §§ 433A.310(1), 433A.115(2); N.H. Rev. Stat.
Ann. §§ 135-C:34, 135-C:27(1); N.J. Stat. Ann. §§ 30:4-27.2(m), 30:4-27.2(h); N.M. Stat. Ann. §§ 43-1-11(E), 43-1-
3(M); N.C. Gen. Stat. Ann. §§ 122C-268(j), 122C-3(11); N.D. Cent. Code Ann. §§ 25-03.1-07, 25-03.1-02(14), (21);
Ohio Rev. Code Ann. §§ 5122.15(C), 5122.01(B); 50 Pa. Stat. and Const. Stat. Ann. §§ 7304(a), 7301; S.C. Code
Ann. § 44-17-580(A); S.D. Codified Laws §§ 27A-1-2, 27A-1-1(6)-(7); Tex. Health & Safety Code Ann. § 574.034(a);
Utah Code Ann. § 62A-15-631(16); VT. Stat. Ann. tit. 18, §§ 7611, 7101(17); Va. Code. Ann. § 37.2-817(C); Wash
Rev. Code Ann. § 71.05.240(3); W. Va. Code. Ann. §§ 27-5-4(k), 27-1-12(a); Wis. Stat. Ann. §§ 51.20(1)(a)(1),
51.20(1)(a)(2); Wyo. Stat. Ann. §§ 25-10-110(j), 25-10-101(a)(ii).

[8] "Marked" is defined as "very noticeable."   Marked, Britannica.com, https://www.britannica.com/dictionary/marked
(last visited March 21, 2023).   And "subnormal" means "lower or smaller than normal."   Subnormal,
Britannica.com, https://www.britannica.com/dictionary/subnormal (last visited March 21, 2023).   Thus, an individual
with "marked subnormal" intelligence is someone with very noticeable, low intelligence.   *See, e.g.*, Henry v. Dees,
658 F.2d 406, 411 (5th Cir. 1981) (noting that the defendant's "intelligence quotient places him in the educable mental
retardate category").

[9] Mental Illness, *Black's Law Dictionary* (11th ed. 2019) ("A disorder in thought or mood so substantial that it *impairs*
judgment, behavior, perceptions of reality, or the ability to cope with the ordinary demands of life." (emphasis added)).

[10] Legally Incapacitated Person, *Black's Law Dictionary* (11th ed. 2019 (explaining that a legal "incompetent" is

not equivalent to the statutory definitions at issue.  *See United States v. Hansel*, 474 F.2d 1120, 1125 (8th Cir. 1973) (recognizing that "the term 'mental defective' has on occasion, been given a more expansive meaning by courts and legislatures").  These related definitions only matter if they result in someone being *adjudged defective* or *involuntarily committed*.  The legal determination is the operative status in the statute, not the underlying cause.  As such, simply having a mental illness does not approach the necessary showing to fall under the statute's prohibitions.

The statute's disconnect from "mental illness" alone is further exemplified by the fact that the statutory standard is not *limited* to individuals who have been adjudged or committed based on their mental health.  For example, someone who was committed to a mental institution for drug usage would not necessarily fit into one of the previously discussed categories—marked subnormal intelligence, mentally ill, or incapacitated.   Nonetheless, the statute would still include them in its reach.  As a result, following Defendant's logic, it could be argued that the societal problem § 922(g)(4) seeks to address is "firearm violence by those with below average intelligence," or "firearm violence by the incompetent" or "firearm violence by someone who uses drugs."   The Court rejects this simplistic framing.

Rather, the societal problem that § 922(g)(4) addresses must encompass *all* of these individuals so long as they have been adjudged defective or involuntarily committed.  So, what do they all have in common?  To answer this question, the Court looks to the sole commonality of the two definitions: individuals who have been determined to be a danger to themselves or

---

synonymous with a "leally incapacitated person," which means "[a] person, other than a minor, who is temporarily or permanently impaired by mental illness, mental deficiency, *physical illness* or disability, or *alcohol or drug use* to the extent that the person *lacks sufficient understanding to make or communicate responsible personal decisions* or to enter into contracts" (emphasis added)).

22

others.

This answer is supported by legislative history. As the Supreme Court recognized long ago, Congress enacted the Gun Control Act of 1968 ("GCA") because "it was concerned with the widespread traffic in firearms and with their general availability to those whose possession thereof was contrary to the public interest." *Huddleston v. United States*, 415 U.S. 814, 824 (1974). The GCA's broadly stated purpose "was to curb crime by keeping 'firearms out of the hands of those not legally entitled to possess them because of age, criminal background, or incompetency.'" *Id.* (quoting S.Rep. No. 1501, 90th Cong., 2d Sess. 22 (1968)); *see also* 114 Cong. Rec. 13219 (1968) (remarks by Sen. Tydings). After all, "[n]o one can dispute the need to prevent drug addicts, mental incompetents, persons with a history of mental disturbances, and persons convicted of certain offenses from buying, owning, or possessing firearms. This bill seeks to maximize the possibility of keeping firearms out of the hands of such persons." 114 Cong.Rec. 13647, 21784 (1968). "In order to accomplish this goal, Congress obviously determined that firearms must be kept away from persons . . . who might be expected to misuse them." *Dickerson v. New Banner Inst., Inc.*, 460 U.S. 103, 119 (1983).

More specifically, Congress had two purposes for enacting § 922(g)(4): (1) protecting the community from crime and (2) preventing suicide, both of which were intended to be accomplished by "cut [ting] down or eliminat[ing] firearms deaths caused by persons who are not criminals, but who commit sudden, unpremeditated crimes with firearms as a result of mental disturbances." *See* 114 Cong. Rec. 21,829 (1968). Thus, members of Congress thought it necessary to prevent dangerous individuals who are likely to "commit sudden, unpremeditated crimes with firearms as a result of mental disturbances" from possessing those firearms. *Id.* In

23

doing so, the statutory provision aimed to prohibit firearm ownership among those who "by their previous conduct or mental condition" have *proven* themselves "incapable of handling a dangerous weapon in . . . an open society." *Id.* at 21,809-10 (statement of Rep. Tenzer).

Thus, the societal problem § 922(g)(4) seeks to address is firearm violence by individuals who have been determined to be a danger to themselves or others—not firearm violence by those who simply have any kind of mental illness.

### 2. *Historical basis for Section 922(g)(4)*

Having determined the societal problem at play, the second step of a Second Amendment challenge is deciding whether the regulation is consistent with the Nation's historical tradition of firearm regulation. *Bruen*, 142 S. Ct. at 2129–30. To do this, the Court must determine whether the Government has met its burden of showing that prohibiting individuals who have been determined to be a danger to themselves or others from possessing firearms is consistent with the Nation's historical tradition of firearm regulation.[11] As detailed below, the Government has met this burden.

