No. 24-4192

In The
# United States Court of Appeals
For The Fourth Circuit

———————

UNITED STATES OF AMERICA,

Appellee,

v.

JAMES GOULD,

Appellant.

———————

Appeal from the United States District Court
for the Southern District of West Virginia
*The Honorable Thomas E. Johnston, Chief United States District Judge*

———————

Brief of Appellee the United States of America

———————

WILLIAM S. THOMPSON
United States Attorney

Gabriel C. Price
Assistant United States Attorney
300 Virginia Street, East, Room 4000
Charleston, West Virginia 25301
(304) 345-2200

*Attorneys for the United States of America*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES......................................................................ii

STATEMENT OF JURISDICTION....................................................1

ISSUE PRESENTED FOR REVIEW ...............................................1

STATEMENT OF THE CASE ...........................................................1

STANDARD OF REVIEW....................................................................2

SUMMARY OF ARGUMENT .............................................................3

ARGUMENT

 18 U.S.C. § 922(g)(4) is facially constitutional post-*Bruen*......................4

CONCLUSION ..........................................................................................26

# TABLE OF AUTHORITIES

**Cases**                                                                              **Pages**

*District of Columbia v. Heller,*
    554 U.S. 570 (2008) ................................................................ *passim*

*Logan v. United States,*
    552 U.S. 23 (2007) ................................................................ 15

*Mai v. United States,*
    952 F.3d 1106 (9th Cir. 2020) ................................................ 19

*McDonald v. City of Chicago, Ill.,*
    561 U.S. 742, 130 S. Ct. 3020, 177 L. Ed. 2d 894 (2010) ..................... 5, 7, 8, 12

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen,*
    597 U.S. 1 (2022) ................................................................ *passim*

*O'Connor v. Donaldson,*
    422 U.S. 563–576 (1975) ...................................................... 25

*Roper v. Jolliffe,*
    493 S.W.3d 624 (Tex. App.–Dallas 2015) .................................. 24

*United States v. Rahimi,*
    144 S. Ct. 1889 (2024)......................................................... *passim*

*United States v. Canada,*
    103 F.4th 257 (4th Cir. 2024) .............................................. 8, 10

*United States v. Lam,*
    677 F.3d 190 (4th Cir. 2012) ................................................. 2

*United States v. Perez-Garcia,*
    96 F.4th 1166 (9th Cir. 2024) .............................................. 17-18

*United States v. Pugh,*
    90 F.4th 1318 (11th Cir. 2024) ............................................. 11

*United States v. Rahimi,*
    144 S. Ct. 1889 (2024) ................................................................ 3

*United States v. Salerno,*
    481 U.S. 739 (1987) ............................................................. 2, 25

*United States v. Veasley,*
    98 F.4th 906 (8th Cir. 2024) ................................................... 20

**Statutes**

1 *The Public Statute Laws of the State of Connecticut* (1808) ......................... 20

1 Samuel Shepherd, *Statutes at Large of Virginia from October Session*
    *1792, to December Session 1806, Inclusive* (1835).................................. 20

18 U.S.C. § 922 ......................................................................... *passim*

18 U.S.C. § 925 ............................................................................ 15

18 U.S.C. § 3231 ............................................................................ 1

18 U.S.C. § 3742 ............................................................................ 1

28 U.S.C. § 1291 ............................................................................ 1

34 U.S.C. § 40913 ......................................................................... 16

34 U.S.C. § 40915 ..................................................................... 15, 16

1769 Va. Act 13 ........................................................................... 20

1798 Mass. Act 813 ....................................................................... 20

Act. Of Dec. 1775, *The Public Records of the Colony of Connecticut From May,*
    *1775 to June, 1776, inclusive* 193 (Charles J. Hoadly ed.,1890)...........................18

Act of May 1, 1776, ch. 21, § 2, 5 *Acts and Resolves, Public and Private,*
    *of the Province of Massachusetts Bay* 480 (1886)......................................18

iii

Act of Sept. 20, 1777, ch. 40, § 20, *Acts of the General Assembly of the State of New-Jersey* 90 (1777) .................................................................18

Act of 1777, ch. 6, § 9, 24 *The State Records of North Carolina* 89 (Walter Clark ed.,1905) ..........................................................................18

Act of 1776, 7 *Records of the Colony of Rhode Island and Providence Plantations in New England* 567 (John Russell Bartlett ed., 1862) ...............................18

Act of May 1777, ch. 3, 9 *The Statutes at Large: Being a Collection of All the Laws of Virginia, from the First Session of the Legislature, in the Year 1619,* at 282 (William Waller Hening ed., 1821) ....................................................................18-19

Act of Feb. 16, 1787, §§ 1-3, 1 *Private and Special Statutes of the Commonwealth of Massachusetts* 145-147 (1805) .............................................................19

*The Statute Law of Kentucky* 578 (1810) (William Littell) ..........................................20

