---

**APPEAL NO. 24-4192**

---

In the

# United States Court of Appeals

### For the Fourth Circuit

## UNITED STATES OF AMERICA,

*Plaintiff - Appellee,*

v.

## JAMES GOULD,

*Defendant - Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

---

## REPLY BRIEF OF APPELLANT JAMES GOULD

---

**Wesley P. Page**
**Federal Public Defender**

**Jonathan D. Byrne**
**Appellate Counsel**

**Lex A. Coleman**
**Senior Litigator**

**U. S. Courthouse, Room 3400**
**300 Virginia Street East**
**Charleston, West Virginia 25301**
**Telephone: (304) 347-3350**

*Counsel for Appellant*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................... iii

I.    Gould was never adjudicated to be a mental defective. .......................... 1

II.   Nothing in *Rahimi* excludes a citizen previously committed to a mental institution from "the people" who enjoy Second Amendment protections. ...................................................................................... 1

III.  *Rahimi*'s holding does not make Section 922(g)(4) constitutional. The *Rahimi* analogues have a different "why" and "how" than § 922(g)(4)'s commitment to a mental institution clause. Overgeneralized notions of disarming "dangerous" people do not give rise to any "well-established and representative" "relevantly similar" historical analogues that save § 922(g)(4). ............................................................................................... 2

      A.   Citizens suffering from mental health disorders are particularly vulnerable and deserving of Second Amendment protections. ................. 3

      B.   *Rahimi's* general "underlying historical principle" is both underinclusive and overly broad when applied to § 922(g)(4)'s mental institution commitment clause, and does not give rise to any "well-established and representative" "relevantly similar" historical tradition of firearm regulation. ..................................... 5

            i.    Section 922(g)(4)'s "why" differs from *Rahimi*'s "why." ................ 6

            ii.   Section 922(g)(4)'s "how" materially differs from *Rahimi* and Section 922(g)(8)'s "how." ......................................... 7

            iii.  Section 922(g)(4)'s "how" is permanent. ......................................... 9

      C.   Using an overgeneralized "dangerousness" standard to restrict Second Amendment protections has no limiting principle, cannot be meaningfully reviewed, and would allow Congress to override Constitutional protections by using labels. ................................................. 11

IV.   CONCLUSION .................................................................................. 15

i

REQUEST FOR ORAL ARGUMENT.......................................................................... 16

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

## <u>Cases</u>

*District of Columbia v. Heller*, 554 U.S. 570 (2008) .................................................. 1-3, 10-14

*Friedman v. Highland Park*, 136 S. Ct. 447 (2015) ............................................................ 15

*Jackson v. City and County of San Francisco, California*, 135 S. Ct. 2799 (2015) ................... 15

*McDonald v. City of Chicago*, 561 U.S. 742 (2010) ........................................................... 14

*New York State Rifle & Pistol Ass'n, Inc. v. City of New York, NY*,
140 S. Ct. 1525 (2020) ................................................................................................ 14

*New York States Rifle & Pistol A'ssn* v. *Bruen*, 597 U.S. 1 (2022) ............................... *Passim*

*Peruta v. California*, 137 S. Ct. 1995 (2017) .................................................................... 14

*Range v. Attorney General United States of America*, 69 F.4th 96 (3d Cir. 2023) (*en banc*) ... 12

*Rogers v. Grewal*, 140 S. Ct. 1865 (2020) ....................................................................... 14

*Silvester v. Becerra*, 138 S. Ct. 945 (2018) ...................................................................... 14

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*,
600 U.S. 181 (2023) .................................................................................................... 3

*Tyler v. Hillsdale Cty. Sheriff's Dept.*, 837 F.3d 678 (6th Cir. 2016) .................................. 2, 5

*United States v. Canada*, 103 F.4th 257 (4th Cir. 2024) ...................................................... 3

*United States v. Carter*, 669 F.3d 411 (4th Cir. 2012) ....................................................... 10

