**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

───────────────

**No. 24-4192**

───────────────

UNITED STATES OF AMERICA,

                Plaintiff - Appellee,

     v.

JAMES GOULD,

                Defendant - Appellant.

───────────────

Appeal from the United States District Court for the Southern District of West Virginia, at Charleston. Thomas E. Johnston, District Judge. (2:22−cr−00095−1)

───────────────

Argued: December 12, 2024                           Decided: July 29, 2025

───────────────

Before DIAZ, Chief Judge, and HEYTENS and BENJAMIN, Circuit Judges.

───────────────

Affirmed by published opinion. Chief Judge Diaz wrote the opinion, in which Judge Heytens and Judge Benjamin joined.

───────────────

**ARGUED:** Lex A. Coleman, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Charleston, West Virginia, for Appellant. Gabriel Caleb Price, OFFICE OF THE UNITED STATES ATTORNEY, Charleston, West Virginia, for Appellee. **ON BRIEF:** Wesley P. Page, Federal Public Defender, Jonathan D. Byrne, Appellate Counsel, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Charleston, West Virginia, for Appellant. William S. Thompson, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Charleston, West Virginia, for Appellee.

DIAZ, Chief Judge:

James Gould pleaded guilty to violating 18 U.S.C. § 922(g)(4) by possessing a firearm after having previously been involuntarily committed to a mental institution. He appeals, claiming that the Second Amendment renders the statute facially unconstitutional.

We disagree and affirm Gould's conviction.


I.

A.

Gould was involuntarily committed to mental health facilities four times between May 2016 and July 2019. In February 2022, police found Gould in his West Virginia home with a twelve-gauge shotgun.

A grand jury indicted him on one count of violating 18 U.S.C. § 922(g)(4). That statute makes it unlawful for anyone "who has been adjudicated as a mental defective or who has been committed to a mental institution" to possess a firearm.[1]

Shortly after Gould's indictment, the Supreme Court decided *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022). *Bruen* changed the framework by which we analyze Second Amendment challenges. *See Md. Shall Issue, Inc. v. Moore*, 116 F.4th 211, 218–19 (4th Cir. 2024) (en banc), *cert. denied*, 145 S. Ct. 1049 (2025).

---

[1] Gould has never been "adjudicated as a mental defective." His facial challenge is to the provision barring anyone who "has been committed to a mental institution" from possessing a firearm.

Before *Bruen*, we used a two-step test for Second Amendment challenges.  We first looked to "whether the challenged law impose[d] a burden on conduct falling within . . . the Second Amendment's guarantee," and, if it did, we applied means-end scrutiny.  *See, e.g.*, *United States v. Chester*, 628 F.3d 673, 680 (4th Cir. 2010) (citation omitted).  *Bruen* replaced that test with an inquiry into the nation's history of firearm regulation, placing the onus on the government to demonstrate that the challenged regulation is "consistent with the Nation's historical tradition of firearm regulation."  *Bruen*, 597 U.S. at 24.

Gould moved to dismiss his indictment.  He argued that § 922(g)(4) was unconstitutional because there was no historical tradition at the founding of gun restrictions like those imposed by the statute.  The district court rejected Gould's challenge, concluding that "because there is a historical basis for disarming individuals that have been determined to be dangerous to themselves and/or the public at large, § 922(g)(4) is constitutional on its face." *United States v. Gould*, 672 F. Supp. 3d 167, 184 (S.D. W. Va. 2023).

Gould then changed his plea to guilty.[2]  The district court sentenced him to time served and three years of supervised release.

This appeal followed.

---

[2] A guilty plea doesn't prevent a defendant from claiming on direct appeal that the statute of his conviction is unconstitutional.  *Class v. United States*, 583 U.S. 174, 178 (2018).

B.

We begin with a brief historical primer on § 922(g)(4).

1.

The statute has its origins in the Gun Control Act of 1968. Its original iteration criminalized shipping or transporting firearms or ammunition in interstate commerce by those who had been adjudicated mentally incompetent or committed to a mental institution. Pub. L. No. 90-618, § 102, 82 Stat. 1213, 1220 (1968). The Firearm Owners' Protection Act of 1986 expanded § 922(g) crimes to include, as relevant here, possessing a firearm. Pub. L. No. 99-308, § 102(6)(D), 100 Stat. 449, 452 (1986).