To start, the Government does not rebut Defendant's contention that a formal regulation prohibiting the possession of firearms by the *mentally ill* did not exist at the time the Second Amendment was enacted. (*See* ECF No. 43.) Nevertheless, the Government suggests that the absence of historical statutory prohibitions on firearm possession may have been the consequence of the fact that "in eighteenth-century America, justices of the peace were authorized to 'lock up' 'lunatics' who were 'dangerous to be permitted to go abroad.'" (*Id.* at 7 (citing Carlton F.W.

---

[11] The Court stresses that district courts are "ill equipped to conduct the type of searching historical surveys that the [*Bruen*] Court's approach requires," *Bruen*, 142 S. Ct. at 2179 (Breyer, J., dissenting), even if cases are to be decided "based on the historical record compiled by the parties," *id.* at 2130, n. 6 (Thomas, J.).

Larson, *Four Exceptions in Search of a Theory: District of Columbia v. Heller and Judicial Ipse Dixit,* 60 HASTINGS L.J. 1371, 1377 (2009); Gerald N. Grob, *The Mad Among Us: A History of the Care of America's Mentally Ill* 5-21, 29, 43 (1994) (explaining that these individuals were often removed from the community at large through home confinement or involuntary commitment to welfare and penal institutions).)   As such, the Government reasons that "formal laws regarding disarmament were simply unnecessary."   (*Id.* at 12 n.7.)   Other courts have used this rationale to conclude that "[i]f eighteenth century America viewed it as a permissible infringement on liberty to 'lock up' individuals of unsound mind, then a lesser intrusion on liberty such as a prohibition on firearm possession would seem to have been permissible, as well."   *Keyes v. Lynch*, 195 F. Supp. 3d 702, 718 (M.D. Pa. 2016) (citing *Larson*, supra).

Further bolstering its argument, the Government presents a history of restrictions aimed at preventing persons considered to be dangerous to themselves or others from possessing and using firearms.   (ECF No. 43 at 9–12, 13–14.)   In particular, the Government points to the 1689 English Declaration of Rights, (*id.* at 9), which *Heller* identified as "the predecessor of our Second Amendment," 554 U.S. at 593.   The Declaration provided that "the subjects which are Protestants may have arms for their defense *suitable to their conditions* and *as allowed by law*.   1 W. & M., c. 2, § 7, in 3 Eng. Stat. at Large 441 (1698) (emphasis added).   The Government also cites the Address and Reasons of Dissent of the Minority of the Convention of the State of Pennsylvania to Their Constituents, another "highly influential" "precursor" to the Second Amendment, *Heller*, 554 U.S. at 604, in support of its position, (ECF No. 43 at 7).   That Address notes that at the time of the Second Amendment's ratification, citizens were excluded from the right to bear arms if they posed a "real danger of public injury."   *United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010).

25

Further, the Government provides copious sources discussing the historical basis of laws disarming individuals deemed "dangerous" to society.   (*See, e.g.*, ECF No. 43 at 7 (citing Robert Dowlut, *The Right to Arms: Does the Constitution or the Predilection of Judges Reign?*, 36 OKLA. L. REV. 65, 96 (1983) ("Colonial and English societies of the eighteenth century . . . have excluded infants, idiots, lunatics, and felons [from possessing firearms].")); *id.* at 14 (citing *Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185, 200 (5th Cir. 2012) (identifying classes of individuals perceived to be dangerous and disarmed during the colonial era).)   In fact, this Court recently detailed the United States's historical tradition for laws prohibiting individuals deemed "dangerous" from possessing firearms in the interest of public safety.  *See Nutter*, 2022 WL 3718518, at *5–8.

As this Court explained, "[h]istory is consistent with common sense: it demonstrates that legislatures have the power to prohibit dangerous people from possessing guns."  *Nutter*, 2022 WL 3718518, at *8 (quoting *Kanter*, 919 F.3d at 451 (Barrett, J., dissenting)).)   And "[c]ommon sense tells us that the public understanding of the Second Amendment at the time of its enactment, which allowed for disarmament of Blacks and Native Americans based on their perceived threat, would have accepted disarmament of people" who have been involuntarily committed to a mental institution because they were part of "a group found by the legislative branch to present a danger of misusing firearms."  *See id.*   Thus, despite Defendant's claims, "[n]othing in the historical record suggests a popular understanding of the Second Amendment at the time of the founding that extended to preserving gun rights for groups who pose a particular risk of using firearms against [themselves or other] innocent people."  *See id.*

When the *Heller* Court interpreted the Second Amendment, it reviewed history and

26

tradition from England, the colonial and founding periods, and the nineteenth century to determine how that history and tradition informed or reflected the founding-era understanding of the Second Amendment. Examining these same kinds of sources to identify the historical justification for § 922(g)(4) reveals one controlling principle that applies to each historical period: dangerous persons could be disarmed. Accordingly, because there is a historical basis for disarming individuals that have been determined to be dangerous to themselves and/or the public at large, § 922(g)(4) is constitutional on its face.

### IV.   CONCLUSION

For these reasons, Defendant's *Bruen*-Based Motion to Dismiss, (ECF No. 40), is **DENIED**.

**IT IS SO ORDERED**.

The Court **DIRECTS** the Clerk to send a copy of this Order to the Defendant and counsel, the United States Attorney, the United States Probation Office, and the United States Marshal.

ENTER:        May 5, 2023

_____
THOMAS E. JOHNSTON, CHIEF JUDGE

27

JA143

# District Judge Daybook Entry

## United States District Court - Southern District of West Virginia at Charleston

| | | | |
|---|---|---|---|
| Date: | 10/12/2023 | Case Number: | 2:22-cr-00095 |
| Case Style: | USA vs. James Gould | | |
| Type of hearing: | Plea Hearing | | |
| Before the Honorable: | 2515-Johnston | | |
| Court Reporter: | Ayme Cochran | Courtroom Deputy: | Staci Wilson |

Attorney(s) for the Plaintiff or Government:

Timothy Boggess

Attorney(s) for the Defendant(s):

Lex Coleman

| | | |
|---|---|---|
| Law Clerk: | Ryan Combs | |
| Probation Officer: | Olivya Jones | |

## Court Times

| Start Time | End Time | Court Time Description |
|---|---|---|
| 10:14 AM | 11:00 AM | Non-Trial Time/Uncontested Time |

Time in court: 0 hours and 46 minutes. Non-Trial Time/Uncontested Time

## Courtroom Notes

Scheduled Start 10:00 a.m.
Actual Start 10:14 a.m.

Defendant present in person and by counsel.
Defendant placed under oath.
Court finds Defendant competent to go forward.
There is no plea agreement in this case.
Defendant waives reading of Indictment.
Court reads statute with which Defendant is charged.
Defendant advised of elements of offense which Government would have to prove at trial.
Defendant advised of the penalties which may apply based upon the plea.
Defendant advised of right to plead not guilty, to remain silent, and to stand trial.
Court asks Government to provide factual basis for the plea.
Government calls SETH FISHER; oath given.
Direct by Mr. Boggess.
Cross by Mr. Coleman.
Court calls upon Defendant to enter a plea.
Defendant pleads guilty to Count One of the Indictment and executes written guilty plea form.