Vagrancy Act of 1744, 17 Geo. 2, c. 5 .....................................................19, 20

W. Va. Code § 27-5-4 .........................................................................23, 24

## Regulations

27 C.F.R. § 478.11 ..........................................................................24

27 C.F.R. § 478.144 .........................................................................15

## Other

1 William Blackstone, *Commentaries on the Laws of England* 294 (1765) ...................19

4 *Journals of the Continental Congress 1774-1789* (Worthington Chauncey Ford ed., 1906) .........................................................................18

iv

Henry Care, *English Liberties, or the Free-Born Subject's* Inheritance
(6th ed. 1774) .................................................................... 20

Edward Coke, *The First Part of the Institutes of the Lawes of England,
or, a Commentarie upon Littleton* (1628) .................................... 19

Albert Deutsch, *The Mentally Ill in America: A History of their Care
and Treatment from Colonial Times* (1949) ................................ 20

Richard Moran, *The Origin of Insanity as a Special Verdict: The Trial for
Treason of James Hadfield (1800)*, 19 Law & Soc'y Rev. 487 (1985) ...................... 19

U.S. Const. Amend. II ..............................................................*passim*

v

## STATEMENT OF JURISDICTION

James Gould was indicted by a federal grand jury in the Southern District of West Virginia for the offense of possession of a firearm by a person who had previously been involuntarily committed to a mental institution, in violation of 18 U.S.C. § 922(g)(4). JA12. The district court had jurisdiction over the case pursuant to 18 U.S.C. § 3231. Gould was sentenced on March 21, 2024, and the final judgement was entered on April 1, 2024. JA170. Gould timely filed his notice of appeal from the final judgment on April 1, 2024. JA177. This Court has jurisdiction pursuant to 18 U.S.C. § 3742 and 28 U.S.C. § 1291.

## ISSUE PRESENTED

In a well-reasoned order, the district court denied Gould's motion to dismiss the indictment based on *Bruen,* challenging the constitutionality of 18 U.S.C. § 922(g)(4), which prohibits the possession of a firearm by a person who had previously been involuntarily committed to a mental institution. Did the district court err?

## STATEMENT OF THE CASE

Defendant James Gould was indicted on May 3, 2022, with a violation of 18 U.S.C. § 922(g)(4). JA12. The indictment alleged that on or about February 18, 2022, Gould knowingly possessed a firearm, a Remington 12 gage shotgun. JA12. The

indictment further alleged that at the time Gould possessed the firearm, he had been adjudicated mentally defective and had been involuntarily committed in Jackson County, West Virginia, on or about July 30, 2019. JA12.

On February 17, 2023, Gould filed a motion to dismiss the indictment based on a facial challenge to the constitutionality of 18 U.S.C. § 922(g)(4). JA13-52. The Government filed their response to Gould's motion to dismiss on March 17, 2023. JA53-68. A hearing on Gould's motion was held before the district court on March 30, 2023. JA69. The district court issued a memorandum opinion and order denying Gould's motion to dismiss on May 5, 2023. JA117-143.

On October 12, 2023, Gould pled guilty to the single count indictment. JA145. On March 21, 2024, Gould was sentenced to time served (which was approximately eight months) and placed on a term of three years of supervised release. JA166. Gould filed his notice of appeal on April 1, 2024. JA177.

## STANDARD OF REVIEW

This Court reviews a challenge to a criminal statute's constitutionality *de novo*. *United States v. Lam*, 677 F.3d 190, 201 (4th Cir. 2012). A facial challenge to a statute requires a defendant to "establish that no set of circumstances exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987). To prevail, the

2

Government need only demonstrate that the statute is constitutional in some of its applications. *United States v. Rahimi*, 144 S. Ct. 1889, 1898 (2024).

## SUMMARY OF ARGUMENT

Gould's offense of conviction, 18 U.S.C. § 922(g)(4), is facially constitutional. In order to sustain a facial challenge to a statute, there must be no set of circumstances in which the statute may be applied constitutionally. Section 922(g)(4) bans the possession of a firearm by a person who has been involuntarily committed to a mental institution. An involuntary commitment requires a specific finding of dangerousness. The text and history of the Second Amendment support the constitutionality of Section 922(g)(4). The Supreme Court has repeatedly stated that prohibitions on the possession of a firearm by the mentally ill are presumptively valid.

Additionally, in upholding a similar statute, 18 U.S.C. § 922(g)(8), the Supreme Court in *Rahimi* identified the historical analysis that supports the disarmament of individuals who have been found to pose a danger to others. The recent guidance of the Supreme Court, which clarified that the Second Amendment analysis looks to the underlying principle being addressed by historical tradition and laws rather than requiring a "historical twin," led to the conclusion that the legislature may constitutionally prohibit the possession of firearms by those who have been found by

3

a court to pose a danger to others. The district court correctly denied Gould's motion to dismiss his indictment.