*United States v. Nutter*, 624 F. Supp. 3d 636 (S.D. W. Va. 2022) ...................................... 13

*United States v. Rahimi,* 144 S. Ct. 1889 (2024) ........................................................ *Passim*

*United States v. Rahimi*, 61 F.4th 443 (5th Cir. 2023), *rev'd on other grounds*,
144 S. Ct. 1889 (2024) ............................................................................................ 11-12

*United States v. Rose*, No. 1:23-cr-00034-HAB-SLC (N.D. Ind. 2023) ........................ 2, 5

*Voisine v. United States*, 136 S. Ct. 2272 (2016) ................................................. 14

## Constitutional Provisions

U.S. Const. amend. II .................................................................................*Passim*

## Federal Statutes

18 U.S.C. § 922(g)(3) ............................................................................... 10

18 U.S.C. § 922(g)(4) ................................................................................*Passim*

18 U.S.C. § 922(g)(8) ........................................................................6, 7, 9, 11

18 U.S.C. § 924(a)(8) ................................................................................ 14

34 U.S.C. § 40915(a) .................................................................................. 9

## Other Authorities and Sources

Akihito Suzuki, *Lunacy in seventeenth- and eighteenth-century England: analysis of Quarter Sessions records, Part II*, 3 History of Psychiatry 29 (1992) https://journals.sagepub.com/doi/pdf/10.1177/0957154X9200300903 (last viewed Aug. 23, 2024) ................................................................... 4

American and Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders*, Fifth Edition, Text Revised (DSM-5-TR) (2022) ................................. 5

Cong. Globe, 40th Cong., 2d Sess., 1967 (1868) ............................................... 4

Lisa Miller, *John Hinckley left the Mental Hospital Seven Months Ago*, New York Magazine (Mar. 21, 2017), https://nymag.com/intelligencer/2017/03/john-hinckley-is-out-of-the-mental-hospital.html (last viewed Aug. 21, 2024) .................... 13

Virginia Aldigé Hiday, Ph.D. et al., *Criminal Victimization of Persons with Severe Mental Illness*, 50 Psychiatric Services 7 (1999) https://psychiatryonline.org/doi/epub/10.1176/ps.50.1.62   (last   viewed Aug. 8, 2024) ................................................................................... 4

Verena Rossa-Roccor et al., *Victimization of People With Severe Mental Illness Outside and Within the Mental Health Care System: Results on Prevalence and Risk Factors From a Multicenter Study,* 11 Front. Psychiatry 563860 (2020), https://www.frontiersin.org/journals/psychiatry/articles/10.3389/fpsyt.2020.563860/full (last viewed Aug. 8, 2024) .................................................................. 3, 4

Vagrancy Act of 1744, 17 Geo. 2, c. 5 ............................................................. 4

## I.      Gould was never adjudicated to be a mental defective.

While the Government is correct that the indictment alleged Gould had been adjudicated a mental defective, Govt. Br. at 2, the record shows that Gould was **never** adjudged a mental defective, nor was he convicted under the mental defective clause in Section 922(g)(4). While the district court conflated Section 922(g)(4)'s two clauses for purposes of denying Gould's motion to dismiss, the two disabilities are not the same, and the mental institution commitment clause does not by itself make a citizen "mentally ill" as the term was used by the *dicta* in *District of Columbia v. Heller*, 554 U.S. 570 (2008). An adjudged "mental defective," again per the ATF regulation, could perhaps align more closely with "mentally ill" as mentioned by *Heller's dicta*, but that issue is not before the Court in this case.

## II.      Nothing in *Rahimi* excludes a citizen previously committed to a mental institution from "the people" who enjoy Second Amendment protections.

The Government argues *Heller* and *New York States Rifle & Pistol A'ssn* v. *Bruen*, 597 U.S. 1 (2022), both support the idea that only law-abiding citizens enjoy Second Amendment protections.[1] Yet the Government never explains why anyone committed to a mental institution is not a law-abiding citizen.