Today, § 922(g)(4) prevents a person who has been either "adjudicated as a mental defective" or "committed to a mental institution" from possessing a firearm or ammunition. The Bureau of Alcohol, Tobacco, Firearms and Explosives has interpreted the phrase "committed to a mental institution" to apply only to those who have been committed involuntarily. The Bureau defines the phrase as:

> A formal commitment of a person to a mental institution by a court, board, commission, or other lawful authority. The term includes a commitment to a mental institution involuntarily. The term includes commitment for mental defectiveness or mental illness. It also includes commitments for other reasons, such as for drug use. The term does not include a person in a mental institution for observation or a voluntary admission to a mental institution.

27 C.F.R. § 478.11. In other words, the phrase "committed to a mental institution" in § 922(g)(4) means to be involuntarily placed there by a lawful authority.[3]

---

[3] Neither party challenges the Bureau's authority to promulgate this clarifying definition.

4

By its plain terms, § 922(g)(4) operates as a lifetime ban on possessing a firearm. But that's not the end of the story.

### 2.

Previously, one could petition the Attorney General for relief from the ban by showing that he or she "will not be likely to act in a manner dangerous to public safety and that the granting of the relief would not be contrary to the public interest." 18 U.S.C. § 925(c). But that "provision has been rendered inoperative" because Congress, since 1992, "has repeatedly barred the Attorney General from using appropriated funds to investigate or act upon [relief] applications." *Logan v. United States*, 552 U.S. 23, 28 n.1 (2007) (quotation omitted).

Instead, Congress has permitted states that meet certain requirements to grant relief from the statute's firearm ban. *See* 34 U.S.C. § 40915.[4] A state's process suffices if it (1) allows a person to apply for relief (2) before a state court, board, or commission that will determine—consistent with principles of due process—whether "the person will not be likely to act in a manner dangerous to public safety and that the granting of the relief would not be contrary to the public interest" and (3) provides for de novo judicial review of a

---

[4] Congress enacted 34 U.S.C. § 40915 in 2008. NICS Improvement Amendments Act of 2007, Pub. L. No. 110-180, § 105, 121 Stat. 2559, 2569–70 (2008).

denial of a petition.  *Id.* § 40915(a).  Thirty-three states,[5] including West Virginia, have established such processes.[6]

## II.

Although we review Gould's constitutional challenge de novo, *United States v. Collins*, 982 F.3d 236, 243 (4th Cir. 2020), Gould must still clear a high hurdle.  That's because he brings a facial challenge, "the most difficult challenge to mount successfully." *United States v. Salerno*, 481 U.S. 739, 745 (1987).

To succeed, Gould must "establish that no set of circumstances exists under which [§ 922(g)(4)] would be valid or that the statute lacks any plainly legitimate sweep." *United States v. Stevens*, 559 U.S. 460, 472 (2010) (cleaned up).  He can't prevail if § 922(g)(4) "is constitutional in some of its applications." *United States v. Rahimi*, 602 U.S. 680, 693 (2024).

## III.

### A.

The Second Amendment states, "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be

---

[5] And one territory.

[6] Bureau of Alcohol, Tobacco, Firearms & Explosives, NICS Improvement Amendments Act of 2007, https://www.atf.gov/firearms/docs/guide/nicsactlist7-7-210pdf/download [https://perma.cc/FB65-7KMG].

infringed." U.S. Const. amend II. The text "guarantee[s] the individual right to possess and carry weapons in case of confrontation." *District of Columbia v. Heller*, 554 U.S. 570, 592 (2008). *Heller* held that the District of Columbia's ban on possessing handguns in the home violated the Second Amendment. *Id.* at 635. To reach that conclusion, it also held that the Second Amendment conferred an individual right to own firearms for self-defense in case of confrontation. *Id.* at 592–95.

But the right isn't unlimited. As *Heller* described it, "[f]rom Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id.* at 626.

As an example, the Court noted that "nothing in [its] opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill." *Id.* These "presumptively lawful regulatory measures," *id.* at 627 n.26, also include laws barring the carrying of firearms in "sensitive places" and "laws imposing conditions and qualifications on the commercial sale of arms," *id.* at 626–27.

The government asks us to decide Gould's case based on *Heller*'s dictum that laws disarming the mentally ill are presumptively lawful.[7] And it's true that we "routinely afford substantial, if not controlling deference to dicta from the Supreme Court," *Manning*

---

[7] *Heller*'s discussion about "longstanding prohibitions on the possession of firearms by . . . the mentally ill" is nestled in a brief section that the Court caveated by noting that it was not "undertak[ing] an exhaustive historical analysis . . . of the full scope of the Second Amendment." 554 U.S. at 626. We've acknowledged that this portion of *Heller* is dictum, albeit important dictum. *Md. Shall Issue*, 116 F.4th at 221–22.