Court finds Defendant is competent and capable of entering an informed plea.
Court finds Defendant's plea to be voluntary.
Court finds that Defendant understands the consequences of the plea.
Court finds that Defendant understands the rights being given up.
Court defers finding sufficient factual basis for Defendant's plea at this time.
Court accepts plea.
Court defers adjudging Defendant guilty until the time of sentencing.
Defendant released pending sentencing.
Sentencing set for January 25, 2024, at 3:00 p.m.
Court recessed at 11:00 a.m.

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

UNITED STATES OF AMERICA,

                Plaintiff,

v.                                  CRIMINAL ACTION NO. 2:22-cr-00095

JAMES GOULD,

                Defendant.

**ORDER**

On October 12, 2023, came the United States of America, by Assistant United States Attorney Timothy D. Boggess, and also came the Defendant, James Gould, in person and by his attorney, Lex A. Coleman during which Defendant, as more particularly set forth on the record, entered a guilty plea to a Single Count Indictment, which charges him with being a person who has previously adjudicated as a mental defective or committed to a mental institution in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(4) and 924(a)(2).

Pursuant to U.S.S.G. § 6A1 *et seq.*, it is hereby **ORDERED** that:

1.      The Probation Office undertake a presentence investigation of the Defendant and prepare a presentence report for the Court;

2.      Pursuant to Federal Rule of Criminal Procedure 32(e)(3), the United States Probation officer is directed not to disclose to the Defendant, the Defendant's counsel, or the attorney for the Government the Probation Officer's recommendation, if any, on the sentence;

3.      The Court **ORDERS** that the United States Probation Office prepare and forward a draft presentence report to the United States and counsel for the Defendant no later than **December 14, 2023**; that the United States Attorney and counsel for the Defendant file any

objections to the draft presentence report no later than **December 28, 2023;** and that the Probation Office submit a final presentence report to the Court no later than **January 11, 2024**.   The Court **SCHEDULES** final disposition of this matter for **January 25, 2024, at 3:00 p.m.**

4.      The Government and the Defendant **must** file a Sentencing Memorandum addressing the sentencing factors set forth in 18 U.S.C. § 3553(a) as each party believes they may pertain to this case.   The Sentencing Memorandum **must** also address any such matters that have not already been addressed in the form of motions or objections to the Presentence Report and may include argument as to the sentence to be imposed.   Any arguments as to the sentence imposed must be individually and separately raised, and clearly addressed in the Sentencing Memorandum. *See, e.g.*, *United States v. Ross*, 912 F.3d 740, 744 (4th Cir. 2019) (requiring sentencing courts to "address or consider all non-frivolous reasons presented for imposing a different sentence and explain why [it] has rejected those arguments." (citing *United States v. Blue*, 877 F.3d 513, 518 (4th Cir. 2017))).   The filing of the Sentencing Memorandum is **MANDATORY**.   The Sentencing Memoranda shall be no more than ten (10) pages in length, unless leave is granted by the Court for additional pages and shall be filed with *and received by* the Clerk no later than **January 18, 2024**; and

5.      Bond in the amount of $10,000 unsecured, previously executed, shall be continued to ensure Defendant's appearance before this Court at such times and places as the Court may direct.

The trial of this criminal action is hereby **VACATED**.

**IT IS SO ORDERED**.

The Court **DIRECTS** the Clerk to send a copy of this Order to the Defendant and counsel, the United States Attorney, the United States Probation Office, and the United States Marshal.

ENTER:        October 12, 2023

_____

THOMAS E. JOHNSTON, CHIEF JUDGE

```
                IN THE UNITED STATES DISTRICT COURT
            FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
                          AT CHARLESTON


_____x
                                :
UNITED STATES OF AMERICA,        :      Criminal Action
                                :
             Plaintiff,          :      No.  2:22-cr-00095
                                :
v.                               :
                                :      Date:  March 21, 2024
JAMES GOULD,                     :
                                :
             Defendant.          :
_____x


            TRANSCRIPT OF SENTENCING HEARING HELD
      BEFORE THE HONORABLE THOMAS E. JOHNSTON, CHIEF JUDGE
              UNITED STATES DISTRICT COURT
               IN CHARLESTON, WEST VIRGINIA

APPEARANCES:

For the Government:          AUSA TIMOTHY D. BOGGESS
                             United States Attorney's Office
                             United States Courthouse & IRS
                             Complex
                             110 North Heber Street, Room 261
                             Beckley, WV 25801


For the Defendant:           AFPD LEX A. COLEMAN
                             Federal Public Defender's Office
                             Room 3400
                             300 Virginia Street East
                             Charleston, WV 25301


Probation Officer:           Heather Edwards


Court Reporter:              Ayme Cochran, RMR, CRR

Proceedings recorded by mechanical stenography;
transcript produced by computer.
```

2

```
 1          PROCEEDINGS had before The Honorable Thomas E.

 2   Johnston, Chief Judge, United States District Court,

 3   Southern District of West Virginia, in Charleston, West

 4   Virginia, on March 21, 2024, at 2:12 p.m., as follows:

 5          COURTROOM DEPUTY CLERK:  The matter before the

 6   Court is the United States v. James Gould, criminal action

 7   number 2:22-cr-00095, scheduled for sentencing.

 8          THE COURT:  Good afternoon.

 9      Will counsel please note their appearances?

10          MR. BOGGESS:  Timm Boggess, Assistant U. S.

11   Attorney for the United States.

12          MR. COLEMAN:  Lex Coleman, Your Honor, for Mr.

13   Gould, who is seated in the courtroom to my left.

14          THE COURT:  Good afternoon.

15      Mr. Gould, will you please stand, and I will ask the

16   deputy clerk to administer an oath to you at this time.

17          COURTROOM DEPUTY CLERK:  Please raise your right

18   hand.

19          **JAMES GOULD, DEFENDANT, SWORN**

20          THE COURT:  You may be seated.

21      Mr. Gould, do you understand that you are now under

22   oath and you must tell the truth and, if you testify

23   falsely, you may face prosecution for perjury or for making

24   a false statement?

25          THE DEFENDANT:  Yes, sir.
```

```
 1              THE COURT:  And throughout the course of this
 2      hearing if there's anything that occurs that you don't
 3      understand, I want you to feel free to speak up and seek
 4      clarification.
 5          Also, if at any time you need to confer with your
 6      attorney, I'll be pleased to pause the proceedings to allow
 7      you to do so.
 8          Do you understand all that?
 9              THE DEFENDANT:  Yes, sir.
10              THE COURT:  All right.  Mr. Coleman, have you
11      received and read and reviewed a copy of the Presentence
12      Report with your client?
13              MR. COLEMAN:  Yes, sir, I have.
14              THE COURT:  And, Mr. Gould, have you received and
15      read and reviewed with your counsel a copy of the
16      Presentence Report?
17              THE DEFENDANT:  Yes, sir.
18              THE COURT:  And has the Government received and
19      reviewed a copy of the Presentence Report?
20              MR. BOGGESS:  Yes, Your Honor.
21              THE COURT:  All right.  Mr. Coleman, you can be
22      seated.
23              MR. COLEMAN:  Thank you, Your Honor.
24              THE COURT:  A couple of things.  This is not the
25      usual way that I do things, but I'm hoping that it will save
```

1    us some time.  I have every intention today of giving the

2    defendant time served.  So, with that, I want to discuss

3    just a couple of issues.