## ARGUMENT

**18 U.S.C. § 922(g)(4) is facially constitutional post-*Bruen*.**

### A. The Second Amendment

The Second Amendment to the Constitution provides that "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. Amend. II. In *District of Columbia v. Heller*, 554 U.S. 570, 635 (2008), the Supreme Court recognized that the Second and Fourteenth Amendments protect the right of law-abiding, responsible citizens to possess a handgun in the home for lawful purposes, like self-defense. The Court thus held unconstitutional two District of Columbia laws that effectively banned handgun possession in the home and required all firearms within homes to be kept inoperable and so unavailable for self-defense. *Id.* at 628–34.

"Like most rights," however, *Heller* emphasized that "the right secured by the Second Amendment is not unlimited." *Id.* at 626. It is "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id.* *Heller* made clear that the opinion should not "be taken to cast doubt on longstanding

4

prohibitions on the possession of firearms by felons and the *mentally ill*, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." *Id.* at 626–27 (emphasis added); *see also McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 786 (2010). *Heller* described these regulations as "presumptively lawful" measures. *Heller,* 554 U.S. at 627 n.26.

In *Bruen*, the Court "made the constitutional standard endorsed in *Heller* more explicit." *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 31 (2022). *Bruen* elaborated on the test *Heller* and *McDonald* set forth to determine whether a government regulation infringes on the Second Amendment right to possess and carry guns for self-defense: "When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 24. Only after the government makes that showing "may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'" *Id.* at 24.

In announcing the test to be used for determining whether the Second Amendment has been infringed, *Bruen* did not alter *Heller's* conclusion that rights under the Second Amendment can be limited. The Justices who made up the majority understood the opinion to "decide[] nothing about who may lawfully possess a firearm." *Id.* at 72 (Alito, J., concurring). Justice Kavanaugh, in his concurrence, was more explicit. He recognized that "the Second Amendment allows a 'variety' of gun regulations" and the Court's decision was not meant to "cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill." *Id.* at 81 (Kavanaugh, J., concurring) (internal citations omitted).

Applying its more explicit standard of review, the Court held unconstitutional a New York licensing law that allowed an applicant to obtain a license to carry a gun outside his home only upon proving "proper cause exists." *Id.* at 71. First, the Court held the Second Amendment's plain text covered the conduct at issue. *Id.* at 31–32. The petitioners were "ordinary, law-abiding, adult citizens" who sought to carry handguns publicly for self-defense. *Bruen,* 597 U.S. at 34-37. The Court further found that the weapons at issue, handguns, were "in common use" today for defense. *Id.* at 32. This, the Court concluded, fell within "the right to keep and bear arms." *Id.*

6

The Court then turned to a review of the historical traditions associated with firearms. *Id.* at 34–70. The Court then concluded that there was insufficient historical data to justify a "proper-cause" requirement present in the New York licensing scheme. *Id.* at 70. The Court then came to the ultimate conclusion that New York's "proper-cause" licensing scheme violates the Fourteenth Amendment in that it prevents *law-abiding citizens* with ordinary self-defense needs from exercising their right to keep and bear arms. *Id.* at 71 (emphasis added).

**B.** ***Bruen*** **reaffirmed** ***Heller*** **and** ***McDonald***'**s conclusion that longstanding prohibitions of possession of firearms by the mentally ill remain constitutional.**

The majority in *Bruen* was explicit on their reliance and "keeping" with *Heller*. *Bruen*, 597 U.S. at 17. *Bruen* then undertook a detailed analysis in explaining that *Heller* and *McDonald* were consistent with *Bruen* in demanding a test rooted in the Second Amendment's text, as informed by history. *Id.* at 19. As it did in *Heller*, the Supreme Court emphasized that the Second Amendment protects the right of "ordinary, law-abiding citizens" to "carry a handgun for self-defense outside the home." *Id.* at 10. But as it did in *Heller*, the Court in *Bruen* also recognized that the "right secured by the Second Amendment is not unlimited." *Id.* at 21. In *Bruen*, at least five justices recognized that the decision did not "cast doubt on longstanding

7

prohibitions on the possession of firearms by felons and the mentally ill." *See id.* at 81 (quoting *Heller*, 554 U.S. at 626–27) (Kavanaugh J., concurring and joined by Roberts, C.J.). In dissent, Justice Breyer, joined by Justices Sotomayor and Kagan, agreed that such statutes were not in doubt. *See id.* at 129–30 (Breyer, J., dissenting). Additionally, Justice Alito stated in his concurrence, "Our holding decides nothing about who may lawfully possess a firearm or the requirements that must be met to buy a gun... Nor have we disturbed anything that we said in *Heller* or *McDonald* about restrictions that may be imposed on the possession or carrying of guns." *Id.* at 72 (internal citation omitted).