---

[1]   This is after diminished Second Amendment protections were afforded non law-abiding citizens through intermediate scrutiny for the fourteen years between *Heller* and *Bruen*.

Citizens previously committed to a mental institution are still part of "the people" under the Second Amendment, such that possessing a firearm in their homes is protected conduct under *Bruen*'s step one. *Bruen*, 597 U.S. 1, at 70, *quoting Heller*, 554 U.S. at 581. *Heller's dicta* does not resolve the question of the Second Amendment's application to § 922(g)(4). Instead, *Heller*'s definition of "the people" in the Second Amendment, which was essential to *Heller*'s individual rights holding, plainly includes citizens like Gould. *See United States v. Rahimi,* 144 S. Ct. 1889, 1933 (2024)*; Tyler v. Hillsdale Cty. Sheriff's Dept.*, 837 F.3d 678, 690 (6th Cir. 2016)(rejecting *Heller*'s presumptively lawful mention of the mentally ill as excluding someone previously committed to a mental institution from Second Amendment protections); *United States v. Rose*, No. 1:23-cr-00034-HAB-SLC, ECF No. 36 (N.D. Ind. 2023); *see also* Gould Opening Br. at 23-37. *Rahimi* does not require a different conclusion where the majority did not even discuss, much less analyze, *Bruen*'s step one. *See Rahimi*, 144 S. Ct. at 1903.

**III.** ***Rahimi*'s holding does not make § 922(g)(4) constitutional. The *Rahimi* analogues have a different "why" and "how" than § 922(g)(4)'s commitment to a mental institution clause. Overgeneralized notions of disarming "dangerous" people do not give rise to any "well-established and representative" "relevantly similar" historical analogues that save § 922(g)(4).**

Gould does not dispute that *Heller* mentions presumptively lawful regulations disarming the "mentally ill," but does disagree with the Government's assertion that *Rahimi* meaningfully reaffirmed that *dicta* as an implicit finding § 922(g)(4) is constitutional. Govt. Br. at 12-13. Rather than recharacterizing the *dicta* as such an

implicit finding, Chief Justice Roberts' comment merely rejected Rahimi's suggestion that *Heller* held the Second Amendment categorically protected firearm possession within the home. *Rahimi,* 144 S. Ct. at 1902. The Government's assertion on this point, therefore, cannot stand on the brief, out-of-context comments by Chief Justice Roberts. *Rahimi* instead expressly ***declined*** to decide whether laws banning the possession of guns by categories of persons thought to present a special danger of misuse were constitutional. *Ibid.* Similarly, Gould disagrees with the Government's claim that *United States v. Canada*, 103 F.4th 257, 258-259 (4th Cir. 2024), requires § 922(g)(4) to be found constitutional based upon *Heller's dicta* – where *Canada* expressly declined/refused to endorse the continuing validity of *Heller*'s "longstanding prohibitions." *Ibid.*

Otherwise, throughout its brief, the Government relies on concurrences and dissents from both *Bruen* and *Rahimi* more than it does the actual holdings of those cases. While perhaps consistent with the Government's preferred arguments, the cited sources are not holdings, so this Court may not treat them as such. *See Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 230 (2023).

### A. Citizens suffering from mental health disorders are particularly vulnerable and deserving of Second Amendment protections.

It has become well accepted that people with mental health disorders have a significantly higher risk of becoming victims of violence compared to the general population. Verena Rossa-Roccor et al., *Victimization of People With Severe Mental Illness*

3

*Outside and Within the Mental Health Care System: Results on Prevalence and Risk Factors From a Multicenter Study,* 11 Front. Psychiatry 563860 (2020);[2] Virginia Aldigé Hiday, Ph.D. et al., *Criminal Victimization of Persons with Severe Mental Illness*, 50 Psychiatric Services 7 (1999).[3] Fundamental Second Amendment protections, therefore, are extremely important to this very vulnerable segment of American citizens. "Disarm a community and you rob them of the means of defending life. Take away their weapons of defense and you take away the inalienable right of defending liberty." *Rahimi*, 144 S. Ct. at 1897, *quoting* Cong. Globe, 40th Cong., 2d Sess., 1967 (1868) (statement of Rep. Stevens). Yet § 922(g)(4) purports to do just that to citizens who have previously been involuntarily committed to a mental institution notwithstanding the lack of any contemporaneous finding that they pose a danger of physical harm to themselves or another, and without regard to whether the relevant commitment order is even in effect.