*v. Caldwell*, 930 F.3d 264, 281 (4th Cir. 2019) (en banc), especially "when the supposed dicta is recent and not enfeebled by later statements," *Hengle v. Treppa*, 19 F.4th 324, 347 (4th Cir. 2021) (cleaned up).

Far from enfeebling its dictum, for the last fifteen years the Supreme Court has reiterated the presumptive validity of limitations on the right to keep and bear arms for the mentally ill. *McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010) (plurality opinion) ("We repeat [*Heller*'s] assurances [about prohibitions on the possession of firearms by the mentally ill] here."); *Rahimi*, 602 U.S. at 699 ("*Heller* never established a categorical rule that the Constitution prohibits regulations that forbid firearm possession in the home. In fact, [*Heller*] stated that many such prohibitions, like those on the possession of firearms by felons and the mentally ill, are presumptively lawful." (cleaned up)).

We recently explained that the *Heller*'s dictum is consistent with our pre-*Bruen* precedent, which held that 18 U.S.C. § 922(g)(1) (prohibiting felons from possessing a firearm) was constitutional. *United States v. Hunt*, 123 F.4th 697, 702–04 (4th Cir. 2024) *cert. denied*, No. 24-6818, 2025 WL 1549804 (U.S. June 2, 2025). And when we decided whether the Second Amendment protects the right to own a firearm with an obliterated serial number, we stated that "[n]othing in *Bruen* abrogated *Heller*'s extensive discussion of the contours of the scope of the right enshrined in the Second Amendment." *United States v. Price*, 111 F.4th 392, 400 (4th Cir. 2024) (en banc) *cert. denied*, 145 S. Ct. 1891 (2025).

Even so, the issue is not so straightforward. For one thing, § 922(g)(4) doesn't refer to "the mentally ill," a phrase that logically describes those *currently* experiencing mental

illness.  Instead, the statute covers anyone "who has been [involuntarily] committed to a mental institution."

The two aren't synonymous.  A person who was involuntarily committed for a mental illness and has recovered would still be swept up within the ambit of § 922(g)(4), but wouldn't be *currently* mentally ill.[8]  Like the Ninth Circuit, "[w]e emphatically do not subscribe to the notion that 'once mentally ill, always so.'"  *Mai v. United States*, 952 F.3d 1106, 1121 (9th Cir. 2020).

An additional complication is what to make of the term "mentally ill."  Is it meant to capture all who've ever been prescribed an antidepressant?  What about those who, at some point in their lives, have been diagnosed with depression, anxiety, schizophrenia, bipolar disorder, or any one of scores of discrete conditions?  *See* Diagnostic and Statistical Manual of Mental Disorders (5th ed. 2013).  And how severe must the mental illness have been to be denied the protections of the Second Amendment?  Difficulties abound.[9]

---

[8] The Sixth Circuit, in an *as-applied*, pre-*Bruen* challenge, concluded that § 922(g)(4) at least could be unconstitutional when applied to an individual who suffered a bout of depression thirty years prior with no problems afterward. *Tyler v. Hillsdale Cnty. Sheriff's Dep't*, 837 F.3d 678, 688, 699 (6th Cir. 2016) (en banc) (plurality opinion); *id*. at 710 (Sutton, J., concurring in most of the judgment).

[9] This isn't the first time *Heller* has defied easy application.  The *Heller* Court described the right protected by the Second Amendment as extending to "law-abiding, responsible citizens."  *Heller*, 554 U.S. at 635.  In *United States v. Rahimi*, 602 U.S. 680 (2024), the government argued that a person could be disarmed because he is not "responsible."  *Id.* at 701.  But the Court rejected that argument because responsible "is a vague term" that its prior decisions "did not define."  *Id.* at 701–02.  "Mentally ill" as used in the Court's Second Amendment decisions is similarly vague and undefined.

But there's another path: we can gauge the constitutionality of § 922(g)(4) by looking at the nation's history and tradition of restricting firearms access for persons deemed to be dangerous to themselves or others, which includes at least some deemed to be dangerous because of mental illness.