4        One is I did find an issue and I discussed this with

5    the -- with the probation officer and I actually got the

6    records from it.  The bottom line is this.  Looking at

7    Paragraph 52, a violation of protective order conviction, it

8    is virtually impossible to tell because it -- excuse me --

9    it was sentenced on the same day as the DUI conviction.

10   It's virtually impossible to untangle the two.

11       I found a Fourth Circuit case, *United States v.*

12   *Gillespie*, from 2011, 406 F. App'x 749, which analogizes

13   violation of a protective order to contempt of court.  So,

14   the analysis, therefore, takes us to 4A1.2(c)(1) and it only

15   counts if he received either 30 days -- let me make sure I

16   get the language correct here because it requires a bit of

17   precision.  It only counts if the defendant was sentenced to

18   a term of probation of more than one year or a term of

19   imprisonment of at least 30 days.

20       Now, he appears to have been sentenced -- the

21   paperwork, as I read it, shows that he was sentenced to six

22   months with credit for time served suspended for one year of

23   unsupervised probation.  So, the probation requirement there

24   is more than one year.  So, that -- the probation doesn't

25   count.

5

```
1          And I tried to figure out if the time served amounted
2     to 30 days or more.  Actually, what it says is at least
3     30 days, but -- and I talked with the probation officer
4     about this and based on the paperwork it is impossible from
5     my perspective to determine how much time the defendant
6     spent with regard to that specific conviction for which he
7     was given credit for time served.  Actually, the paperwork
8     kind of looks like credit for time served is a part of the
9     form.  So, he may have spent all of that time in custody for
10    the DUI.
11         It's just, from my perspective, I can't figure it out,
12    but I don't believe that that point should count because I
13    don't think there's sufficient evidence to demonstrate that
14    he served 30 days, at least 30 days, with regard to that
15    conviction.
16         Does counsel have anything they want to add on that?
17         Mr. Coleman, I'm sure you probably don't.
18              MR. COLEMAN:  You're correct.
19              THE COURT:  Mr. Boggess?
20              MR. BOGGESS:  No, Your Honor.  I have nothing to
21    indicate the number of days either.  So --
22              THE COURT:  I -- I will tell you, as I said, dig
23    into the paperwork and you're not going to find a clear
24    answer on that, unfortunately.  So, I am only going to
25    assess then three criminal history points, which drops him
```

6

 1   to a criminal history category of II.

 2       All right.  Having said that, with regard to the

 3   defendant's objection regarding the gun being stolen, I

 4   would think that my indication of the sentence I intend to

 5   give would moot that objection; is that correct, Mr.

 6   Coleman?

 7           MR. COLEMAN:  It moots it, as well as some

 8   documentation that Mr. Boggess provided yesterday.

 9           THE COURT:  Yeah.  I saw that, too.  So, I think

10   that I probably would have -- would have overruled that

11   objection if we -- if we had gotten to it and I'll note that

12   for the record.

13       With regard to the lawful sporting purposes, I actually

14   -- I will tell you for the record that I consulted with the

15   Chief Probation Officer, who is not only a turkey hunter,

16   but has been after me to get into turkey hunting for years,

17   and that I would find by a preponderance of the evidence

18   that this firearm was possessed for lawful sporting

19   purposes.

20       Again, I think that's kind of mooted by my intention to

21   give -- to give the time served sentence, but I don't -- I

22   think that would apply.  So -- and that's going to go into

23   my calculation.

24       Mr. Boggess, you look itchy.  I don't mean just because

25   you're scratching your head either.

1          MR. BOGGESS:  No.  Your Honor, I understand the

2     Court's position.  I would just like to place on the record

3     I don't know when this situation would arise again, but I

4     would think the fact that the defendant possessed a stolen

5     firearm would prevent him from being able to legally possess

6     that for lawful sporting purposes, but I understand the

7     Court's rulings and what it's going to do, but I just wanted

8     to put that on the record so if we are in this situation

9     again this wouldn't be precedent where, in that situation,

10     we did this, but --

11          THE COURT:  Well, unless you've got some authority

12     to support that position, I think that's similar to the

13     argument that you had that because he was prohibited that

14     it's not lawful sporting purposes and I don't think the case

15     law supports that.  So, nice try, but it -- I think, based

16     on what I know, there's sufficient evidence to demonstrate

17     that even though the firearm, I think, was, in fact, stolen,

18     there is every indication to believe that Mr. Gould's

19     purpose was to turkey hunt given the time of the year, given

20     the fact that he had had a sportsman's license the previous

21     year which allows for turkey hunting, he still had time to

22     purchase a license for 2022 before the season, and the fact

23     that he purchased turkey shot.  All of that adds up to me to

24     be well beyond the preponderance that this was -- this was

25     possessed for lawful sporting purposes.

8

1          Now, with regard to your other objections, Mr. Coleman,

2     I don't know how many of those you intend to press given

3     what I've said already.

4                MR. COLEMAN:  Really just the one --

5                THE COURT:  And let me say this, too.  With regard

6     to some of your factual objections, I recognize that this

7     defendant and his brothers have an ongoing dispute.  I don't

8     think any of us really can disagree with that.

9          Mr. Boggess, do you disagree with that?

10               MR. BOGGESS:  Not at all, Your Honor.

11               THE COURT:  Yeah.  So, I think much of this can --

12     much of that -- much of what you've raised in terms of

13     factual issues, Mr. Coleman, I think can sort of be

14     explained away or chalked up to the dispute between him and

15     his brothers.

16               MR. COLEMAN:  I agree and they're not material to

17     your guideline calculations anyway.

18               THE COURT:  I don't think there's anything that's

19     material to the guideline calculation.  Now, I will say that

20     I have considered some of those circumstances in terms of

21     the length of supervised release, but other than that, it's

22     not going to affect -- it's not -- it has no -- it -- I

23     obviously knew all of this stuff before I decided I was

24     going to give a time-served sentence and, again, I think

25     there's an ongoing dispute between he and his brothers and

9

1    -- which is not helped by their proximity to one another.

2         So, is there anything else we need to take up in terms

3    of resolving objections, Mr. Coleman?

4              MR. COLEMAN:  The only other two are the

5    supervised release conditions and how you want to address

6    them.

7              THE COURT:  All right.  So, with regard to your --

8    you made this argument to me before, both of these arguments

9    to me before, in the *Webb* case.