In *McDonald*, Justice Alito made clear that the Court did not cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill. *McDonald*, 561 U.S. at 786. In reading *Heller*, *McDonald*, and *Bruen*, a clear majority of justices on the Supreme Court have stated that the prohibitions on possession of firearms by felons and the mentally ill are presumptively lawful.

In *Canada*, a panel on the Fourth Circuit quickly disposed of a facial challenge to Section 922(g)(1). *United States v. Canada*, 103 F.4th 257, 258 (4th Cir. 2024). *Canada* held that under any framework, Section 922(g)(1) remains constitutional. *Id.* In doing so, the Court referenced the language from *Heller* and *Bruen* regarding

8

"longstanding prohibitions." *Id.* Although *Canada* expressly declined to resolve whether Section 922(g)(1)'s constitutionality turns on the definition of the "people" at step one of *Bruen*, a history and tradition of disarming dangerous people considered at step two of *Bruen*, or the Supreme Court's repeated reference to "law-abiding citizens" and "longstanding prohibitions on the possession of firearms by felons," the Court found that no matter which path they chose, they all lead to the same conclusion that Section 922(g)(1) is facially constitutional because it may be constitutionally applied in at least some "set of circumstances." *Id.* at 258. *Canada* also noted an earlier Fourth Circuit pre-*Bruen*, post-*Heller* case which found Section 922(g)(1) constitutional. *Id.*, citing *United States v. Moore*, 666 F.3d 313, 318 (4th Cir. 2012). In *Moore*, the Court held that, "the clear declaration in *Heller* that such felon in possession laws are a presumptively lawful regulatory measure resolves that challenge fairly quickly." *Moore*, 666 F.3d at 318. Although *Moore* was addressing a challenge to Section 922(g)(1), the "clear declaration" from *Heller* that was relied upon included longstanding prohibitions on possession of firearms by both felons and the mentally ill. Therefore, the same language recognized in part by *Canada* and *Moore* is applicable to a challenge to Section 922(g)(4).

9

Gould argues that the district court erred by "not finding that *Bruen's* Second Amendment standard displaced *Heller's* presumptively lawful dicta." App. Br. at 42. However, this Court's decision in *Canada*, which upheld the constitutionality of Section 922(g)(1) under any analytical path, further supports the district court's decision. Gould also argues that the District Court erred in equating Gould with John Hinckley, Jr. App. Br. at 41. However, Gould's argument that the district court erred in citing to a patently obvious example of a person who should be prohibited from carrying a firearm due to mental illness urges this Court to commit the same erroneous analysis that the Supreme Court found the Fifth Circuit performed in *Rahimi*. The Supreme Court clarified that the proper inquiry governing facial challenges to a statute is to "seek harmony, not to manufacture conflict." *Rahimi*, 144 S. Ct. at 1903. *Rahimi* reiterated that courts should consider circumstances in which the statute was most likely constitutional rather than hypothetical scenarios that might raise constitutional concerns. *Id.*

This Court recognized that same standard in upholding Section 922(g)(1) in *Canada*. This Court looked at hypothetical situations most likely to be deemed constitutional, such as those involving people convicted of drive-by-shootings, carjackings, armed bank robbery, or even *assassinating the President of the United States*.

10

*Canada*, 103 F.4th at 258 (emphasis added). Likewise, in Gould's case, the District Court followed the correct analysis in identifying situations in which the statute could be applied constitutionally in at least some set of circumstances, such as when a person was involuntarily committed after attempting to assassinate the President of the United States. Gould advances only a facial challenge to Section 922(g)(4). Because the issue is limited to whether Section 922(g)(4) is unconstitutional in all of its applications and that no set of circumstances exist in which it could be constitutionally applied, the District Court's reference to Hinckley is entirely consistent with a proper analysis regarding the facial constitutionality of the statute.

Gould attempts to contrast the facts of his case with the facts of Hinckley's case. However, in a facial challenge, the underlying facts of Gould's case are irrelevant to the analysis. *See United States v. Pugh*, 90 F.4th 1318, 1325 (11th Cir. 2024), citing *Cheshire Bridge Holdings, LLC v. City of Atlanta, Georgia*, 15 F.4th 1362, 1365 (11th Cir. 2021) and *Miami Herald Publ'g Co. v. City of Hallandale*, 734 F.2d 666, 674 n.4 (11th Cir.), *opinion clarified*, 742 F.2d 590 (11th Cir. 1984)). Gould argues that unlike Hinckley, he had only previously been involuntarily committed to a mental institution for evaluation, never adjudged a mental defective, never adjudged not guilty in a criminal proceeding by reason of insanity, and in three of the four involuntary

11

commitments attempted had been only briefly committed, observed, and released without further court or medical supervision. App. Br. at 41-42. Gould also attempts to distinguish his case from Hinkley's due to Hinkley's firearm disability arising out of the operation of both clauses under Section 922(g)(4). Again, Gould's attempts to distinguish his underlying factual scenario necessarily fail due to his challenge being limited to a facial attack on the constitutionality of the statute.