Historians also generally agree that the confinement of "lunatics" in seventeenth and eighteenth-century England was not large scale. Akihito Suzuki, *Lunacy in seventeenth- and eighteenth-century England: analysis of Quarter Sessions records, Part II*, 3 History of Psychiatry 29 (1992).[4] Further, despite its reliance on the British Vagrancy Act of 1744

---

[2] https://www.frontiersin.org/journals/psychiatry/articles/10.3389/fpsyt.2020.563860/full (last viewed Aug. 8, 2024).

[3]   https://psychiatryonline.org/doi/epub/10.1176/ps.50.1.62   (last viewed Aug. 8, 2024).

[4] https://journals.sagepub.com/doi/pdf/10.1177/0957154X9200300903 (last viewed Aug. 23, 2024).

on appeal, Govt. Br. at 19-20, the Government has previously conceded in other cases that there is no historical tradition of prohibiting the possession of firearms by the mentally ill. *See, e.g.*, *United States v. Rose*, No. 1:23-cr-00034-HAB-SLC, ECF No. 31 at 10 (N.D. Ind. 2023); *accord Tyler*, 837 F.3d at 689.

The current version of the *Diagnostic and Statistical Manual*, the foundational standard used by mental health professionals in the United States to define and classify mental disorders, includes criteria sets for more than 70 mental health diagnosis. *See generally* American and Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders*, Fifth Edition, Text Revised (DSM-5-TR)(2022). Few of those recognized disorders involve violence or symptoms posing physical dangers to the patient or others. Contrary to Congress' and the Government's assertions, therefore, prior involuntary commitment to a mental institution is not synonymous with being "mentally ill" at some later time (such as when a firearm is possessed), or with inherent public or private "dangerousness" justifying permanent deprivation of Second Amendment protections.

**B.   *Rahimi*'s general "underlying historical principle" is both underinclusive and overly broad when applied to § 922(g)(4)'s mental-institution-commitment clause, and does not give rise to any "well-established and representative" "relevantly similar" historical tradition of firearm regulation.**

Lacking any well-established and representative "relevantly similar" historical analogue, the Government falls back on the "underlying historical principle" from

5

*Rahimi* that individuals who have had a finding of dangerousness by a court may still be disarmed. Govt. Br. at 22. The Government's preference for broad generalized principles, however, conveniently omits *Bruen*'s "well-established and representative" standard for historical analogues, which still requires a relevantly similar "how" and "why" in terms of comparable justifications and comparable burdens on the fundamental Second Amendment right. *Rahimi*, 144 S. Ct. at 1898, 1931-1933, 1937; *Bruen*, 597 U.S. at 29. This standard is in no way "trapped in amber," nor was it expressly modified or abandoned by *Rahimi*'s majority. This is important, where the "how" and "why" of § 922(g)(4) simply do not align with the historical analogues *Rahimi* cited, any of the purported analogues argued by the Government, or any of the broad basket of analogues cobbled together by the district court. And contrary to the Government's assertions, § 922(g)(4) is materially distinguishable from § 922(g)(8).