We turn now to that analysis, with our historian caps on, as dictated by *Bruen*.

## B.

Recall that *Bruen*'s analysis proceeds in two steps. First, "[w]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Bruen*, 597 U.S. at 24. If it does, the second step requires "[t]he government [to] justify its regulation by demonstrating that it is *consistent with* the Nation's historical tradition of firearm regulation." *Id.* (emphasis added).

While we haven't shied away from deciding challenges at *Bruen*'s first step, *e.g.*, *Price*, 111 F.4th at 398; *Bianchi v. Brown*, 111 F.4th 438, 452–53 (4th Cir. 2024) (en banc), *cert. denied*, 145 S. Ct. 1534 (2025), we won't do so here. Section 922(g)(4) bars an individual who is otherwise law-abiding from possessing a weapon in common use for a common purpose. The conduct the statute prohibits is therefore covered by the Second Amendment's plain text and thus is presumptively protected.

On to *Bruen*'s second step. *Bruen* jettisoned an interest-balancing test in favor of one focused on the historical understanding of the scope and limitations of the right to keep and bear arms. But it also recognized that, in conducting that analysis, courts may need to reason by analogy to modern laws that deal with modern problems that the Founders didn't anticipate. *Bruen*, 597 U.S. at 28–29. And to prevail, the government need not show a

historical "dead ringer." *Id.* at 30. It need show only a "representative historical *analogue*, not a historical *twin*." *Id.*

The Court's decision in *United States v. Rahimi*, 602 U.S. 680 (2024) is helpful here. Rahimi challenged 18 U.S.C § 922(g)(8), which prohibits possession of a firearm by an individual who is subject to a court order that "includes a finding that such person represents a credible threat to the physical safety of [an] intimate partner or child." 18 U.S.C § 922(g)(8)(C)(i). In upholding the statute's constitutionality, the Court explained that "[t]he [modern] law must comport *with the principles* underlying the Second Amendment" even if it lacks a "historical twin." *Rahimi*, 602 U.S. at 692 (emphasis added) (cleaned up).

*Rahimi* never identified a historical law specifically disarming those who posed a threat to an intimate partner or child. Yet it still found the challenged statute constitutional based on the history of (1) surety laws, which required individuals found by a magistrate to pose a threat of future misbehavior, including spousal abuse, to post a bond or be jailed, and (2) "going armed" laws, which disarmed and imprisoned those who used arms to terrify the public. *Id.* at 694–98.

And the Court upheld the statute's constitutionality even though it was "by no means identical to these founding era regimes." *Id.* at 698. It was enough that the statute's "prohibition on the possession of firearms by those found by a court to present a threat to others fit[] neatly within the *tradition* the surety and going armed laws represent." *Id.* (emphasis added).

Our task then is to examine the historical right the Second Amendment codifies and evaluate its consistency with the bar imposed by § 922(g)(4), keeping in mind the principles undergirding the tradition of firearm regulation.  In doing so, we look to the "how and why the regulation[] burden[s] a law-abiding citizen's right to armed self-defense."  *Bruen*, 597 U.S. at 29; *accord Rahimi*, 602 U.S. at 692.

The "how" here is disarmament, on pain of incarceration.  As for the "why," we consider the societal problem § 922(g)(4) seeks to address.  *See Bruen*, 597 U.S. at 26–27.  We agree with the district court that the answer isn't simply "firearm violence by the mentally ill."  *Gould*, 672 F. Supp. 3d at 179.  The statute applies, as relevant here, to anyone who has been "committed to a mental institution," § 922(g)(4), which can include commitments for "mental defectiveness," mental illness, or "other reasons, such as for drug use," 27 C.F.R. § 478.11.

The statute doesn't bar every person who has suffered from mental illness from possessing a firearm.  Rather, its reach is limited to those instances in which an independent "court, board, commission, or other lawful authority," *id.*, has determined that the individual poses a sufficient risk of danger to themselves or others that renders temporary confinement, against the person's will, necessary.  *See Gould*, 672 F. Supp. 3d at 180 & n.7 (noting that posing a danger to oneself or others is a requirement for involuntary commitment in nearly every state and collecting statutes).

Mental illness is *a* reason why someone may be deemed to be a threat to themselves or others.  The underlying societal problem, however, is preventing violence by those found to pose an increased risk of danger to the community or themselves.