10             MR. COLEMAN:  Yes, sir.

11             THE COURT:  I sided with you on the Fifth

12   Amendment issue and that has been standard form language in

13   my J&Cs ever since.  So, that one -- I guess I'll overrule

14   that one as moot because you're going to get that anyway.

15        With regard to the other one, I went back and looked at

16   the transcript regarding the reporting requirement and,

17   first of all, I note that the language only requires the

18   defendant to make notifications if the probation officer

19   determines that it's necessary.  So, I can't imagine

20   revoking a defendant for violating that condition unless the

21   defendant has clearly been told you need to give this

22   notification.

23        In other words, I think they need to be -- because I

24   understand your argument that there could be circumstances

25   where there could -- there could be some ambiguity as to

 1    whether or not the notification is required.  So, I can't

 2    imagine revoking a defendant unless they've been told you

 3    need to do this.  And even if they've been told that there's

 4    an opportunity for that to be contested before the

 5    notification is required.  That could be brought before me

 6    on a motion and the defendant could say I don't think I

 7    should have to do this notification, the probation officer

 8    could tell me why, and I could decide it.  So, I think there

 9    is some due process built into the condition.

10        Second, I really have difficulty imagining how it would

11    possibly apply in this defendant's case.  Now -- so, first

12    of all -- so, for that reason, I seriously doubt it will

13    ever come up.

14        On the other hand, one of the reasons we have laws and

15    contracts and that sort of thing is to try to anticipate

16    things that we can't imagine.  I don't know what might

17    happen in the future that would spark a probation officer to

18    suggest to Mr. Gould you need to notify this person of this.

19    I -- I can't predict the future.  I can't see the future.

20        I think that these conditions, as a whole, the -- the

21    standard conditions recommended by the Sentencing Commission

22    and they -- they go through an elaborate process with these

23    things and consider the applicable statutory factors.  I

24    think these -- these standard conditions as a whole serve

25    laudable functions for supervision of defendants during

1    their period of supervised release.  So, I want to sort of

2    head off at the pass these challenges to the standard

3    conditions because I think as a whole they do -- and I think

4    I indicated in the *Webb* case, you know, they're kind of a

5    mess, but the Sentencing Commission a few years ago cleaned

6    them up and I think they're better and more functional now.

7    So, I am going to be -- it's going to be hard to persuade me

8    to abandon individual standard conditions because I think as

9    a whole they are important and useful and this one falls

10   into that category.  So, having had an opportunity to

11   reflect on it since the last time we talked about it, Mr.

12   Coleman, I've decided to overrule that objection.

13       And I think that -- oh, and you objected to the -- you

14   objected to the mental health condition and this is a

15   terrible pun, but I think in this case that's a no-brainer.

16   So, I'm going to overrule -- I'm going to overrule your

17   objection on that.

18       Now, does that resolve all of your objections?

19           MR. COLEMAN:  Yes, Your Honor, it does.

20           THE COURT:  All right.  Very well.

21       So, subject to those rulings, I will adopt the

22   Presentence Report and addendum as written.

23       I will note that I received sentencing memos from both

24   parties and have considered them.

25           On October 12th, 2023, the defendant appeared before

12

1    this Court and entered a plea of guilty to a single-count

2    indictment charging him with a possession of a firearm after

3    being involuntary committed to a mental institution in

4    violation of 18 U. S. C. Section 922(g)(4) and 924(a)(2).

5    And it is (a)(2) in this case, right, as opposed to the --

6              MR. BOGGESS:  Yes.

7              THE COURT:  This happened before the amendment.

8              MR. COLEMAN:  Yes.

9              MR. BOGGESS:  And I think that the amendment

10   doesn't apply to that section, I don't think, does it?

11             MR. COLEMAN:  I agree.

12             THE COURT:  Okay.  I hadn't thought about that.

13   All right.  Very well.

14        Now, with regard to the factual basis, the only

15   question I have is, we had a discussion about this at the

16   plea hearing and what the defendant and his counsel settled

17   on was that he -- with regard to the commitment in question

18   in the indictment was that he was committed to Highland

19   Hospital, but the Presentence Report says River Park.  So, I

20   want to clarify once and for all where it was he was

21   committed.  I know there have been multiple commitments, so

22   it gets a little confusing, but the -- and there was no

23   objection to this, in part probably because in the grand

24   scheme of things it doesn't really make that much of a

25   difference, but I did want to clarify that with regard --

```
 1    the Presentence Report in Paragraph 16 says River Park
 2    Hospital.  I think at the plea hearing Mr. Boggess suggested
 3    that he was initially committed to a facility in Jackson
 4    County and then everybody agreed that he went to Highland
 5    after that because I went back and looked at the transcript.
 6        I asked the defendant this question at the plea hearing
 7    and he said he thought it was Highland Hospital, as well.
 8    So, thus, the confusion.
 9        Well, I guess one way to deal with this is, whether
10    it's Highland Hospital or River Park Hospital, are we in
11    agreement that either one of them qualifies as a mental
12    institution under the language of the statute?
13                MR. COLEMAN:  That's never been in dispute.
14                THE COURT:  Okay.  Do you agree with that, Mr.
15    Boggess?
16                MR. BOGGESS:  Yes, Your Honor.
17                THE COURT:  All right.  Very well.
18        All right.  In that case, I will find a factual basis
19    for the plea and adjudge the defendant guilty of the crime
20    as charged.
21        I now -- I now want to give my tentative findings as to
22    the applicable guidelines.  Because the guidelines are low
23    we don't have a third level for acceptance of
24    responsibility.
25                So -- so, I find a Base Offense Level of 14, which is
```

14

```
1    then reduced to a 6 based on the lawful sporting purposes;
2    plus 2 for a stolen firearm; minus 2 for acceptance of
3    responsibility, for a Total Offense Level of 6; a Criminal
4    History Category of II based on 3 criminal history points,
5    yielding an imprisonment range of 1 to 7 months, which is in
6    Zone B, which allows for certain alternatives to
7    imprisonment.
8         Also, if I were to give straight probation it would be
9    1 to 5 years, would be the statutory range; 1 to 3 years of
10   supervised release; a fine range of $1,000 to $9,500; and a
11   mandatory special assessment of $100.
12        Are there any legal objections to my findings as to the
13   applicable guidelines?
14             MR. BOGGESS:  No, Your Honor.
15             MR. COLEMAN:  No, Your Honor.
16             THE COURT:  Has the special assessment been paid?
17             MR. COLEMAN:  Not yet.
18             THE COURT:  All right.  All right.  Very well.
19        All right.  Mr. Gould, at this time, the Federal Rules
20   of Criminal Procedure give you the right to make any
21   statement that you would like to make, although you're not
22   obligated to make any statement.  However, if you do choose
23   to make a statement, I would ask that you stand to do so.
24             THE DEFENDANT:  I'm sorry for what I did.  I did
25   not agree with several of the things that my brother said
```

1    about me when I was committed.  I can't dispute that they

2    said them, but I do not agree that what they said was true.