**C. *Rahimi* again approved the "presumptively lawful" language in *Heller* and *McDonald* in a direct challenge to a portion of 18 U.S.C. § 922(g).**

On June 21, 2024, the Supreme Court issued its opinion in *Rahimi*. Unlike the statutes at issue in *Heller*, *McDonald*, and *Bruen*, *Rahimi* involved a direct challenge to a criminal statute under 18 U.S.C. § 922(g). Chief Justice Roberts, in writing for the majority, clarified the misunderstanding some lower courts had with the recent Second Amended cases stating, "These precedents were not meant to suggest a law trapped in amber." *Rahimi*, 144 S. Ct. at 1897. In upholding Section 922(g)(8), the Court explained that the regulation need not be a "dead ringer" or a "historical twin." *Id.* at 1898.

12

The Court then analyzed the surety laws and going armed laws and "confirm[ed] what common sense suggests: When an individual poses a clear threat of physical violence to another, the threatening individual may be disarmed." *Id.* at 1901. The Court found that the Second Amendment does not prohibit the enactment of "laws banning the possession of guns by categories of persons thought by a legislature to present a special danger of misuse." *Id.* Further, the Court noted that Section 922(g)(8) applied only once a court has found that the defendant "represents a credible threat to the physical safety" of another. *Id.* at 1901-02. This judicial determination of dangerousness was determined to fit within the historical tradition of laws prohibiting possession of a firearm. *Id.* at 1902.

Like *Bruen*, *Rahimi* reiterated that many prohibitions, specifically those on the possession of firearms by "felons and the mentally ill," are "presumptively lawful." *Id.* In his concurrence, Justice Kavanaugh again approved of *Heller's* recognition of traditional exceptions to the Second Amendment, including possession of firearms by felons and the mentally ill. *Id.* at 1923. Justice Sotomayor's concurrence found that the case is "easy" even under *Bruen*, and the Court correctly concluded that the Second Amendment permits the disarmament of individuals who pose a credible threat to the physical safety of others. *Id.* at 1904. Justice Sotomayor's concurrence agreed with the

13

analysis that it is the disarmament of dangerous individuals to mitigate threats of physical violence that is the principle shared by the history and current statute and that was enough to uphold the regulation in Section 922(g)(8). *Id.* Justice Barrett's concurrence agreed that the correct historical principle was "preventing individuals who threaten physical harm to others from misusing firearms." *Id.* at 1926. She further cited to her own dissent in *Kanter* for the proposition that "[h]istory is consistent with common sense: it demonstrates that legislatures have the power to prohibit dangerous people from possessing guns." *Id.*, citing *Kanter v. Barr*, 919 F.3d 437, 451, 464–65 (7th Cir. 2019), *abrogated by Bruen*, 597 U.S. 1, (Barrett, J., dissenting).

Gould is correct that *Rahimi* rejected the argument that a defendant could be disarmed simply because he was not "responsible." *See Rahimi*, 144 S. Ct. at 1903. However, the rejection of this argument does not help Gould. Immediately following the language rejecting the argument that "responsible" has a set meaning, the Court concluded: "An individual found by a court to pose a credible threat to the physical safety of another may be temporarily disarmed consistent with the Second Amendment." *Id.* While rejecting the argument to create a definition and tests based on the specific term "responsible," *Rahimi* explicitly found that the underlying principle of disarming those found to pose a danger to be constitutional. *Id.*

14

Gould also attempts to distinguish *Rahimi* by characterizing his prohibition on possessing a firearm as permanent, but his brief fails to recognize that one may regain the right to possess a firearm after an involuntary commitment upon a subsequent finding that the person no longer poses a danger. Until 1992, Congress allowed an individual to obtain relief from Section 922(g)(4)'s bar to possessing a firearm by demonstrating to the Attorney General that "the circumstances regarding the disability, and [his] record and reputation, are such that [he] will not be likely to act in a manner dangerous to the public safety and that the granting of the relief would not be contrary to the public interest." 18 U.S.C. § 925(c). The Attorney General has delegated this power to the Director of ATF. 27 C.F.R. § 478.144. Since 1992, however, Congress has effectively suspended this provision by prohibiting the use of federal funds to process Section 925(c) relief applications. *See Logan v. United States*, 552 U.S. 23, 28 n.1 (2007).

A person may nevertheless still obtain relief from the prohibition in Section 922(g)(4) through a state-run "relief from disabilities program." 34 U.S.C. § 40915(a). Such a program must, among other requirements, provide relief where "the circumstances regarding the disabilities ... and the person's record and reputation, are such that the person will not be likely to act in a manner dangerous to public safety

15

and … the granting of relief would not be contrary to the public interest." 34 U.S.C. § 40915(a)(2). Congress provides grants to help states maintain such programs. 34 U.S.C. § 40913(b)(7). To date, 33 states (including all states within the Fourth Circuit, and specifically West Virginia) have established qualifying programs. *See* https://www.atf.gov/file/155981/download (last visited July 9, 2024). Therefore, the disarmament of a person who has been found to pose a danger only lasts until a subsequent finding that the individual no longer poses the danger that necessitated the involuntary commitment. The ability to obtain that judicial finding and a restoration of one's right to possess a firearm further supports the conclusion that Section 922(g)(4) is constitutional in at least some of its applications.