### i. Section 922(g)(4)'s "why" differs from *Rahimi*'s "why."

Section 922(g)(4)'s "why" is not consistent with any relevantly similar historical analogue regulating firearm possession generally, or by citizens with mental health conditions specifically. The district court held that Congress enacted § 922(g)(4) (1) to protect the community from crime, and (2) to prevent suicide by cutting down or eliminating firearms deaths caused by persons who are not criminals, but who commit sudden, unpremeditated crimes with firearms as the result of mental disturbances. JA139-JA140. The district court further held that the societal problem addressed by

§ 922(g)(4) is firearm violence by individuals determined to be a danger to themselves or others, not firearm violence by those who simply have some kind of impaired mental functioning. *Ibid*. In substance, the district court expanded the application of § 922(g)(4) well beyond its plain text, and even the plain text of the ATF's refining regulation in order to sustain its constitutionality. If that is what every Court going forward is allowed to do, it "defeats the purpose of a historical inquiry altogether." *Rahimi*, 144 S. Ct. at 1944 (Thomas, J., dissenting). If, however, § 922(g)(4)'s "why" is deduced solely from its text as *Bruen* requires, neither the *Rahimi* analogues, alternate grounds briefed by the Government, or the analogues cobbled together by the district court match the "why" of any historical tradition of disarming any citizens – much less citizens previously committed to a mental institution - at the time of the founding.

### ii. Section 922(g)(4)'s "how" materially differs from *Rahimi* and § 922(g)(8)'s "how."

Section 922(g)(4)'s committed to-a-mental institution clause's "how" is not only very different from any other historical analogues, but also simultaneously underinclusive and overly broad, even if directed by the Government's preferred "why." If some catchall rubric of "dangerousness" is going to functionally limit the availability of Second Amendment protections, then would not the same or even greater dangers also be presented by citizens voluntarily committed or only committed to residential mental health facilities for evaluation, diagnosis, and observation (depending on the particular mental illness involved)? Why would someone involuntarily committed for

symptoms of dementia, drug addiction, or bipolar disorder apparently be so much more dangerous than someone voluntarily committed for schizophrenia or antisocial personality disorder such that the former are disarmed, but the latter are not? That makes no sense, and certainly does not consistently advance the "why" of reducing crime by disarming dangerous people. Individuals voluntarily seeking residential mental health (or drug) treatment could easily be just as dangerous to themselves or others as involuntarily committed citizens. That the symptoms or onset timing of their conditions allowed them to either appreciate the benefits of being voluntarily admitted, or to be convinced to avoid the due process and delay of involuntary proceedings to consent to treatment, hardly renders such individuals less dangerous. Thus their omission from § 922(g)(4)'s permanent disarmament completely undermines the Government's argument that a well-established and representative historical tradition of disarming dangerous people (i.e., the mentally ill) justifies application of the committed-to-a-mental institution clause.

At the same time, by operating well outside the actual commitment order finding someone is a danger to themselves or others, § 922(g)(4) is overinclusive where it disarms previously treated citizens who no longer pose a danger to themselves or anyone else (if they indeed ever did). If the finding of present dangerousness justifying the commitment ends with the expiration or termination of the commitment order,

then there is no circumstance that would facially justify § 922(g)(4)'s permanent disarmament.

### iii.    Section 922(g)(4)'s "how" is permanent.

The Government tries to bolster § 922(g)(4)'s "how" by claiming the resulting disarmament is temporary in the same sense as § 922(g)(8). This is not true. Section 922(g)(8)'s disarmament applies only during the period a domestic relations protective order is in effect, and when the order expires so does the firearm disability. *See Rahimi*, 144 S. Ct. at 1902. Despite involving a finding the affected citizen poses a risk of physical harm to another, § 922(g)(8)'s disability automatically dissipates when the relevant order expires. It does not require further court action, further application for relief by the individual subject to the order, or a further express finding of non-dangerousness. *Ibid.* Section 922(g)(8)'s physical harm finding is also contemporaneous with issuance of the restraining order creating the firearm disability. This is not the case with the committed-to-a-mental-institution disability under § 922(g)(4), where the resulting disarmament is not contemporaneous with any finding of dangerousness and the involuntary commitment order being issued, and the disarmament is permanent. The involuntary commitment order could have been entered and expired over two and half years ago as with Gould, or forty years ago. Under § 922(g)(4) it doesn't matter. And the Government's sense of "temporary," at least with respect to some subsequent finding of "safety" or "non-dangerousness" under 34 U.S.C. § 40915(a), is functionally