With this foundation, we turn to the relevant history.[10]

## C.

### 1.

One scholar has noted that "[o]ne searches in vain through eighteenth-century records to find any laws specifically excluding the mentally ill from firearms ownership." Carlton F.W. Larson, *Four Exceptions in Search of a Theory:* District of Columbia v. Heller *and Judicial* Ipse Dixit, 60 Hastings L.J. 1371, 1376 (2009). But that's largely because the mentally ill were at the time "cared for on an ad hoc and informal basis either by the family or community." Gerald N. Grob, The Mad Among Us: A History of the Care of America's Mentally Ill 6 (1994).

In any event, the lack of historical laws specifically disarming the mentally ill isn't the final word. After all, laws restricting firearm ownership aren't "trapped in amber." *Rahimi*, 602 U.S. at 691. And "assumptions" that "founding-era legislatures maximally exercised their power to regulate . . . are flawed." *Id.* at 739–40 (Barrett J., concurring).

So we consider whether the disarmament authorized by § 922(g)(4) is "relevantly similar to laws that our *tradition is understood to permit*." *Id.* at 692 (majority opinion) (emphasis added) (cleaned up). And here we find that support in two related historical

---

[10] Society's understanding of mental illness has advanced in the centuries since the founding. The forms, causes, and treatments of various mental illnesses were largely unknown in the eighteenth century. Whether our forefathers recognized it or not, the treatment of mental illnesses calls for a nuanced approach, and those who suffered from them at the founding and beyond deserved more compassion—and less stigma—than they received. We're nevertheless bound by *Bruen* and *Rahimi* to look at history, despite its shortcomings, to guide our analysis.

traditions: the actions of legislatures and communities that *incapacitated* those suffering from mental illness when the afflicted posed a danger to themselves or others, and the accepted power of legislatures to disarm groups of people considered dangerous.

2.

In the years before the founding, legislatures routinely empowered "local officials to limit the freedom of 'distracted persons' who menaced other residents."  Grob, *supra*, at 16.  The main response was incarceration, whether by one's family members or the community at large.  "If violent or troublesome, even the propertied insane were without compunction locked up and chained by their families in strong-rooms, cellars, and even in flimsy outhouses."  Albert Deutsch, The Mentally Ill in America: A History of Their Care and Treatment from Colonial Times 40 (Columbia Univ. Press 2nd ed. 1949).  When a family was unavailable and a town large enough, "[i]ncarceration in jail was the common solution."  *Id.* at 41.

But where there was neither a jail nor family available, towns found other ways to incapacitate the mentally ill.  In Pennsylvania, a court ordered the construction of a small house for confining Erik Cornelissen after his father Jan complained that Erik was "bereft of his naturall Sences & is turned quyt madd and [Jan] being a poore man [was] not able to maintaine him."  The Record of Upland Court from the 14th of November, 1676, to the 14th of June, 1681, *in* 7 Memoirs of the Historical Society of Pennsylvania 35, 102 (Edward Armstrong ed., Philadelphia, J.B. Lippincott & Co. 1860).  And the town of Braintree, Massachusetts funded the construction of a seven-by-five-foot house for a

14

brother's "distracted" sister.  Records of the Town of Braintree, 1640 to 1793, at 26 (Samuel A. Bates ed., Randolph, Daniel H. Huxford 1886).

The powers granted to authorities to detain individuals were sometimes extensive. For example, in 1676, Massachusetts resolved that "[w]hereas, [t]here are distracted persons in some tounes, that are unruly," "selectmen in all tounes where such persons are are hereby impowred & injoyned to take care of all such persons, that they doe not damnify others."  Deutsch, *supra*, at 43.

And detainment meant incarceration.  In 1727, Connecticut passed a bill to build its first correctional facility, which would house "persons under distraction and unfit to go at large, whose friends do not take care for their safe confinement" alongside criminals and beggars.  *Id.* at 52.  Rhode Island did the same.  *Id.* at 52–53.

As urbanization progressed, legislatures became more active.  The first hospital in the colonies, opened in Philadelphia in the 1750s, was created with a plea to the Pennsylvania Assembly that "Lunaticks . . . are a Terror to their Neighbours, who are daily apprehensive of the Violences they may commit."  Grob, *supra*, at 19.  And Massachusetts mandated that "penal institutions accept 'lunatics, and persons furiously mad' whose behavior threatened the welfare of others."  *Id.* at 43.