3        I have never been suicidal.  I did have a few instances

4    where I had an allergic reaction to a steroid.

5        That said, I did know at the time I retrieved the

6    shotgun from my parents' home that I had previously been

7    involved --

8            COURT REPORTER:  Can you slow down a little bit

9    for me, please?  That said, can you repeat from that?

10           THE DEFENDANT:  I did have a few instances where I

11   had an allergic reaction to steroids.  That said, I did know

12   at the time I retrieved the shotgun from my parents' home

13   that I had previously been involuntary committed.  I knew

14   that and I don't dispute that.

15       Had I stopped to actually think about it, I shouldn't

16   have gotten the shotgun, even if it was to hunt later in the

17   season.

18       I understand that the Government has now obtained

19   records showing the gun I had on February 18th was one I

20   used to own and had sold it to Old and New Sports and that

21   Eddie apparently bought it from there.  I did not have that

22   information for that particular shotgun at the time, as

23   there were several shotguns.

24       I did not know or intend to take anything belonging to

25   him.  I got the shotgun and I acted believing it was my own

1    or my father's, which I have an interest in, when I took it.

2    So, I'm sorry for getting that mixed up.

3        Also, there were several of the same makes and models

4    and I picked up the wrong one.  As I have learned through

5    this case, having the shotgun at all was a serious crime and

6    I was not -- it was not my wish or intention to commit any

7    crime, much less a serious one.

8        I have never been able to dispute the actual evidence

9    and have never tried to.  Once my attorney made all of this

10   legal -- or made all of his legal arguments and you ruled on

11   your motion I pled guilty because I am.  Again, I'm sorry

12   for that.

13       The situation with the shotgun was only -- has only

14   further complicated what was already a very difficult

15   situation with my children, my brothers, resolving my

16   mother's estate, and dealing with bankruptcy of my parents'

17   company.

18       I have my son back now, my daughter has been doing

19   great at WVU, and I'm just trying to stay on my feet.

20           THE COURT:  All right.  Thank you, sir.  You may

21   be seated.

22       Mr. Coleman, anything else on behalf of the defendant

23   before I impose sentence?

24           MR. COLEMAN:  No, Your Honor.  In light of your

25   previous comments, I agree with what you've represented to

17

1    the parties and your reasons.

2              THE COURT:  All right.  Mr. Boggess?

3              MR. BOGGESS:  Your Honor, we've set forth our

4    position in our sentencing memorandum.  You said you've

5    already read that and acknowledged that.  So, I have nothing

6    further to add.

7              THE COURT:  Very well.  Thank you.

8        All right.  Mr. Gould, after consideration of the

9    advisory guidelines and the other applicable factors from 18

10   U. S. C. Section 3553(a), I am now ready to impose sentence.

11       Will you please stand?

12       There are very good reasons for the statutes -- for the

13   statute you are charged under.  Mental illness contributes

14   significantly to the carnage and mass shootings that we see

15   in this country.  On the other hand, it is not often charged

16   because of the nature of mental illness and probably because

17   it comes with a potential built-in defense.

18        The facts of this case do not fit readily into the

19   purposes of the statute.  In fact, the Government may come

20   to regret bringing this case because it's a pretty good set

21   of facts for the *Bruen* challenge that I suspect Mr. Coleman

22   will be taking to the Court of Appeals and -- and we'll see

23   what happens there.  It's going to depend a lot on the panel

24   that he gets.

25        But the origins of the case appear to be a combination

1    of genuine mental health issues combined with a family

2    dispute.  The old stigmas regarding mental health are,

3    thankfully, yielding to more enlightened approaches that

4    reflect the fact that the person suffering from mental

5    health issues needs help and family disputes are hardly the

6    stuff of federal crimes.  Thus, I do not view this as a

7    particularly serious offense.

8         Further, as long as you are mentally healthy, there is

9    no further need to deter you or protect the public; hence,

10   the mental health treatment condition of supervised release

11   that I will include.

12        I'm not sure if it's possible to deter others from this

13   crime, as they may not be thinking rationally and,

14   therefore, capable of being incentivized.

15        Finally, I think you've been punished enough with an

16   ultimate guideline range of 1 to 7 months, which would

17   almost certainly in my court yield a probation sentence.

18   You've spent eight months in custody, during which your wife

19   tragically passed away, and another six months on home

20   confinement.  So, you have served far more in the way of

21   punishment already than I would have otherwise imposed if

22   you had been on bond all that time.

23        I'm going to leave you with three pieces of advice.

24   One -- first, slow down.  I have never seen so many speeding

25   tickets in a criminal history before as yours and you're

```
 1   going to kill somebody eventually driving so fast.  So, slow
 2   down.
 3        Second, you now know this very well.  No guns.  We can
 4   debate, and perhaps Mr. Coleman and Mr. Boggess will debate
 5   whether or not that's appropriate in your case, but for
 6   right now, that's what the law says.  No guns.  Stay away
 7   from them.
 8        Third, you need to find peace with your brothers.  Now,
 9   I can't -- that's not something I can really help with, but
10   I do -- I got the report of what happened yesterday.  I took
11   it with a huge grain of salt because, you know, you haven't
12   been arrested.  There's been no conviction.  You know, that
13   information hasn't had the opportunity to be tested.  But
14   it's clear you have an ongoing dispute with your brothers
15   and that's -- you are not going to -- one of the main
16   conditions of supervised release is you can't commit
17   additional crimes.  And I'm very concerned that that ongoing
18   dispute is going to get you in trouble not only with the
19   state authorities, and not only put you in a bad position
20   for the resolution of the dispute, it may put you before me
21   again because you've committed some sort of state crime in
22   the dispute with your brothers.  I don't want to see you
23   again and I'm sure you don't want to be here again.  So, you
24   need to find a way to make peace with your brothers.
25        Finally, whether you want to admit it or not, you do
```

1    have mental health issues and you need to stay on top of

2    them.  And I think that that's a very important reason to

3    have the supervision of the probation officer and the mental

4    health treatment condition.  That's -- that can only benefit

5    you.  And I think you're less likely to get into mischief if

6    your mental health issues are properly addressed.

7        I actually think you have great potential to move past

8    this and move on to again becoming a productive citizen if

9    you -- first and foremost, if you stay on top of your mental

10   health issues.  So, I hope you will do that.  The probation

11   officer will keep an eye on that.

12       And, otherwise, whatever happened yesterday,

13   notwithstanding, it appears that you have been doing well in

14   getting your life back on track and, for that, I wish you

15   Godspeed.

16       Now, before impose sentence, Mr. Coleman, have I

17   addressed all of the arguments that you have made on behalf

18   of your client?

19           MR. COLEMAN:  Yes, Your Honor, you have.

20           THE COURT:  All right.  Very well.

21       Therefore, Mr. Gould, it is the judgment of this Court

22   that you be committed to custody for a term of time served.

23       You will begin a term of three years of supervised

24   release today.

25       And you need to report to the probation officer

1    probably today.  Normally, I would say within 72 hours, but

2    everybody is here, so I would just say report today to begin

3    your supervised release.