However, even if there was no such mechanism to restore one's rights, nothing in *Rahimi's* holding limits the finding of constitutionality *only* to temporary bans. *Rahimi's* finding is premised on the overarching historical principle that a legislature may disarm an individual who poses a danger to others, including those found to pose a danger sufficient to warrant involuntary commitment. And the specific statute at issue in *Rahimi* – § 922(g)(8), which prohibits possession of firearms by those subject to domestic violence protective orders – deals with a form of disarmament that is frequently temporary by its very nature, as it only applies during the timeframe in

16

which a person is subject to such a protective order. The Court's reference to the "temporary" nature of disarmament in the specific context of Section 922(g)(8) provides no basis to import a requirement that the disarmament be temporary for all prohibitions under 18 U.S.C. § 922(g). The central historical tradition that renders Section 922(g)(4) constitutional is the longstanding tradition of disarming those found to pose a danger to others, and that tradition applies with equal force to both temporary and permanent disarmaments.

The analysis and conclusion in *Rahimi* regarding Section 922(g)(8) support the constitutionality of Section 922(g)(4). In fact, in front of the district court, Gould argued that there was no difference between the analysis for Section 922(g)(8) and Section 922(g)(4). JA86. Gould relied on the concurrence and majority of the Fifth Circuit and stated, "[t]he Fifth Circuit dealt with that very effectively and justified very clearly why it did not support a (g)(8) [violation] being constitutional. There's no difference with a (g)(4) [violation]." JA86. Gould was correct that there is no difference between the analysis in *Rahimi* and the analysis for Section 922(g)(4). However, it is the analysis in *Rahimi* done by the Supreme Court, upholding the statute at issue in that case due to longstanding traditions of disarming those who pose a danger, that

17

equally applies to Section 922(g)(4)'s disarmament of people involuntarily committed following a finding of dangerousness.

### D. History supports the disarmament of the mentally ill.

Categorical bans on the possession of firearms by specific groups are compatible with the Second Amendment. *See United States v. Perez-Garcia*, 96 F.4th 1166, 1177 (9th Cir. 2024) (noting that legislatures may "regulate who may possess weapons in the first place"). For example, when the Revolutionary War began, the Continental Congress recommended, and most States enacted, laws disarming loyalists and others who refused to swear allegiance to the new Republic. *See 4 Journals of the Continental Congress 1774-1789*, at 205 (Worthington Chauncey Ford ed., 1906) (Mar. 14, 1776); Act. Of Dec. 1775, *The Public Records of the Colony of Connecticut From May, 1775 to June, 1776, inclusive* 193 (Charles J. Hoadly ed., 1890); Act of Sept. 20, 1777, ch. 40, § 20, *Acts of the General Assembly of the State of New-Jersey* 90 (1777); Act of 1777, ch. 6, § 9, 24 *The State Records of North Carolina* 89 (Walter Clark ed., 1905); Act of May 1, 1776, ch. 21, § 2, 5 *Acts and Resolves, Public and Private, of the Province of Massachusetts Bay* 480 (1886); Resolves of Apr. 6, 1776, 8 *The Statutes at Large of Pennsylvania from 1682-1801*, at 559-561 (1902); Act of 1776, 7 *Records of the Colony of Rhode Island and Providence Plantations in New England* 567 (John Russell Bartlett ed., 1862); Act of May

18

1777, ch. 3, 9 *The Statutes at Large: Being a Collection of All the Laws of Virginia, from the First Session of the Legislature, in the Year 1619,* at 282 (William Waller Hening ed., 1821). Additionally, as a condition of being pardoned, Massachusetts required rebels to surrender their arms, which would be returned to them after three years if they kept the peace. Act of Feb. 16, 1787, §§ 1-3, 1 *Private and Special Statutes of the Commonwealth of Massachusetts* 145-147 (1805).

"[H]istorical evidence supports the view that society did not trust the mentally ill with the responsibility of bearing arms." *Mai v. United States*, 952 F.3d 1106, 1114 (9th Cir. 2020). For example, in England, the Vagrancy Act of 1744 allowed justices of the peace to lock up and seize the property of those "who by Lunacy ... are furiously mad, or are so far disordered in their Senses that they may be dangerous." 17 Geo. 2, c. 5 (capitalization altered); Richard Moran, *The Origin of Insanity As A Special Verdict: The Trial for Treason of James Hadfield (1800),* 19 Law & Soc'y Rev. 487, 509–510 (1985). A "lunatic" could include a person who "hath lucid intervals; sometimes enjoying his senses, and sometimes not." 1 William Blackstone, *Commentaries on the Laws of England* 294 (1765); see also Edward Coke, *The First Part of the Institutes of the Lawes of England, or, a Commentarie upon Littleton* § 405, at 247 (1628).