9

no different than the "may issue" firearm permit regime handily rejected by *Bruen*. Irrespective of the finding the Government claims must be made in West Virginia (supposedly by clear and convincing evidence), the form orders used in West Virginia still require only a probable cause finding for treatment – a standard no lighter than what grand juries regularly apply to bring felony criminal charges.

The Government's "temporary" argument exposes a further paradox with § 922(g)(4)'s committed-to-a-mental-institution clause. The precedent in the Fourth Circuit permits a drug addict to remove the firearm disability arising under 18 U.S.C. § 922(g)(3) simply by ceasing the use of drugs. *United States v. Carter*, 669 F.3d 411, 419 (4th Cir. 2012). Should the same addict be committed to residential drug treatment, however, the very mechanism that helps him break his cycle of addiction instead operates as a separate and permanent firearm disability, even if the individual citizen never actually posed a realizable risk of physical harm to himself or anyone else.

By suggesting a lesser burden on Second Amendment protections is what makes them constitutional, the Government's temporary disarmament arguments also wade into the interest balancing *Heller* and *Bruen* both rejected, and that *Bruen* rejected with respect to means-end scrutiny. *Heller,* 554 U.S. at 635; *Bruen,* 597 U.S. at 24-26. Neither *Bruen* nor *Rahimi* found that lesser or limited degrees of burden on Second Amendment protections made any regulation constitutional.

10

To the extent § 922(g)(4)'s "why" or "how" were to in some way separately align with certain different historical analogues, there are no historical analogues combining both, unless the manner in which either is defined is so broadly construed that practically any historical firearm regulation would suffice. This cannot be the case, otherwise such an over-generalized approach would render the Second Amendment, *Heller*, and *Bruen* completely meaningless.

### C. Using an overgeneralized "dangerousness" standard to restrict Second Amendment protections has no limiting principle, cannot be meaningfully reviewed, and would allow Congress to override Constitutional protections by using labels.

Again, part of Congress' purported purpose in enacting § 922(g)(4) was to regulate the firearm possession of (i.e. disarm) individuals ***who are not criminals***. Let that sink in. If not criminals, then the object was to regulate firearm possession by ***law-abiding citizens*** (to follow the Government's arguments). As a consequence, the same criminal public affray laws supporting temporary disarmament under § 922(g)(8), *see Rahimi*, 144 S. Ct. at 1901, would not be a relevantly similar analogue for disarming citizens previously committed to a mental institution, particularly with firearms in their own homes for purposes of self-defense. The Government, and the district court below, would nevertheless circumvent that distinction by labelling citizens previously committed to a mental institution as "dangerous" in order to permanently disarm them. The problem with using such an overbroad standard, just as with "law abiding," *United*

11

*States v. Rahimi*, 61 F.4th 443, 452 (5th Cir. 2023), *rev'd on other grounds*, 144 S. Ct. 1889, and "responsible," *Rahimi*, 144 S. Ct. at 1903, is that "dangerous" likewise has no limiting principle. As evidenced by the district court opinion in this case, "dangerous" is also as expansive as it is vague. Once used, it easily allowed the district court to find a historical tradition existed for holding § 922(g)(4) constitutional. *See Range v. Attorney General United States of America*, 69 F.4th 96, 102 (3d Cir. 2023)(*en banc*). Resorting to such an arbitrary standard in the context of permanent disarmament directly contradicts *Bruen* and *Rahimi*, where the presumption against restrictions on keeping and bearing firearms is a central feature of the Second Amendment. It does not merely narrow the Government's regulatory power. It is a barrier, placing the right to keep and bear arms off limits to the Government. *Rahimi*, 144 S. Ct. at 1931, discussing *Bruen*, 597 U.S. at 17. If courts are permitted to redefine the "why" supporting either a given modern firearm regulation or a purported historical analogue so broadly to size-up their "match," *Bruen*'s heightened "text and history" standard will be eroded to the point any firearm regulation a given Congress desires will be sustained, not just existing provisions of the Gun Control Act.