These efforts extended through to the founding.  *See* Act of Feb. 9, 1788, ch. 31, 1788 N.Y. Laws 643, 645 (authorizing justices of the peace to "lock[] up in some secure place" "persons, who by lunacy or otherwise are furiously mad . . . that they may be dangerous"); Act of Dec. 24, 1792, ch. 55, *in* 1 Va. Stat. at Large 162, 162–63 (Shepherd

1835) (authorizing justices of the peace to confine persons of "unsound mind" to a hospital).

Particularly noteworthy is the relative ease by which people could be institutionalized.  At the hospital in Philadelphia, "[a]ll that was necessary was for a relative, a friend—or, perhaps, an enemy—to apply to one of the managers or physicians for an order of admission."  Deutsch, *supra*, at 62.

This history points to two conclusions.  First, at the time of the founding, and indeed for long before, governments routinely incapacitated those suffering from severe mental illness.  Second, the reason for such action was that the individual was considered a threat to their community.

3.

Next, we consider the history of a legislature's ability to disarm people thought to be dangerous.  At the outset, we note that some of the historical laws disarming categories of people based on a determination of dangerousness would (thankfully) flunk constitutional analysis today on other grounds.  *United States v. Jackson*, 110 F.4th 1120, 1126–27 (8th Cir. 2024) (noting that restrictions on firearms ownership based on race and religion would be impermissible today); *United States v. Williams*, 113 F.4th 637, 656 (6th Cir. 2024) ("Classifying people as dangerous simply because of their race or religion was wrong from the beginning and unconstitutional from 1868.").  We analyze them not to endorse their offensive aims, but to show that, at the founding, categorical disarmament of groups of people was permissible and consistent with the contemporary understanding of the Second Amendment.

16

We performed much of this work in *United States v. Hunt*, 123 F.4th 697 (4th Cir. 2024). There, we explained that legislatures historically imposed restrictions that "swept broadly, disarming all people belonging to groups that were, in the judgment of those early legislatures, potentially violent or dangerous." *Id.* at 707.

Those pre-ratification laws typically targeted religious or racial minorities. The seventeenth century was a chaotic one for England. In 1689—after a civil war, the reign of the Catholic King James II, and the Glorious Revolution which enthroned the Protestant King William III—Parliament passed "An Act for the better secureing the Government by disarming Papists and reputed Papists." 1 W. & M. c. 15 (1689).

That Act permitted any two justices of the peace to prohibit a Catholic from possessing any arms or ammunition other than as allowed by the justices. *Id.* § 3. But it allowed individual Catholics to retain their arms if they swore a loyalty oath. *Id.* § 6.

"According to this calculus, disarming what [Parliament] saw as a troublesome group would spare England from the religious wars that had rocked the kingdom for decades." *Williams*, 113 F.4th at 651. The upshot is that (1) Parliament could disarm a group of people based on the prospective threat they posed, not individually but as a class, but (2) an individualized showing that a particular person was not dangerous—here, an oath—provided relief.

Even earlier, and on this continent, colonists too disarmed groups of people.

In 1642, Puritans in Virginia asked their fellow worshippers in Massachusetts to send them ministers. Kevin Butterfield, The Puritan Experiment in Virginia, 1607–1650,

at 11 (June 1999) (M.A. thesis, College of William & Mary).  John Winthrop, the governor of Massachusetts, dispatched three.  *Id.* at 15.

The governor of Virginia, under orders to "oppose any and all religious nonconformity," acted quickly to silence them.  *Id.* at 22.  Local authorities reacted by taking various measures against the Puritans, including "generally disarm[ing]" them, an extreme measure given the risks of living in mid-seventeenth century colonial America.  Charles Campbell, History of the Colony and Ancient Dominion of Virginia 211–12 (Philadelphia, J.B. Lippincott & Co. 1860).  Once more, a category of people was disarmed based on their perceived status as a potential threat—here, a group of religious nonconformists.

Fast forward a century to the French and Indian War, part of the Seven Years' War that pitted Protestant England against Catholic France.  Maryland, Virginia, and Pennsylvania each passed legislation disarming Catholics on a class-wide basis.  Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 Wyo. L. Rev. 249, 263 (2020).  Individuals could petition for restoration of their right to bear arms, *see, e.g.*, An Act for Disarming Papists, and Reputed Papists, Refusing to Take the Oaths to the Government, ch. 4 (1756), *in* 7 Va. Stat. at Large 35, 38 (Hening 1820) (allowing Catholics to "be discharged of and from all disabilities and forfeitures" provided they swear an oath), but this relief was only prospective, and individuals had to demonstrate their loyalty post hoc.