4         While on supervised release, you must not commit

5    another federal, state or local crime.  And you must not

6    unlawfully possess a controlled substance.  You must also

7    comply with the terms and conditions of supervised release

8    as set forth in Paragraphs 97 through 120 of the Presentence

9    Report.

10        Now, a couple of qualifications on that.  I don't find

11   that you pose -- I do find that you pose a low risk of

12   future substance abuse, so I'm not going to impose the drug

13   testing requirement.  The drug treatment is -- is a part of

14   the standard conditions and I'm going to leave that in,

15   although I'm not going to -- I usually give a special

16   condition on that, which I won't, but it's only if the

17   probation officer finds that it's necessary and I don't

18   think it appears necessary in your case.

19        I'm not going to impose a fine in this case.  I believe

20   that would be an unwarranted disparity.

21        And a mandatory special assessment of $100 is required.

22   It will be imposed and made due immediately.  In your case,

23   I'm just going to require that it be paid within the next

24   three months.

25        You may be seated.

```
1        Mr. Gould, you have the right to appeal the judgment of
2   this Court.  Any Notice of Appeal must be filed with the
3   Clerk not more than 14 days from the date of the entry of
4   the judgment order.
5        If you desire counsel on appeal and you are not able to
6   retain counsel, the appropriate Court will review a
7   financial affidavit filed by you to determine whether or not
8   to appoint counsel.
9        Now, do you understand your right to appeal and the
10  14-day filing requirement?
11              THE DEFENDANT:  Yes.  Yes.
12              THE COURT:  All right.  And I will place the
13  Presentence Report under seal subject to counsel's right to
14  unseal as necessary for appeal.
15       One thing I will mention.  We basically dealt with this
16  earlier, but one of the factual issues you raised, Mr.
17  Coleman, was the three domestic violence petitions.  I
18  didn't consider those, though, because there was no
19  information regarding resolution.
20              MR. COLEMAN:  Thank you.
21              THE COURT:  So, that's just an example.
22       All right.  Anything else that we need to take up in
23  this case?
24              MR. BOGGESS:  Nothing from the United States, Your
25  Honor.
```

1            MR. COLEMAN:  No, Your Honor.  Thank you.

2            THE COURT:  All right.  Thank you.

3        (Proceedings concluded at 2:42 p.m., March 21, 2024.)

4

5    CERTIFICATION:

6        I, Ayme A. Cochran, Official Court Reporter, certify

7    that the foregoing is a correct transcript from the record

8    of proceedings in the above-entitled matters as reported on

9    March 21, 2024.

10

11    s/Ayme A. Cochran, RMR, CRR                April 24, 2024

12    Ayme A. Cochran, RMR, CRR                        DATE

13

14

15

16

17

18

19

20

21

22

23

24

25

AO 245B (Rev. 02/18)    Judgment in a Criminal Case
Sheet 1

# UNITED STATES DISTRICT COURT

### Southern District of West Virginia

| | |
|---|---|
| UNITED STATES OF AMERICA | **JUDGMENT IN A CRIMINAL CASE** |
| **v.** | |
| JAMES GOULD | Case Number:  2:22-cr-00095 |
| | USM Number:  17889-510 |
| | Lex A. Coleman |
| | Defendant's Attorney |

## THE DEFENDANT:

☑ pleaded guilty to count(s)    Single Count Indictment

☐ pleaded nolo contendere to count(s)
   which was accepted by the court.

☐ was found guilty on count(s)
   after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 U.S.C. §§ 922(g)(4) | Possession of a Firearm After Being Adjudicated Mentally | February 18, 2022 | One |
| and 924(a)(2) | Defective or Involuntarily Committed | | |
| | | | |

    The defendant is sentenced as provided in pages 2 through ___7___ of this judgment.  The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s)

☐ Count(s) ___    ☐ is    ☐ are dismissed on the motion of the United States.

    It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid.  If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

March 21, 2024
Date of Imposition of Judgment

THOMAS E. JOHNSTON, CHIEF JUDGE

April 1, 2024
Date

JA170

AO 245B (Rev. 02/18)   Judgment in Criminal Case
Sheet 2 — Imprisonment

Judgment — Page __2__ of __7__

DEFENDANT:  JAMES GOULD
CASE NUMBER:  2:22-cr-00095

## IMPRISONMENT

The defendant is hereby committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of:

time served.

☐ The court makes the following recommendations to the Bureau of Prisons:

☐ The defendant is remanded to the custody of the United States Marshal.

☐ The defendant shall surrender to the United States Marshal for this district:

  ☐ at _____ ☐ a.m. ☐ p.m.  on _____ .

  ☐ as notified by the United States Marshal.

☐ The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

  ☐ before 2 p.m. on _____ .

  ☐ as notified by the United States Marshal.

  ☐ as notified by the Probation or Pretrial Services Office.

## RETURN

I have executed this judgment as follows:

Defendant delivered on _____ to _____

at _____ , with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____
DEPUTY UNITED STATES MARSHAL

JA171

AO 245B (Rev. 02/18)   Judgment in a Criminal Case
Sheet 3 — Supervised Release

Judgment—Page __3__ of __7__

DEFENDANT: JAMES GOULD
CASE NUMBER: 2:22-cr-00095

## SUPERVISED RELEASE

Upon release from imprisonment, you will be on supervised release for a term of :

3 years.

## MANDATORY CONDITIONS

1. You must not commit another federal, state or local crime.

2. You must not unlawfully possess a controlled substance.

3. You must refrain from any unlawful use of a controlled substance. You must submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.

   ☑ The above drug testing condition is suspended, based on the court's determination that you pose a low risk of future substance abuse. *(check if applicable)*

4. ☐ You must make restitution in accordance with 18 U.S.C. §§ 3663 and 3663A or any other statute authorizing a sentence of restitution. *(check if applicable)*

5. ☑ You must cooperate in the collection of DNA as directed by the probation officer. *(check if applicable)*

6. ☐ You must comply with the requirements of the Sex Offender Registration and Notification Act (34 U.S.C. § 20901, *et seq.*) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in the location where you reside, work, are a student, or were convicted of a qualifying offense. *(check if applicable)*

7. ☐ You must participate in an approved program for domestic violence. *(check if applicable)*

**JA172**

AO 245B (Rev. 02/18)   Judgment in a Criminal Case
Sheet 3A — Supervised Release

Judgment—Page  4  of  7

DEFENDANT:  JAMES GOULD
CASE NUMBER:  2:22-cr-00095

# STANDARD CONDITIONS OF SUPERVISION

As part of your supervised release, you must comply with the following standard conditions of supervision. These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the court about, and bring about improvements in your conduct and condition.