Likewise, in pre-Founding and Founding-era America, those who had become affected with mental illnesses "were generally treated as if they had been … [s]tripped of all … their rights and privileges." Albert Deutsch, *The Mentally Ill in America: A History of their Care and Treatment from Colonial Times* 41 (1949). Some colonies authorized justices of the peace to "lock[ ] up" lunatics considered "dangerous to be permitted to go abroad." Henry Care, *English Liberties, or the Free-Born Subject's Inheritance* 329 (6th ed. 1774). "It should come as no surprise that confinement did not include access to guns." *United States v. Veasley*, 98 F.4th 906, 913 (8th Cir. 2024).

Around the time of the Second Amendment's ratification, several states had enacted laws—tracking the English Vagrancy Act—that permitted the commitment of persons determined by justices of the peace, magistrates, or selectmen to be "[l]unatics" or of "unsound mind." *See, e.g.*, 1769 Va. Act 13; 2 William Littell, *The Statute Law of Kentucky* 578 (1810) (referencing statute of 1787); 1 Samuel Shepherd, *Statutes at Large of Virginia from October Session 1792, to December Session 1806, Inclusive* 163 (1835) (1792 law); 1798 Mass. Act 813; 1 The Public Statute Laws of the State of Connecticut 386 (1808) (1793 law). Governing officials under these and other provisions had "a lot of discretion when deciding whether to confine the mentally ill." *Veasley*, 98 F.4th at 914.

20

Likewise, the historical tradition regarding surety and going armed laws that were relied on in *Rahimi* are just as applicable to an analysis of Section 922(g)(4). Gould argues that surety laws do not support the prohibition against possession of a firearm under Section 922(g)(4) because "civil surety laws did not disarm anyone." App. Br. at 45. Gould's argument suffers from the same flaw that the Supreme Court criticized in the Fifth Circuit's analysis in *Rahimi* by requiring a precise historical twin rather than a historical analogy. *See Rahimi*, 144 S. Ct. at 1898. *Rahimi*, in clarifying and expanding the historical analysis in *Bruen*, identified that surety laws were "[w]ell entrenched in the common law" to prevent all forms of violence. *Id.* at 1900. *Rahimi* found that those surety laws often offered the accused significant procedural protections through the requirement of a complaint before a judge, the taking of evidence, and summoning the accused who could respond to the allegations. *Id.* *Rahimi* found that these surety laws provided a mechanism for preventing violence before it occurred. *Id.*

In reading the majority and concurrences from *Rahimi*, the underlying historical principle relied upon to uphold the constitutionality of the statute at issue there was the disarmament of individuals who have had a finding of dangerousness by a court or judicial fact finder. *Id.* at 1901-02. The Court held that "we have no

21

trouble concluding that Section 922(g)(8) survives Rahimi's facial challenge. Our tradition of firearm regulation allows the Government to disarm individuals who present a credible threat to the physical safety of others." *Id.* Gould's attempt to cast surety laws as irrelevant to the analysis because they do not function in the exact manner as the current law fails to follow the clear guidance that the Supreme Court provided in *Rahimi*. The Supreme Court expressly relied on those same surety laws to uphold the constitutionality of the disarmament of an individual who was subject to a domestic violence restraining order.

Contrary to Gould's argument, the surety laws relied on by the Supreme Court in *Rahimi* were aimed directly at the "why" in Gould's case. The principle identified in *Rahimi* was "preventing individuals who threaten physical harm to others from misusing firearms." *Id.* at 1896. Relying on surety laws, the majority succinctly identified the historically accepted principle that "[w]hen an individual poses a clear threat of physical violence to another, the threatening individual may be disarmed." *Id.* at 1901. That same principle can be applied to the statute in Gould's case. Section 922(g)(4) only prohibits the possession of a firearm after there has been a finding of a credible threat of dangerousness. It is this finding of a person being a danger to

themselves or others, along with the attendant procedural protections, that aligns with

the historical principle that was recognized in *Rahimi*.

**E. West Virginia's involuntary commitment requires a finding of dangerousness.**

In West Virginia, the procedure for the involuntary commitment of a person

to a mental institution is found in W. Va. Code § 27-5-4. The West Virginia statutory

scheme requires a judicial determination regarding:

(A) Whether the individual is mentally ill or has a substance use disorder;

(B) Whether, as a result of illness or substance use disorder, the individual is likely to cause serious harm to self or others if allowed to remain at liberty and requires continued commitment and treatment;

(C) Whether the individual is a resident of the county in which the hearing is held or currently is a patient at a mental health facility in the county; and

(D) Whether there is a less restrictive alternative than commitment appropriate for the individual that is appropriate and available.