Section 922(g)(4) was enacted in 1968 (fifty years before *Heller)*, at a time when American law did not even recognize the Second Amendment's application to citizens not serving in a militia. Twentieth century sensibilities about gun regulation emerged and coalesced around the collectivist interpretation of the Second Amendment, which

allowed substantial regulation of firearm possession and use. As a result, *Heller, Bruen* and subsequent rulings meaningfully limiting Government firearm regulation are now new, unfamiliar, and in some instances repugnant to modern views of individual freedoms. *See United States v. Nutter*, 624 F. Supp. 3d 636, 642 (S.D. W. Va. 2022)("[t]o suggest that only people convicted of crimes with an exact historical analogue can be subject to gun restrictions would lead to absurd results"). This does not and should not make greater deference to Second Amendment protections wrong, nor require that every pre-existing firearm regulation remain in effect to the extent it was before *Heller* or *Bruen*.

John Hinckley, Jr. had never been committed to a mental institution before attempting to assassinate President Ronald Reagan on March 30, 1981. Following that attempt, he was adjudged mentally incompetent and found not guilty by reason of insanity (meeting the ATF's definition of a "mental defective"), and spent the next thirty-four years involuntarily committed to a mental hospital.[5] As stated in Gould's opening brief, where Hinckley's firearm disability arose from more than § 922(g)(4)'s mental-institution-commitment clause, he was not an accurate comparison for finding that clause facially constitutional.

---

[5] Lisa Miller, *John Hinckley left the Mental Hospital Seven Months Ago*, New York Magazine (Mar. 21, 2017), https://nymag.com/intelligencer/2017/03/john-hinckley-is-out-of-the-mental-hospital.html (last viewed Aug. 21, 2024).

Section 922(g)(4) strips an individual of his or her ability to possess firearms and ammunition without any due process. The ban is automatic, and an uncontestable consequence of an order involuntarily committing an individual for residential mental health treatment. There is no hearing or opportunity to be heard on the statute's applicability, and no court is required to decide whether a person should be disarmed. The only process required is that provided for the original commitment order. Violating § 922(g)(4) carries strong penalties, by being punishable for up to 15 years imprisonment, 18 U.S.C. § 924(a)(8). Section 922(g)(4) so burdens Second Amendment protected conduct without any historical tradition of firearm regulation disarming citizens previously committed to a mental institution.

*Bruen's* increased Second Amendment deference did not just apparate out of thin air. Prior to *Bruen*, Justice Thomas had consistently observed the states and lower courts were resisting the Supreme Court's decisions in *Heller* and *McDonald v. City of Chicago*, 561 U.S. 742 (2010), by failing to protect Second Amendment rights to the same extent they protected other constitutional rights.[6] As a consequence, this Court should

---

[6] S*ee, e.g.*, *Rogers v. Grewal*, 140 S. Ct. 1865 (2020)(appeal of New Jersey may issue carry permit requirement and near-total prohibition on public carry); *New York State Rifle & Pistol Ass'n, Inc. v. City of New York, NY*, 140 S. Ct. 1525 (2020)(appeal of New York firearm license ordinance, dismissed as moot when city amended ordinances during appeal; Alito dissent joined by Gorsuch and Thomas); *Silvester v. Becerra*, 138 S. Ct. 945 (2018)(appeal of California's 10-day waiting/cooling off period for firearm purchases); *Peruta v. California*, 137 S. Ct. 1995, 1999 (2017)(appeal of California's prohibition of public carry and carrying concealed firearms in public); *Voisine v. United States*, 136 S. Ct. 2272, 2291-92 (2016)(appeal of denying Second Amendment protections based on

14

"remain wary of any theory that would exchange the Second Amendment's boundary line – 'the right of the people to keep and bear Arms, shall not be infringed' – for vague principles with contours defined by whoever happens to be in power." *Rahimi*, 144 S. Ct. at 1946 (Thomas, J., dissenting). This is the ultimate danger presented by creating patchwork "historical traditions" regulating firearms based on generalized "dangerousness". *Bruen,* despite *Rahimi*, still contemplates more than that.