The ratification debates reflected similar views on the reach of the Second Amendment.  *Heller* described the Dissent of the Minority of the Convention of

18

Pennsylvania of 1787 as "highly influential" to understanding the scope and limitations of the right to bear arms. *Heller*, 554 U.S. at 604. That dissent proposed including the right to bear arms in the Constitution but excluded persons "for crimes committed, *or real danger of public injury from individuals*." The Address and Reasons of Dissent of the Minority of the Convention, of the State of Pennsylvania, to Their Constituents 1 (Philadelphia, E. Oswald 1787) (emphasis added).

Laws restricting racial groups' access to arms due to a belief that its members posed a danger were also common both before and after ratification. State legislatures banned enslaved people and freedmen from possessing firearms. *Range v. Att'y Gen.*, 124 F.4th 218, 264–65 (3d Cir. 2024) (en banc) (Krause, J., concurring in the judgment); *see also Williams*, 113 F.4th at 656. Those laws stemmed from fears of armed freedman facilitating slave revolts. Joseph G.S. Greenlee, *Disarming the Dangerous: The American Tradition of Firearm Prohibitions*, 16 Drexel L. Rev. 1, 27 (2024). But some post-ratification laws permitted freedmen to own firearms if they could show that they were not dangerous. *Williams*, 113 F.4th at 656; *see Range*, 124 F.4th at 265–66 (Krause, J., concurring in the judgment).

In sum, history shows that legislatures had the authority, consistent with the understanding of the individual right to keep and bear arms, to disarm categories of people based on a belief that the class posed a threat of dangerousness. *Hunt*, 123 F.4th at 707. And when combined with the historical treatment of those who suffered from mental illness, we perceive an unambiguous history and tradition of disarming and incarcerating those whose illness made them a danger to themselves or others.

D.

With history behind us, we return to the question presented — whether § 922(g)(4) is "'relevantly similar' to laws our tradition is understood to permit." *Rahimi*, 602 U.S. at 692 (quoting *Bruen*, 597 U.S. at 29). We keep in mind that Gould's challenge to § 922(g)(4) is a facial one. And we take to heart "that facial challenges are 'disfavored' because they 'often rest on speculation,' 'short circuit the democratic process,' and 'run contrary to the fundamental principle of judicial restraint.'" *Bianchi*, 111 F.4th at 452 (quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450–51 (2008)).

So we focus on "situations in which [§ 922(g)(4) is] most likely to be constitutional." *Rahimi*, 602 U.S. at 701. At least in West Virginia, we find such situations.[11]

*Rahimi* again does much of the work here. The Court identified three characteristics there that led it to conclude that § 922(g)(8) is relevantly similar to its historical analogues, the surety and going armed laws. First, it explained that the statute "applies only once a court has found that the defendant represents a credible threat to the physical safety of another." *Rahimi*, 602 U.S. at 699 (cleaned up). Second, § 922(g)(8) is time-limited, banning firearm possession only for so long as an individual is subject to a restraining order. *Id.* And third, the penalty for violating one of § 922(g)(8)'s historical analogues,

---

[11] We focus on West Virginia because that's where Gould lives. In so doing, we don't mean to convert Gould's facial challenge into an as-applied one.

the going armed laws, is imprisonment, which is a greater burden than the lesser restriction of disarmament. *Id.* Section 922(g)(4) and the historical tradition that preceded it largely share the same features.

Start with *Rahimi*'s discussion of the importance of a court finding of dangerousness. In the Mountain State, a person may be involuntarily committed because of a mental illness only upon a judicial finding (by clear and convincing evidence) that: (1) the individual is mentally ill; (2) because of the mental illness, the individual likely poses a risk to himself or others; and (3) there isn't a less restrictive alternative than commitment appropriate and available. W. Va. Code Ann. § 27-5-4(k). At the hearing, the individual has a right to counsel and to present witnesses. *Id*. § 27-5-4(h).

In short, the individual to be committed is afforded substantial protection against arbitrary commitment (and thus, disarmament). That's consistent with the history of requiring justices of the peace to find that someone was so mentally ill that they posed a danger sufficient to warrant commitment. So as in *Rahimi*, the fact that § 922(g)(4)'s ban applies only after a judicial finding that an individual is a threat to themselves or others counsels in favor of a finding of constitutionality. And those procedural protections, as discussed above, are similar to (and sometimes greater than) those afforded to the dangerously mentally ill at the founding.