1. You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of your release from imprisonment, unless the probation officer instructs you to report to a different probation office or within a different time frame.
2. After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.
3. You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.
4. You must answer truthfully the questions asked by your probation officer, but may decline to do so if you believe it will incriminate you.  See United States v. Meeks-Little, 5:21-cr-129 (3/1/23), Dkt. 72, Judgment at 4, item 4.
5. You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
6. You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.
7. You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so.  If you do not have full-time employment you must try to find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
8. You must not communicate or interact with someone you know is engaged in criminal activity.  If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.
9. If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.
10. You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).
11. You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.
12. If the probation officer determines that you pose a risk to another person (including an organization), the probation officer may require you to notify the person about the risk and you must comply with that instruction.  The probation officer may contact the person and confirm that you have notified the person about the risk.
13. You must follow the instructions of the probation officer related to the conditions of supervision.

## U.S. Probation Office Use Only

A U.S. probation officer has instructed me on the conditions specified by the court and has provided me with a written copy of this judgment containing these conditions. For further information regarding these conditions, see *Overview of Probation and Supervised Release Conditions*, available at: www.uscourts.gov.

Defendant's Signature _____    Date _____

AO 245B (Rev. 02/18)   Judgment in a Criminal Case
Sheet 3B — Supervised Release

Judgment—Page __5__ of __7__

DEFENDANT:  JAMES GOULD
CASE NUMBER:  2:22-cr-00095

## ADDITIONAL SUPERVISED RELEASE TERMS

In addition, the defendant shall comply with the following special conditions of supervised release:

The Defendant shall comply with the Standard Conditions of Supervision adopted by the Southern District of West Virginia in Local Rule of Criminal Procedure 32.3, as follows:

1)      If the defendant is unemployed, the probation officer may direct the offender to register and remain active with Workforce West Virginia.

2)      Defendants shall submit to random urinalysis or any drug screening method whenever the same is deemed appropriate by the probation officer and shall participate in a substance abuse program as directed by the probation officer.  Defendants shall not use any method or device to evade a drug screen.

3)      As directed by the probation officer, the defendant will make copayments for drug testing and drug treatment services at rates determined by the probation officer in accordance with a court-approved schedule based on ability to pay and availability of third-party payments.

4)      A term of community service is imposed on every offender on supervised release or probation.  Fifty hours of community service is imposed on every offender for each year the offender is on supervised release or probation.  The obligation for community service is waived if the offender remains fully employed or actively seeks such employment throughout the year.

5)      The defendant shall not possess a firearm, ammunition, destructive device, or any other dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers), and shall reside in a residence free from such items.

6)      The defendant shall not purchase, possess, or consume any organic or synthetic intoxicants, including bath salts, synthetic cannabinoids, or other designer stimulants.

The defendant must participate in a mental health treatment program and follow the rules and regulations of the program.  The probation officer, in consultation with the treatment provider, will supervise your participation in the program.

As part of the sentence, the defendant has been ordered to pay the special assessment.  The payment of the special assessment shall be a special condition of the defendant's supervised release.

JA174

AO 245B (Rev. 02/18)   Judgment in a Criminal Case
                       Sheet 5 — Criminal Monetary Penalties

Judgment — Page    6    of    7

DEFENDANT: JAMES GOULD
CASE NUMBER: 2:22-cr-00095

## CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

|  | **Assessment** | **JVTA Assessment*** | **Fine** | **Restitution** |
|---|---|---|---|---|
| **TOTALS** | $ 100.00 | $ 0.00 | $ 0.00 | $ 0.00 |

☐ The determination of restitution is deferred until _____ . An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

☐ The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| **Name of Payee** | **Total Loss**** | **Restitution Ordered** | **Priority or Percentage** |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
| **TOTALS** | $ _____ 0.00 | $ _____ 0.00 |  |

☐ Restitution amount ordered pursuant to plea agreement $ _____

☐ The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐ The court determined that the defendant does not have the ability to pay interest and it is ordered that:

  ☐ the interest requirement is waived for the   ☐ fine   ☐ restitution.

  ☐ the interest requirement for the   ☐ fine   ☐ restitution is modified as follows:

\* Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22.
\*\* Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

**JA175**

AO 245B  (Rev. 02/18)  Judgment in a Criminal Case
Sheet 6 — Schedule of Payments

Judgment — Page ___7___ of ___7___

DEFENDANT:  JAMES GOULD
CASE NUMBER:  2:22-cr-00095

## SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

A  ☑  Lump sum payment of $ 100.00 due immediately, balance due

    ☐  not later than _____ , or
    ☑  in accordance with  ☐  C,  ☐  D,  ☐  E, or  ☑  F below; or

B  ☐  Payment to begin immediately (may be combined with  ☐ C,  ☐ D, or  ☐ F below); or

C  ☐  Payment in equal _____ *(e.g., weekly, monthly, quarterly)* installments of $ _____ over a period of _____ *(e.g., months or years)*, to commence _____ *(e.g., 30 or 60 days)* after the date of this judgment; or

D  ☐  Payment in equal _____ *(e.g., weekly, monthly, quarterly)* installments of $ _____ over a period of _____ *(e.g., months or years)*, to commence _____ *(e.g., 30 or 60 days)* after release from imprisonment to a term of supervision; or

E  ☐  Payment during the term of supervised release will commence within _____ *(e.g., 30 or 60 days)* after release from imprisonment.  The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

F  ☑  Special instructions regarding the payment of criminal monetary penalties:

If not paid immediately, the defendant shall pay the special assessment within the first three months of supervised release. The defendant shall make the payments to the Clerk, United States District Court, P. O. Box 2546, Charleston, WV 25329.

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during the period of imprisonment.  All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐  Joint and Several

    Defendant and Co-Defendant Names and Case Numbers *(including defendant number)*, Total Amount, Joint and Several Amount, and corresponding payee, if appropriate.

☐  The defendant shall pay the cost of prosecution.

☐  The defendant shall pay the following court cost(s):

☐  The defendant shall forfeit the defendant's interest in the following property to the United States:

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) fine principal, (5) fine interest, (6) community restitution, (7) JVTA assessment, (8) penalties, and (9) costs, including cost of prosecution and court costs.

JA176

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### CHARLESTON DIVISION

**UNITED STATES OF AMERICA**

**v.**                                                    **Case No. 2:22-cr-00095**

**JAMES GOULD**

### <u>NOTICE OF APPEAL</u>

NOTICE IS HEREBY GIVEN that the above-named defendant, James Gould,

by his counsel, hereby appeals to the United States Court of Appeals for the Fourth

Circuit from the final judgment entered in this action on April 1, 2024 [Dkt. No. 103].

Date:  April 1, 2024.                    Respectfully submitted,

                                         **JAMES GOULD**

                                         By Counsel

**WESLEY P. PAGE**
**FEDERAL PUBLIC DEFENDER**

**s/ Lex A. Coleman**
Lex A. Coleman, WV Bar No. 10484
Senior Litigator, AFPD
300 Virginia Street, East, Room 3400
Charleston, West Virginia  25301
Telephone: (304) 347-3350
Facsimile:  (304) 347-3356
E-mail: lex_coleman@fd.org

Page **1** of **1**

JA177