W. Va. Code § 27-5-4(k). The term "committed to a mental institution," as used in

Section 922(g)(4), means, "A formal commitment of a person to a mental institution

by a court, board, commission, or other lawful authority. The term includes a

commitment to a mental institution involuntarily. The term includes commitment

for mental defectiveness or mental illness. It also includes commitments for other

23

reasons, such as for drug use." 27 C.F.R. § 478.11. However, the term "does not include a person in a mental institution for observation or a voluntary admission to a mental institution." *Id.*

The commitment of Gould in this case required a judicial determination that Gould was likely to cause serious harm to self or others (dangerousness), and that finding had to be based upon clear and convincing evidence. W. Va. Code § 27-5-4(k). Accordingly, the same requirement of a judicial determination of dangerousness found by the Court in *Rahimi* when upholding Section 922(g)(8) is present in Gould's case. However, the standard for the judicial finding of dangerousness in the context of the protective order in *Rahimi* only required a judicial finding based on a preponderance of the evidence. *See Roper v. Jolliffe*, 493 S.W.3d 624, 638 (Tex. App.—Dallas 2015). Thus the procedural protections afforded to a person who is involuntarily committed are even greater than those found constitutionally sufficient in *Rahimi*. The holding in *Rahimi* thus squarely supports a finding that Section 922(g)(4) is constitutional.

**F. Gould's facial challenge is without merit.**

Gould challenges Section 922(g)(4) on its face. This is the "most difficult challenge to mount successfully," because it requires a defendant to "establish that no set of circumstances exists under which the Act would be valid." *Rahimi*, 144 S. Ct. at 1898, citing *Salerno*, 481 U.S. at 745. The United States need only demonstrate that the challenged statute is constitutional in *some* of its applications. *Id.* To prevail on a facial challenge, Gould must therefore show that "no set of circumstances" exists in which that law can be applied without violating the Second Amendment. *Salerno,* 481 U.S. at 745. Following with the analysis in *Rahimi*, Section 922(g)(4) is clearly constitutional in at least some of its applications, including in Gould's own case. Gould, who had been involuntarily committed to a mental institution in West Virginia, would necessarily have been found, based on clear and convincing evidence, likely to cause serious harm to himself or others without such commitment. In fact, the Constitution prohibits involuntary commitment of any "nondangerous individual who is capable of surviving safely in freedom" with or without the assistance of family and friends. *O'Connor v. Donaldson*, 422 U.S. 563, 575–576 (1975). The constitutional requirement of a finding of dangerousness prior to any involuntary commitment renders Section 922(g)(4) constitutional based on the same rationale that was used in

25

*Rahimi*. The same "principle" of disarmament of dangerous individuals to mitigate threats to the physical safety of others identified in *Rahimi* is the basis for the validity of Section 922(g)(4). That finding of dangerousness places a person, such as Gould, in the category of persons thought by a legislature to present a special danger of misuse of firearms, and such individuals may be constitutionally disarmed.

## CONCLUSION

For the foregoing reasons, Gould's conviction should be affirmed.

<div style="margin-left: 40%">

Respectfully submitted,

WILLIAM S. THOMPSON
United States Attorney

By:     s/Gabriel C. Price
GABRIEL C.  PRICE
Assistant United States Attorney

</div>

## CERTIFICATE OF COMPLIANCE

Certificate of Compliance With Type-Volume Limitation,
Typeface Requirements, and Type Style Requirements

1.    This brief complies with the type-volume limitation of Fed. R. App. P.
32(a)(7)(B), because this brief contains 5589 words, excluding the parts of the brief
exempted by Fed. R. App. P. 32(f) (cover page, disclosure statement, table of contents,
table of citations, statement regarding oral argument, signature block, certificates of
counsel, addendum, attachments).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5)
and the type style requirements of Fed. R. App. P. 32(a)(6), because the brief has been
prepared in a proportionally-spaced typeface using Microsoft Word 2016 in 14-point
Goudy Old Style.



s/Gabriel C. Price
GABRIEL C. PRICE
Assistant United States Attorney
Attorney for the United States


Date:    August 8, 2024

## CERTIFICATE OF SERVICE

I hereby certify that on August 8, 2024, I electronically filed the foregoing "BRIEF OF APPELLEE THE UNITED STATES OF AMERICA" with the Clerk of court using the CM/ECF System, which will send notice of such filing to the following registered CM/ECF user:

Lex A. Coleman
Senior Litigator AFPD
Room 3400, United States Courthouse
300 Virginia Street East
Charleston, West Virginia 25301
E-mail: lex_coleman@fd.org

Jonathan D. Byrne
Appellate Counsel
Room 3400, United States Courthouse
300 Virginia Street East
Charleston, West Virginia 25301
E-mail: jonathan_byrne@fd.org

s/Gabriel C. Price
GABRIEL C. PRICE
Assistant United States Attorney
Attorney for the United States