## IV.    CONCLUSION

For the reasons stated in this reply and his opening brief, Gould maintains that a citizen previously committed to a mental institution's conduct of possessing a shotgun in their home is still protected conduct under the Second Amendment - such that § 922(g)(4)'s committed to a mental institutional clause is presumptively unconstitutional under *Bruen*'s step one. Gould further maintains that, given the absence of any well-established and representative "relevantly similar" historical analogues, the Government failed to carry its burden of showing § 922(g)(4) is consistent with America's historical tradition of firearm regulation. Section 922(g)(4)'s committed to a mental institutional clause, therefore, is facially unconstitutional under the Second Amendment.

---

reckless misdemeanor conduct); *Friedman v. Highland Park*, 136 S. Ct. 447, 449 (2015)(appeal of Illinois' AR-style rifle and large capacity magazine bans); *Jackson v. City and County of San Francisco, California*, 135 S. Ct. 2799, 2800-02 (2015)(appeal of California ordinance requiring trigger locks for handguns stored in residences).

15

On that basis, this Court should reverse the district court's denial of Gould's motion to dismiss, vacate his conviction, and dismiss his indictment with prejudice or, alternately, reverse and remand with instructions for the district court to do the same.

## REQUEST FOR ORAL ARGUMENT

This case presents the important question of whether the Second Amendment can tolerate permanent disarmament of citizens by § 922(g)(4)'s commitment to a mental institution clause. The Court's answer to this question will affect the fundamental rights of countless citizens with mental health histories in the Fourth Circuit, as well as the growing cohort of defendants being prosecuted under § 922(g)(4). Gould believes oral argument will certainly assist the Court in resolving this very important question.

Respectfully submitted,

**JAMES GOULD**
By Counsel

**WESLEY P. PAGE**
**FEDERAL PUBLIC DEFENDER**

**s/Lex A. Coleman**
Lex A. Coleman
Senior Litigator
Office of the Federal Public Defender
Room 3400, United States Courthouse
300 Virginia Street East
Charleston, West Virginia 25301
Phone: (304) 347-3350
E-mail: lex_coleman@fd.org

16

**s/Jonathan D. Byrne**
Jonathan D. Byrne
Appellate Counsel
Office of the Federal Public Defender
Room 3400, United States Courthouse
300 Virginia Street East
Charleston, West Virginia 25301
Phone: (304) 347-3350
E-mail: jonthan_byrne@fd.org

*Dated*: August 29, 2024

## CERTIFICATE OF COMPLIANCE
## WITH TYPEFACE AND LENGTH LIMITATIONS

1.    This brief complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

      this brief contains 3849 words

2.    This brief complies with the typeface and type style requirements because:

      this brief has been prepared in a proportionally spaced typeface using *Microsoft Word 2016* in *14 pt Garamond*.


**DATE:    August 29, 2024**

                              s/Lex A. Coleman
                              Lex A. Coleman
                              Senior Litigator
                              Office of the Federal Public Defender
                              Room 3400, United States Courthouse
                              300 Virginia Street East
                              Charleston, West Virginia 25301
                              E-mail: lex_coleman@fd.org

                              s/Jonathan D. Byrne
                              Jonathan D. Byrne
                              Appellate Counsel
                              Office of the Federal Public Defender
                              Room 3400, United States Courthouse
                              300 Virginia Street East
                              Charleston, West Virginia 25301
                              E-mail: jonathan_byrne@fd.org