Turning to *Rahimi*'s temporal considerations, a West Virginian who "is prohibited from possessing a firearm pursuant to . . . provisions of federal law by virtue solely of . . . having a prior involuntary commitment to a mental institution" can petition a state circuit court to have that right restored. W. Va. Code Ann. § 61-7A-5(a). If the petitioner can

show by clear and convincing evidence that he or she can responsibly possess the firearm and doesn't pose a danger to public safety, and that restoration of the right isn't contrary to the public interest, the court may restore the right. *Id*. § 61-7A-5(e). And a petitioner denied relief may appeal the decision. *Id.*

Put another way, disarmament under § 922(g)(4) isn't categorically permanent in West Virginia. True, the time limit isn't self-executing and the person who has been involuntarily committed must prove their competency. But that hardly makes § 922(g)(4) unique—among modern provisions or its historic analogues.

For example, a sister provision, § 922(g)(3), bans those who are "addicted to any controlled substance" from possessing guns. We've explained that § 922(g)(3)'s ban is permissible because it covers "only the time period during which [Congress] deemed such persons to be dangerous." *United States v. Carter*, 669 F.3d 411, 419 (4th Cir. 2012); *see also United States v. Veasley*, 98 F.4th 906, 915 (8th Cir.) ("Stopping the use of drugs, after all, restores gun rights under § 922(g)(3)."), *cert. denied*, 145 S. Ct. 304 (2024).

Just like stopping the use of drugs serves as a temporal stopping point (and puts the onus on the drug user to relieve the burden), § 922(g)(4) permits an individual to regain the right to carry arms if they remove the condition that makes them dangerous to themselves or others. And, as described above, early American laws often put the burden on those they disarmed to have their right restored—whether by swearing an oath or otherwise demonstrating that they were not dangerous.

Admittedly, this case differs from *Rahimi* in one aspect. One consideration in *Rahimi* was that if a state could constitutionally imprison an individual for certain conduct,

22

then it could also disarm the individual for that conduct. *Rahimi*, 602 U.S. at 699. Given that the going armed laws provided for imprisonment, it followed that disarmament, a lesser punishment, could also be imposed consistent with history and tradition. *Id.*

Though we find little evidence in the historical record of keeping firearms out of the hands of people released from mental institutions in the founding era, that dearth stems from a lack of mental institutions generally during that period. But what history does reveal is that people who were mentally ill were considered dangerous when their illness posed a threat to themselves or others, and so the state could incapacitate and disarm them.

When a person today is released from a mental institution, the setting changes. But the historical justification for their disarmament, that they pose a danger, persists until they can demonstrate otherwise to a court.

*Rahimi* doesn't hold that a law restricting firearm use is constitutional *only if* the historical tradition that justified disarming someone required continuous imprisonment. The laws disarming religious and racial groups during the eighteenth century didn't involve, for example, locking up all Catholics. Instead, we think—consistent with the reasoning in *Rahimi*—that a person (like Gould) found to be dangerous because of mental illness can be disarmed until he can show that his affliction no longer renders him dangerous.

Gould makes one more argument. He claims that § 922(g)(4) is facially unconstitutional because the fact that an institution has released someone necessarily means that the person is no longer a danger to themselves or others. And if that's true, their right to own a firearm should be restored automatically upon release.

The problem for Gould is that West Virginia doesn't require a finding that an individual is no longer a threat for them to be released from involuntary commitment. Rather, release may be granted when a medical official determines that "the conditions justifying involuntary hospitalization no longer exist or that the individual can no longer benefit from hospitalization." W. Va. Code Ann. § 27-7-1.

Sometimes the release occurs with conditions (such as a requirement to continue outpatient treatment) and can be revoked if the individual doesn't comply. *Id*. § 27-7-2. Or the individual may be released even when they are "unimproved" if a responsible person is willing and able to take care of them. *Id.* § 27-7-3.

It's not a stretch to find constitutional applications of § 922(g)(4) here. And it's reasonable to conclude that release from a mental institution (at least in West Virginia) isn't the same as a judicial determination that a person is no longer dangerous.

\*    \*    \*

We emphasize the narrowness of our holding. Disarmament under § 922(g)(4) is facially constitutional because situations exist where it may be applied consistent with the Second Amendment. We express no opinion on as-applied challenges to the statute.

*AFFIRMED*

24